**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,** | |
| Plaintiff and Counterclaim-Defendant, | |
| v. | No. 06-cv-13565 (CLB)(MDF) |
| **PLATFORM SOLUTIONS, INCORPORATED**, | |
| Defendant and Counterclaim-Plaintiff. | |

**T3 TECHNOLOGIES, INC.'S COMPLAINT FOR DAMAGES
AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

NOW INTO COURT, through undersigned counsel, comes T3 Technologies, Inc. ("T3" or "Intervenor"), respectfully to aver as follows:

**Nature of the Action**

1.      This case arises out of the unlawful and anticompetitive acts of Plaintiff International Business Machines Corporation ("Plaintiff" or "IBM") to continue dominating the market for certain types of large-scale mainframe computers, described in more detail below. Mainframe computers support critical data processing needs for a wide range of businesses and other entities, including federal, state and local governments, banks and other financial institutions, airlines, and retailers.

2.       In addition to selling mainframe computers, IBM also sells mainframe operating systems. For a mainframe computer to function efficiently, it is critical that it be loaded with: (a) an operating system (whether from IBM, Unisys, or Bull) that is compatible with the specific mainframe hardware; and (b) application software that is compatible with the chosen operating system and hardware. Mainframe operating systems are a separate product from mainframe

hardware for various reasons, including the fact that IBM's operating system can be (and has been) sold separately for use on mainframe hardware sold by other companies. Indeed, in 1956 the Department of Justice ("DOJ") forced IBM to enter into a consent decree that effectively required IBM to makes its operating system (and related technical support) available on fair, reasonable, and non-discriminatory licensing terms for use on mainframes sold by other companies.

3.      The DOJ's requirement that IBM fairly and reasonably license its operating system resulted in two phenomena.  First, starting in the mid-1970s, other companies such as Amdahl and Hitachi started selling competing mainframe hardware that could be loaded with the IBM operating system and IBM-compatible software applications.[1] For several decades, IBM cooperated with these competing mainframe sellers by providing them with licenses, technical information, and technical support so they could make their computers compatible with IBM's operating systems and related software applications. Second, because consumers, manufacturers and software developers reasonably believed that: (a) there would continue to be competition from several mainframe hardware manufacturers; and (b) IBM would adhere to its repeated promise to fairly and reasonably license its operating system for use on competitors' hardware, the mainframe industry coalesced around the IBM mainframe architecture as the industry standard. To this day, the IBM architectural platform defines a "mainframe."

4.      Because the majority of mainframe manufacturers and software developers have focused on the IBM architecture as the mainframe "standard" (in contrast to other mainframe architecture), IBM's operating system dominates the operating system market, with over 85% of

---

[1] For the purposes of T3's claims, computers that can run IBM's mainframe operating system are referred to as "IBM-compatible," regardless of whether those computers are made by IBM or a third party. Software application programs that run on IBM-compatible mainframes using the IBM mainframe operating system are referred to as "IBM-compatible" or "IBM-mainframe-compatible" software, regardless of whether those applications are made by IBM.

all mainframes being loaded with one of IBM's mainframe operating systems. While the foregoing evidences IBM's dominance in the market for mainframe operating systems, it does not fully reflect IBM's coercive control over the vast majority of mainframe users. Once a mainframe user decides which operating system to use, the user is essentially wedded to that operating system because it must invest substantial sums for additional applications and hardware which are compatible with that operating system. Because 85% of the mainframe users have adopted IBM's operating systems, thousands of companies have invested over a trillion dollars in IBM-compatible software and hardware. These users (who reasonably expected that IBM would continue fairly and reasonably offering its operating system and technical support for use on competing hardware) are now "locked in" to using IBM-compatible software and hardware. If these companies tried to change to a competing operating system (such as Unisys and Bull), they would incur enormous switching costs described below, including: (a) the need to invest substantial sums for new software and hardware that is compatible with the new operating system; and (b) the potential loss of data and significant disruptions to their operations.

5.    While IBM has sold mainframe computers to a wide variety of users for decades, since the 1990s (if not earlier), IBM has focused its sales efforts on major corporate customers who require larger mainframe systems, while allowing partners (such as T3) to sell IBM mainframes to small or mid-sized customers that needed smaller mainframes.  While IBM focused on Fortune 500 companies and like customers who required massive computing capacity, T3 focused on price-sensitive customers that require mainframe systems with less capacity, such as educational institutions, small and medium businesses, and state and local governments.  The result was a specific niche for these small to mid-sized customers, in which T3 excelled.  For many years, T3 was among the most successful of IBM's partners.  In addition to its success in selling IBM mainframes, T3 became a successful business in building,

marketing, selling, and servicing its own T3-branded mainframes. Before IBM's exclusionary conduct destroyed T3's business, T3 was the second largest mainframe system integrator, with over 600 systems sold in 28 countries.

6. In or about 2000 there were two major changes in the mainframe industry. First, IBM's two primary remaining competitors, Amdahl and Hitachi, announced their exit from the market, which meant that there would no longer be a substantial supply of competing IBM-compatible mainframes in the market. Second, at about that time, IBM decided to eliminate all of its mainframes below a measurement of 60 million instructions per second or "MIPS." Thus, if they needed to replace equipment or add hardware to expand their existing IBM-compatible systems many of T3's customers could no longer buy hardware for their smaller IBM-compatible systems from IBM, Amdahl or Hitachi. They would have to either: (a) spend substantial sums to upgrade to IBM's more-expensive machines which offered more power than they needed; or (b) undertake substantial costs and business disruption to switch to a non-IBM-compatible system.

7. Because IBM, Amdahl and Hitachi were no longer serving the lower-end of the mainframe market (which were the majority of T3's customers), T3 started selling its own product called the tServer. The tServer is an Intel-based server that contains software developed by Fundamental Software, Inc. ("FSI"), which enables an Intel-based server to act as a mainframe. Under IBM's prior policy of reasonable and non-discriminatory patent licensing, FSI had obtained patent licenses from IBM so that FSI's software could operate with IBM's 31-bit mainframe operating system. The result was that T3's tServers which contained FSI's software were actually much-less expensive substitutes for IBM's mainframes, because FSI software enabled less-expensive Intel-based hardware to run the IBM operating system and IBM-compatible software applications. For T3's customers, who were already locked-into using IBM-compatible systems and generally needed only smaller mainframes with lower computing

power, the tServer was the main, if not only, real alternative to upgrading to IBM's larger machines that offered more computing power than they needed at a much higher price. T3 also continued to sell and market IBM mainframes to its customers who needed more computing power.

8.    IBM initially allowed T3 to sell its tServers in the lower end of the market that IBM had abandoned. However, within months after the 1956 DOJ Consent Decree was completely phased out in July 2001, IBM started taking steps to impede and undermine T3's sales of tServers so that IBM could force smaller customers to upgrade to IBM's higher-powered, more-expensive machines. In many instances, IBM also made it difficult for T3's customers to obtain licenses for IBM's operating systems, thereby affecting T3's sales and reputation in the business community. While IBM used various actions starting in 2002 to undermine T3's sales of tServers that contained FSI software, one of IBM's most notable actions was that in 2003: (a) IBM discontinued its existing 31-bit operating system and publicly stated that over the next few years it would no longer offer technical support for that system; and (b) although IBM had granted FSI a patent license for the earlier 31-bit operating systems (and despite decades of promises to fairly and reasonably license its operating system), IBM refused to sell FSI a license so that FSI could make its software compatible with IBM's new 64-bit z/OS, VSE, TSF and z/VM (collectively "z/OS") operating system for sale to commercial end users. This dramatically undermined T3's ability to sell its much-less expensive 31-bit tServers, because customers that bought a tServer: (a) within a few years would not be able to get critical, ongoing technical support for the 31-bit IBM operating systems that could be used on the tServers; and (b) because IBM refused to license its new operating system to FSI for sale to commercial end users, customers would not be able to use the new IBM's 64-bit operating system, which was the only one that IBM would continue to support.

9.     By its acts, IBM leveraged its coercive power over users who were locked into IBM's operating system to force them to buy IBM's mainframe hardware by essentially threatening that customers that bought competing tServer hardware from T3 would no longer be able to get technical support for the IBM operating system upon which they were critically dependent. IBM's clear goal was to: (a) eliminate competition from T3, thereby reducing customer choice and forcing them to buy a more expensive mainframe than they needed; and (b) eliminate the customer niche that IBM had previously abandoned and which T3 had spent years developing.

10.     After IBM undermined T3's ability to sell its 31-bit tServers and eliminated T3's ability to sell 64-bit servers, T3 sought to sell Liberty Servers, which used software from Platform Solutions, Inc. ("PSI") that would make Hewlett Packard ("HP") servers act as a less-expensive substitute for IBM's 64-bit mainframes. PSI was started by former Amdahl employees, who licensed Amdahl's mainframe computer technology and who have sought to practice Amdahl's former business model of marketing IBM-compatible mainframes in competition with IBM. In addition to providing consumers with an alternative to IBM's own mainframe computers, a PSI computer system provides consumers with the ability to run other types of operating system software, such as Linux, Microsoft Windows and UNIX, on a single machine. The PSI mainframe computer system is thus the first open architecture mainframe computer system.

11.     Once again, IBM undertook various steps to undermine T3's less-expensive substitutes for IBM's mainframes. Despite its (1) publicly disseminated and relied upon policy of reasonable, non-discriminatory licensing, (2) past licensing to companies operating the same business model in the same market, and (3) thirty years of actions and statements that were

designed to encourage and induce the industry to adopt and conform to IBM's architecture and standards:

    (a) IBM has refused to license its older OS/390-related patents (and other patents) to PSI;

    (b) IBM has refused to license its current mainframe z/OS 64-bit operating systems to customers unless they purchased or continued use to an IBM mainframe, thereby forcing customers that needed a 64-bit mainframe to use only an IBM mainframe, instead of T3's Liberty Server that could (absent IBM's conduct) offer the same service at a much lower price because of the PSI's software; and

    (c) IBM has refused to provide critical product interface information that IBM had previously provided to others and that was needed to develop a compatible mainframe operating system in order to hinder and delay T3's ability to market its competing Liberty Servers that contain PSI's software.

Furthermore, IBM has also embarked on a campaign of systematic efforts to create "fear, uncertainty, and doubt" ("FUD") by falsely representing to T3 customers that if they buy a Liberty Server containing PSI software it would result in a loss of reliability, availability and serviceability ("RAS").

    12. While PSI offers to the larger users a system that can be used as a lower-priced substitute for an IBM-compatible mainframe, T3 is the primary (if not only) competitor selling such systems to small and/or mid-sized mainframe users that want an IBM-compatible mainframe below 350 MIPS. Rather than compete with PSI and T3 on price and quality – which would have resulted in greater supply, more choices and lower prices for consumers -- IBM has implemented a strategy designed to: (a) eliminate competition in the niche that IBM had abandoned and T3 had fostered, (b) force locked-in IBM-compatible mainframe users to upgrade to IBM's more expensive mainframes that they did not need; and (c) maintain and expand IBM mainframe monopoly in the niche for lower-MIPS users.

    13. The market-wide cost of IBM's exclusionary campaign to eliminate competition to its mainframe computers will be billions of dollars. These costs will ultimately be paid by consumers. In addition, IBM's actions have injured T3 by excluding and/or impeding T3 from

selling competing systems based on the FSI and PSI software. By this action, T3 seeks to recover damages based on the lost profits and lost business opportunities that it has suffered and is suffering as a result of IBM's exclusionary conduct, and to restore free and open competition in the relevant markets so that future customers will have the opportunity to choose the best products at competitive prices. Because the claims of T3 against IBM are in significant part dependent on PSI's counterclaims against IBM, T3 seeks to intervene in this lawsuit.

## The Parties

14.    IBM is, and at all times mentioned herein has been, a corporation incorporated and existing under the laws of the State of New York, with its principal place of business in Armonk, New York.

15.    Intervenor T3 is a Florida corporation, whose principal place of business is in Tampa.

16.    All parties transact business in interstate and foreign commerce, and the activities alleged herein have a substantial effect on interstate and foreign commerce.

## Jurisdiction

17.    This Court jurisdiction over T3's claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and §§ 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14 and 15, pursuant to 28 U.S.C. § 1331. The Court has jurisdiction over any claims not so arising based on 28 U.S.C. § 1367 because such claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

18.    This Court has jurisdiction over T3's state law claims pursuant to 28 U.S. § 1367.

19.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332 because Intervenor, plaintiff, and defendant are citizens of different states and the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $75,000.

## Venue

20.     Venue for these Counterclaims is proper in this District because IBM maintains its principal place of business in this District.

## Factual Allegations

### A.     The Relevant Antitrust Markets

21.     The relevant geographic market in this case is worldwide. IBM markets its mainframe computers and operating systems to customers throughout the world, and T3 is seeking to compete against IBM for customers throughout the world. As a result of the exclusionary conduct alleged below, T3 has lost and is losing sales both in the United States and in export markets throughout the world.

22.     Although IBM holds a dominant position in the broader markets for all mainframe computers and mainframe operating systems, the relevant antitrust markets in this case are: (a) the market for mainframe computers that are compatible with IBM's mainframe operating systems and other IBM-compatible applications (the "IBM-compatible mainframe" market); and (b) the market for IBM-compatible mainframe operating systems.

### 1.     The Market for IBM-Compatible Mainframe Computers

23.     Mainframe computers are large, expensive, powerful computers used for processing high volumes of information at very high speeds. Most of the world's largest corporations and government entities rely on mainframe computers for their high volume and mission-critical data processing needs, including matters such a billing, accounting, order entry, record keeping and transaction processing. Much of the work done on these mainframe computers uses software custom-written by or for the end-user organization for the specific needs of the user.

24.    Because IBM's conduct has impeded competition in the market for IBM-compatible mainframes, there are no reasonable substitutes for IBM-compatible mainframes for a substantial and well-defined subset of mainframe customers who are "locked in" to the IBM platform based on their prior hardware/software purchasing decisions and their relatively high data processing demands. As alleged below, T3 sells its computer systems primarily (if not exclusively) to existing owners and users of IBM-compatible mainframe systems who are locked-into continuing to use IBM-compatible systems because of the time, money and effort that they have already invested in those systems and applications, and the incredible costs involved in switching to other, non-IBM-compatible systems and software.  By IBM's own estimates, consumers have invested well over $1 trillion in software compatible with IBM's mainframe operating systems and hardware. Such enormous investment in IBM-compatible software has effectively locked in many consumers to IBM-compatible mainframe computer systems, because conversion or migration to non-IBM-compatible mainframe computer systems would be prohibitively expensive.

25.    To switch to a non-IBM-compatible mainframe computer system, locked in consumers (such as T3's customers) would need to expend enormous amounts of time, money, and other resources to acquire new applications software and/or to translate, convert, or migrate their existing data and applications to a non-IBM-compatible mainframe computer system and to retrain employees and reconfigure operations to work with the new operating system. Many locked in consumers who use IBM-compatible mainframe software for mission critical functions, such as banking, insurance, or governmental functions, cannot risk catastrophic failures caused by switching to a non-IBM-compatible mainframe system. Thus, other than prematurely replacing hardware costing hundreds of thousands of dollars, these customers have no choice but to purchase IBM-compatible mainframes.

26.    Even if they had comparable data processing and other performance capabilities, computers that principally run UNIX, Linux, or Windows operating systems are not reasonable substitutes because: (a) many mainframe software applications were not written for those operating systems; and (b) once customers buy IBM-compatible products, they cannot easily or cheaply switch to another operating system that is not compatible with the applications they already own.

27.    Cross-elasticity of demand supports defining IBM-compatible mainframes as a distinct antitrust market because consumers locked in to IBM-compatible mainframe applications would tolerate supracompetitive price increases for IBM-compatible mainframes if the price increases did not exceed the costs of abandoning their existing investments in IBM-compatible mainframe software.

28.    Until roughly 2001, other developers of IBM-compatible mainframes such as Amdahl and Hitachi competed with IBM in the relevant market, and the existence of that history of competition from IBM-compatible mainframe developers further demonstrates the existence of a relevant market for IBM-compatible mainframes.  However, because competition has been thwarted by IBM's actions as alleged herein, IBM is currently the sole developer of IBM-compatible mainframe computers, and its share of IBM-compatible mainframe sales currently stands at almost 100 percent. As a result, since Amdahl's and Hitachi's exit from the market, prices for mainframe computers have been substantially higher than they would have been in a competitive market.

29.    There are substantial barriers to entry in the IBM-compatible mainframe market. Mainframes are extremely expensive to build, and it takes years to gain market acceptance. Even where a developer such as PSI uses existing hardware, it takes years to develop IBM-compatibility. Prior to PSI, T3, and FSI, no new significant developer of IBM-compatible

mainframes had entered the market in thirty years. IBM's two competitors, Amdahl and Hitachi, exited the market in 2000 instead of continuing to invest in the development of the mainframe technologies needed to market a mainframe computer in competition with IBM. IBM's market influence, including the types of anticompetitive conduct alleged herein, also creates additional barriers to entry.

30.    The relevant market in which IBM-compatible mainframes compete could alternately be defined to include the mainframe computers manufactured by companies such as Unisys and Bull that share "Reliability, Availability and Serviceability" and lock-in characteristics similar to IBM-compatible mainframes. However, these mainframes are marketed and supported as niche products, have very small market shares, and do not pose significant competition to IBM. On information and belief, IBM has itself noted that other "servers" running Unix and Windows are not actual mainframes that are interchangeable with IBM mainframes and that, according to IBM's own documents, the total cost of ownership for its flagship z/990 mainframe is 30 percent to 60 percent less than combining thirty Sun or Linux servers to perform the same functions.

31.    IBM also has monopoly and market power under this broader market definition, with a share in excess of 85 percent. All of the allegations made herein apply with equal force to this alternate market definition.

### 2.    The Market for Operating Systems for IBM-Compatible Mainframes

32.    The second relevant antitrust market in this case is the market for IBM-compatible mainframe operating systems. Operating systems are required for the mainframe to function; they control the operational resources of the computer and allow compatible application software to run on the computer. The dominant mainframe computer operating systems are IBM's older OS/390 (distribution and support for which has been dropped) and

newer z/OS operating systems (which includes z/OS, VSE, z/TSF and z/VM), with thousands of customers worldwide.

33.     As discussed above, the operating system has to be compatible with both the mainframe hardware and the software applications that run on the computer. To be viable, an operating system must be "backward compatible" with prior versions of that operating system and with the software applications written for those prior versions of the operating system so that customers can continue to access their existing applications and data.

34.     Due to its longstanding monopoly in mainframes and mainframe operating systems, there already exists an enormous, trillion dollar installed base of IBM-compatible software and hardware. IBM-compatible mainframe operating systems are specifically designed to work with and exploit the technical complexities and capabilities of mainframe computers and must be compatible with the hardware architecture, specifications and interfaces to function properly. In addition, the operating system and its application program interfaces must be compatible with the existing installed base of IBM and third-party IBM-mainframe-compatible software.

35.     Locked in consumers with existing applications and software cannot as a practical matter switch to other operating systems such as Bull, Unisys, UNIX, Linux, or Windows, because of the prohibitive switching costs such consumers would incur in abandoning their installed base of IBM-compatible mainframe software. Application programs, data files, and other software designed to operate with only IBM-compatible mainframe operating systems are not compatible with other operating systems. Many customers also have employees specifically trained to operate IBM software and hardware. Accordingly, to switch to a non-IBM-compatible operating system, locked in consumers would either have to abandon their existing investment in IBM-compatible mainframe software or expend enormous amounts of money and other

resources to retrain employees and to convert or replace their existing applications and data to work with a non-IBM-compatible mainframe operating systems. Thus, there are no reasonable substitutes for z/OS for a substantial and well-defined subset of mainframe customers who are locked in to the IBM operating systems based on their prior hardware/software purchasing decisions and investment in human resources.

36.    Cross-elasticity of demand supports limitation of the market to IBM-compatible mainframe operating systems, because consumers locked in to IBM-compatible mainframe software would tolerate supracompetitive prices for IBM-compatible mainframe operating systems if the supracompetitive portion of the price did not exceed the cost of abandoning their existing investment in IBM-compatible mainframe software. On information and belief, according to IBM itself, the vast majority of core, back-office applications are still implemented as COBOL transactions running on IBM mainframes, and analysts have estimated that the value of COBOL lines in use (which number in the hundreds of billions) exceeds the value of the largest publicly traded companies. As IBM succinctly states on its web site, "[a]fter 20 years, and billions of dollars wasted on trying to migrate applications from mainframes, the largest and most robust enterprises continue to depend heavily on the mainframe."

37.    The primary IBM-compatible mainframe operating system currently marketed or supported by IBM is z/OS. Because IBM has withdrawn the older OS/390 version and its predecessors from marketing, and no longer supports them, z/OS is: (a) the only IBM-compatible mainframe operating system available to either purchasers of new IBM-compatible mainframes or existing customers who wish to upgrade; and (b) the only operating system for which IBM offers technical support. Thus, IBM has monopoly power in the market for IBM-compatible operating systems.

38.     There are significant barriers to entry in the market for mainframe operating systems. A new operating system for a mainframe computer is extraordinarily complex and takes many years to develop. Because of the mission-critical nature of the work performed on mainframe computers, it is extremely unlikely that a customer would choose an operating system that has not been thoroughly developed, tested and proven over many years. To the extent that any operating system conceivably could develop into a viable competing operating system for mainframe computers, that operating system would require compatibility with customers' current operating systems and software applications so that customers could continue to access their existing programs and data. The existence of intellectual property rights in the relevant market also creates additional barriers to entry.

39.     The relevant market in which IBM mainframe operating systems compete could alternately be defined to include other mainframe operating systems, such as the proprietary operating systems used to run mainframe computers manufactured by Unisys and Bull. IBM also has monopoly and market power under that broader market definition, with a share in excess of 85 percent. On information and belief, as IBM has itself acknowledged, Linux, Unix or Windows are not true mainframe operating systems because they have neither the performance capabilities nor the dynamic functionality of a mainframe operating system. Thus, those operating systems are not reasonable substitutes. All of the allegations made herein apply with equal force to this alternate market definition.

**B.    <u>The History and Growth of the IBM-Compatible Mainframe Market</u>**

40.     IBM has long dominated competition in the relevant markets for mainframe computers and mainframe operating systems. From the 1950s to the early 1970s, IBM achieved dominance in the market for mainframe computers. Toward the end of this period, IBM achieved dominance in the market for mainframe operating systems as well.

41.     In 1956, IBM responded to antitrust claims brought by the United States Department of Justice by entering into a consent decree that put limits on its ability to exploit its monopoly in tabulating machines and electronic data processing machines.

42.     Beginning with IBM's introduction in 1964 of its S/360 line of mainframe computers and operating systems, and continuing with subsequent model lines, IBM freely and broadly disseminated the architecture specifications of its mainframe computers and operating systems. Customers, competitors, and other third-party software and hardware developers used the information disseminated by IBM to create software and hardware products designed specifically for use with IBM's mainframe computers and operating systems—resulting in the adoption of the IBM architectural platform and the standards and specifications embodied therein as the industry standards for complex computing.

43.     The profusion of new IBM-compatible mainframe software and hardware products vastly expanded the installed base of IBM-compatible mainframe operating systems. The resulting "network" effect provided additional incentive for consumers to adopt and to use IBM mainframe operating systems, which further expanded the installed base of IBM-compatible application software.

44.     The expansion in the installed base of IBM mainframe operating systems and other IBM-compatible mainframe software benefited IBM by making its mainframe operating systems more desirable and decreasing the viability of operating systems incompatible with that installed base. The development by customers and competitors of IBM-compatible mainframe hardware and application software benefited consumers by spurring innovation and decreasing prices for IBM-compatible mainframe hardware and software.

45.     IBM's policy of reasonable and non-discriminatory licensing and system openness was integral to its success, public image and reputation. IBM knew that such policies

were integral to customer and developer acceptance and continued use of the IBM architectural platform as an industry standard.

46.    Since the 1970s, customers and programmers have adopted the IBM architectural standard with knowledge that IBM would face competition in IBM-compatible computers, and would not have a complete monopoly over the market. They adopted the IBM architectural standard based on IBM's conduct and public statements that it would promote free competition.

47.    By 1976, competitors such as Amdahl Corporation were using the information disseminated by and licensed from IBM to develop competing IBM-compatible mainframe computers, on which consumers could run their IBM mainframe operating systems and IBM-compatible mainframe application software. For decades following the development of such IBM-compatible mainframe computers, IBM licensed its mainframe operating systems on nondiscriminatory terms to the purchasers of such IBM-compatible mainframe computers. The availability of competing IBM-compatible mainframe computers from Amdahl and from other vendors, such as Hitachi Data Systems, provided additional incentives for consumers to use IBM mainframe operating systems and to develop or use other IBM-compatible mainframe application software. Nonetheless, IBM always retained a competitive advantage because there was a "lag" in the development of compatible products, and because it has always enjoyed a lucrative monopoly over the operating systems run on mainframe computers.

48.    By the late-1990s, Amdahl and Hitachi collectively attained over a twenty percent market share in the IBM-compatible market. However, in 2000, Amdahl and Hitachi announced that they were exiting the mainframe computer market, leaving IBM as the only developer of IBM-compatible mainframes.

**C.**   **T3 Seeks An Alternative To IBM Mainframes To Meet The Needs of T3's Customers.**

49.     Founded in 1992, T3 Technologies, Inc. specializes in servicing the needs of the mainframe community through its worldwide resources and partners. Prior to the anticompetitive acts alleged herein, T3 was the #2 mainframe systems integrator with nearly 1,000 customers in 28 countries. T3's clients included Fortune 500, academic institutions, small and medium businesses, state and local governments, and even the U.S. Military.  T3 also provides systems programming and other support services to z/OS and VSE data centers.

50.     In 1994, T3 became an IBM business partner authorized to sell IBM mainframes to end users.  While IBM has sold mainframe computers to a wide variety of users for decades, since the 1990s (if not earlier), IBM has focused its sales efforts on bigger customers that need larger mainframe systems, while allowing partners such as T3 to sell IBM mainframes to small or mid-sized customers that needed smaller mainframes. Over the course of several years, developed a strong reputation and client base in this market niche.  From 1994 to 1999, T3 sold IBM mainframes of 50 MIPS or lower.

51.     As of 1999, IBM's offering of mainframes generally ranged from 5 to in excess of 1000 MIPS.  However, in that year, IBM decided to eliminate all of its mainframes below 60 MIPS.  IBM's decision to stop selling mainframes below 60 MIPS, combined with Amdahl and Hitachi's exit from the market in 2000, meant that there would be no new mainframes suited to a large portion of T3's customer base.  Consumers who only needed mainframes with computing power below 60 MIPS, were faced with reduced choices and increased prices – they had little choice but to buy more computing power from IBM than they needed at a much higher price.

52.     As a result of IBM's decision to abandon the lower end of the market, T3 sought out and formed a business relationship with FSI, a company based in Freemont, California.  In the 1990's, FSI created a software product that, when integrated with an Intel-based server, acted

as a mainframe computer.  Specifically, under IBM's prior policy of reasonable and non-discriminatory patent licensing, which existed before the Justice Department decree expired, FSI obtained patent licenses from IBM that enabled the FSI technology, when integrated on an Intel-based server, to run IBM's 31-bit mainframe operating system software.  At one point, even IBM created a product using FSI's technology.  This product was developed through IBM's personal computer division, not its mainframe division.  In fact, T3 signed an agreement with IBM in 2001 to be an authorized reseller of this product.  However, after approximately six months, IBM took the product off of production and ended the program.

53.    In August 2000, T3 licensed FSI's technology to incorporate into a computer system that T3 would build and sell under its own brandname, the tServer. Since introducing  the tServer in 2000, T3 has installed over 600 systems worldwide.  T3's tServers were built using IBM components from IBM's personal computing division and other third party hardware and software components.  Prior to IBM's anticompetitive conduct, the tServer was the best selling mainframe under 80 MIPS and was the industry's most cost-effective low-MIPS mainframe.  In fact, the US Air Force even uses tServers for several AWAC and nuclear weapons control applications.  T3 supports its tServers with a highly rated service and support team.  During this time, T3 sold tServers with computing power that ranged from 8 to 30 MIPS.

**D.    IBM Starts Taking Steps To Block Competition From T3's tServer.**

54.    In mid-2001, the 1956 DOJ Consent Decree with IBM came to an end.  In or about 1996, the government concluded that although IBM still had substantial market power in the operating systems market and mainframe market, the decree should be dissolved because: (1) IBM had confirmed that it instituted and maintained a policy of "system openness," making its computer systems more compatible with those of other developers and that this policy derived from considerations independent of the Decree and would continue after the Decree terminated;

(2) IBM faced competition in the market for IBM-compatible mainframes from companies such

as Amdahl and Hitachi

55.    In agreeing to dissolve the decree, the Department of Justice explicitly stated that

any attempt by IBM to return to its tying practices would be unlawful:

> If, after the Decree terminates, IBM engages in any
> anticompetitive activity that would violate the antitrust laws, it
> would immediately be liable to suit. For example, should IBM
> engage in **anticompetitive tying—be it to parts or operating
> systems**—the United States could bring an action for injunctive
> relief both to stop the illegal conduct and to get other, broader
> prophylactic relief. [citations omitted]. Also, IBM would be liable
> to a host of potential private treble damage actions. [citations
> omitted].
> (Emphasis added).

56.    In May 1997, the court approved the dissolution of the decree, which was finally

phased out by July 2, 2001.  Within months after the DOJ Consent Decree was fully phased out,

IBM took the first of several steps to impede competition from T3's tServers.  In 2001 and 2002,

when T3 was selling its popular tServer, T3 also had an agreement with IBM to sell IBM

mainframes to T3's customers that needed more computing power than offered by T3's tServers.

T3 was a licensed reseller for IBM mainframes and was selling IBM mainframes with computing

power between 60 to 200 MIPS. Thus, T3 would sell tServers to the smaller consumers that IBM

abandoned, and T3 would sell IBM mainframe systems to customers that needed more

computing power. However, in the Spring of 2002 (less than a year after the DOJ Consent

Decree was phased out), Steven Friedman, the President of T3, went to a meeting at IBM in New

York and met with Richard Cummings, the Vice-President of North American Mainframe

Channel Sales, and Joe Kirshner, the Vice-President of U.S. Mainframe Channel Sales.  These

IBM representatives told Mr. Friedman that IBM did not like T3 selling IBM-compatible

mainframes using FSI's technology even if IBM did not offer any products with similar

computing power or pricing. These IBM representatives demanded that T3 terminate its

relationship with FSI and stop selling IBM-compatible mainframes using FSI's technology.  If T3 did not stop selling IBM-compatible mainframes using FSI's technology, IBM would prohibit T3 from selling IBM's mainframes. T3 ultimately refused to terminate its relationship with FSI and, as a result, IBM punished T3 for selling a competing product by terminating its mainframe license agreement with T3 at the end of 2002.

57.    Although it was hampered by IBM's punitive termination of T3 as a distributor of IBM mainframes -- and various other actions that IBM used from 2002 forward to impede T3's sales of tServers -- in 2003 and 2004, T3's revenues expanded significantly because of T3's growing success. During this timeframe, T3 was selling approximately 100 to 150 systems per year, and its profit included revenue from related support services. The computing power of FSI's technology increased somewhat and, as a result, T3's tServer has the limited ability to scale from 8 to 30 to 60 to 100 MIPS.

58.    In or about 2003, IBM began a strategy to take advantage of customers' dependence on IBM's operating system to essentially coerce them to shift from a 31-bit mainframe to a 64-bit mainframe, while blocking T3's ability to sell competing versions of such a system. Although IBM had previously sold other, older operating systems (such as the OS/390 operating system), by September 2004, IBM had stopped supporting those older operating systems, and IBM's z/OS operating system was the only IBM-compatible mainframe operating system in production that IBM continued to service or support. Even though IBM previously provided technical support for the z/OS operating system that was used by customers on 31-bit machines (including T3's competing 31-bit tServers), in September of 2004, IBM announced that, as of March 2007, it would discontinue supporting z/OS versions that run on anything other than 64-bit hardware.  At the same time, IBM took efforts to block FSI and T3 from selling a competing 64-bit machine.  In the 1990's FSI obtained a patent license from IBM that enabled

FSI it to create software that could run IBM's 31-BIT mainframe operating software on a less-expensive Intel-based server. However, FSI did not have (and IBM refused to sell) a patent license to do the same for IBM's newly-developed, 64-Bit operating system for sale to commercial end users.

59.    Thus, IBM would no longer provide technical support for the z/OS operating system that was used on Amdahl's, Hitachi's and T3's IBM-compatible mainframes, which are 31-bit systems. The fact that IBM would no longer provide technical support for the IBM operating systems that run on T3's 31-bit tServer: (a) made it increasingly difficult to sell those systems; and (b) generated enormous demand (which did not exist naturally) for consumers to upgrade their existing 31-bit IBM-compatible systems to new, more expensive 64-bit IBM mainframe hardware and software.

60.    Since 2004, IBM has continued taking efforts to undermine T3's ability to sell tServers containing FSI technology.  On information and belief, FSI's patent license expired on October 31, 2006. IBM had previously refused to grant a patent license to FSI that would allow FSI's technology in a system based on IBM's 64-Bit mainframe operating software to commercial end users, such as T3's customers. As of November 1, 2006, IBM also refused to extend FSI's patents on IBM's 31-bit operating software and refused to license any of its z/OS operating software to any consumer who wanted to purchase T3 tServer, even if it were running on 31-bit technology.  Thus, even though it had previously granted licenses to customers to use the z/OS operating software on 31-bit FSI-based systems (such as T3's tServer), after November 2006 IBM would not even recognize at least 100 licenses of its z/OS operating software on 31-bit systems based on FSI technology that had been purchased prior to November 1, 2006.  IBM refused to recognize these licenses even though it had received and accepted royalties for these licenses.  As a result, IBM effectively shut down FSI and T3 as competitors.

**E.    T3 Starts Competing With a PSI-Based System.**

61.    As IBM's exclusionary conduct made T3's 31-bit tServers increasingly difficult to sell, and eliminated T3's ability to sell 64-bit tServers, T3 started investigating other technologies to integrate into it's systems, and eventually decided to sell 64-bit Liberty Servers, which incorporated PSI's technology.  As a February 12, 2007 press release stated, T3 is PSI's preferred channel partner and is marketing T3's Liberty Servers with PSI technology through a distribution and licensing relationship with PSI.

62.    PSI was founded in 1999—shortly before Amdahl and Hitachi left the IBM-compatible mainframe computer market—with the goal of developing its competitive computer system. In particular, PSI sought to develop a computer system that (i) would include less expensive hardware than IBM's mainframe computers, and (ii) not only would run the IBM mainframe operating system (so that consumers could continue to run their IBM-compatible applications software), but also would run other, non-IBM operating systems (such as UNIX, Linux or Windows) in order to accommodate consumers' desires to utilize additional, non-IBM-compatible applications software and provide consumers with greater flexibility in the future paths of their informational technology purchasing decisions.

63.    While PSI offers larger users a system that can be used as a lower-priced substitute for an IBM-compatible mainframe, T3 primarily focused on selling systems based on the PSI technology to small and/or mid-sized mainframe users that want an IBM-compatible mainframe below 350 MIPS.  PSI and T3 initially chose to utilize equipment manufactured by HP. HP provides the hardware, while PSI and T3, who are authorized resellers of the hardware, implements binary compatibility with IBM's machine architecture through specialized firmware that runs on Intel 64-bit Itanium processors used in the HP equipment. PSI and T3 additionally provides hardware for data transfer.

64. PSI implements guest-to-host compatibility of the IBM z/Architecture and the Intel Itanium architecture through firmware which executes directly on the Itanium processor. The mainframes marketed by PSI also can run open operating systems such as Linux, FIP-UX and Open VMS. This enables the entire hardware system to present both open and IBM-compatible machine architectures to the end-user.

65. T3's Liberty Servers run z/OS, z/VSE, OS/390, and VSE operating systems in 31 or 64-bit technologies and are scalable up to 260 MIPS and have unequalled cost advantages over IBM's proprietary mainframes. As a result, the Liberty Server offered T3 the possibility of expanding its sales beyond the scope offered by the tServer because in contrast to the 31-bit tServer which had a maximum of 100 MIPS, the Liberty Server could run 64-bit operating systems and could be scalable up to 260 MIPS.

66. As with the tServer, T3 sold and marketed its Liberty Servers to small and mid-size mainframe customers around the world. T3 has been dedicated to serving the small to mid-sized marketplace for 14 years. T3's Liberty Server was designed from the start for small to mid-sized data centers (under 350 MIPS). T3's Liberty Servers offer customers tremendous flexibility not previously available in IBM z/Series systems. T3's Liberty Servers start at just 26 MIPS and support both the 31-bit and 64-bit versions of the IBM z/OS. T3's Liberty Servers can be configured to provide the right amount of computing power, along with the ability to fully incorporate open technology into customers' proprietary mainframe datacenters. In this manner, T3's customers do not pay for functionality that they do not need. In addition to marketing its Liberty Servers, T3 did substantial marketing of the PSI branded larger systems that was effectively blocked by IBM's anticompetitive conduct. Notwithstanding the anticompetitive conduct by IBM alleged herein, by 2007, T3 had made limited strides in marketing its Liberty Server family of open mainframe computers, including sales to four new customer shipments in

the first 60 days of general availability.  Among the new T3 customers were the University of Alabama Hospital at Birmingham, Pitt County, North Carolina, Cascade Natural Gas Corporation, and Polk County Iowa.  T3 made limited sales, which while substantially below what T3 could have done absent IBM's misconduct, reflect the value of its Liberty Servers and T3's service.

67.    In the February 12, 2007 press release found on PSI's website, the Executive Vice President of Sales for PSI, states: "T3 Technologies strong partnership with PSI is crucial in bringing choice to this underserved market. With T3 Technologies proven track record of sales, service and support and PSI's Open Mainframe technology, z/OS and z/VSE, datacenters now have an alternative to proprietary IBM hardware."

68.    There exists pent up demand from smaller and mid-size customers looking for a highly flexible mainframe that can grow easily and affordably with them as their computing needs increase, T3 invested in millions of dollars in additional sales, support and customer service resources to accommodate the increasing interest in the open mainframe computers now available to small and mid-size customers through the sale of T3 Liberty Servers. Based on 2005 IDC data, the market segment for systems up to 350 millions of instructions per seconds (MIPS) approaches 1,000 server units and $500 million in sales annually. T3's successful business, however, was effectively shut down by IBM's unlawful and anticompetitive conduct detailed below.

**F.    IBM's Efforts To Prevent Competition From PSI-Based System**

69.    Even before T3 actually sought to sell PSI-based systems, IBM was trying to block PSI-based systems from the market using many of the same operating system licensing tactics it used to block T3's FSI-technology-based tServer from the market.  Because of IBM's monopoly in the market for mainframe operating systems and the vast base of consumers locked

in to IBM-compatible mainframe software, both PSI and T3 could not compete against IBM if the PSI-technology-based computers were not compatible with IBM's mainframe operating systems. More specifically, to compete, the PSI-technology-based computer systems needed to be compatible with IBM's most recent and currently supported version of its mainframe operating system. Accordingly, to develop and test its technology for IBM-mainframe-compatible computers, PSI needed to license the IBM mainframe operating system. Moreover, customers who wish to purchase a PSI-based system (whether it be one of T3's Liberty Servers or PSI's larger systems) needed assurances that they would be able to license IBM's mainframe operating system for use on that computer—otherwise, they would not be able to continue running the IBM-compatible application software in which they have invested so much.

70.     On information and belief, in December 2000, PSI began negotiations to ensure that IBM would license its operating systems and associated intellectual property for use on PSI mainframes, as it had in the past for customers of mainframe computers developed by Amdahl and others. Pursuant to its apparent strategy of exploiting its entrenched operating system monopoly to reinforce its mainframe computer monopoly, IBM was resistant to PSI's efforts and offered conflicting reasons for refusing to license its operating systems for use on PSI mainframes. With respect to its older OS/390 operating system, IBM stated that it would continue licensing that version of its operating system as it had in the past. Then it subsequently asserted that it would not license either its newest z/OS operating system, or its older OS/390 operating system, for use on a Intel 64-bit system, but it offered no reason for not doing so.

71.     On information and belief, PSI sought further assurances that IBM would not discriminate against PSI's consumers in its software and intellectual property licensing. IBM, however, delayed responding to PSI's requests. By January 2003, IBM had still refused to reach an agreement with respect to licensing. However, it denied that it had rejected PSI's request and

instead stated that it had not yet decided whether to license the z/OS and OS/390 operating systems for use by PSI on a 64-bit platform, in part because it had not yet determined an appropriate price for the license.

72.    On information and belief, in late February 2003, PSI wrote to IBM making "a final plea for a timely resolution to this issue" and reiterating the details of its request. PSI sought an agreement in principle from IBM not to deny licenses for its operating systems to customers of PSI's computer systems. PSI emphasized that, as a company in the process of closing its first round of venture financing, PSI likely would be irreparably harmed if IBM's delay in resolving these issues resulted in PSI's inability to close on its financing in a timely fashion. PSI also wrote that "[a] simple letter confirming that IBM intends to pursue the same non-discriminatory licensing policy as in the past, or something to that effect, should suffice for our immediate purposes."

73.    On information and belief, in response, IBM represented that it would permit customers to license IBM's mainframe operating system for use on PSI computer systems under IBM's then-current licensing terms, based on performance and functionality, provided that PSI's computer systems did not infringe IBM intellectual property rights. IBM further stated: "[W]e believe the system described by you will have needs under IBM's patents. Under our current practice, IBM would be willing to enter into a patent license with PSI."

74.    On information and belief, having been assured that IBM would not discriminate in its licensing and that any patent conflicts could be avoided though a licensing agreement, PSI proceeded with its development plan.

75.    On information and belief, on or about May 14, 2003, PSI and IBM entered into a development license agreement for OS/390. OS/390 had already been withdrawn from marketing and, undisclosed to PSI at the time of the agreement, IBM subsequently withdrew the OS/390

from service and support in September 2004, leaving z/OS as the only supported mainframe operating system.

76.    On information and belief, in March 2004, PSI ordered and subsequently received two licenses to run IBM's z/OS operating system on PSI mainframes. These orders were processed through PSI's IBM account representatives at IBM's Atlanta and Dallas offices. They were aware that the software was ordered for use on the PSI platform. Since issuing those initial licenses to PSI, however, IBM has reversed course and now refuses to grant further licenses of the current version of its mainframe operating system to PSI or to license its mainframe operating system to PSI and T3 customers.

77.    On information and belief, in a May 24, 2006 letter, IBM definitively stated that it would refuse to license its mainframe operating system to any customer of PSI's competing mainframe computer system.

**G.    IBM Promises, Then Refuses, To License Any Applicable Patents to PSI.**

78.    On information and belief, IBM has widely represented, on its website and elsewhere, that it is committed to openness and that it licenses its patents on a nondiscriminatory basis. Product developers such as PSI have consistently relied on this policy over the years in the event there was any concern over infringement of IBM patents. The link to this page on the website was http://www.ibm.comi'ibmllicensing/patents/practices.shtml, which was taken down without any statement or explanation sometime in 2006. Consumers have relied on similar assurances of system openness in choosing to purchase IBM products.

79.    On information and belief, in 2001, IBM represented to PSI that it would make available OS/390 interfaces and architectures that had been made available to other competitors. In March 2003, IBM also represented that it would be willing to enter into a patent license with PSI.

80.    On information and belief, in 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions. In particular, IBM represented that it would license patents required for IBM mainframe compatibility for a running royalty rate of 1 percent of net sales of licensed products, up to a maximum cumulative royalty rate of 5 percent for a license of five or more patents. In the course of those discussions, PSI provided IBM with substantial technical information about its product under development. PSI requested that IBM identify any of its patents that IBM believed might be implicated by PSI's proposed product. IBM did not do so.

81.    On information and belief, IBM thereafter refused to continue patent license discussions with PSI unless PSI: (i) disclosed specific technical information about its product currently under development; (ii) executed an agreement stating that any information PSI disclosed to IBM in the course of those discussions would be treated as non-confidential and would be fully usable by IBM, including in its business activities in competition with PSI; and (iii) agreed that IBM was not obligated to enter into any license agreement. Accordingly, as a condition of even entering into licensing negotiations, IBM required PSI to disclose confidential, proprietary information, while simultaneously signing an agreement stating that PSI was not revealing confidential, proprietary information.

82.    On information and belief, in August 2005, IBM sent PSI a list of some 150 patents which it characterized as a "representative list" of IBM patents that "may" be infringed by the PSI system, without linking them to any PSI product. IBM stated that this was "not an exhaustive list," and requested PSI to demonstrate—but again without agreeing to maintain the confidentiality of PSI's product information—that PSI's system did not infringe any of the claims in any of these patents.

83.    On information and belief, because of the extensiveness of the list of "representative" patents that IBM had asserted "may" be infringed by PSI's product, and the fact that it would have been prohibitively expensive for PSI to analyze every IBM patent claim even on that "representative" list in order to make a non-infringement demonstration to IBM, PSI suggested the parties simply resume their patent licensing discussions. In this connection, PSI offered to provide whatever technical information about its products that would be needed by IBM, without requiring IBM to agree to keep PSI's technical product information confidential.

84.    On information and belief, in February 2006, representatives of PSI and of IBM met again to discuss the patent licensing issues. The IBM personnel at the meeting stated that, with respect to a patent license, there would be substantial resistance from IBM's business side. Specifically, an IBM representative stated something to the effect of: "No one on the zSeries hardware team wants to see z/OS on an HP machine."

85.    On information and belief, more than three months later, on May 24, 2006, IBM wrote to PSI stating that it would refuse to license any IBM patents to PSI or customers using PSI-based systems, which, by definition includes T3 customers. IBM thus reneged on its express promises made to PSI in 2001 through 2004 concerning its willingness to license its patents to PSI and to continue its decades-long practice of licensing its patents to third parties engaged in the development of IBM-compatible mainframe computers.

86.    On information and belief, IBM's decisions and conduct were motivated solely by its desire to eliminate a competitor that threatens its highest margin business, and not by a desire to protect the intellectual property that it has freely licensed to others.

**H.    IBM Has Used A Campaign to Destroy PSI's and T3's Reputation and Business.**

87.    IBM has also been contacting PSI's and T3's customers and potential customers to instill "Fear, Uncertainty, and Doubt" regarding T3, PSI and its products. IBM has told PSI's and T3's customers and potential customers, without any basis, that their products will not work.

88.    IBM has told PSI's and T3's customers and potential customers that it will refuse to license its operating systems for use on PSI mainframes and that it is "committed to putting PSI out of business."

89.    On information and belief, IBM has further threatened PSI's business partners with lawsuits to dissuade them from working with PSI. In fact, even since IBM's Amended Complaint was filed, a senior IBM executive contacted a PSI business partner and threatened that company with litigation if it continued to do business with PSI.

**I.    IBM's Tying and Exclusionary Conduct Injure**
**Competition, Competitors, and Consumers in the Relevant Markets.**

90.    For decades, IBM has actively encouraged customers, developers, programmers, business partners and competitors to standardize on its mainframe architecture by repeatedly representing that it engages in fair, reasonable and nondiscriminatory licensing of interoperability information needed to manufacture compatible products and related intellectual property. IBM postures itself as a champion of "open systems and standards," arguing that competitors must have reasonable and nondiscriminatory access to interoperability information and related intellectual property is essential to competitive development and innovation in information technology industries, such as the mainframe industry.

91.    Customers, developers, programmers, business partners and competitors have relied on IBM's position of reasonable and non-discriminatory licensing of interoperability information and related intellectual property throughout the development of the standards and specifications embodied in the IBM mainframe architectures. IBM customers are now locked in

to the use of IBM-compatible mainframes and operating systems as the result of these standards and specifications. It is a blatant abuse of that standard setting process for IBM to now seek to enforce patents it claims read on those standards and specifications to exclude competitors from the mainframe market and thereby extract higher prices and higher profits from its customers. Yet, that is exactly what IBM has sought to do: (a) through its refusal to provide its mainframe operating system to customers of T3, FSI and PSI; and (b) this litigation against PSI.

92.    To the extent that use of the functionalities claimed by IBM's patents is necessary to manufacture any IBM-compatible mainframe, those patents also are essential facilities. IBM's refusal to provide access to these essential facilities, when considered in light of IBM's market power, previous policy, practice, representations, and inducement of customers, developers, and programmers to adopt IBM's architectural platform as an industry standard, is independently, and in combination with IBM's tying and other wrongful conduct, anticompetitive. IBM's sole intent in changing its policy is to maintain and expand its monopoly; it does not have a legitimate pro-competitive interest in protecting the same intellectual property that it has freely licensed to others.

93.    IBM's z/OS operating system is the only technically supported operating system currently available to run on IBM-compatible mainframes and that is compatible with the application software written for IBM-compatible mainframes. By refusing to license z/OS to customers for use on PSI's, FSI's and T3's competing mainframes, IBM has made itself the only supplier of IBM-compatible mainframes. Accordingly, all consumers locked in to IBM-compatible mainframe operating systems must purchase IBM mainframe computers.

94.    Mainframe operating systems and mainframe computers are separate products that could be sold separately by IBM, as demonstrated by IBM's past practice for several decades of licensing IBM mainframe operating systems to consumers for use with IBM-

compatible mainframe computers developed by Amdahl or Hitachi Data Systems. In fact, IBM has historically published software licensing terms for OS/390 and z/OS stating that the operating system will run on the then currently supported IBM servers "or equivalent." This included the 64-bit only versions of z/OS, version 1.6 and version 1.7. On August 8th, 2006, IBM announced the terms for its latest version of z/OS, version 1.8, which dropped the term "or equivalent," referencing only System z servers.

95.    By changing its historic practices of (i) providing nondiscriminatory licenses to its mainframe operating systems to developers of compatible mainframes and software, (ii) licensing its mainframe operating systems to purchasers of competitors' mainframe computers, and (iii) freely licensing its interoperability information and related intellectual property on reasonable and non-discriminatory terms, among other things, IBM has engaged in exclusionary conduct injuring competition in the relevant market for IBM-compatible mainframe computers.

96.    Locked in consumers could not have known at the time of their initial investment in applications requiring IBM mainframe operating systems that IBM would discontinue its longstanding policy of licensing its mainframe operating systems to run on competing IBM-compatible mainframe computers.

97.    IBM is seeking to extend and prolong its longstanding monopoly over IBM-compatible mainframe computers and mainframe operating systems and ensure that rival hardware and software platforms do not become viable alternatives to IBM's proprietary mainframe systems. IBM's conduct in the mainframe operating systems market significantly harms and threatens continuing harm to competition, offends established public policy as set forth in federal and state antitrust laws, is oppressive, and is substantially injurious to consumers. IBM has created insurmountable barriers to entry in the market for IBM-compatible mainframe computers and excluded competitors such as PSI, FSI, and T3 from that market. The resulting

elimination of competition in the market for IBM-compatible mainframe computers harms consumers by giving IBM monopoly pricing power and reducing innovation. The harm to such consumers from IBM's conduct outweighs any utility it might have.

98.      By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a FSI-based or PSI-based machine, IBM has injured PSI and T3 as competitors in the market for IBM-compatible mainframe computers. IBM's unlawful conduct has (a) prevented PSI and T3 from marketing and selling a competing computer system; (b) jeopardized PSI's and T3's funding and their relationship with prospective customers; (c) delayed PSI's and T3's entry into the market; and (d) allowed IBM to reap hundreds of millions of dollars in additional profits that otherwise would have been realized as cost savings by the governmental institutions, corporations, and academic institutions that would have purchased PSI's lower-priced products. Moreover, in addition to preventing PSI and T3 from selling PSI mainframes, IBM's unlawful conduct has prevented PSI and T3 from selling related applications and services, such as storage, technical support, maintenance and consulting services, and punished T3 for selling tServers which used FSI technologies.

99.      IBM itself has recognized that conduct such as that in which it is now engaging is anticompetitive and unlawful. As part of the United States Department of Justice's antitrust action against Microsoft, IBM testified that Microsoft had engaged in exclusionary conduct by discriminating against IBM with respect to the terms on which it made its Windows operating system available to IBM in retaliation against IBM's efforts to develop a competing operating system, OS/2. IBM subsequently pursued private antitrust claims against Microsoft, and obtained a $775 million settlement of those claims without even filing a complaint. IBM's prior antitrust claims against Microsoft in the markets for PC operating systems and personal computers are very similar to PSI's and T3's current claims based on IBM's exclusionary conduct in the

markets for mainframe computers and mainframe operating systems. Indeed, PSI's and T3's claims are based on conduct that is even more blatantly exclusionary because IBM has expressly tied sales of its operating system to the purchase or continued use of an IBM mainframe and has refused to make its operating systems available at all to purchasers of PSI's mainframe computer products.

100.    And in the European Union, IBM, through its trade organization ECIS, has taken legal positions completely contrary to its arguments in this case. For example, IBM currently contends, through its trade organization, that Microsoft should be compelled to timely supply full interoperability information to competitors for various products, including Microsoft Office, Windows, and Exchange programs, and that such information constitutes an essential facility. Again, IBM's conduct here is even more blatantly exclusionary than Microsoft's. Microsoft never disclosed interoperability information to expand the market and encourage the adoption of a Microsoft standard. IBM, by contrast, did just that: promoting a policy of reasonable, non-discriminatory licensing to help expand the market for its operating systems, applications, and mainframes.

101.    IBM's improper, exclusionary tactics has resulted in higher mainframe costs for consumers. IBM's tactics have allowed it to resist the downward pricing pressures that competition and innovation should have created. IBM measures mainframe performance by MIPS. On information and belief, IBM has tracked the "price per MIPS" of its mainframe systems over more than forty (40) years. The price per MIPS has precipitously fallen over this period of time, from nearly $10,000,000 U.S. in 1960 to approximately $2,000 in 2000. This general trend of decreasing prices has been observed throughout the computer industry and is attributable in large part to advances in processor design and manufacturing techniques.

102.    When competition for IBM-compatible mainframes disappeared, IBM was able to significantly resist the downward trend in price per MIPS. Amdahl and Hitachi, left the market for IBM-compatible mainframes in 2000. On information and belief, if the downward trend in price per MIPS between 1960 and 2000 had continued from 2000 to 2006, the price per MIPS should now be approximately $165—but today it is more than six times that amount at approximately $1,000. As a result, the largest systems today cost closer to $18 million rather than the $3 million they would have cost based on the price trends that were followed throughout most of the mainframe's history. This is the inevitable result when competition is eliminated.

103.    On information and belief, the documents that IBM has produced in this case illustrate just how insulated IBM's mainframe prices and profits are from competition. IBM is well aware that the PSI system that T3 sells offers mainframe customers both a competitive choice they want and the opportunity for substantial cost savings vis-à-vis the IBM systems that they would be forced to purchase or maintain if IBM could succeed in its campaign to exclude PSI from the market.

**FIRST CAUSE OF ACTION:**
**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

104.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 103 of its Petition for Intervention and Complaint.

105.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing with respect to the develop of the standards and specifications embodied in the z/Architecture and its practice of reasonable and non-discriminatory licensing of intellectual property to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing

technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of critical information regarding product interface information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's and T3's ability to market its competing products, and/or (viii) other wrongful conduct as alleged hereinabove, individually and collectively constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

106.   IBM has a monopoly and exercises market power in the relevant markets for IBM-compatible mainframe computers and mainframe operating systems.

107.   IBM's conduct as alleged herein has enabled it to unlawfully maintain, extend and prolong its monopoly in the market for IBM-compatible mainframes.

108.   IBM's purported bases for the anticompetitive acts alleged herein are pretextual and any pro-competitive benefits of such acts are outweighed by the harm to competition and consumers.

109.   As a direct and proximate result of IBM's tying, denial of access to an essential facility and other anticompetitive acts as alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and consumers in the affected markets.

### SECOND CAUSE OF ACTION:
### Attempted Monopolization in Violation of Section 2 of the Sherman Act. 15 U.S.C. § 2

110.   T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 109 of its Petition for Intervention and Complaint.

111.   IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its

historic practices and course of dealing to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of critical information regarding the development path for IBM's operating system products and the technical information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's and T3's ability to market its competing products, and/or (viii) other wrongful conduct as alleged hereinabove, individually and collectively constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.    IBM has undertaken these acts with the specific intent of monopolizing the market for IBM-compatible mainframes.

113.    There is a dangerous probability that IBM, unless it is restrained, will succeed in monopolizing the market for IBM-compatible mainframe computers.

114.    There are no legitimate business justifications for IBM's anticompetitive practices, and IBM's purported bases for tying its operating system to its mainframe and refusing to enter into a patent license with PSI on IBM's standard terms and conditions are pretextual.

115.    As a direct and proximate result of IBM's tying, monopoly leveraging, interference with a prospective contractual relationship, denial of access to an essential facility, and other anticompetitive acts as alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and of consumers in the affected markets.

## THIRD CAUSE OF ACTION:
### Violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1

116.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 115 of its Petition for Intervention and Complaint.

117.    IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.    Alternatively, IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason.

119.    Mainframe operating systems and mainframe computers are separate products in separate markets, not substitutable for one another, can be sold or licensed separately, and are subject to separate consumer demand. Moreover, the licensing of a mainframe operating system necessarily implies a license to perform all of the functions required by the operating system, including any that may be validly patented.

120.    By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a competing machine, IBM coerces consumers to purchase IBM's mainframe computers.

121.    IBM has monopoly power in the market for IBM-compatible mainframe operating systems enabling it to appreciably restrain trade in the market for IBM-compatible mainframes, and to coerce the purchase of IBM's mainframe computers.

122.    IBM's tying has affected and will continue to affect a not insubstantial volume of interstate commerce in the relevant markets.

123.    T3 has been injured in its business and has suffered pecuniary harm as a consequence of IBM's tying and will continue to suffer such harm so long as IBM's tying persists.

124.    As a direct and proximate result of IBM's tying, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and of consumers in the affected markets.

**FOURTH CAUSE OF ACTION:**
**Violation of Section 3 of the Clayton Act, 14 U.S.C. § 15**

125.    T3 realleges and incorporates by reference the allegations of paragraphs I through and including 124 of its Petition for Intervention and Complaint.

126.    As alleged above, IBM conditions the license of its mainframe operating systems on the use of an IBM mainframe, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 15. The effect of these arrangements has been to substantially lessen competition in the relevant markets for mainframe computers.

127.    There is no legitimate business justification for IBM's anti-competitive practices and any purported legitimate business justifications are mere pretexts.

128.    IBM's anticompetitive practices have proximately caused damage to T3 in an amount to be proven at trial.  If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and consumers in the affected markets.

**FIFTH CAUSE OF ACTION:**
**Violation of Section 349-50 of New York General Business Law**

129.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 128 of its Petition for Intervention and Complaint.

130.    IBM has engaged in deceptive acts and practices within the meaning of Sections 349-50 of New York General Business Law by, among other things, (i) misrepresenting to PSI and the public that it practices reasonable non-discriminatory licensing; (H) representing to PSI in 2001, 2003 and 2004 that it would enter into a patent license with respect to the OS/390 patents on a nondiscriminatory basis and on standard terms and conditions, (Hi) using pretext of purported patent infringement to justify tying, (iv) changing its products and support without need or notice in order to exclude PSI and T3 and harm consumers without disclosing this to customers, (vi) denigrating PSI, T3, and their products to consumers; and (vii) other false and misleading statements.

131.    IBM's conduct as alleged hereinabove causes consumer injury and harm to the public interest because (a) consumers have been deceived into purchasing IBM's products based on its reputation and representations of openness and fairness, and (b) IBM's conduct has fomented its monopoly and caused higher prices in the mainframe computers by hindering and delaying PSI's and T3's entry into the market.

132.    PSI, T3, and consumers in New York have suffered and will continue to suffer injury and loss of money or property as a result of IBM's unfair or fraudulent business acts and practices as alleged herein. If not enjoined, IBM's conduct will cause further injury to PSI, T3, and consumers.

## SIXTH CAUSE OF ACTION:
### Promissory Estoppel

133.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 132 of its Petition for Intervention and Complaint.

134.    Until 2006, IBM had a publicly announced policy of reasonable, nondiscriminatory patent licensing on its website.

135.    In letters dated January 12, 2001, February 15, 2001, and March 9, 2001, IBM represented that it would license intellectual property that had previously been licensed to Amdahl and others on similar terms.

136.    In March 2003, after being informed by PSI that it needed assurances regarding licensing, IBM represented to PSI that, "[u]nder our current practice, IBM would be willing to enter into a patent license with PSI."

137.    In 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM again represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions. PSI communicated these representations to T3.

138.    IBM was aware of the importance to PSI's and T3's business of licensing patents, and IBM made the promises and representations alleged above with the knowledge that PSI and its T3 were relying on them.

139.    PSI and T3 reasonably, foreseeably, justifiably, and to its detriment, relied on IBM's representations and promises. PSI and T3 are now unable to market and sell the PSI mainframe as a result of IBM's actions as alleged herein.

140.    IBM has failed and refused to perform its promises alleged above.

141.    PSI will perform, or is excused from performing as a result of IBM's breaches, all of its obligations under the contract.

142.    Particularly in light of the other behavior alleged herein, it would be unconscionable not to enforce IBM's promises. IBM, with sole control over what it considers to be essential facilities, made promises and delayed definitive responses while aware that PSI and T3 were building a business model and obtaining financing based on those promises. Ultimately, it attempted to force PSI to disclose confidential, proprietary information—while signing an unconscionable and nonsensical agreement that such information was not confidential and could be used by IBM in any manner that it pleased—as a precondition to further negotiations. After PSI eventually acquiesced to that agreement, IBM revealed its true intent not to license any patents to PSI.

143.    The terms of the promise were and are just and reasonable, and provide for adequate consideration, in that PSI and T3 will undertake the same terms and conditions as IBM has accepted from other parties to its license agreements and patent licenses.

144.    PSI and T3 have no adequate remedy at law, in that IBM's continuing breach and its failure to perform in the future cannot be adequately compensated for in money damages. Accordingly, PSI and T3 are entitled to specific performance of the contract as alleged herein. In the alternative, IBM is estopped from asserting infringement of intellectual property that IBM represented that it would license.

### SEVENTH CAUSE OF ACTION:
### Violation of Section 542.19 of the Florida Antitrust Act

145.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 144 of its Petition for Intervention and Complaint.

146.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing

customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of critical information regarding the development path for IBM's operating system products and the technical information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's and T3's ability to market their competing products, and/or (viii) other wrongful conduct as alleged hereinabove, individually and collectively constitute monopolization and attempted monopolization in violation of the Florida Antitrust Act, Fla. Stat. § 542.19.

147.    IBM has engaged, and is continuing to engage, in the wrongful conduct alleged herein with an anticompetitive motive.

148.    IBM's purported bases for the anticompetitive acts alleged herein are pretextual and any pro-competitive benefits of such acts are outweighed by the harm to competition and consumers.

149.    T3 has been injured in its business and has suffered pecuniary harm as a consequence of IBM's wrongful conduct alleged herein and will continue to suffer such harm so long as IBM's wrongful conduct persists.

150.    As a direct and proximate result of IBM's wrongful conduct as alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured.  If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and consumers in the affected markets.

### EIGHTH CAUSE OF ACTION:
### Violation of Section 542.18 of the Florida Antitrust Act

151.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 150 of its Petition for Intervention and Complaint.

152.    IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and/or its refusal to license or provide technical support for those operating systems for use on competing hardware (such as PSI's computer systems and T3's tServers and Liberty Servers), as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is *per se* unlawful under Section 542.18 of the Florida Antitrust Act.

153.    Alternatively, IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license or provide technical support for those operating systems for use on competing hardware (such as PSI's computer systems and T3's tServers and Liberty Servers), as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is unlawful under Section 542.18 of the Florida Antitrust Act under the rule of reason.

154.    IBM has engaged, and is continuing to engage, in the wrongful conduct alleged herein with an anticompetitive motive.

155.    IBM's purported bases for the anticompetitive acts alleged herein are pretextual and any pro-competitive benefits of such acts are outweighed by the harm to competition and consumers.

156.    IBM's tying and other wrongful acts alleged herein have affected, and will continue to affect, a not insubstantial volume of trade and commerce in the relevant markets, including within Florida.

157.    T3 has been injured in its business and has suffered pecuniary harm as a consequence of IBM's tying and other wrongful conduct alleged herein and will continue to suffer such harm so long as IBM's wrongful conduct persists.

158.    As a direct and proximate result of IBM's tying and other wrongful conduct alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured.  If not enjoined, IBM's conduct will cause further injury to the business and property of PIS, T3, and of consumers in the affected markets, including within Florida.

## JURY DEMAND

159.    T3 demands a jury on all issues triable to a jury.

## PRAYER FOR RELIEF

Wherefore, T3 prays:

(1)    That the Court enter a judgment that IBM has violated sections 1 and 2 of the Sherman Act, section 3 of the Clayton Act, sections 349-50 of New York General Business Law, and sections 542.18-19 of the Florida Antitrust Act;

(2)    That the Court preliminarily and permanently enjoin IBM from the acts alleged herein and award T3 treble damages, attorneys' fees, interest, and costs under the Sherman Act and section 4 of the Clayton Act, 15 U.S.C. § 15;

(3)    That the Court award T3 specific performance of IBM's promise to license its OS/390 related patents on the same terms as extended to others; and

(4)    That the Court award T3 such other and further relief and damages which the Court deems proper.

Dated: January 30, 2008                                Respectfully submitted,


_____/s Elena K. Chan_____
Bruce E. Gerstein (BG-2726)
Noah Silverman (NS-5728)
Elena K. Chan (EC-2337)
**GARWIN GERSTEIN & FISHER LLP**
1501 Broadway, Suite 1416

New York, New York 10036
Tel.: 212-398-0055
Fax: 212-764-6620

David L. Patrón
Brent Barriere
Susie Morgan
Harry Barton
Skylar Rosenbloom
**PHELPS DUNBAR LLP**
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Tel.: 504-566-1311
Fax: 504-568-9130

***Attorneys for T3 Technologies Inc.***

CERTIFICATE OF SERVICE

      I, Elena K. Chan, hereby certify that on January 30, 2008, I electronically filed the foregoing T3 Technologies, Inc.'s Complaint For Damages And Preliminary And Permanent Injunctive Relief, using the CM/ECF System, which sent notification of such filing to the following:

| | |
|---|---|
| David L. Elsberg | davidelsberg@quinnemanuel.com |
| Alexander Barnard | alexander.barnard@credit-suisse.com |
| Katherine Jane Weall | katherineweall@quinnemanuel.com |
| Frederick A. Lorig | fredericklorig@quinnemanuel.com |
| Edward J. DeFranco | eddefranco@quinnemanuel.com |
| Thomas D. Pease | thomaspease@quinnemanuel.com |
| Richard Walter Erwine | richarderwine@quinnemanuel.com |
| Morris Waisbrot | mwaisbrot@hhlaw.com |
| Steven M. Edwards | smedwards@hhlaw.com |
| Stephen Edward Morrissey | smorrissey@susmangodfrey.com |
| Stephen D. Susman | ssusman@susmangodfrey.com |
| Ryan C. Kirkpatrick | rkirkpatrick@susmangodfrey.com |
| Jacob W. Buchdahl | jbuchdahl@susmangodfrey.com |
| Tibor Ludovico Nagy | tnagy@susmangodfrey.com |

And to the following person via electronic mail:

| | |
|---|---|
| Richard I. Werder, Jr. | rickwerder@quinnemanuel.com |


                                    _____/s Elena K. Chan_____
                                              Elena K. Chan