## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Plaintiff,

v.

PLATFORM SOLUTIONS, INC. and T3
TECHNOLOGIES, INC.,

        Defendants and
        Counterclaim Plaintiffs.

06-cv-13565 (CLB) (MDF)

**JURY TRIAL DEMANDED**

---

### DEFENDANTS AND COUNTERCLAIM PLAINTIFFS PLATFORM SOLUTIONS, INC.'S AND T3 TECHNOLOGIES, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO INTERNATIONAL BUSINESS MACHINES CORPORATION'S SECOND AMENDED COMPLAINT

---

Defendant and Counterclaimant Platform Solutions, Inc. ("PSI") and Intervenor Counterclaimant and Defendant T3 Technologies, Inc. ("T3") hereby answer the Second Amended Complaint of Plaintiff International Business Machines Corporation ("Plaintiff" or "IBM").

PSI and T3 respond to IBM's individual allegations using the same paragraph numbers that appear in the Second Amended Complaint. All factual allegations not expressly admitted below are denied.

#### The Nature of the Action

1.    Denied.

2.    PSI and T3 admit that PSI has developed and that PSI and T3 are bringing to market and offering for sale computer systems that are compatible with and will run

IBM's copyrighted operating systems, other software programs written for IBM's operating systems, and other operating systems and software programs, and that it has informed customers and potential customers of this compatibility. PSI and T3 deny that PSI's products are "emulator systems" that merely seek to "imitate" IBM's computers; PSI's products are open mainframe servers that are compatible with the broadest set of datacenter environments and operating systems, including IBM z/OS, Linux, Windows, and HP-UX. PSI developed its products to provide mainframe computer customers with choice in the mainframe computer and operating systems markets in which IBM wields monopoly power. PSI and T3 deny the remaining allegations of paragraph 2.

3.    PSI and T3 admit that IBM's efforts have included the development of computer hardware and software products tailored to meet demanding customer requirements, but deny that all of IBM's efforts were directed to those goals and denies the remaining allegations of the second sentence of paragraph 3. PSI and T3 admit the allegations of the third sentence of paragraph 3 except that PSI and T3 deny that IBM's computer systems provide "unparalleled performance, reliability, availability, serviceability, and security," and further deny that customer acceptance of IBM's computer systems and programs has resulted solely from IBM's investments. PSI and T3 deny the remaining allegations of paragraph 3.

4.    Denied.

5.    PSI and T3 admit that PSI expected IBM to grant PSI a patent license based on its publicly-advertised policy of reasonable, non-discriminatory patent licensing and its express statements to PSI. PSI and T3 deny the remaining allegations of paragraph 5.

6.    Denied.

7.    PSI admits that after the commencement of this litigation one of its officers received, unsolicited, documents labeled "IBM confidential materials" from a source outside of PSI, that these materials were promptly turned over to trial counsel, and that PSI has produced those documents in discovery to IBM. PSI admits that its counsel is unwilling to engage in informal discovery by answering requests for information not made through the discovery process. PSI denies that these documents were ever

circulated within PSI, that they were used in any way, that they are of any value to PSI, and PSI denies the remaining allegations of paragraph 7. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.[1]

8.    PSI and T3 admit that IBM's intellectual property includes copyrighted materials. PSI and T3 admit that PSI firmware enables its products to execute instructions written for IBM's ESA/390 Architecture and z/Architecture. PSI and T3 denies that this enablement constitutes "translating" within the meaning of ICA. PSI and T3 deny the remaining allegations of paragraph 8.

9.    PSI and T3 admit that IBM seeks the remedies set forth in paragraph 9, but deny that it is entitled to any of them.

10.    PSI admits that IBM seeks declaratory relief set forth in paragraph 10. PSI admits that it requested, out of an abundance of caution, that IBM license any patents that might arguably be necessary for PSI to develop and market its products. PSI admits that it has demanded that IBM not tie its mainframe computers to its operating systems, and license its operating systems to PSI and its customers. PSI admits that prior to this suit it notified IBM that its conduct violates the antitrust laws, and that PSI has filed antitrust counterclaims in this action. PSI admits that IBM has raised its patent rights as a *post hoc* justification for its anticompetitive conduct, but denies that its allegations justify its conduct. PSI denies the remaining allegation of paragraph 10. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

### The Parties

11.    PSI and T3 deny the allegation that IBM faces competition from a large number of firms both inside and outside the United States with respect to the mainframe

---

[1] T3 generally objects that IBM has failed to specify which allegations are made against each defendant. T3 answers based on its good faith understanding of which allegations relate to which claims. The proper practice would have been for IBM to specifically identify the allegations being made against PSI and those made against T3.

computer systems and operating systems at issue in this action, and admit the remaining allegations of paragraph 11.

12.    Admitted.

13.    Admitted.

### Jurisdiction and Venue

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted.

18.    Admitted.

### Factual Background

19.    PSI and T3 deny that IBM has invested the time, effort, money, know-how, and creativity that it would have under competitive conditions, and aver that "massive" is too vague an adjective to permit a response and therefore deny that allegation. PSI and T3 otherwise admit the allegations of paragraph 19.

20.    PSI and T3 admit that System z is the brand name that IBM uses for its current mainframe computers, mainframe operating systems, and software applications for mainframe computers, and that System z is an umbrella term IBM uses for those products. PSI and T3 further admit that IBM's current mainframe computers and operating systems evolved from products dating back to 1964, and that the S/390, introduced in 1990, is among the predecessors to IBM's current mainframe computers. PSI and T3 admit that the System z products include zSeries servers and z9 servers and IBM mainframe operating systems and products that run on those computers or other IBM-compatible mainframe computers. PSI and T3 deny that the development of System z or the System z products resulted solely from IBM's investments, and deny any remaining allegations of paragraph 20.

21.    Admitted, except that PSI and T3 deny the allegation of the first sentence of paragraph 21 that zSeries servers and their predecessors have been the backbone of commercial computing for decades on the ground that the allegation is too vague to

permit a response.  To the extent the allegation is meant to suggest that IBM mainframes are the only mainframe computers that have been renowned for their reliability, scalability, availability, serviceability and industrial-strength attributes, PSI and T3 deny the allegation; to the extent that this allegation suggests that IBM has a dominant position in the market for mainframe computers, PSI and T3 admit this allegation.

22.    Admitted.

23.    PSI and T3 admit the first sentence of paragraph 23.  PSI and T3 deny the second sentence inasmuch as the word "massive" is too vague to permit a response.

24.    PSI and T3 admit that particular operating systems are designed to capitalize on the features and characteristics of compatible architectures, that IBM's OS/390 operating system is compatible with its S/390 computers, that its z/OS operating system is compatible with its Series Z computers, and that the compatibility between IBM's operating systems and the architectures of its mainframe computer systems is an important factor contributing to the accuracy and reliability of those systems and customer acceptance of those systems for mission-critical applications.  PSI and T3 deny the remaining allegations of paragraph 24.

25.    PSI and T3 admit the allegations of the first two sentences of paragraph 25. With respect to the third sentence of paragraph 25 PSI and T3 admit that the software programs referenced in the second sentence of paragraph 24 will operate in conjunction with IBM computer architectures, but note that such programs also will operate in conjunction with IBM-compatible architectures such as those previously marketed by Amdahl and Hitachi and now marketed by PSI and T3.

26.    PSI and T3 are without information or knowledge sufficient to form a belief as to the allegations regarding IBM's patent portfolio, and therefore denies those allegations.  PSI and T3 admit that IBM has sought to copyright its mainframe operating system and other software products, but deny that all its intellectual property is copyrighted and deny that IBM's contractual restrictions are reasonable.  The statement that IBM has maintained "certain aspects of its z/Architecture®, ESA/39O Architecture, and predecessor architectures as IBM trade secrets" is too vague to permit a response,

and PSI and T3 are further without information or knowledge sufficient to form a belief as to this allegation. PSI and T3 deny the remaining allegations of Paragraph 26.

27.    Denied.

28.    PSI and T3 admit that PSI's products run on Intel Itanium chips and are capable of executing the instructions of IBM's OS/390 and z/OS operating systems and other IBM computer programs that run in conjunction with those operating systems, such as IBM's CICS and DB2. PSI admits that Intel is an investor in and business partner of PSI, and T3 is without knowledge sufficient to admit or deny this allegation. PSI and T3 otherwise deny the allegations of paragraph 28.

29.    PSI and T3 admit that PSI's products run on Intel Itanium-based servers, admit that its products are compatible with certain standards and specifications of IBM's ESA/390 architecture and z/Architecture computer systems, admit that they are capable of running IBM's OS/390 and z/OS operating systems and other IBM computer programs that run in conjunction with those operating systems, such as IBM's CICS and DB2. PSI and T3 further admit that certain Hewlett Packard servers use Intel Itanium chips, and that certain of PSI's products incorporate Hewlett Packard servers. PSI and T3 deny the remaining allegations of paragraph 29.

30.    PSI and T3 admit the allegations of the second sentence of paragraph 30, admit that compatibility with any particular facility supported by IBM's z/Architecture requires the ability to support that facility, and admit that the viability of PSI's IBM-compatible products depends in part on the ability to run z/OS and other System z software required or licensed by its customers. PSI and T3 deny the remaining allegations of paragraph 30.

31.    PSI and T3 admit that PSI has stated that its products are designed to execute the instructions in the z/Architecture and s/390 instruction sets required by its intended customers and that its products are compatible with the OS/390 and z/OS operating systems and other IBM, vendor and customer application software that runs on those operating systems. PSI and T3 further admit that they have stated that PSI's products will run IBM's latest version of its z/OS operating system and will perform

many z/OS workloads as if they were operating on an IBM mainframe.  PSI denies the remaining allegations of paragraph 31.

32.    PSI admits that it was founded by employees of Amdahl; admits that it acquired rights to use Amdahl-created software and diagnostics; and admits that IBM had entered into certain agreements with Amdahl under which IBM disclosed technical information to it.  PSI otherwise denies the allegations of paragraph 32.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

33.    PSI admits the allegations of paragraph 33, but further states that IBM licensed the basic interoperability information to Amdahl only after it was threatened with antitrust enforcement proceedings and in order to avoid such proceedings.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it.  T3 therefore denies these allegations.

34.    PSI admits that certain aspects of the IBM architectures are not published in the public POP and that Amdahl received information regarding some of these aspects pursuant to certain agreements with IBM.  PSI otherwise denies the allegations of paragraph 34. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

35.    PSI admits that IBM and Amdahl entered into the TIDA agreement in 1986, and subsequently entered into the TILA agreement in 1996, and that those agreements were specifically negotiated and set forth terms and conditions governing technical information that IBM provided to Amdahl pursuant to those agreements, and avers that the TIDA agreement was entered into pursuant to IBM's commitment to the European antitrust authorities to make interoperability information available to competing undertakings, such as Amdahl, on a timely basis.   PSI denies that all the technical information disclosed to Amdahl then constituted or now constitute "trade

secrets,"[2] and avers that much of it is freely available from multiple sources, including, *inter alia*, Hercules's open source emulation program and IBM's United States and foreign patent applications.  PSI denies the remaining allegations of paragraph 35. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

36.    PSI admits that the TILA/TIDA agreements prohibited Amdahl from disclosing, publishing, or disseminating TILA/TIDA information except as provided by the TILA/TIDA agreement.  PSI denies the remaining allegations of paragraph 36.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

37.    Admitted, except that PSI is without knowledge sufficient to admit or deny that the Amdahl and Fujitsu TILAs and TIDAs were in all respects identical.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

38.    PSI admits that the technical information disclosed to Amdahl and Fujitsu defined certain standards and specifications for IBM's ESA/390 and predecessor architectures that were not disclosed in the publicly-available POP at the time. PSI otherwise denies the allegations of paragraph 38. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

39.    PSI admits that technical information provided to Amdahl under the TILA and TIDA was used in Amdahl's development of diagnostic tools, but denies that such

---

[2] PSI objects to IBM's definition of IBM Technical Information as "trade secrets" throughout the Second Amended Complaint, and denies the allegation that they are the same. To the extent that PSI uses the term "technical information" in its answer, it refers to the plain meaning of the term, not the definition assigned by IBM.

tools were based entirely or principally on such information and avers that the tools were based principally and substantially on Amdahl's own innovations and publicly available information, and denies that the principal use of the TILA and TIDA information was in the creation of diagnostic tools rather than the development of Amdahl's IBM-compatible processors. PSI further admits that Amdahl diagnostic tools were used to test whether Amdahl processors were compatible with IBM's architectures and would produce the same results as IBM processors. PSI further admits that Amdahl's diagnostic tools can be used to assist in the testing of S/390-compatible processors, including an Intel Itanium processor overlaid with PSI-developed firmware and microcode. PSI otherwise denies the allegations of paragraph 39. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

40.    PSI admits that IBM technical information was used by Amdahl in developing diagnostic tools, including DIRT, HOT, ALPHA and 8E7, as well as various "bring-up-programs" or "BUPs."  PSI denies that those Amdahl diagnostic tools were based entirely or principally on IBM technical information, and on information and belief avers that substantially less than 10% of the code in those programs was based on any IBM technical information disclosed under the TIDA or TILA agreements, and the development of those programs was based on Amdahl's own innovative efforts.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

41.    Admitted by PSI. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

42.    PSI admits that some of Amdahl's diagnostic tools contains code derived from IBM technical information, but denies that any of the tools were laced with such information or were based principally on such information.  On information and belief PSI avers that far less than 10% of the code contained in Amdahl's diagnostic tools was

derived from IBM technical information that IBM claimed was confidential, and much of that information has subsequently become publicly available and thus non-confidential. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

43.    Admitted by PSI. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

44.    PSI admits that Amdahl decided to stop marketing IBM-compatible computers around 1999.  PSI denies the remaining allegations of paragraph 44. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

45.    Admitted by PSI, except PSI avers that it was the understanding of both parties that the emulation software, diagnostic tools and related materials would not contain IBM confidential information or materials from which such information could be readily discerned.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

46.    PSI admits the first two sentences of paragraph 46, except that it avers that Amdahl's interests in the negotiations were negotiated by a member of Mr. Handschuh's staff.  PSI admits that Mr. Handschuh and Mr. Hilton, to varying degrees, were aware that the TILA and TIDA agreements contained restrictions on disclosure.  PSI otherwise denies the allegations of paragraph 46.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

47.    Admitted, except to the extent that IBM considers TILA/TIDA information to be "provide[d]" or "receive[d]" when object code diagnostic tools are transferred, or to include non-confidential information, which PSI denies.  T3 is without information or

knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

48.     PSI admits that it unknowingly or inadvertently received certain diagnostic program listings that may have contained some TIDA-derived information from Amdahl/Fujitsu after both parties agreed that PSI should not receive such listings, and that it subsequently learned that it had received such information and took steps to ensure that it made no improper use of such information.  PSI denies that it ever used IBM trade secrets, and denies the remaining allegations of paragraph 48.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

49.     Denied by PSI.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

50.     PSI admits that, prior to this suit, it maintained that it did not receive IBM confidential information. PSI admits that Mr. Hilton did unknowingly receive and retain BUP source listings in electronic form that Fujitsu had produced to PSI.  PSI admits that it subsequently received diagnostic binary modules and source code listings for DIRT, 8E7, and Alpha.  PSI denies that it received source code listing for all programs, and specifically denies that it received them for HOT.  PSI further denies that it has ever used, or is using, source code listings to discern IBM's confidential information for the purpose of designing its products or that its products are derived from such information.  PSI denies the remaining allegations of paragraph 50.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

51.     Admitted by PSI.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

52.    Denied by PSI.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

53.    Admitted by PSI. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

54.    PSI admits the first sentence of paragraph 54 except for the "grandiose vision" characterization, which is too vague and conclusory to require a response.  PSI admits the second sentence of paragraph 54.  PSI admits that IBM declined to license its S/390 architectures and system designs in exchange for equity, but avers that it did so because of its own "similar business plans" and that it was at all times willing to license the interfaces and architectures "that have already been made available to others on comparable terms."   PSI otherwise denies the allegations of paragraph 54.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

55.    PSI admits that it inquired as to the implications of acquiring Amdahl's S/390 business on the TIDA/TILA information that Amdahl licensed from IBM.  PSI admits that IBM told PSI that Amdahl could not transfer the information.  PSI admits that it did not dispute this assertion to IBM.  PSI otherwise denies the allegations of paragraph 55.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

56.    PSI admits that it considered licensing the TIDA/TILA information directly from IBM, and admits that its decision not to was in part guided by a cost-benefit analysis of whether it was worthwhile to purchase the information from IBM at a relatively high cost.  PSI denies the remaining allegations of paragraph 56.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

57.    PSI admits the first sentence of paragraph 57.  PSI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57, but denies the alleged falsity of the statement.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

58.    PSI admits the first sentence of paragraph 58.  PSI denies that the quoted statement is false. PSI avers that in the same letter Mr. Handschuh requested IBM to advise PSI if it had any basis for suspecting that PSI was using IBM intellectual property, and that PSI received no response.  PSI further avers that it had advised IBM in 2001 that PSI possessed Amdahl diagnostic tools. PSI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58, and therefore denies those allegations.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

59.    PSI admits that it refused IBM's unprecedented request that PSI allow it to inspect PSI's machine prior to it going to market.  PSI admits that it notified IBM of the presence of diagnostics source code listings with TIDA tags, and admits the language quoted in paragraph 59. PSI further admits that, as set forth in the quoted language, PSI acknowledged that it received source code listings in addition to the object code versions of certain of Amdahl's test and diagnostic programs.  PSI otherwise denies the allegations of paragraph 59.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

60.    PSI admits the first sentence of paragraph 60.  PSI admits the quoted portion of the second sentence of paragraph 60.  PSI denies the remaining allegations of paragraph 60.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

61.    PSI admits the first sentence of paragraph 61.  PSI admits that after IBM sent a letter containing dozens of demands for detailed information, essentially asking for a written narrative of the creation of PSI's product, PSI informed IBM that it would not engage in extensive informal discovery.  PSI lacks sufficient knowledge and information to respond to the third sentence of paragraph 61, and therefore denies the allegations contained therein.  All remaining allegations of paragraph 61 are denied. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

62.    PSI admits that various versions of diagnostics have been transferred to and created by PSI over time and that they exist in different locations.  PSI further admits that it inadvertently received some listings that contain source code related to functions that may have been initially disclosed to Amdahl pursuant to the TILA/TIDA agreements. PSI denies the remaining allegations of paragraph 62.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

63.    PSI admits that the listings reflected in the letter to IBM were the result of a preliminary scan and that PSI's investigation of IBM's allegations has been and is continuing.  PSI is without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 63, and therefore denies them. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

64.    PSI admits that the scan results do not reflect other diagnostic tools licensed by Amdahl that do not contain TILA/TIDA-derived source code, may not pick up all potential TILA/TIDA information, and may pick up source code that may be derived from TILA/TIDA information that is now in the public domain. PSI denies that all Amdahl diagnostic tools—and specifically executable versions of ALPHA and DIRT— illegally contain or reveal TIDA/TILA information, and avers that IBM has been aware since March 5, 2001 that PSI received DIRT, HOT and BUPs from Amdahl and that IBM has never—prior to its Amended Complaint—asserted that PSI's use of such diagnostics

is improper or violates any agreement. PSI denies the remaining allegations of paragraph 64. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

65. PSI admits that it inadvertently obtained assembly listings, some of which potentially disclose TILA/TIDA information, from Fujitsu, and avers that no IBM trade secrets were used in the development of its product. PSI denies the allegations of paragraph 65. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

66. Denied by PSI. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

67. Denied by PSI. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

68. PSI admits that one of its officers received, unsolicited, documents labeled as IBM confidential materials from a source outside of PSI, which he promptly turned over to trial counsel, and that these documents contain IBM pricing information and business information. PSI promptly produced those documents to IBM, and has maintained their confidentiality. PSI denies that these documents were ever circulated within PSI, that they were used in any way, that they are of any value to PSI, and PSI denies the remaining allegations of paragraph 68. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

69. PSI admits that its counsel informed IBM that it was unwilling to engage in informal discovery by answering requests for information not made through the discovery process. PSI admits that it knew that the documents were labeled IBM confidential and it therefore promptly turned them over to trial counsel. PSI otherwise

denies the allegations of paragraph 69. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

70.     PSI admits the use of the language quoted in paragraph 70, the dates of the correspondence, and the authors of the correspondence.  PSI denies the remaining allegations of paragraph 70, including the characterization of the quoted language. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

71.     PSI and T3 are without knowledge or information sufficient to form a belief as to IBM's subjective beliefs, and therefore deny the allegations of paragraph 71 concerning what IBM believes.  PSI and T3 deny the remaining allegations of paragraph 71.

72.     Denied.

73.     PSI and T3 admit that IBM is designated on the face of the patents as the assignee.  PSI and T3 are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 73, and therefore deny those allegations.

74.     PSI and T3 deny the first sentence of paragraph 74.  The second sentence of paragraph 74 is both a statement of intent and a legal conclusion, neither of which require a response.

75.     PSI admits that it has, at various times, licensed copies of z/OS and other IBM software pursuant to the terms of the ICA.  PSI admits that, among other things, the ICA requires the user to agree not to "reverse assemble, reverse compile, or otherwise translate the ICA Program unless expressly permitted by applicable law without the possibility of contractual waiver."  PSI otherwise denies that allegations in paragraph 75. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

76.    PSI admits that its firmware enables its products to execute instructions written for IBM's ESA/390 Architecture and z/Architecture, admits that it has described z/OS and other zSeries software as having the capability to be run on top of the firmware layer in PSI's products, admits that its firmware works in conjunction with Intel Itanium processors to execute the z/Architecture and ESA/390 Architecture instructions utilized by z/OS and other software written for those architectures, and admits that its products are intended, in part, to ensure that z/OS and other zSeries software run on a PSI system will produce the same results as they would when run on an IBM zSeries mainframe computer.    PSI denies the remaining allegations of paragraph 76. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

77.    PSI admits that its products execute the "legacy instructions" included in the current version of IBM's mainframe operating system, that it has referred to its products' ability to execute the instructions contained in IBM's operating systems as "just in time translation," and that instructions are stored in cache in the computer's memory. PSI denies the remaining allegations of paragraph 77.

78.    PSI admits that its founder and Chief Technology Officer Ronald N. Hilton was the inventor of the inventions claimed in U.S. Patent No. 7,092,869 (the "'869 patent"), and that its products practice the invention claimed by the '869 patent.  PSI denies the remaining allegations of paragraph 78. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

79.    PSI admits that it has stated in public presentations that its products execute the instructions of IBM's mainframe operating systems and that it has referred to this function as "just in time translation."  PSI denies the remaining allegations of paragraph 79.   T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

80. PSI admits that it has offered to indemnify and agreed to indemnify certain of its customers for patent infringement claims, and further avers that IBM indemnifies its own customers from claims of infringement related to its products. PSI denies the remaining allegations of paragraph 80. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

81. PSI admits that it has met with and corresponded with IBM regarding PSI's efforts to market IBM-compatible mainframe products. PSI denies the remaining allegations of paragraph 81. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

82. PSI admits that it has met and corresponded with IBM regarding PSI's requests that IBM provide licenses for any patents that IBM believes are necessary to develop, sell and distribute IBM-compatible mainframes and that IBM make its operating systems and other software available to PSI and customers of PSI's products. PSI further admits that IBM has refused to provide PSI or its customers with access to IBM's operating systems and software. PSI denies the remaining allegations of paragraph 82. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

83. PSI admits that, prior to the commencement of this litigation, it informed IBM that IBM's conduct is unlawful under the antitrust laws and is damaging to PSI. PSI denies the remaining allegations of paragraph 83. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

84. PSI admits that the allegations contained in paragraph 84 except insofar as the allegations refer to PSI's products as "emulator systems." PSI denies the remaining allegations of paragraph 84. T3 is without information or knowledge sufficient to form a

belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

85.    With respect to the first sentence of paragraph 85, PSI admits that it met with IBM in New York in February 2006 to discuss the licensing of any patents that IBM believed were relevant to PSI's products, but denies the remaining allegations of that sentence.  PSI admits the allegations of the second sentence of paragraph 85, and that IBM's correspondence dated May 24, 2006 contained the language quoted in the remainder of paragraph 85.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

86.    PSI admits the content of the June 8, 2006 correspondence alleged in paragraph 86, but denies that IBM did or could reasonably construe this as threatening antitrust litigation.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

87.    PSI admits that IBM declined PSI's request for reconsideration of IBM's decision not to grant PSI a patent license and not to license its software to run on PSI's products using the language quoted in paragraph 87.   PSI denies the remaining allegations of paragraph 87.  T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

88.    PSI admits the content of the communications alleged in paragraph 88, and avers that the letter also indicated that PSI had relied on IBM's representations that it would license the s/390 patents.  PSI denies that IBM did or could reasonably construe this correspondence as threatening antitrust litigation.   T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

89.    PSI admits that it has filed counterclaims alleging antitrust violations and claims substantial damages as a result of IBM's antitrust violations and other unlawful

conduct.  PSI otherwise denies the allegations in paragraph 89. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

90.    PSI denies that its products infringe the asserted IBM patents and denies that the parties' dispute was ripe as of the filing of IBM's complaint.  PSI otherwise admits the allegations in paragraph 90. T3 is without information or knowledge sufficient to form a belief as to these allegations and/or these allegations do not relate to claims against it. T3 therefore denies these allegations.

91.    PSI and T3 admit that T3 began marketing IBM-compatible mainframes containing PSI firmware in November 2006, that T3's web site announced the availability of those products and the imminent availability of additional open system mainframes containing PSI technology, and that T3 was (IS??) actively marketing those products and offering them for sale in New York and elsewhere.  PSI and T3 deny the remaining allegations of paragraph 91.

92.    PSI and T3 admit that PSI's products will run the latest IBM operating system and that its products have advanced partitioning capabilities that allow customers to control z/OS based software licensing fees by isolation of individual workloads on logical servers, but not in any way contrary to IBM's licensing rules.  PSI and T3 have no knowledge as to whether the alleged "statement and threats" have been communicated to IBM.  PSI and T3 otherwise deny the allegations of paragraph 92.

93.    PSI and T3 admit that the referenced article appeared in a trade publication on September 26, 2006 and contained the quoted passages, but deny the allegation that the publication of the article resulted from "these and other activities" on the ground that it is too vague to permit a response.

### Count One: Infringement of the '261 Patent

94.     PSI and T3 incorporate by reference their responses to paragraphs 1-93 of the Second Amended Complaint.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Denied.

101.    Denied.

## Count Two: Infringement of the '520 Patent

102.    PSI and T3 incorporate by reference their responses to paragraphs 1-101 of the Second Amended Complaint.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

## Count Three: Infringement of the '709 Patent

110.    PSI and T3 incorporate by reference their responses to paragraphs 1-109 of the Second Amended Complaint.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

## Count Four: Infringement of the '678 Patent

118.    PSI and T3 incorporate by reference their responses to paragraphs 1-117 of the Second Amended Complaint.

119.   Denied.

120.   Denied.

121.   Denied.

122.   Denied.

123.   Denied.

124.   Denied.

125.   Denied.

## Count Five: Infringement of the '106 Patent

126.   PSI and T3 incorporate by reference their responses to paragraphs 1-125 of the Second Amended Complaint.

127.   Denied.

128.   Denied.

129.   Denied.

130.   Denied.

131.   Denied.

132.   Denied.

133.   Denied.

## Count Six: Infringement of the '495 Patent

134.   PSI and T3 incorporate by reference their responses to paragraphs 1-133 of the Second Amended Complaint.

135.   Denied.

136.   Denied.

137.   Denied.

138.   Denied.

139.   Denied.

140.   Denied.

141.   Denied.

## Count Seven: Infringement of the '789 Patent

142.    PSI and T3 incorporate by reference their responses to paragraphs 1-141 of the Second Amended Complaint.

143.    Denied.

144.    Denied.

145.    Denied.

146.    Denied.

147.    Denied.

148.    Denied.

149.    Denied.

## Count Eight: Infringement of the '851 Patent

150.    PSI and T3 incorporate by reference their responses to paragraphs 1-149 of the Second Amended Complaint.

151.    Denied.

152.    Denied.

153.    Denied.

154.    Denied.

155.    Denied.

156.    Denied.

157.    Denied.

## Count Nine: Infringement of the '002 Patent

158.    PSI and T3 incorporate by reference their responses to paragraphs 1-157 of the Second Amended Complaint.

159.    Denied.

160.    Denied.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

## Count Ten: Infringement of the '812 Patent

166.    PSI and T3 incorporate by reference their responses to paragraphs 1-165 of the Second Amended Complaint.

167.    Denied.

168.    Denied.

169.    Denied.

170.    Denied.

171.    Denied.

172.    Denied.

173.    Denied.

## Count Eleven: Trade Secrets Misappropriation[3]

174.    PSI incorporates by reference its responses to paragraphs 1-174 of the Second Amended Complaint.

175.    PSI is without knowledge or information sufficient to form a belief as to the first sentence of paragraph 175, and therefore denies those allegation.  PSI admits that IBM licensed to Amdahl certain information that was not disclosed in the POP.  PSI otherwise denies the allegations of paragraph 175.

176.    Denied inasmuch as this paragraph relates to the purported trade secrets alleged to have been misappropriated by PSI.  To the extent the allegations relate to other purported trade secrets that may be owned or created by IBM, PSI is without knowledge or information sufficient to form a belief, and therefore denies those allegations.

177.    PSI admits that the technical information disclosed to Amdahl may have initially been derived from a version of the POP that was different from the public version of the POP.  PSI denies the remaining allegations of paragraph 177.

178.    Denied inasmuch as this allegation relates to the purported trade secrets alleged to have been misappropriated by PSI.

---

[3] Counts Eleven through Fifteen are only alleged as to PSI and therefore require no response from T3.  To the extent necessary, and out of an abundance of caution, T3 denies those counts.

179.    On information and belief, PSI admits that trade secrets, if any, disclosed to Amdahl under the TILA/TIDA licenses were not transferable to PSI so long as such information remained confidential.  PSI otherwise denies the allegations of paragraph 178.

180.    PSI admits that it was generally aware that the TIDA/TILA agreements had restrictions on use and that Amdahl had used certain information disclosed under the TIDA/TILA agreements in developing certain diagnostic programs.  Upon information and belief, PSI avers that, at a maximum, less than ten percent of these diagnostics related to the so-called TIDA/TILA information.   PSI denies the remaining allegations of paragraph 180.

181.    Denied.

182.    Denied.

183.    Denied.

184.    This paragraph contains a legal conclusion and statement of intent that does not require a response.

185.    Denied.

186.    Denied.

### Count Twelve: Tortious Interference with Contract

187.    PSI incorporates by reference its responses to paragraph 1-186 of the Second Amended Complaint.

188.    This allegation is too vague to permit a response, and is therefore denied.

189.    Denied.

190.    Denied.

191.    Denied.

192.    Denied.

193.    Denied.

194.    Denied.

### Count Thirteen: Breach of Contract

195.    PSI incorporates by reference its responses to paragraph 1-194 of the Second Amended Complaint.

196.    PSI admits that it has, at various times, licensed copies of z/OS and other IBM software pursuant to the terms of the ICA.  PSI denies, however, that the scope of these licenses apply to any of the facts alleged in the Second Amended Complaint.

197.    Admitted.

198.    Denied.

199.    PSI admits that, among other things, the ICA requires the user to agree not to "reverse assemble, reverse compile, or otherwise translate the ICA Program unless expressly permitted by applicable law without the possibility of contractual waiver."  PSI otherwise deny the allegations in paragraph 199.

200.    PSI admits that its products execute the "legacy instructions" contained in z/OS, and that those instructions are executed by the Itanium processors contained in those products.  PSI denies that running an IBM operating system on a PSI mainframe involves translation within the meaning of paragraph 4.1 of the ICA, and denies the remaining allegations of paragraph 200.

201.    Denied.

202.    Denied.

203.    Denied.


### Count Fourteen: Copyright Infringement

204.    PSI incorporates by reference its responses to paragraphs 1-203 of the Second Amended Complaint.

205.    PSI admits that certain versions of OS/390 and z/OS are registered as copyrighted. PSI is without knowledge or information sufficient to respond to the remaining allegations of paragraph 205.

206.    Admitted.

207.   PSI admits that IBM is identified as the owner of registered copyrights for z/OS and S/390. PSI is without knowledge or information sufficient to respond to the remaining allegations of paragraph 207, and therefore denies them.

208.   PSI admits that it has made duplicates of certain copies of IBM's operating systems. PSI denies the remaining allegations of paragraph 208.

209.   PSI admits paragraph 209, except inasmuch as it implies that PSI did any of the alleged copying referenced in this paragraph, participated in any of the alleged copying referenced in this paragraph, or that any such copying was unlawful.

210.   Denied.

211.   Denied.

212.   Denied.

213.   Denied.

214.   Denied.

215.   Denied.

**Count Fifteen: Declaratory Judgment**

216.   PSI incorporates by reference its responses to paragraphs 1-215 of the Second Amended Complaint.

217.   PSI admits that, now that it has filed counterclaims in this action, there is a real and actual controversy between PSI and IBM relating to IBM's antitrust liability. PSI denies that there was a real and actual controversy between PSI and IBM at the time that IBM filed this action, and denies the remaining allegations of paragraph 216.

218.   PSI is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217.

219.   PSI admits that it has (a) requested licenses to any patents that IBM believes to be relevant on the same terms as offered to other competitors and IBM's own customers, (b) requested software licenses, (c) asserted that IBM's refusal to license on nondiscriminatory terms is anticompetitive, (d) acknowledged confusion in the market over IBM's policies, (e) acknowledged on numerous occasions the harm to PSI flowing from IBM's discriminatory policy, (f) has filed antitrust counterclaims in this action, and

(g) and stated that it is prepared to litigate the issues in this case.  PSI otherwise denies the allegations in paragraph 219.

220.    PSI admits that IBM has refused to agree to license any arguably applicable patents to PSI, and it has refused to license its copyrighted operating systems and other software for use on PSI's systems.  PSI admits that there is a real and actual controversy regarding IBM's claims of patent infringement, except inasmuch as IBM has asserted patents based on possible future alleged infringement by PSI.  PSI otherwise denies the allegations of paragraph 220.

221.    PSI admits that, after initially agreeing to license its patents and operating systems, IBM has told PSI that it will not license its patents or its operating systems and other software for use on PSI's mainframes. PSI otherwise denies the allegations in paragraph 221.

222.    PSI admits that there is a real and actual controversy regarding IBM's antitrust liability now that PSI has filed antitrust counterclaims.  PSI denies that there was a real and actual controversy at the time that IBM filed this action, and denies the remaining allegations of paragraph 222.

223.    Denied.


## AFFIRMATIVE AND OTHER DEFENSES

Further answering the Amended Complaint, PSI and T3 assert the following defenses.  PSI's and T3's investigation of IBM's claims and its defenses is ongoing, and PSI and T3 reserve the right to amend their answer with additional defenses as further information is obtained.

### First Defense:  Non-infringement of the Asserted Patents

1.    PSI and T3 have not infringed, contributed to the infringement of, or induced the infringement of any valid claim of the '261 patent, '520 patent, '709 patent, the '678 patent, '106 patent, '495 patent, '789 patent, '851 patent, '002 patent or '812 patent (collectively, the "Asserted Patents"), and are not liable for infringement thereof.

2.     All PSI and T3 methods, systems, apparatus, and/or products that are accused of infringement have substantial uses that do not infringe and therefore cannot induce or contribute to the infringement of the Asserted Patents.  Moreover, PSI and T3 do not intend or have knowledge that its customers will use their products in a manner that infringes the Asserted Patents.

### Second Defense:  Invalidity of the Asserted Patents

3.     On information and belief, the claims of the Asserted Patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, and 112, and the doctrine of double patenting.

### Third Defense:  Prosecution History Estoppel

4.     IBM's alleged causes of action for patent infringement are barred under the doctrine of prosecution history estoppel, and IBM is estopped from claiming that one or more of the Asserted Patents covers or includes any accused PSI method, system, apparatus, and/or product.

### Fourth Defense:  Dedication to the Public

5.     IBM has dedicated to the public all methods, systems, apparatus, and/or products disclosed in the Asserted Patents, but not literally claimed therein, and is estopped from claiming infringement by any such public domain methods, systems, apparatus, and/or products.

### Fifth Defense: License (Implied and Express)

6.     To the extent that any of IBM's allegations of infringement are premised on the alleged use, sale, or offer for sale of methods, systems, apparatus, and/or products that were developed by or for a licensee of IBM or its predecessors-in-interest and/or provided to PSI and T3 by or to a licensee of IBM or its predecessors-in-interest, such allegations are barred pursuant to license.  In particular, many of the patents-in-suit cover functions embodied in z/OS or necessarily performed by a customer running z/OS.  IBM confers an express or implied license under those patents to PSI and its customers.

### Sixth Defense:  Acquiescence, Laches and Equitable Estoppel (Patent Infringement)

7.    IBM's claims against PSI and T3 are barred by the doctrines of acquiescence, laches and equitable estoppel.  Specifically, IBM has engaged in systematic deceptive conduct that caused PSI to reasonably believe that IBM would license the patents-in-suit to PSI, including, without limitation: (a) providing PSI with a development license in 2003 for a system that IBM now contends "necessarily infringes" the patents-in-suit; (b) representing to PSI that it was willing to grant a patent license for all of the patents-in-suit; (c) posting its RAND licensing policy on its website; and (d) waiting more than three years to file suit.

**Seventh Defense:  Patent Unenforceability Due to Patent Misuse**

8.    The Asserted Patents are unenforceable due to patent misuse.  Plaintiff has sought to illegally extend its alleged patent rights by alleging that methods, systems, apparatus, and/or products having substantial non-infringing commercial uses contributorily infringe the patents and induce infringement of the patents.

9.    IBM has also sought to extend its patent rights by conditioning the license of its patents and/or the sale of its patented products on the acquisition of a license to rights in another patent or purchase of a separate product.  Specifically, IBM has sought to extend its patent rights by refusing to license its operating system to run on other suppliers mainframes unless those suppliers obtain a license to IBMs patents—which license IBM also refuses to grant.  In this way, IBM seeks to use its right to license its *operating systems* to extend the reach of its *patents* to devices (i.e. other manufacturer's mainframes) that they do not cover.

10.    IBM has also engaged in patent misuse by offering PSI a patent license for all of the patents-in-suit so long as PSI agreed to limit the functionality of its machine so as not compete with IBM in certain segments of the market.  IBM has misused its patents by agreeing with other companies to cross-license patents so long as those companies did not offer mainframes that compete with IBM mainframes.

11.    IBM has also sought to extend its patent rights by inducing customers, business partners, application developers and competitors to standardize on the standards and specifications comprising the IBM z/Architecture and its predecessor architectures

through repeated representations that it will license its intellectual property and other interoperability information needed to make compatible products on fair, reasonable and non-discriminatory terms.  Now that the mainframe industry has conformed to the mainframe standards and specifications adopted by IBM, and now that IBM's installed base of mainframe customers is locked in to the use of IBM-compatible mainframes and IBM operating systems, IBM is seeking to improperly seeking to enforce Asserted Patents that purport to read on standards and specifications for the IBM z/Architecture.

### Eighth Defense:  Covenant Not to Sue (Patent Infringement)

12.    To the extent that any of IBM's allegations of infringement are premised on the alleged use, sale, or offer for sale of methods, systems, apparatus, and/or products that were manufactured by or for a licensee of IBM or its predecessors-in-interest and/or provided to PSI or T3 by or from a licensee of IBM or its predecessors-in-interest, under a covenant not to sue, IBM's claims, individually and as a whole, are barred by said covenant.

### Ninth  Defense:  Unclean Hands (All Claims)

13.    IBM's purported claims, individually and as a whole, are barred by the doctrine of unclean hands, including its deceptive and misleading conduct in the standard setting process relating to the development of the z/Architecture standards and its mainframe and mainframe operating system monopolies, including through its repeated representations that it would engage in fair, reasonable and non-discriminatory licensing of interoperability information and related intellectual property.

### Tenth Defense: Inequitable Conduct (All Claims)

14.    IBM's purported claims, or some of them, are barred by inequitable conduct before the United States Patent and Trademark Office, including the failure to disclose relevant prior art, and by its deceptive and misleading conduct in the standard setting process relating to the development of the z/Architecture standards and its mainframe and mainframe operating system monopolies, including through its repeated representations that it would engage in fair, reasonable and non-discriminatory licensing of interoperability information and related intellectual property.

### Eleventh Defense: Failure to State a Claim (Breach of Contract)

15.    IBM has failed to sufficiently allege facts showing a breach of any contract by PSI.  As a matter of law, the terms of the contract alleged by IBM are not violated by the conduct alleged by IBM.

### Twelfth Defense: Equitable Estoppel, Waiver, Acquiescence (Breach of Contract, Trade Secret Misappropriation, Copyright Infringement, and Tortious Interference)

16.    IBM's claims are barred, in whole or in part, under the equitable doctrines of estoppel and acquiescence because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products, and was notified six years ago that PSI received Amdahl diagnostics.

### Thirteenth Defense: Waiver (Breach of Contract)

17.    IBM's purported breach of contract claim is barred by the doctrine of waiver because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products, and accepted payment for those licenses.

### Fourteenth Defense: Laches (Breach of Contract)

18.    IBM's purported breach of contract claim is barred by the doctrine of laches because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products.  Further, IBM has long known that PSI had licensed IBM's operating systems for purposes of developing its own IBM-compatible mainframe computer products and has never previously claimed that PSI's conduct constituted a breach of any contract.

### Fifteenth Defense:  Void for Illegality and/or Violative of Public Policy (Breach of Contract)

19.    The contract, as interpreted by IBM, is void for illegality and is contrary to public policy.  Specifically, it seeks to enforce a tying agreement in contravention of state and federal antitrust laws and public policy.

### Seventeenth Defense: Self-Help (All Claims)

20.    PSI actions were excused by PSI's right to use self-help to avoid the consequences of IBM's unlawful actions.

### Eighteenth Defense: Lack of Subject Matter Jurisdiction (Declaratory Judgment Action)

21.    IBM has not sufficiently alleged facts showing an actual case or controversy as to the declaratory judgment action. Specifically, it has failed to allege specific and concrete threats of litigation by PSI.  The vague references to anticompetitive conduct alleged in the complaint are not sufficient.

22.    That PSI has counterclaimed for antitrust violations does not remedy these deficiencies. *See Jervis B. Webb Co. v. Southern Sys., Inc*., 742 F.2d 1388, 1398 (Fed.Cir. 1984) ("A case or controversy must exist as of the date of the filing of the declaratory judgment action.").

23.    Although PSI will not be filing a separate motion to dismiss the declaratory judgment action, it urges this Court to dismiss IBM's declaratory judgment allegations and claims *sua sponte*.  *See Soto v. United States*, 185 F.3d 48, 51 (2d Cir. 1999) (stating that federal courts have both the power and obligation to raise their lack of jurisdiction *sua sponte*).

### Nineteenth Defense: Mootness (Declaratory Judgment Action)

24.    IBM's purported declaratory judgment action has been rendered moot by PSI's counterclaims, as alleged herein.

### Twentieth Defense: Privilege (Tortious Interference with Contract)

25.    The actions alleged to support IBM's purported tortious interference claim are privileged and justified by fair competition.

### Twenty-first Defense: Fair Use (Copyright)

26.    PSI's alleged use, if any, of the work referred to in the complaint constitutes fair use.

### Twenty-second Defense: Authorization (Breach of Contract, Trade Secret Misappropriation and Tortious Interference with Contract)

27.    PSI's alleged actions were either expressly or impliedly authorized by IBM.

**Twenty-third Defense: Laches (Trade Secret Misappropriation and Tortious Interference with Contract)**

28.    IBM's purported breach of contract claim is barred by the doctrine of laches.  Among other things, IBM was aware in 2001 that PSI had licensed Amdahl's diagnostic programs.

**Twenty-fourth Defense: Statute of Limitations (Trade Secret Misappropriation, Tortious Interference with Contract, Breach of Contract, Copyright Infringement)**

29.    IBM's claims are barred, in whole or in part, by the applicable statute of limitations.

**Twenty-fifth Defense: Independent Development (Trade Secret Misappropriation)**

30.    PSI independently developed the information alleged in the Amended Complaint to constitute a trade secret.

**Twenty-sixth Defense: Failure to Exercise Safeguards (Trade Secret Misappropriation)**

31.    IBM did not exercise reasonable safeguards in protecting the information alleged in the Amended Complaint to constitute a trade secret.

**Twenty-seventh Defense: Lack of a Trade Secret (Trade Secret Misappropriation)**

32.    The information underlying IBM's trade secret misappropriation claim either never was, or no longer was at the time of the alleged misappropriation, a trade secret.

**Twenty-eighth Defense: Copyright Misuse**

33.    IBM's claims are barred by the doctrine of copyright misuse.

**Twenty-ninth Defense: Failure to Mitigate (All Claims)**

34.    While denying each and every allegation by IBM that it has suffered any loss or damages, Defendants allege on information and belief that IBM failed to avoid, minimize, or mitigate the damages that IBM alleges and is barred from recovering for those losses avoidable by reasonable efforts.

**Thirtieth Defense: Offset and Recoupment (All Claims)**

35.    Plaintiff's claims asserted in the Amended Complaint are barred, in whole or in part, by the doctrines of offset and recoupment.

### Thirty-first Defense: Parol Evidence Rule and Statute of Frauds (Breach of Contract and Tortious Interference with Contract)

36.    Plaintiff's claims are barred, in whole or in part, but the Parol Evidence Rule and Statute of Frauds.

### JURY DEMAND

PSI and T3 demand a jury on all issues triable to a jury.

### PRAYER FOR RELIEF

Wherefore, PSI and T3 pray for the following relief:

(1) That the Court enter a judgment that PSI and T3 have not infringed, contributorily infringed or induced the infringement of any claim of the Asserted Patents;

(2) That the Court enter a judgment that the Asserted Patents are invalid;

(3) That the Court enter a judgment that IBM take nothing by reason of its claims against PSI and T3 and dismiss the claims with prejudice;

(4) That the Court grant the relief sought in PSI's Amended Counterclaims and T3's Counterclaims;

(6) That the Court award PSI and T3 such other and further relief which the Court deems proper.

Dated:  February 8, 2008

**SUSMAN GODFREY L.L.P.**

By: _____/s/ Stephen D. Susman_____
        Stephen D. Susman
        Jacob W. Buchdahl
        Tibor L. Nagy

SUSMAN GODFREY L.L.P.
654 Madison Ave., 5th Floor
New York, NY 10022
(212) 336-8330

Stephen Morrissey (SM-2952) (*Pro Hac Vice*)
Ryan Kirkpatrick (RK-2281) (*Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90069
(310) 789-3100
*Attorneys for Platform Solutions Inc. and T3
Technologies, Inc.*

Bruce E. Gerstein (BG-2726)
Noah Silverman (NS-5728)
Elena K. Chan (EC-2337)
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055

David L. Patrón
Brent Barriere
Harry Barton
Skylar Rosenbloom
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
(504) 566-1311

*Attorneys for T3 Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document, DEFENDANTS AND COUNTERCLAIM PLAINTIFFS PLATFORM SOLUTIONS, INC.'S AND T3 TECHNOLOGIES, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO INTERNATIONAL BUSINESS MACHINES CORPORATION'S SECOND AMENDED COMPLAINT, has been served on this 8th day of February, 2008, via electronic mail:

Richard I. Werder, Jr.
Edward J. Defranco
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 849-7000

Attorneys for Plaintiff
International Business Machines Corporation

    /s/ Ryan Kirkpatrick
      Ryan Kirkpatrick