## UNITED STATES DISTRICT COURT

## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,** Plaintiff | **CIVIL ACTION** |
| | **NO. 06-CV-13565 (CLB) (MDF)** |
| **VERSUS** | **JURY TRIAL DEMANDED** |
| **PLATFORM SOLUTIONS, INC.,** Defendant | |

### T3 TECHNOLOGIES, INC.'S AMENDED PETITION
### FOR INTERVENTION AND COMPLAINT FOR DAMAGES

**NOW INTO COURT,** through undersigned counsel, comes T3 Technologies, Inc. ("T3" or "Intervenor"), respectfully to aver as follows:

### <u>Nature of the Action</u>

1.      This case arises out of the unlawful and anticompetitive acts of Plaintiff International Business Machines Corporation ("Plaintiff" or "IBM") directed at Defendant Platform Solutions Inc. ("PSI" or "Defendant"), T3 and their customers as part of IBM's efforts to continue to dominate the relevant product markets for large-scale computers, commonly known as "mainframe computers," that are compatible with the IBM operating systems needed to run these computers, called "mainframe operating systems."

2.      In an effort to eliminate consumer choice and destroy the only viable source of competition to its own mainframe computers, IBM is tying its mainframe computers to its mainframe operating systems by conditioning the licensing of its operating systems upon the purchase or continued use of an IBM mainframe computer – to the detriment of PSI, T3, and the consuming public. By doing so, and refusing to license its operating systems to customers who wish to use IBM's dominant operating systems on PSI's mainframe systems, which are rebranded, sold, and supported by T3, IBM is depriving mainframe computer and operating

- 1 -

system customers of the benefits of competition and forcing those customers to pay supracompetitive prices for its products and services.

3.    IBM is the dominant player in both the United States and worldwide markets for mainframe computers and mainframe operating systems, and it has held that position for decades. Mainframe computers and mainframe operating systems support the mission critical data processing needs of a wide range of businesses and other entities, including federal, state and local governments, banks and other financial institutions, airlines, and retailers. The markets for mainframe computers and mainframe operating systems are multi-billion dollar markets.

4.    Compatibility between operating system software, application software, and mainframe hardware is essential to the functionality of a mainframe computer system. Accordingly, IBM's dominance of these markets has created distinct product markets for IBM-compatible mainframes and IBM-compatible software.[1] Consumers have invested over a trillion dollars in IBM-compatible software and hardware. These are now "locked in" to using IBM-compatible software and hardware. Were they to change platforms, they would incur enormous switching costs. As evidence of this fact, IBM's profit margins for mainframe products are the highest of all products sold by IBM.

5.    IBM has historically faced competition from other manufacturers of IBM-compatible mainframes. For decades, IBM has licensed its mainframe operating systems to customers who have purchased IBM-compatible mainframe computers from other manufacturers, and has cooperated with competing developers of IBM-compatible mainframe

---

[1] For the purposes of T3's claims, computers that will run IBM's mainframe operating system software are referred to as "IBM-compatible," regardless of whether those computers are manufactured by IBM or a third party. Software application programs that run on IBM-compatible mainframes using the IBM mainframe operating system are also referred to as "IBM-compatible" or "IBM-mainframe-compatible" software programs, regardless of whether those applications are made by IBM.

computers by providing them with licenses, technical information, and technical support for IBM's mainframe operating systems and related software applications.

6.      This conduct was part of a deliberate campaign to encourage mainframe manufacturers, application developers, and customers to adopt the IBM architecture as the industry standard. This campaign was successful. To this day, the IBM architectural platform defines a "mainframe," and thousands of companies have invested billions of dollars into this industry-standard platform.

7.      When IBM's two primary remaining competitors, Amdahl and Hitachi, announced their exit from the market in 2000, however, IBM changed its policies and began exploiting its monopoly over the architectural platform that it has induced customers, programmers, and developers to adopt. As a result, on information and belief, prices of mainframes are now six times higher than they would have been under competitive conditions.

8.      PSI and T3 are the primary (if not only) competitors marketing IBM-compatible mainframes. PSI was started by former Amdahl employees, licensed Amdahl's mainframe computer technology, and seeks to practice Amdahl's former business model of marketing IBM-compatible mainframes in competition with IBM. In conjunction with its business partners, PSI has developed and is continuing to develop and market IBM-compatible mainframes capable of running IBM's mainframe operating system and thereby processing IBM-mainframe-compatible application software and data to compete with IBM's own mainframe computers. In addition to providing consumers with an alternative to IBM's own mainframe computers, a PSI computer system provides consumers with the ability to run other types of operating system software, such as Linux, Microsoft Windows and UNIX, on a single machine. The PSI mainframe computer system is thus the first open architecture mainframe computer system.

9.      After the departure of Hitachi and Amdahl from the mainframe marketplace, T3 Technologies, Inc. became the number two mainframe systems integrator with nearly 1,000 customers in 28 countries.  T3 also became the number one seller on non-IBM, IBM-compatible mainframes. T3 is authorized to sell and support T3-branded, IBM-compatible mainframes using PSI technology to end-user customers in North America, South America, Europe, and other parts of the world.

10.      On information and belief, rather than compete with PSI and T3 on the merits, IBM has used on a campaign of unlawful, inequitable, deceptive, and anticompetitive conduct in an effort to maintain and expand its mainframe monopoly. In particular, IBM has: (1) tied the licensing of its most current mainframe operating systems, z/OS, VSE, TSF and z/VM (collectively "z/OS"), to consumers' purchase or continued use of an IBM mainframe, thereby forcing customers of its operating system and applications to purchase or use IBM mainframes (instead of from competitors such as PSI and T3); (2) embarked on a campaign of systematic efforts to create "fear, uncertainty, and doubt" ("FUD")") by falsely representing to customers of T3 and PSI that purchasing competing products will result in a loss of reliability, availability and serviceability ("RAS"); (3) implemented sales and support policies that effectively forced customers to "upgrade" to newer versions of IBM's  operating system and discontinued technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems such as T3's or PSI's; (4) refused to provide critical product interface information that IBM had previously provided to others and that was needed to develop a compatible mainframe operating system in order to hinder and delay PSI's and T3's ability to market their competing products; and (5) refused to license allegedly applicable patents to PSI notwithstanding its (a) publicly disseminated and relied upon policy of reasonable, non-discriminatory licensing; (b) express

assurances to PSI that it would license its OS/390-related patents to PSI; (c) past licensing to companies operating the same business model in the same market; and (d) thirty years of actions and statements made during the development of the standards and specifications comprising IBM's architectural platform that were designed to encourage and induce programmers, developers, customers and competitors to adopt and conform to those standards, followed by its recent campaign to exploit the monopoly it obtained through its standard setting activities to extend and prolong its mainframe monopoly at the expense of consumers and competition.

11.    IBM is thus using its monopoly power in the relevant markets to harm competition, suppress innovation, and interfere with free customer choice. IBM's actions have injured PSI and T3 by excluding and/or impeding PSI and T3 as competitors and preventing PSI and T3 from selling  their computer systems. On information and belief, IBM has also tortiously interfered with the sale of PSI to another company, thereby limiting the ability of PSI and T3 to effectively compete against IBM.

12.    The market-wide cost of IBM's exclusionary campaign to eliminate competition to its mainframe computers will be billions of dollars. These costs will ultimately be paid by consumers. By this action, T3 seeks to recover damages based on the lost profits and lost business opportunities that it has suffered and is suffering as a result of IBM's exclusionary conduct, and to restore free and open competition in the relevant markets so that future customers will have the opportunity to choose the best products at competitive prices.  Because the claims of T3 against IBM largely mirror PSI's counterclaims against IBM, T3 seeks to intervene in this lawsuit.

## The Parties

13.    IBM is, and at all times mentioned herein has been, a corporation incorporated and existing under the laws of the State of New York, with its principal place of business in Armonk, New York.

14.    Intervenor T3 is a Florida corporation, whose principal place of business is in Tampa.

15.    All parties transact business in interstate and foreign commerce, and the activities alleged herein have a substantial effect on interstate and foreign commerce.

## Jurisdiction

16.    This Court jurisdiction over T3's claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and §§ 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14 and 15, pursuant to 28 U.S.C. § 1331. The Court has jurisdiction over any claims not so arising based on 28 U.S.C. § 1367 because such claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

17.    This Court has jurisdiction over T3's state law claims pursuant to 28 U.S. § 1367.

18.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332 because Intervenor, plaintiff, and defendant are citizens of different states and the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $75,000.

## Venue

19.    Venue for these Counterclaims is proper in this District because IBM maintains its principal place of business in this District.

**Factual Allegations**

**Relevant Markets**

20.     The relevant markets in this case are the markets for IBM-compatible mainframe computers and IBM-compatible operating systems.

21.     Mainframe computers are large, expensive, powerful computers used for processing high volumes of information at very high speeds. Most of the world's largest corporations and government entities rely on mainframe computers for their high volume and mission-critical data processing needs, including matters such a billing, accounting, order entry, record keeping and transaction processing. Much of the work done on these mainframe computers uses software custom-written by or for the end-user organization for the specific needs of the user.

22.     Although IBM holds a dominant position in the broader market for all mainframe computers, the relevant antitrust market in this case is the market for mainframe computers that are compatible with IBM's mainframe operating systems and other IBM-compatible applications (the "IBM-compatible mainframe" market). Because IBM's conduct has impeded competition in that market, there are no reasonable substitutes for IBM-compatible mainframes for a substantial and well-defined subset of mainframe customers who are "locked in" to the IBM platform based on their prior hardware/software purchasing decisions and their relatively high data processing demands.  As alleged below, T3 sells its computer systems primarily (if not exclusively) to existing owners and users of IBM-compatible mainframe systems who are locked-into continuing to use IBM-compatible systems because of the time, money and effort that they have already invested in those systems and applications, and the incredible costs involved in switching to other, non-IBM-compatible systems and software.  By IBM's own estimates, consumers have invested well over $1 trillion in software compatible with IBM's mainframe operating systems

and hardware. Such enormous investment in IBM-compatible software has effectively locked in many consumers to IBM-compatible mainframe computer systems, because conversion or migration to non-IBM-compatible mainframe computer systems would be prohibitively expensive.

23.      To switch to a non-IBM-compatible mainframe computer system, locked in consumers (such as T3's customers) would need to expend enormous amounts of time, money, and other resources to acquire new applications software and/or to translate, convert, or migrate their existing data and applications to a non-IBM-compatible mainframe computer system and to retrain employees and reconfigure operations to work with the new operating system. Many locked in consumers who use IBM-compatible mainframe software for mission critical functions, such as banking, insurance, or governmental functions, cannot risk catastrophic failures caused by switching to a non-IBM-compatible mainframe system. Moreover, many customers have more than one mainframe and their mainframes must be compatible to permit "coupling," which allows for substantially reduced software licensing fees, increases the amount of computing power that can be devoted to particular tasks, and creates other efficiencies. Thus, other than prematurely replacing hardware costing hundreds of thousands of dollars, these customers have no choice but to purchase IBM-compatible mainframes.

24.      Even if they had comparable data processing and other performance capabilities, computers that principally run UNIX, Linux, or Windows operating systems are not reasonable substitutes because "lock-in" effects prevent customers from choosing products that are not compatible with their existing mainframe operating systems and applications, and because mainframe software applications were not written for those operating systems.

25.      Cross-elasticity of demand supports defining IBM-compatible mainframes as a distinct antitrust market because consumers locked in to IBM-compatible mainframe applications

would tolerate supracompetitive price increases for IBM-compatible mainframe operating systems or IBM-compatible mainframes if the price increases did not exceed the costs of abandoning their existing investments in IBM-compatible mainframe software.

26.    Because competition has been thwarted by IBM's actions as alleged herein, IBM is the sole current developer of IBM-compatible mainframe computers, and its share of IBM-compatible mainframe sales currently stands at almost 100 percent. However, until roughly 2001, other developers of IBM-compatible mainframes such as Amdahl and Hitachi competed with IBM in the relevant market, and the existence of that history of competition from IBM-compatible mainframe developers further demonstrates the existence of a relevant market for IBM-compatible mainframes. Indeed, following Amdahl's and Hitachi's exit from the market, prices for mainframe computers have been substantially higher than they would have been in a competitive market.

27.    There are substantial barriers to entry in the IBM-compatible mainframe market. Mainframes are extremely expensive to build, and it takes years to gain market acceptance. Even where a developer such as PSI uses existing hardware, it takes years to develop IBM-compatibility. Prior to PSI, T3, and Fundamental Software, Inc. ("FSI"), no new significant developer of IBM-compatible mainframes had entered the market in thirty years. IBM's two competitors, Amdahl and Hitachi, exited the market in 2000 instead of continuing to invest in the development of the mainframe technologies needed to market a mainframe computer in competition with IBM. IBM's market influence, including the types of anticompetitive conduct alleged herein, also creates additional barriers to entry.

28.    The relevant market in which IBM-compatible mainframes compete could alternately be defined to include the mainframe computers manufactured by companies such as Unisys and Bull that share "Reliability, Availability and Serviceability" and lock-in

characteristics similar to IBM-compatible mainframes. However, these mainframes are marketed and supported as niche products, have very small market shares, and do not pose significant competition to IBM. On information and belief, IBM has itself noted that other "servers" running Unix and Windows are not actual mainframes that are interchangeable with IBM mainframes and that, according to IBM's own documents, the total cost of ownership for its flagship z/990 mainframe is 30 percent to 60 percent less than combining thirty Sun or Linux servers to perform the same functions.

29.    IBM also has monopoly and market power under this broader market definition, with a share in excess of 85 percent. All of the allegations made herein apply with equal force to this alternate market definition.

30.    The second relevant antitrust market in this case is the market for IBM-compatible mainframe operating systems. Operating systems are required for the mainframe to function; they control the operational resources of the computer and allow compatible application software to run on the computer. The dominant mainframe computer operating systems are IBM's OS/390 (distribution and support for which has been dropped) and z/OS operating systems (which includes z/OS, VSE, TPF and z/VM), with thousands of customers worldwide.

31.    As discussed above, the operating system has to be compatible with both the mainframe hardware and the software applications that run on the computer. To be viable, an operating system must be "backward compatible" with prior versions of that operating system and with the software applications written for those prior versions of the operating system so that customers can continue to access their existing applications and data.

32.    Due to its longstanding monopoly in mainframes and mainframe operating systems, IBM has an enormous, trillion dollar installed base of software and hardware. IBM-

compatible mainframe operating systems are specifically designed to work with and exploit the technical complexities and capabilities of mainframe computers and must be compatible with the hardware architecture, specifications and interfaces to function properly. In addition, the operating system and its application program interfaces must be compatible with the existing installed base of IBM and third-party IBM-mainframe-compatible software.

33.    Locked in consumers with existing applications and software cannot as a practical matter switch to other operating systems such as Bull, Unisys, UNIX, Linux, or Windows, because of the prohibitive switching costs such consumers would incur in abandoning their installed base of IBM-compatible mainframe software. Application programs, data files, and other software designed to operate with only IBM-compatible mainframe operating systems are not compatible with other operating systems. Many customers also have employees specifically trained to operate IBM software and hardware. Accordingly, to switch to a non-IBM-compatible operating system, locked in consumers would either have to abandon their existing investment in IBM-compatible mainframe software or expend enormous amounts of money and other resources to retrain employees and to convert or replace their existing applications and data to work with a non-IBM-compatible mainframe operating systems. Thus, there are no reasonable substitutes for z/OS for a substantial and well-defined subset of mainframe customers who are locked in to the IBM operating systems based on their prior hardware/software purchasing decisions and investment in human resources.

34.    Cross-elasticity of demand supports limitation of the market to IBM-compatible mainframe operating systems, because consumers locked in to IBM-compatible mainframe software would tolerate supracompetitive prices for IBM-compatible mainframe operating systems if the supracompetitive portion of the price did not exceed the cost of abandoning their existing investment in IBM-compatible mainframe software. On information and belief,

according to IBM itself, the vast majority of core, back-office applications are still implemented as COBOL transactions running on IBM mainframes, and analysts have estimated that the value of COBOL lines in use (which number in the hundreds of billions) exceeds the value of the largest publicly traded companies. As IBM succinctly states on its web site, "[a]fter 20 years, and billions of dollars wasted on trying to migrate applications from mainframes, the largest and most robust enterprises continue to depend heavily on the mainframe."

35.    The primary IBM-compatible mainframe operating system currently marketed or supported by IBM is z/OS. Because IBM has withdrawn the OS/390 version and its predecessors from marketing, and no longer supports them, z/OS is the only IBM-compatible mainframe operating system available to either purchasers of new IBM-compatible mainframes or existing customers who wish to upgrade. Thus, IBM has monopoly power in the market for IBM-compatible operating systems.

36.    There are significant barriers to entry in the market for mainframe operating systems. A new operating system for a mainframe computer is extraordinarily complex and takes many years to develop. Because of the mission-critical nature of the work performed on mainframe computers, it is extremely unlikely that a customer would choose an operating system that has not been thoroughly developed, tested and proven over many years. To the extent that any operating system conceivably could develop into a viable competing operating system for mainframe computers, that operating system would require compatibility with customers' current operating systems and software applications so that customers could continue to access their existing programs and data. The existence of intellectual property rights in the relevant market also creates additional barriers to entry.

37.    The relevant market in which IBM mainframe operating systems compete could alternately be defined to include other mainframe operating systems, such as the proprietary

operating systems used to run mainframe computers manufactured by Unisys and Bull. IBM also has monopoly and market power under that broader market definition, with a share in excess of 85 percent. On information and belief, as IBM has itself acknowledged, Linux, Unix or Windows are not true mainframe operating systems because they have neither the performance capabilities nor the dynamic functionality of a mainframe operating system. Thus, those operating systems are not reasonable substitutes. All of the allegations made herein apply with equal force to this alternate market definition.

38.    The relevant geographic market in this case is worldwide. IBM markets its mainframe computers and operating systems to customers throughout the world, and T3 is seeking to compete against IBM for customers throughout the world. As a result of the exclusionary conduct alleged below, T3 has lost and is losing sales both in the United States and in export markets throughout the world.

39.    Although T3 believes that the relevant markets described above are the appropriate markets for considering its antitrust claims, the use of a different broader market definition (though not consistent with economic reality) would not change the conclusion that IBM has substantial market power such that its tying and other anticompetitive conduct are causing harm to competition. For instance, even if one were to consider markets including all high-end enterprise servers, and the operating systems used to run those servers, IBM would have substantial market power in those markets.

**The History and Growth of the IBM-Compatible Mainframe Market**

40.    IBM has long dominated competition in the relevant markets for mainframe computers and mainframe operating systems. From the 1950s to the early 1970s, IBM achieved

dominance in the market for mainframe computers. Toward the end of this period, IBM achieved dominance in the market for mainframe operating systems as well.

41.     In 1956, IBM responded to antitrust claims brought by the United States Department of Justice by entering into a consent decree that put limits on its ability to exploit its monopoly in tabulating machines and electronic data processing machines,

42.     Beginning with IBM's introduction in 1964 of its S/360 line of mainframe computers and operating systems, and continuing with subsequent model lines, IBM freely and broadly disseminated the architecture specifications of its mainframe computers and operating systems. Customers, competitors, and other third-party software and hardware developers used the information disseminated by IBM to create software and hardware products designed specifically for use with IBM's mainframe computers and operating systems—resulting in the adoption of the IBM architectural platform and the standards and specifications embodied therein as the industry standards for complex computing.

43.     The profusion of new IBM-compatible mainframe software and hardware products vastly expanded the installed base of IBM-compatible mainframe operating systems. The resulting "network" effect provided additional incentive for consumers to adopt and to use IBM mainframe operating systems, which further expanded the installed base of IBM-compatible application software.

44.     The expansion in the installed base of IBM mainframe operating systems and other IBM-compatible mainframe software benefited IBM by making its mainframe operating systems more desirable and decreasing the viability of operating systems incompatible with that installed base. The development by customers and competitors of IBM-compatible mainframe hardware and application software benefited consumers by spurring innovation and decreasing prices for IBM-compatible mainframe hardware and software.

45.     IBM's policy of reasonable and non-discriminatory licensing and system openness was integral to its success, public image and reputation. IBM knew that such policies were integral to customer and developer acceptance and continued use of the IBM architectural platform as an industry standard.

46.     Since the 1970s, customers and programmers have adopted the IBM architectural standard with knowledge that IBM would face competition in IBM-compatible computers, and would not have a complete monopoly over the market. They adopted the IBM architectural standard based on IBM's conduct and public statements that it would promote free competition.

47.     By 1976, competitors such as Amdahl Corporation were using the information disseminated by and licensed from IBM to develop competing IBM-compatible mainframe computers, on which consumers could run their IBM mainframe operating systems and IBM-compatible mainframe application software. For decades following the development of such IBM-compatible mainframe computers, IBM licensed its mainframe operating systems on nondiscriminatory terms to the purchasers of such IBM-compatible mainframe computers. The availability of competing IBM-compatible mainframe computers from Amdahl and from other vendors, such as Hitachi Data Systems, provided additional incentives for consumers to use IBM mainframe operating systems and to develop or use other IBM-compatible mainframe application software. Nonetheless, IBM always retained a competitive advantage because there was a "lag" in the development of compatible products, and because it has always enjoyed a lucrative monopoly over the operating systems run on mainframe computers.

48.     By the late-1990s, Amdahl and Hitachi collectively attained over a twenty percent market share in the IBM-compatible market. However, in 2000, Amdahl and Hitachi announced that they were exiting the mainframe computer market, leaving IBM as the only developer of IBM-compatible mainframes.

49.     At approximately the same time, the United States Department of Justice joined IBM in a motion to eliminate all remaining provisions of the 1956 Consent Decree, which imposed some limits on IBM's ability to exploit its dominant position in the markets for operating systems and mainframe computers. The government concluded that, although IBM still had substantial market power in the OS/390 operating systems market and mainframe market, the decree should be dissolved because: (1) IBM had confirmed that it instituted and maintained a policy of "system openness," making its computer systems more compatible with those of other developers and that this policy derived from considerations independent of the Decree and would continue after the Decree terminated; (2) IBM faced competition in the market for IBM-compatible mainframes from companies such as Amdahl and Hitachi. The court approved the dissolution of the decree on May 1, 1997 and it was phased out by July 2, 2001.

50.     The Department of Justice, in agreeing to dissolve the decree, explicitly stated that any attempt by IBM to return to its tying practices would be unlawful:

> If, after the Decree terminates, IBM engages in any anticompetitive activity that would violate the antitrust laws, it would immediately be liable to suit. For example, should IBM engage in **anticompetitive tying—be it to parts or operating systems**—the United States could bring an action for injunctive relief both to stop the illegal conduct and to get other, broader prophylactic relief. [citations omitted]. Also, IBM would be liable to a host of potential private treble damage actions. [citations omitted].
> (Emphasis added).

### IBM's Mainframe Monopoly Has Resulted in Higher Costs for Consumers Since 2000

51.     As discussed further below, once Amdahl and Hitachi exited the market for IBM-compatible mainframes, IBM reversed its practice of system openness and reasonable non-discriminatory licensing and embarked on a strategy of monopolizing the market for mainframe computers.

52. IBM's post-2000 dominance has allowed it to resist the downward pricing pressures that competition and innovation should have created. IBM measures mainframe performance by reference to a measurement known as millions of instructions per second or "MIPS." On information and belief, IBM has tracked the "price per MIPS" of its mainframe systems over more than forty (40) years. The price per MIPS has precipitously fallen over this period of time, from nearly $10,000,000 U.S. in 1960 to approximately $2,000 in 2000. This general trend of decreasing prices has been observed throughout the computer industry and is attributable in large part to advances in processor design and manufacturing techniques.

53. When competition for IBM-compatible mainframes disappeared, IBM was able to significantly resist the downward trend in price per MIP. Amdahl and Hitachi, left the market for IBM-compatible mainframes in 2000. On information and belief, if the downward trend in price per MIPS between 1960 and 2000 had continued from 2000 to 2006, the price per MIPS should now be approximately $165—but today it is more than six times that amount at approximately $1,000. As a result, the largest systems today cost closer to $18 million rather than the $3 million they would have cost based on the price trends that were followed throughout most of the mainframe's history. This is the inevitable result when competition is eliminated.

54. On information and belief, the documents that IBM has produced in this case illustrate just how insulated IBM's mainframe prices and profits are from competition. IBM is well aware that the PSI system that T3 sells offers mainframe customers both a competitive choice they want and the opportunity for substantial cost savings vis-à-vis the IBM systems that they would be forced to purchase or maintain if IBM could succeed in its campaign to exclude PSI from the market.

## IBM's Evolving Mainframe Operating System

55.    From 1996 to 2000, the leading operating system marketed by IBM was OS/390. OS/390 was compatible with the version of IBM's mainframe operating system it superseded and with the huge installed base of IBM-compatible mainframe application software and data.

56.    Initially, and for several years following the release of IBM's OS/390, consumers could also run the IBM OS/390 operating system and their installed base of other IBM-compatible mainframe software on IBM-compatible mainframe computers supplied by other computer developers such as Amdahl and Hitachi Data Systems, which combined to account for roughly 21 percent of the mainframe computer market by 1999. In 2000, however, both Amdahl and Hitachi Data Systems announced that they would stop manufacturing IBM-compatible mainframe computers, leaving IBM as the sole developer.

57.    In October 2000, IBM upgraded its OS/390 operating system to the z/OS operating system and made it available for shipment in January of 2001. z/OS was compatible with existing IBM-compatible mainframe software, including the installed base of OS/390-compatible mainframe software. z/OS also included additional features and capabilities over the previous version of IBM's operating system, OS/390.

58.    In December 2002, IBM withdrew marketing of the superseded OS/390 version of its operating system and announced that it would discontinue service for OS/390 by September 30, 2004, leaving z/OS as the only version of the IBM-compatible mainframe operating system in production and serviced or supported by IBM.

59.    In September of 2004, IBM announced that, as of March 2007, it will discontinue supporting z/OS versions that run on anything other than 64-bit hardware. Accordingly, IBM will no longer support the use of z/OS on Amdahl's, Hitachi's and T3's IBM-compatible mainframes, which are 31-bit.

60.     In the past, IBM has licensed z/OS, VSE/ESA, OS/390, and VM/ESA to users of Amdahl and Hitachi mainframes, as well as users of Flex-ES and tServers, a product offered by T3 and FSI.  Presently, however, IBM will not license z/OS or other operating software to any customer who does not purchase an IBM mainframe.

**PSI Develops a Superior and Less Expensive Product To
Compete in the IBM-Compatible Mainframe Computer Market**

61.     PSI was founded in 1999—shortly before Amdahl and Hitachi left the IBM-compatible mainframe computer market—with the goal of developing its competitive computer system. In particular, PSI sought to develop a computer system that (i) would include less expensive hardware than IBM's mainframe computers, and (ii) not only would run the IBM mainframe operating system (so that consumers could continue to run their IBM-compatible applications software), but also would run other, non-IBM operating systems (such as UNIX, Linux or Windows) in order to accommodate consumers' desires to utilize additional, non-IBM-compatible applications software and provide consumers with greater flexibility in the future paths of their informational technology purchasing decisions.

62.     PSI initially chose to utilize equipment manufactured by Hewlett Packard ("HP"). HP provides the hardware, while PSI, an authorized reseller of the hardware, implements binary compatibility with IBM's machine architecture through specialized firmware that runs on Intel 64-bit Itanium processors used in the HP equipment. PSI additionally provides hardware for data transfer.

63.     PSI implements guest-to-host compatibility of the IBM z/Architecture and the Intel Itanium architecture through firmware which executes directly on the Itanium processor. In this way PSI is distinguished from so-called "emulators," which are typically higher level software applications running on top of an operating system. Thus, the PSI mainframe is

designed to operate far more efficiently than emulator applications. The mainframes marketed by PSI also can run open operating systems such as Linux, HP-UX and Open VMS. This enables the entire hardware system to present both open and IBM-compatible machine architectures to the end-user.

64. Because of IBM's monopoly in the market for mainframe operating systems and the vast base of consumers locked in to IBM-compatible mainframe software, PSI and T3 could not compete in the mainframe computer market if the PSI computers were not compatible with IBM's mainframe operating systems. More specifically, PSI and T3 could not compete if the computer systems were not compatible with IBM's most recent and currently supported version of its mainframe operating system. Accordingly, to develop and test its technology for IBM-mainframe-compatible computers, PSI needed to license the IBM mainframe operating system. Moreover, customers who wish to purchase a PSI computer system from PSI and T3 must be assured that they will be able to license IBM's mainframe operating system for use on that computer—otherwise, they would not be able to continue to run their IBM-compatible application software.

### IBM Adopts a Policy of Discriminating in its Software Licensing Based upon Whether or Not the Customer Has Chosen to Use an IBM Machine or a PSI/T3 Machine

65. On information and belief, in December 2000, PSI began negotiations to ensure that IBM would license operating systems and associated intellectual property for use on PSI mainframes, as it had in the past for customers of mainframe computers developed by Amdahl and others. IBM, which had apparently adopted a new strategy of exploiting its entrenched operating system monopoly to reinforce its mainframe computer monopoly, was resistant and offered conflicting reasons for refusing to license its operating systems for use on PSI mainframes. With respect to OS/390, IBM stated that it would continue licensing that version of

its operating system as it had in the past. Then it asserted that it would license neither z/OS, its latest operating system, nor OS/390, for use on a Intel 64-bit system, but it offered no reason for not doing so. At the time, IBM was licensing OS/390 on its own 64-bit systems, and also had licensed OS/390 and VSE for use on systems that utilized technology from FSI, which T3 integrated into its own product family known as tServer.

66.     On information and belief, PSI sought further assurances that IBM would not discriminate against PSI's consumers in its software and intellectual property licensing. IBM, however, delayed responding to PSI's requests. By January 2003, IBM had still refused to reach an agreement with respect to licensing. However, it denied that it had rejected PSI's request and instead stated that it had not yet decided whether to license z/OS and OS/390 for use by PSI on a 64-bit platform, in part because it had not yet determined an appropriate price for the license.

67.     On information and belief, in late February 2003, PSI wrote to IBM making "a final plea for a timely resolution to this issue" and reiterating the details of its request. PSI sought an agreement in principle from IBM not to deny licenses for its operating systems to customers of PSI's computer systems. PSI emphasized that, as a company in the process of closing its first round of venture financing, PSI likely would be irreparably harmed if IBM's delay in resolving these issues resulted in PSI's inability to close on its financing in a timely fashion. PSI also wrote that "[a] simple letter confirming that IBM intends to pursue the same non-discriminatory licensing policy as in the past, or something to that effect, should suffice for our immediate purposes."

68.     On information and belief, in response, IBM represented that it would permit customers of PSI to license IBM's mainframe operating system for use on PSI computer systems under IBM's then-current licensing terms, based on performance and functionality, provided that PSI's computer systems did not infringe IBM intellectual property rights. IBM further stated:

"[W]e believe the system described by you will have needs under IBM's patents. Under our current practice, IBM would be willing to enter into a patent license with PSI."

69.     On information and belief, having been assured that IBM would not discriminate in its licensing and that any patent conflicts could be avoided though a licensing agreement, PSI proceeded with its development plan.

70.     On information and belief, on or about May 14, 2003, PSI and IBM entered into a development license agreement for OS/390. OS/390 had already been withdrawn from marketing and, undisclosed to PSI at the time of the agreement, IBM withdrew the OS/390 from service and support in September 2004, leaving z/OS as the only supported mainframe operating system.

71.     On information and belief, in March 2004, PSI ordered and subsequently received two licenses to run z/OS on PSI mainframes. These orders were processed through PSI's IBM account representatives at IBM's Atlanta and Dallas offices. They were aware that the software was ordered for use on the PSI platform. Since issuing those initial licenses to PSI, however, IBM has reversed course and now refuses to grant further licenses of the current version of its mainframe operating system to PSI or to license its mainframe operating system to PSI and T3 customers.

72.     On information and belief, in a May 24, 2006 letter, IBM definitively stated that it would refuse to license its mainframe operating system to any customer of PSI's competing mainframe computer system.

**IBM Promises, Then Refuses, To License Any Applicable Patents to PSI**

73.     On information and belief, IBM has widely represented, on its website and elsewhere, that it is committed to openness and that it licenses its patents on a nondiscriminatory basis. Product developers such as PSI have consistently relied on this policy over the years in the

event there was any concern over infringement of IBM patents. The link to this page on the website was http://www.ibm.comi'ibmllicensing/patents/practices.shtml, which was taken down without any statement or explanation sometime in 2006. Consumers have relied on similar assurances of system openness in choosing to purchase IBM products.

74.    On information and belief, in 2001, IBM represented to PSI that it would make available OS/390 interfaces and architectures that had been made available to other competitors. In March 2003, IBM also represented that it would be willing to enter into a patent license with PSI, and granted PSI a development license for OS/390.

75.    On information and belief, in 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions. In particular, IBM represented that it would license patents required for IBM mainframe compatibility for a running royalty rate of 1 percent of net sales of licensed products, up to a maximum cumulative royalty rate of 5 percent for a license of five or more patents. In the course of those discussions, PSI provided IBM with substantial technical information about its product under development. PSI requested that IBM identify any of its patents that IBM believed might be implicated by PSI's proposed product. IBM did not do so.

76.    On information and belief, IBM thereafter refused to continue patent license discussions with PSI unless PSI: (i) disclosed specific technical information about its product currently under development; (ii) executed an agreement stating that any information PSI disclosed to IBM in the course of those discussions would be treated as non-confidential and would be fully usable by IBM, including in its business activities in competition with PSI; and (iii) agreed that IBM was not obligated to enter into any license agreement. Accordingly, as a condition of even entering into licensing negotiations, IBM required PSI to disclose confidential,

proprietary information, while simultaneously signing an agreement stating that PSI was not revealing confidential, proprietary information.

77.    On information and belief, in August 2005, IBM sent PSI a list of some 150 patents which it characterized as a "representative list" of IBM patents that "may" be infringed by the PSI system, without linking them to any PSI product. IBM stated that this was "not an exhaustive list," and requested PSI to demonstrate—but again without agreeing to maintain the confidentiality of PSI's product information—that PSI's system did not infringe any of the claims in any of these patents.

78.    On information and belief, because of the extensiveness of the list of "representative" patents that IBM had asserted "may" be infringed by PSI's product, and the fact that it would have been prohibitively expensive for PSI to analyze every IBM patent claim even on that "representative" list in order to make a non-infringement demonstration to IBM, PSI suggested the parties simply resume their patent licensing discussions. In this connection, PSI offered to provide whatever technical information about its products that would be needed by IBM, without requiring IBM to agree to keep PSI's technical product information confidential.

79.    On information and belief, in February 2006, representatives of PSI and of IBM met again to discuss the patent licensing issues. The IBM personnel at the meeting stated that, with respect to a patent license, there would be substantial resistance from IBM's business side. Specifically, an IBM representative stated something to the effect of: "No one on the zSeries hardware team wants to see z/OS on an HP machine."

80.    On information and belief, more than three months later, on May 24, 2006, IBM wrote to PSI stating that it would refuse to license any IBM patents to PSI or PSI customers, which, by definition includes T3 customers. IBM thus reneged on its express promises made to PSI in 2001 through 2004 concerning its willingness to license its patents to PSI and to continue

its decades-long practice of licensing its patents to third parties engaged in the development of IBM-compatible mainframe computers.

81.     On information and belief, IBM's decisions and conduct were motivated solely by its desire to eliminate a competitor that threatens its highest margin business, and not by a desire to protect the intellectual property that it has freely licensed to others.

### IBM Uses its Market Power and Influence to Dissuade Companies from Partnering with PSI and IBM's Tying, Exclusionary and Unlawful Conduct Results in the Cancellation of the Sale of PSI

82.     On information and belief, one of IBM's primary concerns regarding PSI was that it would partner with, or be acquired by, a larger technology company that would have greater resources to market PSI's product and to challenge IBM's anticompetitive actions.

83.     On information and belief, in 2005, after being questioned by IBM about its association with PSI, Fujitsu divested its interest in PSI in an effort to convince IBM that it did not intend to reenter the IBM-compatible business.

84.     On information and belief, in 2005, PSI also began considering a potential acquisition of its business by a major technology company, which has a patent cross-licensing agreement with IBM covering all of the patents in suit, and would thus be insulated from IBM's pre-textual allegations of patent infringement.  Following the completion of that transaction, PSI's mainframes would have been marketed by the acquiring company and encompassed within that company's cross-license.

85.     On information and belief, in September 2006, PSI was on the verge of finalizing the acquisition.

86.     On information and belief, in October 2006, after learning of IBM's refusal to sell or license its operating system and software applications for use on PSI and T3's mainframes, the would-be acquiring company refused to complete the acquisition.  However, up until the time of

this lawsuit, the company was reevaluating whether to acquire PSI because (a) it determined that IBM's patents did not pose any problems, and (b) IBM's refusal to license was anticompetitive and would not be legally supportable.

87.    Upon information and belief, that company was deterred by IBM's refusal to license z/OS on a PSI mainframe.  Indeed, IBM's refusal to license its operating system significantly devalued PSI in the marketplace and effectively eliminated T3's ability to market its product, and IBM both recognized this and intended this.  Upon information and belief, IBM deliberately refused to articulate the reasons for its refusal to license, fearing that reliance on the PSI's lacking of a patent license—which IBM earlier promised to PSI—would lead to the acquisition of PSI by one of the hundreds of companies to which IBM has cross-licensed its patent portfolio pursuant to its RAND patent licensing policy.

88.    IBM's actions have substantially harmed PSI and T3 in the marketplace.

89.    Even after this lawsuit was filed, IBM continued to threaten PSI's and T3' business partners to dissuade them from working with PSI. Upon information and belief, in August 2007, a senior IBM executive threatened a PSI business partner and major technology company with a lawsuit if it continued to do business with PSI. That IBM would continue to threaten PSI's business partners, even after litigation had been initiated and PSI and T3 effectively excluded from the market, confirms IBM's anticompetitive intent and practices.


**IBM Launches a Campaign to Destroy PSI's and T3's Reputation and Business**

90.    IBM has also been contacting PSI's and T3's customers and potential customers to instill "Fear, Uncertainty, and Doubt" regarding T3, PSI and its products. IBM has told PSI's and T3's customers and potential customers, without any basis, that PSI's products will not work as PSI asserts.

**IBM's Campaign To Destroy PSI's And T3's Reputation And Business
Is Part And Parcel Of A Pattern Of Anticompetitive Conduct To
Eliminate Competition In The Market For IBM-Compatible Mainframes**

91.     T3 is quite familiar with IBM's business practices.  Founded in 1992, T3 Technologies, Inc. specializes in servicing the needs of the mainframe community through its worldwide resources and partners. Prior to the anticompetitive acts alleged herein, T3 was the #2 mainframe systems integrator with nearly 1,000 customers in 28 countries. T3's clients included Fortune 500, academic institutions, small and medium businesses, state and local governments, and even the U.S. Military.  T3's original tServer was the industry's best selling mainframe under 80 MIPS. T3 is a leading provider of systems programming and other support services to z/OS and VSE data centers.

92.     In 1994, T3 became an IBM business partner authorized to sell IBM mainframes to end users.  T3 focused on small to mid-sized firms in the mainframe market and, over the course of several years, developed a strong reputation and client base in this market niche.  From 1994 to 1999, T3 sold IBM mainframes of 50 MIPS or lower.  As of 1999, IBM's offering of mainframes generally ranged from 5 to in excess of 1000 MIPS.  However, in that year, IBM decided to eliminate all of its mainframes below 60 MIPS, leaving no mainframes suited to a large portion of T3's customer base.  This decision by IBM eliminated choice and increased prices for consumers.  For those consumers who only needed mainframes with computing power below 60 MIPS (e.g., many of T3's customers), IBM forced them to buy more computing power than they needed at a much higher price.

93.     As a result of IBM's decision to eliminate consumer choice, T3 sought out and formed a business relationship with FSI, a company based in Freemont, California.  In the 1990's, FSI created a software product that, when integrated with an Intel-based server, acted as

a low-level mainframe computer.  Specifically, under IBM's prior policy of reasonable and non-discriminatory patent licensing, which existed before the Justice Department decree expired, FSI obtained patent licenses from IBM that enabled the FSI technology, when integrated on an Intel-based server, to run IBM's 31-bit mainframe operating system software.  At one point, even IBM created a product using FSI's technology.  This product was developed through IBM's personal computer division, not its mainframe division.  In fact, T3 signed an agreement with IBM in 2001 to be an authorized reseller of this product.  However, after approximately six months, IBM took the product off of production and ended the program.

94.    After IBM decided to no longer sell mainframe computers below 60 MIPS, T3 sought out FSI and signed a deal in August of 2000 to license FSI's  technology to build and brand its own IBM-compatible mainframe.  As a result, T3 introduced its tServer back in 2000 and has since installed over 600 systems worldwide.  T3's tServers were built using IBM components from IBM's personal computing division and other third party hardware and software components.  Prior to IBM's anticompetitive conduct, the tServer was the best selling mainframe under 80 MIPS and was the industry's most cost-effective low-MIPS mainframe.  In fact, the US Air Force even uses tServers for several AWAC and nuclear weapons control applications.  T3 supports its tServers with a highly rated service and support team.  T3 was the number one seller in the world of IBM-compatible mainframes using FSI's technology, comprising at least 70 percent of the units sold., approximately three times as many units as its nearest competitor.

95.    During this time, T3 created and sold custom-tailored tServer for its customers with computing power ranging from 8 to 30 MIPS.  Before IBM's anticompetitive conduct effectively put T3 out of business, T3 was an original equipment manufacturer competing against IBM.  FSI's FLEX-ES software is but one of many components that T3 sourced, integrated,

tested, and supported as part of its distinct branded product.  In creating its products for sale to its customer, T3 would identify and order parts/pieces from a variety of third party vendors and distributors and physically upgrade computers with additional chips, memory boards, circuits, ports, communications devices, and other parts to suit its particular customer's needs.   T3 established an "Integration Facility" in Tampa for the express purpose of building, testing, and supporting tServers, and to develop and test new IBM hardware for future generations of tServers. FSI would rely on T3 to investigate and work on problems on such platforms. T3's building, customization, branding, and testing processes were a several day effort, requiring mainframe expertise to conduct.

96.     As part of the building process, T3 would load the FLEX-ES software onto the computer, checking the software installation, installing the tServer at the customer's offices and then helping to port-over any data or applications the customer needed. The FSI software and the underlying operating systems required significant customization by T3's engineers in order to perform in each unique customer configuration. Customization work by T3 was performed both before shipment by T3 and on-site. Prior to shipping, T3 fully tested the completed system. The installation process, also a mainframe-centric task, was typically a several day project at the customer site.  T3 would load the IBM operating system at the customer site during installation.

97.     T3 offered post-purchase support and maintenance service for its products. In addition to providing 7 day,  24 hour post-sale support and maintenance in the United States and Europe, T3 also provided a warranty on its integrated system for a one-year period.  T3 also created and provided all user documentation and training materials for the tServer system.  T3 also developed a proprietary software tool called "Snap" which was a tServer system  monitoring and reporting tool. Snap was installed on every tServer and assisted with standard mainframe system management functions which the FLEX-ES product did not provide.

98.    T3 also had an agreement with IBM to sell IBM mainframes to T3's customers that needed more computing power than offered by its tServers.  T3 was a licensed reseller for IBM mainframes and was selling IBM mainframes with computing power between 60 to 200 MIPS. However, in the Spring of 2002, Steven Friedman, the President of T3, went to a meeting at IBM in New York and met with Richard Cummings, the Vice-President of North American Mainframe Channel Sales, and Joe Kirshner, the Vice-President of U.S. Mainframe Channel Sales.  These IBM representatives told Mr. Friedman that IBM does not like T3 selling IBM-compatible mainframes using FSI's technology even if IBM did not offer any products with similar computing power or pricing. These IBM representatives demanded that T3 terminate its relationship with FSI and stop selling IBM-compatible mainframes using FSI's technology.  If T3 did not stop selling IBM-compatible mainframes using FSI's technology, IBM would prohibit T3 from selling IBM's mainframes.   T3 ultimately refused to terminate its relationship with FSI and, as a result, IBM punished T3 for selling a competing product by terminating its mainframe license agreement with T3 at the end of 2002.

99.    In 2003 and 2004, T3's revenues expanded significantly. During this timeframe, T3 was selling approximately 100 to 150 systems per year, and its profit included revenue from related support services.  The computing power of FSI's technology increased somewhat and, as a result, T3's  tServer  has the limited ability to scale from 8 to 30 to 60 to 100 MIPS.

100.    As of 2004, IBM had already withdrawn marketing of the superseded OS/390 version of its operating system and had announced that it would discontinue service for OS/390 by September 30, 2004, leaving z/OS as the only version of the IBM-compatible mainframe operating system in production and serviced or supported by IBM.  In 2004, IBM also announced that, as of March 2007, it would discontinue supporting z/OS versions that run on anything other than 64-bit hardware. Accordingly, IBM would no longer support the use of z/OS

on any mainframe using 31-bit technology, which included not only Amdahl's and Hitachi's IBM-compatible mainframes, but also T3's tServers.

101.    With its long time competitors Hitachi and Amdahl having dropped out of competition in the mainframe market, IBM's decisions to discontinue service for OS/390 and for z/OS being used on 31-bit mainframe forced enormous demand (which did not exist naturally) for consumers to replace their mainframe hardware and software with new IBM hardware and software.  The withdrawal of support and service also essentially rendered 31-bit mainframes difficult to sell.

102.    In the 1990's FSI obtained a patent license from IBM that allowed it to create software that enabled IBM's 31-BIT mainframe operating software to run on an Intel-based server.  However, FSI did not have a patent license to do the same for IBM's newly-developed, 64-Bit operating system.  On information and belief, FSI's patent license expired on October 31, 2006. IBM refused to grant a patent license to FSI that would allow FSI's technology in a system based on IBM's 64-Bit mainframe operating software to a commercial end user.  As of November 1, 2006, IBM also refused to extend FSI's patents on IBM's 31-bit operating software and refused to license any of its z/OS operating software to any consumer who wanted to purchase T3 tServer, even if it were running on 31-bit technology.  IBM would not even recognize at least 100 licenses of its z/OS operating software on systems based on FSI technology that had been purchased prior to November 1, 2006.  IBM refused to recognize these licenses even though it had received and accepted royalties for these licenses.  As a result, IBM effectively shut down FSI and T3 as competitors.  In many of the same ways that IBM eliminated T3's tServer from the market, IBM eliminated PSI and T3's Liberty servers from the market.

103.    As IBM's exclusionary conduct made T3's 31-bit mainframes that utilized FSI technology increasingly difficult to sell, T3 started to investigate other technologies it could integrate into it's systems to sell to its customers, and eventually decided to sell Liberty Servers, which incorporated PSI's technology.  As a February 12, 2007 press release stated, T3 is PSI's preferred channel partner and is marketing T3's Liberty Servers with PSI technology through a distribution and licensing relationship with PSI.

104.    T3's Liberty Servers run z/OS, z/VSE, OS/390, and VSE operating systems in 31 or 64-bit technologies and are scalable up to 260 MIPS and have unequalled cost advantages over IBM's proprietary mainframes. Although IBM's anticompetitive conduct effectively shut down T3 as a competitor and eliminated T3's ability to achieve its potential sales volume and revenue, it was anticipated that T3 would oversee building, customization, branding, testing, installation, and customer support for its Liberty system.  In selling its computer systems, T3 directly competed with IBM for customer sales.

105.    T3 sold and marketed its Liberty Servers to small and mid-size mainframe customers worldwide through T3's direct sales force in the U.S. and its business partners in Europe, South America, and Asia.  T3 has been dedicated to serving the small to mid-sized marketplace for 14 years.  T3's Liberty Server was designed from the start for small to mid-sized data centers (under 350 MIPS).  T3's Liberty Servers offer customers tremendous flexibility not previously available in IBM z/Series systems.  T3's Liberty Servers start at just 26 MIPS and support both the 31-bit and 64-bit versions of the IBM z/OS.  T3's Liberty Servers can be configured to provide the right amount of computing power, along with the ability to fully incorporate open technology into customers' proprietary mainframe datacenters.  In this manner, T3's customers do not pay for functionality that they do not need.

106.    Notwithstanding the anticompetitive conduct by IBM alleged herein, by 2007, T3 had made limited strides in marketing its Liberty Server family of open mainframe computers, including sales to four new customer shipments in the first 60 days of general availability. Among the new T3 customers were the University of Alabama Hospital at Birmingham, Pitt County, North Carolina, Cascade Natural Gas Corporation, and Polk County Iowa. T3 made limited sales, which while substantially below what T3 could have done absent IBM's misconduct, reflect the value of its Liberty Servers and T3's service.

107.    Based on 2005 IDC data, the market segment for systems up to 350 millions of instructions per seconds (MIPS) approaches 1,000 server units and $500 million in sales annually.

108.    In the February 12, 2007 press release found on PSI's website, the Executive Vice President of Sales for PSI, states: "T3 Technologies strong partnership with PSI is crucial in bringing choice to this underserved market. With T3 Technologies proven track record of sales, service and support and PSI's Open Mainframe technology, z/OS and z/VSE, datacenters now have an alternative to proprietary IBM hardware."

109.    There exists pent up demand from smaller and mid-size customers looking for a highly flexible mainframe that can grow easily and affordably with them as their computing needs increase, T3 invested in millions of dollars in additional sales, support and customer service resources to accommodate the increasing interest in the open mainframe computers now available to small and mid-size customers through the sale of T3 Liberty Servers. T3's successful business, however, was effectively shut down by IBM's unlawful and anticompetitive conduct detailed below.

**IBM's Tying and Exclusionary Conduct Injure
Competition, Competitors, and Consumers in the Relevant Markets and the
<u>Markets for Application Software and Storage Devices</u>**

110.    For decades, IBM has actively encouraged customers, developers, programmers, business partners and competitors to standardize on its mainframe architecture by repeatedly representing that it engages in fair, reasonable and nondiscriminatory licensing of interoperability information needed to manufacture compatible products and related intellectual property. IBM postures itself as a champion of "open systems and standards," arguing that competitors must have reasonable and nondiscriminatory access to interoperability information and related intellectual property is essential to competitive development and innovation in information technology industries, such as the mainframe industry.

111.    Customers, developers, programmers, business partners and competitors have relied on IBM's position of reasonable and non-discriminatory licensing of interoperability information and related intellectual property throughout the development of the standards and specifications embodied in the IBM mainframe architectures. IBM customers are now locked in to the use of IBM-compatible mainframes and operating systems as the result of these standards and specifications. It is a blatant abuse of that standard setting process for IBM to now seek to enforce patents it claims read on those standards and specifications to exclude competitors from the mainframe market, to condition the licensing of its operating system on the purchase of IBM hardware, and thereby extract higher prices and higher profits from its customers. Yet, that is exactly what IBM is seeking to do through this litigation and through its refusal to provide its mainframe operating system to customers of T3 and PSI.

112.    To the extent that use of the functionalities claimed by IBM's patents is necessary to manufacture any IBM-compatible mainframe, those patents also are essential facilities. IBM's refusal to provide access to these essential facilities, when considered in light of IBM's market

power, previous policy, practice, representations, and inducement of customers, developers, and programmers to adopt IBM's architectural platform as an industry standard, is independently, and in combination with IBM's tying and other wrongful conduct, anticompetitive. IBM's sole intent in changing its policy is to maintain and expand its monopoly; it does not have a legitimate pro-competitive interest in protecting the same intellectual property that it has freely licensed to others.

113.    IBM's z/OS operating system is the only operating system currently available to run on IBM-compatible mainframes and that is compatible with the application software written for IBM-compatible mainframes. By refusing to license z/OS to customers for use on PSI's, FSI's and T3's competing mainframes, IBM has made itself the only supplier of IBM-compatible mainframes. Accordingly, all consumers locked in to IBM-compatible mainframe operating systems must purchase IBM mainframe computers.

114.    Mainframe operating systems and mainframe computers are separate products that could be sold separately by IBM, as demonstrated by IBM's past practice for several decades of licensing IBM mainframe operating systems to consumers for use with IBM-compatible mainframe computers developed by Amdahl or Hitachi Data Systems. In fact, IBM has historically published software licensing terms for OS/390 and z/OS stating that the operating system will run on the then currently supported IBM servers "or equivalent." This included the 64-bit only versions of z/OS, version 1.6 and version 1.7. On August 8th, 2006, IBM announced the terms for its latest version of z/OS, version 1.8, which dropped the term "or equivalent," referencing only System z servers.

115.    By changing its historic practices of (i) providing nondiscriminatory licenses to its mainframe operating systems to developers of compatible mainframes and software, (ii) licensing its mainframe operating systems to purchasers of competitors' mainframe computers,

and (iii) freely licensing its interoperability information and related intellectual property on reasonable and non-discriminatory terms, among other things, IBM has engaged in exclusionary conduct injuring competition in the relevant market for IBM-compatible mainframe computers.

116.    Locked in consumers could not have known at the time of their initial investment in applications requiring IBM mainframe operating systems that IBM would discontinue its longstanding policy of licensing its mainframe operating systems to run on competing IBM-compatible mainframe computers.

117.    IBM is seeking to extend and prolong its longstanding monopoly over IBM-compatible mainframe computers and mainframe operating systems and ensure that rival hardware and software platforms do not become viable alternatives to IBM's proprietary mainframe systems. IBM's conduct in the mainframe operating systems market significantly harms and threatens continuing harm to competition, offends established public policy as set forth in federal and state antitrust laws, is oppressive, and is substantially injurious to consumers. IBM has created insurmountable barriers to entry in the market for IBM-compatible mainframe computers and excluded competitors such as PSI, FSI, and T3 from that market. The resulting elimination of competition in the market for IBM-compatible mainframe computers harms consumers by giving IBM monopoly pricing power and reducing innovation. The harm to such consumers from IBM's conduct outweighs any utility it might have.

118.    The harm to competition is not limited to the relevant markets defined above. IBM's conduct is intended to, and does, harm competition in the markets for related markets such as the markets for enterprise server applications and storage devices.

119.    Because of the lock-in, IBM and other companies selling IBM-compatible storage devices have been able to extract enormous premiums from customers. The system sold by PSI and T3 allows customers to utilize industry-standard storage devices, which are substantially

cheaper than IBM-compatible devices. IBM's refusal to license its operating systems is part of a larger scheme to protect these profits.

120.    Similarly, IBM's refusal to license its operating systems and related intellectual property to the customers of PSI and T3, its tying of its operating systems to its mainframe computers, and its conditioning the patent licensing of its operating system on the purchase of IBM hardware, is part of a much larger scheme to maintain its enormous profits and profit margins generated from key applications, such as CICS, DB2, Websphere and IMS, that it licenses to mainframe customers. By conditioning licenses of its mainframes operating systems on the purchase or continued use of IBM mainframes, IBM is also able to lock its customers into using more of its applications, and more expensive versions of its applications, and to insulate its applications from further competition so that it can maintain hundreds of millions of dollars each year in additional monopoly profits. IBM ultimately would face greater competition for these applications if they were available on the products sold by PSI and T3, as customers would have greater choice in determining on which platform to deploy their applications.

121.    Refusing to license its operating systems and intellectual property to the customers of PSI and T3 in order to protect its storage and application products such as CICS, DB2 and Websphere from competition, and to maintain its high profits and profit margins on these products that are not covered by the purported intellectual property rights IBM is asserting against PSI and T3, constitutes and unreasonable and unlawful extension of any legitimate intellectual property rights that IBM may have.

122.    By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a PSI machine, IBM has injured PSI and T3 as competitors in the market for IBM-compatible mainframe computers. IBM's unlawful conduct has (a) prevented PSI and T3 from marketing and selling a competing computer system; (b) jeopardized

PSI's and T3's funding and their relationship with prospective customers; (c) delayed PSI's and T3's entry into the market; and (d) allowed IBM to reap hundreds of millions of dollars in additional profits that otherwise would have been realized as cost savings by the governmental institutions, corporations, and academic institutions that would have purchased PSI's lower-priced products. Moreover, in addition to preventing PSI and T3 from selling PSI mainframes, IBM's unlawful conduct has prevented PSI and T3 from selling related applications and services, such as storage, technical support, maintenance and consulting services, and punished T3 for selling tServers which used FSI technologies.

123. IBM itself has recognized that conduct such as that in which it is now engaging is anticompetitive and unlawful. As part of the United States Department of Justice's antitrust action against Microsoft, IBM testified that Microsoft had engaged in exclusionary conduct by discriminating against IBM with respect to the terms on which it made its Windows operating system available to IBM in retaliation against IBM's efforts to develop a competing operating system, OS/2. IBM subsequently pursued private antitrust claims against Microsoft, and obtained a $775 million settlement of those claims without even filing a complaint. IBM's prior antitrust claims against Microsoft in the markets for PC operating systems and personal computers are very similar to PSI's and T3's current claims based on IBM's exclusionary conduct in the markets for mainframe computers and mainframe operating systems. Indeed, PSI's and T3's claims are based on conduct that is even more blatantly exclusionary because IBM has expressly tied sales of its operating system to the purchase or continued use of an IBM mainframe and has refused to make its operating systems available at all to purchasers of PSI's mainframe computer products.

124. And in the European Union, IBM, through its trade organization ECIS, has taken legal positions completely contrary to its arguments in this case. For example, IBM currently

contends, through its trade organization, that Microsoft should be compelled to timely supply full interoperability information to competitors for various products, including Microsoft Office, Windows, and Exchange programs, and that such information constitutes an essential facility. Again, IBM's conduct here is even more blatantly exclusionary than Microsoft's. Microsoft never disclosed interoperability information to expand the market and encourage the adoption of a Microsoft standard. IBM, by contrast, did just that: promoting a policy of reasonable, non-discriminatory licensing to help expand the market for its operating systems, applications, and mainframes.

### FIRST CAUSE OF ACTION:
### Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

125.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 124 of its Petition for Intervention.

126.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing with respect to the develop of the standards and specifications embodied in the z/Architecture and its practice of reasonable and non-discriminatory licensing of intellectual property to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of critical information regarding product interface information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's and T3's ability to market its competing products, and/or (viii) other wrongful

conduct as alleged hereinabove, individually and collectively constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

127.    IBM has a monopoly and exercises market power in the relevant markets for IBM-compatible mainframe computers and mainframe operating systems.

128.    IBM's conduct as alleged herein has enabled it to unlawfully maintain, extend and prolong its monopoly in the market for IBM-compatible mainframes.

129.    IBM's purported bases for the anticompetitive acts alleged herein are pretextual and any pro-competitive benefits of such acts are outweighed by the harm to competition and consumers.

130.    As a direct and proximate result of IBM's tying, denial of access to an essential facility and other anticompetitive acts as alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and consumers in the affected markets.

**SECOND CAUSE OF ACTION:**
**Attempted Monopolization in Violation of Section 2 of the Sherman Act. 15 U.S.C. § 2**

131.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 130 of its Petition for Intervention.

132.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of

critical information regarding the development path for IBM's operating system products and the technical information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's and T3's ability to market its competing products, and/or (viii) other wrongful conduct as alleged hereinabove, individually and collectively constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

133.    IBM has undertaken these acts with the specific intent of monopolizing the market for IBM-compatible mainframes.

134.    There is a dangerous probability that IBM, unless it is restrained, will succeed in monopolizing the market for IBM-compatible mainframe computers.

135.    There are no legitimate business justifications for IBM's anticompetitive practices, and IBM's purported bases for tying its operating system to its mainframe and refusing to enter into a patent license with PSI on IBM's standard terms and conditions are pretextual.

136.    As a direct and proximate result of IBM's tying, monopoly leveraging, interference with a prospective contractual relationship, denial of access to an essential facility, and other anticompetitive acts as alleged herein, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and of consumers in the affected markets.


### THIRD CAUSE OF ACTION:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

137.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 136 of its Petition for Intervention.

138.   IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.   Alternatively, IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason.

140.   Mainframe operating systems and mainframe computers are separate products in separate markets, not substitutable for one another, can be sold or licensed separately, and are subject to separate consumer demand. Moreover, the licensing of a mainframe operating system necessarily implies a license to perform all of the functions required by the operating system, including any that may be validly patented.

141.   By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a competing machine, IBM coerces consumers to purchase IBM's mainframe computers.

142.   IBM has monopoly power in the market for IBM-compatible mainframe operating systems enabling it to appreciably restrain trade in the market for IBM-compatible mainframes, and to coerce the purchase of IBM's mainframe computers.

143.   IBM's tying has affected and will continue to affect a not insubstantial volume of interstate commerce in the relevant markets.

144.    T3 has been injured in its business and has suffered pecuniary harm as a consequence of IBM's tying and will continue to suffer such harm so long as IBM's tying persists.

145.    As a direct and proximate result of IBM's tying, PSI, T3, and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured. If not enjoined, IBM's conduct will cause further injury to the business and property of PSI, T3, and of consumers in the affected markets.

### FOURTH CAUSE OF ACTION:
#### Violation of Section 3 of the Clayton Act, 14 U.S.C. § 15

146.    T3 realleges and incorporates by reference the allegations of paragraphs I through and including 145 of its Petition for Intervention.

147.    As alleged above, IBM conditions the license of its mainframe operating systems on the use of an IBM mainframe, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 15. The effect of these arrangements has been to substantially lessen competition in the relevant markets for mainframe computers.

148.    There is no legitimate business justification for IBM's anti-competitive practices and any purported legitimate business justifications are mere pretexts.

149.    138.    IBM's anticompetitive practices have proximately caused damage to T3 in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION:
#### Violation of Section 349-50 of New York General Business Law

150.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 149 of its Petition for Intervention.

151.    IBM has engaged in deceptive acts and practices within the meaning of Sections 349-50 of New York General Business Law by, among other things, (i) misrepresenting to PSI and the public that it practices reasonable non-discriminatory licensing; (H) representing to PSI in 2001, 2003 and 2004 that it would enter into a patent license with respect to the OS/390 patents on a nondiscriminatory basis and on standard terms and conditions, (Hi) using pretext of purported patent infringement to justify tying, (iv) changing its products and support without need or notice in order to exclude PSI and T3 and harm consumers without disclosing this to customers, (vi) denigrating PSI, T3, and their products to consumers; and (vii) other false and misleading statements.

152.    IBM's conduct as alleged hereinabove causes consumer injury and harm to the public interest because (a) consumers have been deceived into purchasing IBM's products based on its reputation and representations of openness and fairness, and (b) IBM's conduct has fomented its monopoly and caused higher prices in the mainframe computers by hindering and delaying PSI's and T3's entry into the market.

153.    PSI, T3, and consumers in the New York have suffered and will continue to suffer injury and loss of money or property as a result of IBM's unfair or fraudulent business acts and practices as alleged herein. If not enjoined, IBM's conduct will cause further injury to PSI, T3, and consumers.

### SIXTH COUNTERCLAIM:
### Promissory Estoppel

154.    T3 realleges and incorporates by reference the allegations of paragraphs 1 through and including 153 of its Petition for Intervention.

155.    Until 2006, IBM had a publicly announced policy of reasonable, nondiscriminatory patent licensing on its website.

156.    In letters dated January 12, 2001, February 15, 2001, and March 9, 2001, IBM represented that it would license intellectual property that had previously been licensed to Amdahl and others on similar terms.

157.    In March 2003, after being informed by PSI that it needed assurances regarding licensing, IBM represented to PSI that, "[u]nder our current practice, IBM would be willing to enter into a patent license with PSI."

158.    On information and belief, in May 2003, IBM granted PSI a license to develop OS/390 compatible mainframes, reinforcing PSI's reasonable belief that IBM would grant a patent license for at least those patents that IBM believed were necessary to deliver an OS/390 compatible mainframe.

159.    On information and belief, in Spring 2004, IBM extended that development license, fully recognizing that PSI was building an IBM-compatible mainframe.

160.    In 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM again represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions. PSI communicated these representations to T3.

161.    IBM was aware of the importance to PSI's and T3's business of licensing patents, and IBM made the promises and representations alleged above with the knowledge that PSI and its T3 were relying on them.

162.    PSI and T3 reasonably, foreseeably, justifiably, and to its detriment, relied on IBM's representations and promises. PSI and T3 are now unable to market and sell the PSI mainframe as a result of IBM's actions as alleged herein.

163.    IBM has failed and refused to perform its promises alleged above.

164.    PSI will perform, or is excused from performing as a result of IBM's breaches, all of its obligations under the contract.

165.    Particularly in light of the other behavior alleged herein, it would be unconscionable not to enforce IBM's promises. IBM, with sole control over what it considers to be essential facilities, made promises and delayed definitive responses while aware that PSI and T3 were building a business model and obtaining financing based on those promises. Ultimately, it attempted to force PSI to disclose confidential, proprietary information—while signing an unconscionable and nonsensical agreement that such information was not confidential and could be used by IBM in any manner that it pleased—as a precondition to further negotiations. After PSI eventually acquiesced to that agreement, IBM revealed its true intent not to license any patents to PSI.

166.    The terms of the promise were and are just and reasonable, and provide for adequate consideration, in that PSI and T3 will undertake the same terms and conditions as IBM has accepted from other parties to its license agreements and patent licenses.

167.    PSI and T3 have no adequate remedy at law, in that IBM's continuing breach and its failure to perform in the future cannot be adequately compensated for in money damages. Accordingly, PSI and T3 are entitled to specific performance of the contract as alleged herein. In the alternative, IBM is estopped from asserting infringement of intellectual property that IBM represented that it would license.

## **JURY DEMAND**

168.    T3 demands a jury on all issues triable to a jury.

## **PRAYER FOR RELIEF**

Wherefore, T3 prays:

(1)    That the Court enter a judgment that IBM has violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act, and Section 349-50 of New York General Business Law;

(2)      That the Court award T3 treble damages and attorneys' fees and costs under the Sherman Act and section 4 of the Clayton Act, 15 U.S.C. § 15;

(3)      That the Court award T3 specific performance of IBM's promise to license its OS/390 and z/OS related patents on the same terms as extended to others;

and

(4)      That the Court award T3 such other and further relief and damages which the Court deems proper.


Dated: March 6, 2008                                   Respectfully submitted,


                                                       **/s/ David L. Patrón**

                                                       David L. Patrón
                                                       Brent Barriere
                                                       Harry Barton
                                                       Skylar Rosenbloom
                                                       **PHELPS DUNBAR LLP**
                                                       Canal Place
                                                       365 Canal Street, Suite 2000
                                                       New Orleans, Louisiana 70130
                                                       Tel.: 504-566-1311
                                                       Fax: 504-568-9130

                                                       Bruce E. Gerstein (BG-2726)
                                                       Noah Silverman (NS-5728)
                                                       Elena K. Chan (EC-2337)
                                                       **GARWIN GERSTEIN & FISHER LLP**
                                                       1501 Broadway, Suite 1416
                                                       New York, New York 10036
                                                       Tel.: 212-398-0055
                                                       Fax: 212-764-6620


                                                       *Attorneys for T3 Technologies Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon the following counsel of record via the CM/ECF system, this 6th day of March, 2007.

| | |
|---|---|
| David L. Elsberg | davidelsberg@quinnemanuel.com |
| Alexander Barnard | alexander.barnard@credit-suisse.com |
| Katherine Jane Weall | katherineweall@quinnemanuel.com |
| Frederick A. Lorig | fredericklorig@quinnemanuel.com |
| Edward J. DeFranco | eddefranco@quinnemanuel.com |
| Thomas D. Pease | thomaspease@quinnemanuel.com |
| Richard Walter Erwine | richarderwine@quinnemanuel.com |
| Morris Waisbrot | mwaisbrot@hhlaw.com |
| Steven M. Edwards | smedwards@hhlaw.com |
| Stephen Edward Morrissey | smorrissey@susmangodfrey.com |
| Stephen D. Susman | ssusman@susmangodfrey.com |
| Ryan C. Kirkpatrick | rkirkpatrick@susmangodfrey.com |
| Jacob W. Buchdahl | jbuchdahl@susmangodfrey.com |
| Tibor Ludovico Nagy | tnagy@susmangodfrey.com |

And to the following person via electronic mail:

| | |
|---|---|
| Richard I. Werder, Jr. | rickwerder@quinnemanuel.com |

/s/ David L. Patrón

NO.99850234.1