IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

v.

PLATFORM SOLUTIONS, INC. and T3
TECHNOLOGIES, INC.,

                Defendants.

Civil Action No. 06-cv-13565-LAK (THK)

**JURY TRIAL DEMANDED**

**MEMORANDUM OF LAW IN SUPPORT
OF PLATFORM SOLUTIONS, INC'S
MOTION FOR SUMMARY JUDGMENT
ON COUNTS ELEVEN AND TWELVE OF
INTERNATIONAL BUSINESS MACHINE
CORPORATION'S SECOND AMENDED
COMPLAINT**

**[PUBLIC VERSION - CONFIDENTIAL
VERSION FILED UNDER SEAL
4/16/2008]**

# **TABLE OF CONTENTS**

                                                                                          Page

I.      SUMMARY OF BASIS FOR MOTION ................................................................... 1

II.     PROCEDURAL HISTORY ..................................................................................... 5

III.    ARGUMENT ............................................................................................................ 6

        A.      Standard for Summary Judgment ................................................................ 6

        B.      IBM's Trade Secret Misappropriation and Tortious Interference Claims
                are Governed by California Law .................................................................. 6

        C.      IBM's Trade Secret Claim is Time Barred Under California Civil Code
                3426.6 ......................................................................................................... 8

                1.      Under California law the Statute of Limitations for a Trade Secret
                        Claim Runs from the Date the Plaintiff Has Actual or Inquiry
                        Notice .............................................................................................. 8

                2.      The First Act of Alleged Misappropriation Occurred by the End of
                        2000 ................................................................................................ 11

                3.      IBM had actual notice of the facts constituting the alleged
                        misappropriation in 2001 when PSI directly told IBM that it had
                        acquired "all" Amdahl diagnostics and had direct discussions with
                        IBM about *IBM's* desire to acquire the diagnostics ..................... 11

                4.      From August 2001 until August 2004, the operative date for statute
                        of limitations purposes, PSI made further statements to IBM and
                        the public-at-large confirming that it had acquired and was running
                        Amdahl diagnostics ........................................................................ 13

                5.      IBM's statements prior to and during this lawsuit confirm that
                        PSI's statements would have put any reasonable person on notice
                        of misappropriation ........................................................................ 15

                6.      IBM did not take any steps to investigate Amdahl's disclosure of
                        diagnostics to PSI ........................................................................... 16

                7.      PSI's general denials of misappropriation and statements that it did
                        not receive IBM technical specifications do not constitute
                        fraudulent concealment and cannot toll the statute of limitations ........... 18

                8.      The statute of limitation has run as to all trade secrets arising from
                        or related to Amdahl's disclosure of diagnostic programs to PSI ............ 21

831591v1/08384-009947

D.      The Alleged IBM Confidential Information Does Not Qualify as A Trade
        Secret Under California Civil Code § 3246.1 Due to IBM's Failure to
        Undertake Reasonable Measures to Maintain Secrecy ........................................ 22

E.      IBM's Tortious Interference with Contract Claim is Preempted by the
        California UTSA ................................................................................................. 23

F.      IBM's Intentional Interference with Contract Claim is Barred by the
        Statute of Limitations ......................................................................................... 24

IV.     CONCLUSION ............................................................................................................ 25

831591v1/08384-009947

## TABLE OF AUTHORITIES

### CASES

*Alamar Biosciences Inc. v. Difco Laboratories Inc.,*
    1996 WL. 648286, 40 U.S.P.Q. 2d 1437 (E.D.Cal., Feb. 27, 1996)................................. passim

*In re Allstate Insurance Co.,*
    81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993).....................................11

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ......................................11

*Ashton-Tate Corp. v. Ross,*
    728 F. Supp. 597 (N.D.Cal.1989) ...........................................................10

*Cadence Design System, Inc., v. Avant! Corp.,*
    29 Cal. 4th 215, 127 Cal. Rptr. 2d 169, 57 P.3d 647 (Cal. 2002) ...........................2, 10

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,*
    318 F. Supp. 2d 216 (D.Del. 2004) ..........................................................24

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......................................6

*Champlain Enterprises, Inc. v. U.S.,*
    945 F. Supp. 468 (N.D.N.Y. 1996) ...........................................................8

*Chasteen v. UNISIA JECS Corp.,*
    216 F.3d 1212 (10th Cir. 2000)...........................................................18, 19

*Community Cause v. Boatwright,*
    124 Cal. App. 3d 888, 177 Cal. Rptr. 657 (1981) .............................................18

*Convolve, Inc. v. Compaq Computer Corp.,*
    2006 WL. 839022 (S.D.N.Y. 2006) .......................................................4, 23, 24

*Digital Envoy,*
    370 F. Supp. 2d at 1035 .....................................................................24

*Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.,*
    388 F. Supp. 2d 426 (D.Del. 2005).............................................................24

*Fama v. Commissioner of Correctional Services,*
    235 F.3d 804 (2d Cir. 2000)..................................................................11

831591v1/08384-009947

*Forcier v. Microsoft Corp.*,
   123 F. Supp. 2d 520 (N.D.Cal. 2000) ........................................................................... passim

*Glue-Fold, Inc. v. Slautterback Corp.*,
   82 Cal. App. 4th 1018, 98 Cal. Rptr. 2d 661 (2000) ..................................................10, 22, 23

*Gonsalves v. Kaiser Sand & Gravel Co., Inc.*,
   1994 WL. 125211 (N.D.Cal., Mar. 24, 1994) ...............................................................18

*Hamilton v. Accu-Tek*,
   47 F. Supp. 2d 330 (E.D.N.Y.,1999) ...........................................................................7

*Intermedics, Inc. v. Ventritex, Inc.*,
   822 F. Supp. 634 (N.D.Cal.1993) ........................................................................... passim

*Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103, 245 Cal. Rptr. 658, 751 P.2d 923 (1988) ..........................................8

*Kistler Instrumente A.G. v. PCB Piezotronics, Inc.*,
   419 F. Supp. 120 (W.D.N.Y.1976) ..............................................................................7

*Klaxon v. Stentor Electric Manufacturing Co.*,
   313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941) ................................................6

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ............................................6

*Memry Corp. v. Kentucky Oil Technology, N.V.*,
   2007 WL. 2746736 (N.D.Cal. Sep 20, 2007) ........................................................2, 8, 10

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*,
   407 F.2d 288 (9th Cir.1969) ..................................................................................21

*Neumeier v. Kuehner*,
   31 N.Y.2d 121, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972) ..........................................7

*Padula v. Lilarn Properties Corp.*,
   84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) ......................................7, 8

*SCFB HOLT LLC v. Collins Stewart Ltd.*,
   2004 WL. 1794499 (S.D.N.Y. Aug 10, 2004) ..............................................................7

*Sanchez v. South Hoover Hospital*,
   18 Cal. 3d 93 (1973) ...........................................................................................18

831591v1/08384-009947

*Schultz v. Boy Scouts of America, Inc.*,
65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985) ..........................7

*Sheldon v. PHH Corp.*,
135 F.3d 848 (2d Cir. 1998) ..................................................................7

*Snapp & Associates Insurance Services, Inc. v. Malcolm Bruce Burlingame*,
96 Cal. App. 4th 884, 117 Cal. Rptr. 2d 331 (2002) ..............................18

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
2006 WL 5437322 (C.D.Cal. 2006) ....................................................24

*Thomas & Betts Corp. v. Panduit Corp.*,
108 F. Supp. 2d 968 (N.D.Ill. 2000) ....................................................24

*U.S. Reinsurance Corp. v. Humphreys*,
205 A.D.2d 187, 618 N.Y.S.2d 270 (1st Dept. 1994) ..............................7

*Weins v. Sporleder*,
605 N.W.2d 488 (S.D. 2000) ..............................................................23

*Wilshire Westwood Associates v. Atlantic Richfield Co.*,
20 Cal. App. 4th 732, 24 Cal. Rptr. 2d 562 (1993) ..........................8, 13

## STATUTES

Cal. Civ. Code § 3246.1 ................................................................1, 7, 22

Cal. Civ. Code. § 3426.1 ..................................................................passim

Cal. Civ Code § 3426.6 ......................................................................2, 8

Cal. Civ. Code § 3426.7(b) ..............................................................4, 23

Cal. Civ. Code § 3426.8 ......................................................................23

Federal Rule of Civil Procedure 56 ........................................................6

Unif. Trade Secrets Act § 6, Comment, 14 U.L.A. 462 (1990) ....................9

831591v1/08384-009947

Defendant and Counterclaimant Platform Solutions, Inc. ("PSI") hereby moves for summary judgment as to Counts Eleven (Trade Secret Misappropriation) and Twelve (Tortious Interference with Contractual Relations) of Plaintiff and Counterdefendant International Business Machine Corporation's ("IBM") Second Amended Complaint ("SAC") on the following grounds: (1) IBM's Eleventh Cause of Action is barred by the applicable statute of limitation; (2) IBM cannot show the existence of a protectable trade secret; (3) IBM's Twelfth Cause of Action is preempted by the California Uniform Trade Secrets Act; and (4) IBM's Twelfth Cause of Action is barred by the applicable statute of limitations.

## I.    SUMMARY OF BASIS FOR MOTION

IBM's trade secret misappropriation and tortious interference claims are both predicated on Amdahl Corporation's ("Amdahl")[1] disclosure to PSI of diagnostic programs developed by Amdahl. Diagnostic programs are software programs used to test a computer's compatibility with a defined computer architecture. Beginning in the late 1970s, Amdahl began developing diagnostic programs to test the compatibility of Amdahl's plug-compatible mainframes (PCMs) with IBM's System 370 and successor computer architectures. Amdahl developed the five diagnostic programs at issue in this litigation—DIRT, ALPHA, HOT, 8E7 and Bring-up Programs (BUPS)—using, among other sources, written technical specifications that IBM disclosed to Amdahl pursuant to agreements known as Technical Information Disclosure Agreements (TIDA) and Technical Information License Agreements (TILA). [SAC at ¶¶ 35-40.]

In 1999, Amdahl (which had by that time been acquired by Fujitsu Limited of Japan) spun off PSI to continue Amdahl's business of developing and marketing PCMs. In that transaction, PSI obtained a license to the Amdahl diagnostics, and by the end of 1999 Amdahl had given PSI access to the five accused diagnostic programs. It is undisputed, however, that PSI *never* obtained the technical specifications that IBM had licensed to Amdahl: PSI only received the derivative diagnostic programs developed by Amdahl.

---

[1] In 1997 Amdahl was acquired by Fujitsu Limited. Subsequent to 2001 Amdahl's name was changed to Fujitsu IT Holdings, Inc. A number of its business operations were also transferred to or combined with the business operations of other US subsidiaries of Fujitsu Limited. As used herein, "Amdahl" refers collectively to Amdahl Corporation and any other Fujitsu entities which carried on Amdahl's business operations unless reference to a specific legal entity in necessary for understanding this Memorandum.

831591v1/08384-009947

Now, eight years later, IBM contends that PSI's receipt and use of Amdahl's diagnostics, in any form, constitutes a misappropriation of IBM trade secrets. [SAC at ¶¶ 48-49.] This claim, and IBM's related tortious interference claim, is time-barred under the California Uniform Trade Secrets Act ("CUTSA").

Under CUTSA, an action for misappropriation of trade secrets must be brought "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ Code § 3426.6. Both actual and inquiry notice trigger the statute of limitations under California law. Thus, "[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation." *Memry Corp. v. Kentucky Oil Technology, N.V.*, 2007 WL 2746736, at *7 (N.D.Cal. Sep 20, 2007) (quoting *Alamar Biosciences Inc. v. Difco Laboratories Inc.*, 1996 WL 648286, 40 U.S.P.Q.2d 1437, 1439-1440 (E.D.Cal., Feb. 27, 1996)).

CUTSA expressly rejects the continuing tort doctrine. *See* Cal. Civ. Code. § 3426.1. Instead, CUTSA treats misappropriation as a breach of a confidential relationship, and a misappropriation claim "arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule . . . and each new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misappropriation rather than as giving rise to a separate claim." *Cadence Design Sys., Inc., v. Avant! Corp.*, 29 Cal. 4th 215, 127 Cal. Rptr. 2d 169, 57 P.3d 647, 651 (Cal. 2002). Accordingly,

> when the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at the same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets, at least when the plaintiff shared all the trade secrets with the defendants during the same time period and in connection with the same relationships and when the trade secrets concern related matters.

*Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 657 (N.D.Cal. 1993)

Here, it is incontrovertible that IBM had actual notice of the facts constituting the first instance of misappropriation no less than six years prior to filing its First Amended Complaint on August 7, 2007. Specifically, in late 2000, PSI and IBM were engaged in discussions about a potential partnership. On January 23, 2001, Ronald Hilton, PSI's founder, sent an email to

IBM's Edwin Dalley and Robert Chrisfield explaining PSI's development plans and disclosing that PSI obtained "rights to Amdahl's emulation technology, associated patents, and access to other intellectual property such as S/390 diagnostics and benchmarks." [Declaration of Ronald Hilton at ¶ 10, Ex. A ("Hilton Decl.")] (emphasis added). On March 5, 2001, Hilton again wrote to Chrisfield regarding PSI's plans, stating that:

> we have all the assets developed by Amdahl for S/390 development [including] [b]ring-up programs [and] [s]ystem-level diagnostics such as HOT and DIRT.

[Hilton Decl. at ¶ 11, Ex. B] (emphasis added).

In fact, at the time of these communications, IBM had been in direct discussions with Amdahl about acquiring these very same Amdahl diagnostic programs for itself. [Declaration of Scott Blackledge at ¶ 4 ("Blackledge Decl.").]  When those discussions stalled, PSI initiated discussions directly with IBM regarding a three-way trade in which IBM would receive the Amdahl diagnostics and PSI would receive the IBM technical specifications that had been licensed to Amdahl. [Id. at ¶ 4; Hilton Decl. at ¶ 12.]  Thus, as explained in greater detail below, and as acknowledged in IBM's SAC, IBM at all relevant times knew what the Amdahl diagnostics were, how they were created, and what they tested: system-level compatibility with both public and purportedly non-public aspects of the IBM Principles of Operation. [SAC at ¶ 39; Blackledge Decl. at ¶¶ 7-8.]

Following these discussions, PSI made no attempt to conceal from IBM its receipt and use of the diagnostics.  On May 10, 2002, Hilton told IBM's Scott Blackledge in an email that PSI was successfully running DIRT and HOT and was planning to begin work on ALPHA. [Hilton Decl. at ¶ 13, Ex. D; Blackledge Decl. at ¶ 6.]  Less than a year later, on February 7, 2003, IBM's Director of Licensing, Gerald Lane, faxed Hilton a letter asking what features PSI's product would support.  That same day, Hilton responded via email that:

> To the best of our knowledge, our implementation does not deviate in any way from the IBM architectural specifications. We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility.

[Hilton Decl. at ¶ 14-15, Ex. F] (emphasis added).

More than four years after that last statement was made to IBM, IBM now contends that PSI misappropriated IBM's trade secrets by obtaining HOT, DIRT and the other diagnostics. Astonishingly, IBM's SAC cites Hilton's February 2003 letter as the centerpiece of its

3                              831591v1/08384-009947

misappropriation allegations, without identifying either the date or the fact that the letter was addressed *to IBM*. (SAC at ¶ 50 ("Thus PSI has stated that, 'We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility.'").).

IBM's untimely claim is exactly the type that CUTSA's statute of limitations was designed to preclude. Despite being told directly and repeatedly by PSI that PSI had acquired "all" Amdahl diagnostics and was running them to test full compatibility, despite knowing how those diagnostics were developed and used, and despite acknowledging in 2005 that PSI's general claim that its product is "based on proven systems architecture spun-off from Amdahl" caused it to suspect misappropriation, IBM did nothing and undertook no investigation. Instead, IBM waited until 2007—after PSI had invested tens of millions of dollars developing and bringing to market its competitive mainframe; after the evidence of IBM's knowledge and PSI's use has grown stale; and after PSI filed antitrust claims—to assert trade secret claims based on PSI's acquisition of the Amdahl diagnostics.

Not only is IBM's trade secret claim time-barred, but any protected status that the accused diagnostics may have had has been lost by virtue of IBM's inaction. Under California law, a trade secret plaintiff must undertake efforts reasonable under the circumstances to protect its secrets. Cal. Civ. Code § 3426.1 (West 1997). That duty includes, *inter alia*, investigating or initiating suit when it suspects that a confidential relationship was breached. *See Alamar Biosciences*, 40 U.S.P.Q.2d at 1442. Here, not only did IBM fail to take any action against PSI based on PSI's admitted acquisition of the accused diagnostics, IBM has, to the best of PSI's knowledge, failed to this day to take any action against Amdahl—the party with which IBM had the confidential relationship. *See Forcier*, 123 F. Supp. 2d at 525 ("[The] law impose[s] on plaintiffs 'a responsibility to take prompt and assertive corrective action with respect to *all of [their] interests* whenever [they] detect a fracture in a once confidential relationship.'") (quoting *Intermedics*, 822 F. Supp. at 654) (emphasis added).

IBM's tortious interference claim, which is just a restatement of its misappropriation claim, is similarly barred. First, CUTSA preempts claims for tortious interference premised on misappropriation of trade secrets. Cal. Civ. Code § 3426.7(b); *Convolve, Inc. v. Compaq Computer Corp.*, 2006 WL 839022 at *7 (S.D.N.Y. 2006) (applying the CUTSA). There is no dispute that IBM's tortious interference claim is premised on the alleged misappropriation of

trade secrets. (SAC at ¶ 190.)  Second, the statute of limitations for tortious interference is only two years, and had therefore run prior to the date IBM filed its First Amended Complaint.

IBM is one of the most sophisticated technology companies in the world.  In 2001, PSI told IBM that Amdahl (one of IBM's competitors in the mainframe market, to whom it had licensed numerous technical specifications) had transferred Amdahl's diagnostic programs to PSI.  IBM did nothing. It sat on its rights until PSI brought antitrust counterclaims and then initiated a trade secret suit premised on a series of overreaching legal theories about what is "IBM confidential information" and what constitutes misappropriation of trade secrets.  In so doing, IBM has forced PSI to recreate eight years of engineering and spend millions of dollars defending a lawsuit that should have been brought—if at all—over six years ago.  At the same time, IBM has taken no action against Amdahl—the company that actually owed contractual duties to IBM.  There is no genuine issue of material fact as to either notice or diligence.  PSI therefore respectfully requests that the Court grant summary judgment on IBM's Eleventh and Twelfth Causes of Action.

## II.    PROCEDURAL HISTORY[2]

On November 29, 2006, IBM filed suit against PSI in the United States District Court for the Southern District of New York, bringing five counts of patent infringement, one count of breach of contract, and requesting declaratory judgment that its refusal to license mainframe operating systems to customers who do not buy IBM mainframes is lawful.  [Declaration of Ryan Kirkpatrick at ¶ 2, Ex. A ("Kirkpatrick Decl.").]  On January 20, 2007, PSI filed counterclaims alleging, *inter alia*, that IBM was in violation of numerous antitrust and unfair competition laws and was estopped from asserting patent infringement against PSI based on prior conduct.

On August 7, 2007, the last day to amend pleadings, IBM filed a First Amended Complaint asserting trade secret misappropriation and tortious interference with the Amdahl technical information disclosure agreements. [Kirkpatrick Decl. at ¶ 3, Ex. B.]  Both claims are premised on IBM's contention that diagnostics that PSI acquired from Amdahl, whether in executable code or source code, constitute IBM trade secrets. [FAC at ¶¶ 33-51.]  After the Court granted T3 Technologies, Inc.'s ("T3") motion to intervene, IBM filed a Second Amended

---

[2] The relevant materials facts are set forth in PSI's Separate Statement of Undisputed Facts and discussed in detail in the body of the memorandum.

831591v1/08384-009947

Complaint (SAC) on January 25, 2008 adding T3 as a defendant to IBM's patent infringement claims, but otherwise did not materially change the pleadings. [Kirkpatrick Decl. at ¶ 4, Ex. C.]

## III.    ARGUMENT

### A.    Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Id. at* 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548. The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. 2548. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### B.    IBM's Trade Secret Misappropriation and Tortious Interference Claims are Governed by California Law

In determining which state's law applies to a claim brought under the Court's diversity jurisdiction or supplemental jurisdiction, a federal court applies the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the law of the jurisdictions involved." *In re Allstate Insurance Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993).

Here, there is a clear conflict between New York and California law. California is one of 44 states that has adopted the Uniform Trade Secrets Act, while New York is one of the handful states that continues to follow common law principles. Among other differences at issue in this case, New York courts accept the continuing tort theory for claims of trade secret misappropriation, while California, along with every other state that has adopted the UTSA, does

6

not. *See Intermedics, Inc.*, 822 F. Supp. at 644 n. 10 (noting that Cal. Civ. Code. § 3426.1 expressly rejects the continuing tort theory, while New York courts continue to accept the continuing tort theory, citing *Kistler Instrumente A.G. v. PCB Piezotronics, Inc.*, 419 F. Supp. 120 (W.D.N.Y.1976)); *see also SCFB HOLT LLC v. Collins Stewart Ltd.*, 2004 WL 1794499, *8-9 (S.D.N.Y. Aug 10, 2004)* (noting that New York continues to recognize the continuing tort theory). California law also requires that a plaintiff exercise reasonable efforts to maintain secrecy, *see* Cal. Civ. Code § 3246.1, while New York follows the Restatement definition of a trade secret, *see U.S. Reinsurance Corp. v. Humphreys*, 205 A.D. 2d 187, 191, 618 N.Y.S.2d 270 (1st Dept. 1994).

When the conflict involves questions of tort law, "New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998) (*quoting Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994)). In determining which jurisdiction has the greater interest, New York courts draw a distinction between loss-allocating rules—"such as charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules"—and conduct-regulating rules that establish the requirements for liability. *Padula*, 84 N.Y.2d at 522, 644 N.E.2d at 1002, 620 N.Y.S.2d at 311.

When conduct-regulating rules are at issue, the law of the place of the tort governs. *Sheldon*, 135 F. 3d at 853; *Hamilton v. Accu-Tek*, 47 F. Supp. 2d 330, 336-337 (E.D.N.Y.,1999) ("'it would be almost unthinkable to seek the applicable rule in the law of some other place'" than the place where the tort occurred where that jurisdiction's conduct-regulating laws were designed to control the conduct at issue) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 483, 240 N.Y.S.2d 743, 751, 191 N.E.2d 279, 280 (1963)); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 198, 480 N.E.2d 679, 685, 491 N.Y.S.2d 90, 96 (1985) ("the law of the place of the tort will usually have a predominant if not exclusive concern because the locus jurisdiction's interest in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct"). When the conflict involves rules regarding loss allocation, New York courts apply the three-part test set forth in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972). *See Sheldon*, 135 F.3d at 853.

Here, the relevant laws in conflict—those governing the statute of limitations, the definition of a trade secret, and the preemptive effect of the Uniform Trade Secrets Act—are conduct-regulating rules because they establish the requirements for liability and do not relate to loss allocation. *See Padula*, 84 N.Y.2d at 522, 644 N.E.2d at 1002, 620 N.Y.S.2d at 311. Because the disclosure, acquisition, and use of the accused diagnostics all occurred within California, where both PSI and Amdahl have or had at all times been headquartered, California law governs. *Id.*; *see also Champlain Enterprises, Inc. v. U.S.*, 945 F. Supp. 468, 474 (N.D.N.Y. 1996) ("The place of the wrong, for purposes of New York's *lex loci delicti* rule, is considered to be the place where the last event necessary to make the actor liable occurred.") (citations and internal quotations omitted).

### C. IBM's Trade Secret Claim is Time Barred Under California Civil Code 3426.6

#### 1. Under California law the Statute of Limitations for a Trade Secret Claim Runs from the Date the Plaintiff Has Actual or Inquiry Notice

California's statute of limitations for claims based on alleged misappropriation of trade secrets provides that "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *See* Cal. Civ. Code §3426.6; *Intermedics, Inc.*, 822 F. Supp. at 643. Thus, California law does not require actual knowledge of misappropriation before the statute of limitations begins to run. Rather, "[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation." *Memry Corp.*, 2007 WL 2746736, at *7 (quoting *Alamar Biosciences Inc.*, 40 U.S.P.Q.2d at 1439-1440 (E.D.Cal.1996)); *Wilshire Westwood Associates v. Atlantic Richfield Co.*, 20 Cal. App. 4th 732, 740, 24 Cal. Rptr. 2d 562, 566 (1993) ("If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation."); *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110-11, 245 Cal. Rptr. 658, 751 P.2d 923, 927-28 (1988) ("[T]he limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry . . . . So long as a

831591v1/08384-009947

suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.").

Section 3426.6 also provides that, "[f]or the purposes of this section, a continuing misappropriation constitutes a single claim." Cal. Civ. Code § 3426.1. "This statement reflects a 'rejection of the continuing wrong theory (i.e., rejection of the idea that each subsequent act of misappropriation of a trade secret creates a new claim for a plaintiff and begins a new period of limitations).'" *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 525 (N.D.Cal. 2000) (quoting *Intermedics*, 822 F. Supp. at 653-54); *see also* Unif. Trade Secrets Act § 6, Comment, 14 U.L.A. 462 (1990).

> These two provisions of Section 3426.6 have the following effect:
>
> By simultaneously rejecting the continuing wrong theory and insisting on 'discovery' as the trigger for the statute, the legislature seems to have decided to focus on plaintiff's interest in having real notice that conduct by defendant jeopardized the secrecy of all the confidences that plaintiff had shared with that defendant. [Citation omitted.] *The underlying principle appears to be that once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should know that there is a risk that that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences.*

*Forcier*, 123 F. Supp. 2d at 525 (quoting *Intermedics*, 822 F. Supp. at 654) (emphasis in *Forcier*).

Thus, the law imposes on plaintiffs "a responsibility to take prompt and assertive corrective action with respect to all of [their] interests whenever [they] detect a fracture in a once confidential relationship." *Intermedics*, 822 F. Supp. at 654. Consistent with this principle, the Court in *Intermedics* concluded that:

> when the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at the same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets, at least when the plaintiff shared all the trade secrets with the defendants during the same time period and in connection with the same relationships and when the trade secrets concern related matters.

*Id.* at 657.

831591v1/08384-009947

This analysis has been endorsed by California state courts and numerous district courts. *See Cadence Design Sys., Inc.*, 29 Cal.4th at 127, Cal. Rptr. 2d 169, 57 P.3d at 651 (Cal. 2002) (claim for misappropriation of a trade secret "arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule ... and each new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misappropriation rather than as giving rise to a separate claim"); *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App.4th 1018, 98 Cal. Rptr. 2d 661, 666 (2000) (stating that "we agree with the federal court [in *Intermedics*] that 'California law assumes that once a plaintiff knows or should know that a particular defendant cannot be trusted with one secret, it is unreasonable for that plaintiff simply to assume that defendant can be trusted to protect other secrets'" and affirming the "unanimous conclusion of . . . federal courts construing section 3426.6 [including the district court in *Intermedics*] . . . that it is the first discovered (or discoverable) misappropriation of a trade secret which commences the limitation period"); *Forcier*, 123 F. Supp. 2d at 525-26 (adopting the *Intermedics* analysis and granting summary judgment on misappropriation claim); *Memry Corp.*, 2007 WL 2746736 at *7 (adopting the *Intermedics* analysis and granting summary judgment on misappropriation claim).

The same rule applies to the party who had a confidential relationship with the plaintiff *and* any third parties to whom the trade secrets were disclosed. *Intermedics*, 822 F. Supp. at 647 ("[T]he statute of limitations principles that apply in a misappropriation action against a party who allegedly breached directly a confidential relationship also apply in a misappropriation action against a third party, like Ventritex, who never had a confidential or contractual relationship with plaintiff."); *Ashton-Tate Corp. v. Ross*, 728 F. Supp. 597, 603 (N.D.Cal. 1989) (ruling that the initial act of misappropriation by one party began the running of the statute of limitations for that party and, also, for a third party who obtained the trade secrets from the first party and then used them for their own purposes).

As set forth in more detail below, the alleged misappropriation by PSI first occurred in 1999, when Amdahl transferred the accused diagnostics to PSI. IBM was provided notice of these events in January and March 2001 when PSI told IBM in two separate communications that PSI had acquired the accused diagnostics from Amdahl. The statute of limitations thereafter immediately began running as to misappropriation claims against Amdahl (for misappropriation through disclosure) and PSI (for misappropriation through acquisition and use), *see Intermedics*,

822 F. Supp. at 646, and expired in Spring 2004—over three years *before* IBM filed its FAC.[3] IBM's claim is, therefore, plainly barred.

### 2.  The First Act of Alleged Misappropriation Occurred by the End of 2000

Under California law, a trade secret can be misappropriated through use, acquisition, or disclosure. *See* Cal. Civ. Code § 3426.1 (defining "misappropriation" to mean "(1) Acquisition of a trade secret of another . . .; or (2) Disclosure or use of a trade secret of another . . ."). IBM contends that because Amdahl's diagnostics were created using technical specifications that IBM had disclosed to Amdahl, and, according to IBM, disclose the information in those specifications, both Amdahl's disclosure and PSI's acquisition of the diagnostics constitutes trade secret misappropriation. (SAC at ¶¶ 48-49).

In this case, it is undisputed that Amdahl and PSI signed a license agreement for the diagnostics in February 1999, that PSI immediately thereafter had access to the diagnostics, and that PSI began receiving physical copies of the diagnostics from Amdahl by early 2000. [Hilton Decl. at ¶¶ 6-7.] IBM has identified those diagnostics as disclosing IBM trade secrets in its SAC and interrogatory responses. [SAC at ¶¶ 40-41 (asserting that all the diagnostic tools were "laced" with IBM Technical Information); Kirkpatrick Decl. at ¶ 5, Ex. D.] In light of the above, it is clear that the first act of alleged misappropriation by Amdahl and PSI occurred no later than 2000.

### 3.  IBM had actual notice of the facts constituting the alleged misappropriation in 2001 when PSI directly told IBM that it had acquired "all" Amdahl diagnostics and had direct discussions with IBM about *IBM's* desire to acquire the diagnostics

IBM was fully aware that Amdahl, like IBM, developed diagnostic programs using IBM architectural specifications and that it used those diagnostics to test the compatibility of its plug-compatible mainframes. In 2000, IBM entered into negotiations with Amdahl to acquire the

---

[3] IBM's trade secret misappropriation and tortious interference claims do not relate back to its November 29, 2006 complaint. IBM's patent infringement and breach of contract claims bear no relation to use of alleged trade secrets, and could not have provided PSI with "fair notice" of those claims. *See Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 815 (2d Cir. 2000) ("In determining whether the claim arises out of the same conduct or occurrence [for purposes of applying the relation back doctrine], '[t]he pertinent inquiry . . . is whether the original complaint gave the defendant fair notice of the newly alleged claims.'") (quoting *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir. 1998)).

831591v1/08384-009947

same diagnostics that are at issue in this litigation. [Blackledge Decl. at ¶ 4.] Further, in 2000, IBM hired a number of the very Amdahl mainframe engineers who wrote the accused diagnostic programs while they were at Amdahl. [Blackledge Decl. at ¶ 7.] And these engineers *told* IBM about the diagnostics. Indeed at least one of those engineers pressed IBM's management to acquire the accused diagnostics from Amdahl because they were superior to IBM's own diagnostics. [Blackledge Decl. at ¶¶ 7-8.]

In late 2000, PSI began discussions with IBM regarding a potential partnership. As part of those discussions, on January 23, 2001, Ronald Hilton, PSI's founder, wrote an email to Ed Dalley, an IBM employee, and Robert Chrisfield, IBM's Program Director of eServer Product Alliances, explaining the history and business objectives of PSI. Making no attempt to hide PSI's acquisition of the accused diagnostics, Hilton told Dalley and Chrisfield that PSI had obtained:

> rights to Amdahl's emulation technology, associated patents, and *access to other intellectual property such as S/390 diagnostics and benchmarks*.

[Hilton Decl. at ¶ 10, Ex. A] (emphasis added).

On March 5, 2001, Hilton again wrote to Chrisfield regarding PSI's development plans, stating:

> In support of [PSI's product development plans] we have *all* the assets developed by Amdahl for S/390 development:
> - IA32-based Merlin S/390 simulator
> - *Bring-up programs*
> - *System-level diagnostics such as HOT and DIRT*
> - Performance benchmarks and workload suites.

[Hilton Decl. ¶ 11, Ex. B] (emphasis added).

In the summer of 2001, after Amdahl reached an impasse in its negotiations over the diagnostics and related intellectual property, Hilton began direct negotiations with IBM. Specifically, Hilton and IBM discussed a three-way deal in which IBM would receive Amdahl's diagnostics and Merlin emulation code and PSI would receive a license to IBM's written technical specifications. [Hilton Decl. at ¶ 12.] Both Scott Blackledge, an IBM engineer, and Tom Morris, Jr., Blackledge's manager at IBM, had separate discussions with Hilton in which they indicated that IBM required that it receive the Amdahl diagnostics as part of any exchange of intellectual property. [*Id.*; Blackledge Decl. at ¶ 5.]

831591v1/08384-009947

Six years later, IBM now asserts that both Amdahl and PSI misappropriated IBM trade secrets when Amdahl licensed the accused diagnostics to PSI. IBM's claim is untimely. A misappropriation claim arises when a plaintiff has facts that would make a reasonably prudent person suspicious of the facts underlying the alleged misappropriation. *Wilshire*, 20 Cal. App. 4th at 740, 24 Cal. Rptr. at 566. It is incontrovertible that IBM had notice of such facts in 2001. At that time, IBM knew that: (1) Amdahl's diagnostics were created using technical specifications disclosed by IBM to Amdahl; (2) Amdahl's diagnostics tested compatibility with all aspects of IBM's mainframe architecture, both public and non-public; (3) Amdahl had spun off PSI to continue making IBM-compatible mainframes; and (4) Amdahl had licensed all the accused diagnostics to PSI. There is no triable question of fact as to whether, in 2001, IBM had notice of the facts constituting the basis of its current claims.

    **4.**    <u>From August 2001 until August 2004, the operative date for statute of limitations purposes, PSI made further statements to IBM and the public-at-large confirming that it had acquired and was running Amdahl diagnostics.</u>

Even after August 2001, IBM continued to receive facts that put it on actual notice of the conduct IBM has alleged to constitute misappropriation by Amdahl and PSI.

As of May 2002, Hilton and IBM's Blackledge continued to communicate regarding Merlin and the diagnostics. On May 10, 2002, Blackledge asked whether PSI was able to hire an ALPHA developer, and Hilton responded: "If you're refering [sic] to Alpha the diagnostic, we have not yet attempted to run it, but will probably rely on Amdahl to help us with that. They helped us to get Dirt and Hot running, both of which are working well at this point." [Hilton Decl. at ¶ 13, Ex. D.] Then, on February 7, 2003, Gerald Lane, IBM's Director of Intellectual Property of Licensing, faxed a letter to Hilton asking what architectural specifications PSI's product supported. That same day, Mr. Hilton responded via email that:

> To the best of our knowledge, our implementation does not deviate in any way from the IBM architectural specifications. *We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility.*

[Hilton Decl. at ¶ 15, Ex. F] (emphasis added).

Approximately a year later, on May 4, 2004, PSI's CEO, Michael Maulick, gave a presentation to an audience that included Montgomery Bauman, an IBM employee, regarding PSI's product and history. ████████████████████████

13           831591v1/08384-009947



[Deposition of Erich Clementi at 94-103, Kirkpatrick Decl. at ¶ 8, Ex. G.]

In July 2004, PSI launched a website announcing that "[i]n 1999, PSI was founded by a core team of Amdahl design engineers who acquired the intellectual property and assets of the former Amdahl Corporation." [Declaration of Christian Reilly at ¶ 3 ("Reilly Decl.").]

In sum, by August 7, 2004, the operative date for statute of limitations purposes, IBM knew that: (1) Amdahl's diagnostics were created in part using specifications disclosed by IBM to Amdahl; (2) Amdahl's diagnostics tested purportedly non-public IBM architectural facilities; (3) Amdahl had licensed "all of the assets developed by Amdahl" including "bring-up programs" and "system-level diagnostics such as HOT and DIRT"; (4) PSI had "successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility"; and (5) PSI was publicly touting that it had acquired "the intellectual property and assets of Amdahl

14

831591v1/08384-009947

Corporation." In light of these facts, no reasonable juror could conclude that IBM did not have actual notice of the facts underlying its trade secrets claim.

### 5. IBM's statements prior to and during this lawsuit confirm that PSI's statements would have put any reasonable person on notice of misappropriation.

IBM's statements prior to and during this lawsuit confirm that PSI's correspondence to IBM and PSI's public statements would have put any reasonable person on notice of the facts now alleged to constitute misappropriation. For example, on May 23, 2005, *after* PSI announced that it would soon be announcing general availability of its competitive mainframe, Ronald Lauderdale, IBM's Assistant General Counsel, sent a letter to PSI noting that

> PSI's claim that its product is *"based on proven systems architecture spun-off from Amdahl" is troubling*, as IBM had licensed a number of confidential technical documents to Amdahl and Fujitsu, and that information was not transferable.

[Declaration of Gregory Handschuh at ¶ 8, Ex. E ("Handschuh Decl.")] (emphasis added).

PSI's statement that its product is "based on proven systems architecture spun-off from Amdahl" is far more general than PSI's direct statements to IBM that it acquired "all the assets developed by Amdahl . . . [including] system-level diagnostics such as HOT and DIRT" and that it had "successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility." That IBM found PSI's former claim "troubling" confirms that PSI's earlier statements would have caused any reasonable person to bring suit or, at the very least, investigate the transfer of the diagnostics.

Moreover, in its FAC, IBM makes three claims that confirm that it had notice of misappropriation more than three years before filing suit. *First*, IBM asserts that PSI's product could not exist without misappropriation of trade secrets. [FAC at ¶ 4 ("Without IBM's intellectual property, PSI's system could not exist.").] IBM was, of course, directly told on February 7, 2003 and earlier that PSI's product would be fully compatible with IBM operating systems and had run the system-level diagnostics to confirm this fact. If, as IBM now claims, compatibility is impossible without misappropriation, then IBM plainly had notice more than three years prior to the FAC.

*Second*, IBM's FAC confirms that IBM was aware that Amdahl's diagnostics were created, in part, using IBM's TIDA specifications. [FAC at ¶ 38 ███████████████

831591v1/08384-009947



.]

*Third*, IBM's FAC cites Hilton's *February 7, 2003* letter to IBM's Director of Licensing as conclusive proof that PSI misappropriated IBM trade secrets by using Amdahl system-level diagnostics. [FAC at ¶ 50 ("Thus PSI has stated that, "We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility.").] In other words, IBM is citing, in *August 2007*, a February 2003 letter as one of its strongest pieces of evidence that Amdahl and PSI misappropriated IBM trade secrets (while deliberately omitting both the date of the letter and the fact that it was sent to IBM).

In light of these statements, and the surrounding factual circumstances, there is no triable question that PSI's statements provided actual notice of the facts constituting the alleged misappropriation.

### 6. IBM did not take any steps to investigate Amdahl's disclosure of diagnostics to PSI

Even assuming, *arguendo*, that PSI's direct statements that it had acquired and run the accused diagnostics to "ascertain full compatibility" did not provide actual notice to IBM, at a minimum these statements were sufficient to give IBM cause to suspect misappropriation and trigger the duty to reasonably investigate Amdahl's disclosure of intellectual property to PSI.

IBM did not undertake *any* investigation, let alone a reasonable one. For *six years*, IBM (a) never asked PSI for a description of what had been transferred by Amdahl; (b) never asked PSI to confirm that all diagnostic listings related to architectural features IBM contends to be proprietary had been stripped out; and (c) never asked PSI to confirm that it did not have any diagnostic listings or other intellectual property that were developed by Amdahl using information disclosed pursuant to TIDA agreements. IBM also never made any corresponding inquiries to Amdahl or Fujitsu,

831591v1/08384-009947

Significantly, IBM not only could have requested Amdahl and/or Fujitsu Limited's cooperation in ascertaining what had been transferred to PSI, *it had the contractual right to demand it.* Specifically, IBM's agreements with Amdahl provided IBM with a perpetual and absolute right, upon reasonable notice, "to inspect Applicant's security procedures for compliance" with a detailed set of security procedures, including reporting to IBM "all known or suspected losses, theft, or unauthorized accesses" and keeping a log of all persons who accessed the alleged trade secrets. [Handschuh Decl. at ¶¶ 3-4, Exs. A & B.] Thus, IBM had the power not merely to request Amdahl's voluntary cooperation with its investigation—Amdahl was *contractually obligated* to permit IBM to inspect the manner in which Amdahl kept the specifications and diagnostics (assuming they qualified as IBM Confidential Information under the relevant agreements), to receive a list of the employees who had accessed them, and to investigate any suspected disclosures of the information. IBM never exercised this right.

In light of the foregoing, there is no triable issue of fact as to whether IBM acted with any diligence in investigating the transfer of diagnostics from Amdahl to PSI. California law imposes a clear duty on a plaintiff to conduct a reasonable investigation when it receives facts that would cause a reasonable person to suspect misappropriation. *See Intermedics,* 822 F. Supp. at 654. IBM's failure to even take the minimal step of *asking* the accused parties of what was transferred between them was unreasonable as a matter of law and warrants summary judgment in PSI's favor. *See Alamar Biosciences Inc.,* 40 U.S.P.Q. at 1441. Simply put, no reasonable juror could find IBM's failure to take a single action to investigate the transfer of diagnostics from Amdahl to PSI to be reasonable in light of IBM's knowledge that, *inter alia,* (a) Amdahl used the IBM technical specifications to create diagnostics, (b) PSI was spun-off of Amdahl to continue the same business; (c) PSI had acquired all the intellectual property assets of Amdahl including "system-level diagnostics such as HOT and DIRT"; and (d) PSI had "successfully run Amdahl's system-level diagnostics to ascertain full compatibility." *See id.* (granting summary judgment on trade secret claim where plaintiff never had its attorneys or any other personnel contact the defendant and ask him whether he was using a specific drug in his product); *Forcier,* 123 F. Supp. 2d at 526.

831591v1/08384-009947

7. **PSI's general denials of misappropriation and statements that it did not receive IBM technical specifications do not constitute fraudulent concealment and cannot toll the statute of limitations**

In an attempt to explain away six years of inaction, IBM's SAC asserts that PSI had concealed what it had received from Amdahl. [SAC at ¶¶ 57-59.] To the extent that IBM is attempting to make out a fraudulent concealment claim to toll the statute of limitations, several well-established principles are fatal to IBM's argument.

*First*, fraudulent concealment doctrine "does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim[,]" and it does not alter the rule that "a plaintiff is under a duty to reasonably investigate, and a suspicion of wrongdoing, coupled with a knowledge of the harm and its cause, commences the limitations period." *Snapp & Associates Ins. Services, Inc. v. Malcolm Bruce Burlingame*, 96 Cal. App. 4th 884, 890-91, 117 Cal. Rptr. 2d 331, 335 (2002); *see Sanchez v. South Hoover Hospital*, 18 Cal.3d 93, 99 (1973) (fraudulent concealment only tolls the statute of limitations to the extent that it hindered an "otherwise diligent" plaintiff).

*Second*, a plaintiff attempting to show fraudulent concealment must show all of the substantive elements of fraud (i.e., a specific misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting damages). *Community Cause v. Boatwright*, 124 Cal. App. 3d 888, 900, 177 Cal. Rptr. 657, 664 (1981).

*Third*, general denials of wrongful conduct are not sufficient to toll the statute of limitations unless a reasonable person would rely upon them. *See Gonsalves v. Kaiser Sand & Gravel Co., Inc.*, 1994 WL 125211, at *4 (N.D.Cal., Mar. 24, 1994) (rejecting argument that denial of wrongful conduct tolled statute of limitations); *Chasteen v. UNISIA JECS Corp.*, 216 F. 3d 1212, 1221 (10th Cir. 2000) (finding no genuine issue of material fact as to whether defendants' false assertion in interrogatory responses that it had independently developed an EFI system gave rise to equitable tolling: "[t]he mere denial of liability . . . is not wrongful conduct which implicates the doctrine of equitable tolling . . . [t]o hold otherwise would place defendants in the untenable position of either admitting liability or foregoing a statute of limitations defense").[4]

---

[4] IBM has the burden of proving the facts necessary to toll the statute. *Alamar Biosciences*, 40 U.S.P.Q.2d at 1441 (citing *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995)).

831591v1/08384-009947

IBM's SAC cites three primary acts by PSI in support of its apparent fraudulent concealment argument. First, IBM cites PSI's response to IBM's May 23, 2005 letter in which PSI denied that it received any IBM confidential information and requested that IBM bring any information supporting IBM's assertion to PSI's attention. [SAC at ¶ 58; Handschuh Decl. at ¶ 8, Ex. F.] As discussed above, that May 26, 2005 letter was written over *four years* after Hilton's January 23, 2001 email and Hilton's March 5, 2001 letter, and thus the statute of limitations had already run on IBM's misappropriation claim. Further, it was simply a general denial of improper receipt of IBM trade secrets, *see Chasteen,* 216 F.3d at 1221—a denial PSI maintains today. No reasonable person would rely on such a denial because, *inter alia,* it provides no details as to what PSI believed to constitute "IBM confidential information", a term that IBM clearly defines differently than PSI and Amdahl. And the letter in no way hindered or prevented IBM from asking additional questions to PSI or Amdahl about what was transferred or from exercising its right under the TIDA agreements to inspect Amdahl's record-keeping.[5] Indeed, at the end of the letter, PSI requests that IBM notify PSI of "any reason [IBM has] to believe" that PSI received IBM confidential information. IBM did not assert that it believed the Amdahl diagnostics to constitute IBM trade secrets, nor did it follow up in any other way. *See Alamar Biosciences Inc.,* 40 U.S.P.Q at 1441 (plaintiff's decision "not to press further" after receiving what plaintiff characterized as an "evasive" answer to a question regarding defendant's product "cannot be characterized as reasonably diligent"). Finally, as James Stallings, IBM's General Manager of System z testified on April 11, 2008,



---

[5]     IBM also cites to an earlier April 29, 2005 letter from Handschuh to Colao in which PSI denies that it "knowingly posses[s] any [IBM confidential] information" and suggests that "[i]f IBM has any reason to believe that such is not the case, then I request that you immediately provide PSI with the details or basis for such belief." [Handschuh Decl. at ¶¶ 6-7, Exs. C & D.] Like the May 26, 2005 letter, this letter was written after the statute of limitations expired, was a general denial of misappropriation, and, notably, *invited* IBM to make further inquiries. IBM's only follow-up was Lauderdale's May 23, 2005 letter, in which Lauderdale simply notes that the "confidential technical documents" disclosed to Amdahl and Fujitsu (and which PSI never received) were not transferable. [Handschuh Decl. at ¶ 8, Ex. E.] IBM made no further investigation.

831591v1/08384-009947



[Transcript of the Deposition of James Stallings at 59-60, Kirkpatrick Decl. at ¶ 10, Ex. I.]

Second, IBM cites a November 11, 2003 email from Michael Maulick, PSI's Chief Executive Officer, which states that "PSI acquired the rights to the former Amdahl patents and all of their technology that doesn't contain TIDA or TILA." [SAC at ¶ 56.] Again, this general statement is not sufficient to constitute fraudulent concealment. PSI did not receive IBM's TIDA specifications from Amdahl. And what is or isn't "TIDA or TILA" is a legal question that the parties dispute—both PSI and Amdahl understood that, at a minimum, object code versions of the diagnostics were not restricted information. [Hilton Decl. at ¶ 4.] No reasonable juror could find Maulick's statement that PSI did not receive "TIDA or TILA" sufficiently factual to absolve IBM of its legal duty to investigate the transfer of technology, particularly in light of PSI's prior, unequivocal statements that PSI had received *all* Amdahl diagnostics and used them to ascertain *full* compatibility. Further, the undisputed facts show that IBM did not rely on Maulick's statement—IBM raised trade secret concerns with PSI in Spring 2005. [*See supra.*]

Third, IBM more generally implies that the fact that PSI had asked IBM about acquiring IBM technical specifications in 2000 and 2001 misled IBM as to what PSI acquired from Amdahl. [SAC at ¶¶ 52-55.] This is a non sequitur. PSI did not receive IBM technical specifications from Amdahl. It received diagnostics that were derived in small part from IBM technical specifications. IBM cannot plausibly suggest that PSI's requests for architectural specifications deceived IBM into believing that Amdahl had not licensed the Amdahl diagnostics to PSI—which diagnostics PSI had already directly and unequivocally told IBM on several occasions that it had in fact acquired and run to test full compatibility.

In sum, any potential fraudulent concealment argument is meritless. IBM had actual notice of its claim in 2001 when it was told directly by PSI that Amdahl had transferred Amdahl's system-level diagnostics to it. No actions in the intervening six years hindered or prevented IBM from filing suit or pursuing an investigation, and IBM could not—and did not—reasonably rely on any PSI statements or actions in failing to investigate or bring suit. IBM's trade secret misappropriation claim is barred.

831591v1/08384-009947

8. **The statute of limitation has run as to all trade secrets arising from or related to Amdahl's disclosure of diagnostic programs to PSI**

Under well-established principles of California law, once the statute of limitations begins running as to one trade secret, it begins running to all others, "at least when the plaintiff shared all the trade secrets with the defendants during the same time period and in connection with the same relationships and when the trade secrets concern related matters." *Intermedics*, 822 F. Supp. at 634 (N.D.Cal.,1993); *see also Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 293 (9th Cir.1969) (the "fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated"). This rule applies "even though that first misappropriation was relatively inconsequential and, by itself, would not appear to justify the cost of suing, and even though the second, later misappropriation was a separate act, was committed in relation to a different product, was a thousand fold more damaging, and was the only act of misappropriation that obviously and directly justified instituting litigation." *Intermedics*, 822 F. Supp. at 652.

Here, it is undisputed that: (1) IBM disclosed the technical specifications to Amdahl in connection with the same pre-1999 relationships,[6] for the same purposes (development of IBM-compatible mainframes) and that the technical specifications all concern related matters (allegedly non-public aspects of IBM's ESA/390 mainframe architecture); (2) Amdahl disclosed the diagnostics to PSI in the context of the same relationship, for the same purposes, in relation to the same products, and during the same period; (3) the first alleged misappropriation was in 1999 when Amdahl provided PSI access and use of the object code for 8E7, HOT, DIRT, ALPHA and BUPS; and (4) IBM was provided notice of the transfer of the diagnostics in early 2001. The statute of limitations therefore began running in 2001 as to all of the diagnostics transferred by Amdahl to PSI. *See Forcier*, 123 F. Supp. 2d at 525-26 (granting summary judgment as to all misappropriation claims because the duties arose from a single relationship and the "alleged trade secrets at issue all are related because they were developed for use in the same sophisticated and highly specialized product").

---

[6] Although there were several different TIDA agreements, they were all related in substance and subject matter. Moreover, they were all in place before the alleged misappropriation occurred. It is therefore irrelevant whether the Court considers them to constitute a single relationship or several relationships—they were all allegedly breached by the 1999-2000 disclosures.

831591v1/08384-009947

**D.** **The Alleged IBM Confidential Information Does Not Qualify as A Trade Secret Under California Civil Code § 3246.1 Due to IBM's Failure to Undertake Reasonable Measures to Maintain Secrecy**

For the same reasons that IBM's misappropriation claim is barred by the statute of limitations, it also fails as a substantive matter. California Civil Code section 3246.1 and the corresponding provision of the UTSA define a trade secret as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that that (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1 (West 1997).

Thus, to have a protectable trade secret, a plaintiff must have undertaken "efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* Failing to investigate or bring suit when a plaintiff is suspicious or aware of misappropriation constitutes a failure to maintain secrecy. *See Alamar Biosciences*, 40 U.S.P.Q. at 1442 (failure to investigate or bring suit despite "concerns" and "suspicions" constituted inadequate efforts to maintain secrecy); *Glue-Fold*, 82 Cal. App. 4th at 1027 (failing to bring suit despite notice of misappropriation constituted inadequate efforts to maintain secrecy).

As discussed above, IBM had evidence of the facts necessary to bring suit in 2001, and it had self-acknowledged "suspicions" no later than March 23, 2005 when Lauderdale told PSI that IBM was "troubled" by PSI's claims of having been spun-off from Amdahl. IBM did not raise its misappropriation claim against PSI until August 7, 2007. A failure to conduct an investigation for six years, in the face of self-acknowledged suspicions, cannot constitute reasonable efforts to maintain secrecy.

Further, IBM to this day has not taken any action against Amdahl to protect the alleged trade secrets that Amdahl disclosed to PSI—despite Amdahl's allegedly "massive" breach of its confidential relationship with IBM in 1999. IBM's failure to take action against the party that *supposedly breached the confidential relationship with IBM* shows that IBM's claim is not about protecting purported trade secrets; it is about excluding a competitor. While a plaintiff is generally entitled to choose who to sue, in the trade secret context a failure to take action against another party who has possession of and has misappropriated the same trade secrets constitutes

an unreasonable effort at maintaining secrecy. *See Forcier,* 123 F. Supp. 2d at 525 ("[The] law impose[s] on plaintiffs 'a responsibility to take prompt and assertive corrective action with respect to *all of [their] interests* whenever [they] detect a fracture in a once confidential relationship.'") (quoting *Intermedics,* 822 F. Supp. at 654) (emphasis added).

Thus, IBM's inaction—in addition to barring IBM's claim on statute of limitations grounds—defeats its claim that it has a protectable trade secret in the first instance. *See Alamar Biosciences,* 40 U.S.P.Q. at 1442 (granting summary judgment for failure to exercise reasonable efforts to maintain secrecy in light of "its inactivity in the face of strong evidence of Alamar's use of what MicroScan now claims were its trade secrets"); *Glue-Fold,* 82 Cal. App. 4th at 1027 (2000).

### E.   IBM's Tortious Interference with Contract Claim is Preempted by the California UTSA

The California Uniform Trade Secrets Act preempts all common law claims premised on misappropriation of trade secrets. *Convolve, Inc.,* 2006 WL 839022 at *6  (applying the CUTSA); *see also* Cal. Civ. Code § 3426.7(b).  The preemption inquiry focuses on whether the common law claim arises from the same nucleus of operative facts as the misappropriation claim. *Id.*  "In analyzing claims for the purpose of applying the displacement provision [of the UTSA], the issue is not what label the plaintiff puts on their claims. Rather, the court is to look beyond the label to the facts being asserted in support of the claims." *Id.* (quoting *Weins v. Sporleder,* 605 N.W.2d 488, 491 (S.D. 2000).  "In other words, if the operative facts are *arguably cognizable* under the [UTSA], any common law claim that might have been available on those facts in the past now no longer exists...." *Id.* (quoting *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.,* 270 F. Supp. 2d 943, 948 (W.D.Mich. 2003)) (emphasis added).[7]

Here, a cursory review of the pleadings confirms that IBM's tortious interference claim is predicated on the same nucleus of operative facts as the misappropriation claim.  There are no allegations of tortious interference other than that:

> PSI's receipt and use of IBM Technical Information, and PSI's development, manufacture, offers to sell, and sales of PSI's emulator systems containing, based

---

[7] As illustrated by the analysis in *Convolve,* courts applying CUTSA routinely look to the laws of other states that have adopted the UTSA. *See also* Cal. Civ. Code § 3426.8 ("This title shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this title among states enacting it.").

831591v1/08384-009947

on, or derived from IBM Technical Information has interfered with and caused
the breach of the TIDA and TILA contracts.

(SAC at ¶ 190.)

IBM's tortious interference claim is therefore preempted. *See Convolve, Inc.*, 2006 WL
839022 at *7 (finding that the California Uniform Trade Secrets Act preempted claims for
tortious interference with contract/prospective economic advantage, fraud, and breach of
confidence since those claims arise from the same nucleus of facts as Convolve's
misappropriation of trade secrets cause of action); *Digital Envoy*, 370 F. Supp. 2d at 1035
(preempting plaintiff's claims for unfair competition and unjust enrichment "since those claims
are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief");
*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 318 F. Supp. 2d 216, 219 (D.Del.
2004) (concluding that all state law claims based on the same nucleus of facts as the trade secrets
claim are preempted under the California UTSA); *cf. Ethypharm S.A. France v. Bentley
Pharmaceuticals, Inc.*, 388 F. Supp. 2d 426, 433 (D.Del. 2005) (finding intentional interference
claim preempted under Delaware UTSA when "grounded in the same facts as the
misappropriation claim" and collecting authorities for the proposition that it is irrelevant whether
there is a dispute as to whether the information qualifies as a trade secret); *Thomas & Betts Corp.
v. Panduit Corp.*, 108 F. Supp. 2d 968, 971 (N.D.Ill. 2000) (rejecting an argument that
"preemption is improper because the confidential information taken by [defendant] may not rise
to the level of a trade secret," and explaining that this "theory would render [the displacement
provision] meaningless, for it would forbid preemption of state law claims until a final
determination has been made with respect to whether the confidential information at issue rises
to the level of a trade secret").

F.    **IBM's Intentional Interference with Contract Claim is Barred by the Statute
of Limitations**

Even assuming *arguendo* that IBM's tortious interference claim could be maintained as a
separate cause of action, it is time-barred. The statute of limitations for tortious interference is
two years, which, as with trade secret misappropriation, begins running when the plaintiff has
inquiry notice of a potential claim. *See Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
2006 WL 5437322 *7 (C.D.Cal. 2006); *Forcier*, 123 F. Supp. 2d at 530 ("A cause of action for
interference with contractual relations is governed by the two-year limitations period of

[California's Code of Civil Procedure] section 339, subdivision 1."). Like trade secret misappropriation, tortious interference is not a continuing tort. *See Intermedics*, 822 F. Supp. at 646 ("[I]t would be 'anomalous' to reject the continuing tort doctrine for purposes of [the plaintiff's] claims of misappropriation of trade secrets or confidential information, but to accept an analogous 'continuing breach' doctrine for purposes of [other claims] that are based on the same alleged misappropriations . . . the statute of limitations began running at the same time with respect to all the claims arising out of misappropriation of any and all of the alleged trade secrets or confidential information"). Because IBM had notice in 2001, and wrote to PSI regarding its own suspicions as early as May 2005, IBM's tortious interference claim is barred by the statute of limitations.

## IV.    **CONCLUSION**

For the foregoing reasons, PSI respectfully requests that the Court grant PSI's motion for summary judgment as to Counts Eleven and Twelve of IBM's SAC.


Dated: April 23, 2008                    **SUSMAN GODFREY L.L.P.**

                                         By:    /s/ Jacob Buchdahl
                                               Stephen D. Susman
                                               Jacob W. Buchdahl
                                               Tibor L. Nagy
                                               SUSMAN GODFREY L.L.P.
                                               654 Madison Ave., 5th Floor
                                               New York, NY 10022
                                               (212) 336-8330

                                               Stephen Morrissey (SM-2952) (*Pro Hac Vice*)
                                               Ryan Kirkpatrick (RK-2281) (*Pro Hac Vice*)
                                               SUSMAN GODFREY L.L.P.
                                               1901 Avenue of the Stars, Suite 950
                                               Los Angeles, CA 90069
                                               (310) 789-3100
                                               *Attorneys for Platform Solutions Inc.*

831591v1/08384-009947