IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

              **Plaintiff,**

      -vs.-

PLATFORM SOLUTIONS, INC. and T3
TECHNOLOGIES, INC.,

           **Defendants.**

Civil Action No. 06-CV-13565-LAK
(THK)

MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF IBM'S
OPPOSITION TO PLATFORM
SOLUTIONS, INC.'S MOTION FOR
SUMMARY JUDGMENT ON
COUNTS ELEVEN AND TWELVE
OF IBM'S SECOND AMENDED
COMPLAINT


[PUBLIC VERSION]

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ......................................................................... 6

    A.    Certain Features Of IBM's Computer Architectures Are Maintained
        By IBM As Trade Secrets ..................................................................... 6

    B.    Amdahl Received IBM's TIDA/TILA Information And Used It
        In Its Development Programs ................................................................ 7

    C.    PSI Was Spun Off From Amdahl To Continue Amdahl's Emulation Project ......... 8

    D.    PSI Repeatedly Sought A TIDA/TILA License From IBM ................................. 9

    E.    PSI Misappropriated IBM's Trade Secrets And Carried Out A Cover-Up ........... 11

    F.    IBM Learned Of PSI's Misappropriation After Filing This Lawsuit ..................... 15

III.  ARGUMENT ................................................................................................. 16

    A.    PSI's Motion For Summary Judgment That IBM's Trade Secret
        Misappropriation Claim Is Barred By The Statute of Limitations
        Should be Denied ............................................................................... 16

        1.    PSI Relies On The Wrong Statute Of Limitations ..................................... 17

        2.    Under New York's Statute Of Limitations, A Claim For Trade Secret
            Misappropriation "Accrues" Anew Upon Each Successive Use ............... 19

        3.    IBM's Trade Secret Claims Are Timely Under New York Law ................. 20

    B.    Even If California's Statute of Limitations Were To Apply, Genuine Issues
        of Material Fact Preclude Summary Judgment ..................................... 22

        1.    PSI's Own Evidence Undermines PSI's Contention That IBM Had
            Notice At Any Time Between PSI's Formation And The Filing of
            IBM's First Amended Complaint ......................................................... 25

            (a)    PSI's 2001 Correspondence With IBM Does Not Show Notice .... 25

            (b)    PSI's Declarations Do Not Establish Notice ................................. 27

         2.    Nothing in PSI's Statements From August 2001 Through August 2004
            Establishes Notice ............................................................................... 28

         3.    Nothing In IBM's Pre- And Post-Lawsuit Statements Suggests That
            IBM Knew Or Should Have Known Of PSI's Misappropriation
            Before August 17, 2004 ....................................................................... 30

    C.    IBM's Trade Secrets At All Times Were The Subject Of Reasonable
        Efforts To Maintain Their Secrecy ..................................................... 32

    D.    Tortious Interference With Contract ................................................... 35

IV.   CONCLUSION ............................................................................................. 35

i

# TABLE OF AUTHORITIES

Page

## CASES

*Alamar Biosciences Inc. v. Difco Labs Inc.*,
40 U.S.P.Q.2d 1437 (E.D. Cal. 1997) ............................................................................. 35

*Andrew Greenberg, Inc. v. Svane, Inc.*,
36 A.D.3d 1094, 930 N.Y.S.2d 358 (3d Dep't 2007) ...................................................... 20

*April Enters., Inc. v. KTTV*,
147 Cal. App. 3d 805 (1983) .......................................................................................... 23

*Architectronics, Inc. v. Control Sys., Inc.*,
935 F. Supp. 425 (S.D.N.Y. 1996) ......................................................................... 3, 18, 20

*Bausch & Lomb, Inc. v. Alcon Labs., Inc.*,
64 F. Supp. 2d 233 (W.D.N.Y. 1999) .............................................................................. 20

*Bernson v. Browning-Ferris Indus.*,
7 Cal. 4th 926 (1994) ...................................................................................................... 23

*Buffets, Inc. v. Klinke*,
73 F.3d 965 (9th Cir. 1996) ............................................................................................ 33

*Cal. Int'l Chem. Co., Inc. v . Sister H. Corp.*,
1999 WL 50891 (9th Cir. Jan. 19, 1999) ........................................................................ 33

*Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*,
79 F. Supp. 2d 374 (S.D.N.Y. 2000) ............................................................................... 17

*Elghanayan v. Elghanayan*,
190 A.D.2d 449, 598 N.Y.S.2d 524 (1st Dep't 1993) ..................................................... 18

*Emerson Elec. Co. v. Black & Decker, Inc.*,
1997 WL 666283 (S.D.N.Y. Oct. 27, 1997) ................................................................... 18

*Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*,
939 F. Supp. 593 (N.D. Ill. 1996) ................................................................................... 18

*Forcier v. Microsoft Corp.*,
123 F. Supp. 520 (N.D.Cal. 2000) .................................................................................. 34

*Garamendi v. SDI Vendome S.A.*,
276 F. Supp. 2d 1030 (C.D. Cal. 2003) .......................................................................... 23

*Glue-Fold, Inc. v. Slautterback Corp.*,
82 Cal. App. 4th 1018, 98 Cal. Rptr. 2d 661 (2000)................................................... 34-35

*Grisham v. Philip Morris U.S.A., Inc.*,
40 Cal. 4th 623 (2007) .................................................................................................... 23

*Hynix Semiconductor v. Rambus, Inc.,*
  2007 WL 3284060 (N.D. Cal. Nov. 2, 2007) ........................................................ 23

*In re Providian Credit Card Cases,*
  96 Cal. App. 4th 292 (2002) ............................................................................... 33

*Ins. Co. of N. Am. v. ABB Power Generation,*
  925 F. Supp. 1053 (S.D.N.Y. 1996)................................................................ 3, 18

*Ins. Co. of N. Am. v. ABB Power Generation,*
  112 F.3d 70 (2d Cir. 1997)................................................................................. 17

*Intermedics, Inc. v. Ventritex, Inc.,*
  775 F. Supp. 1258 (N.D. Cal. 1991) ..............................................................22-23

*Intermedics, Inc. v. Ventritex, Inc.,*
  822 F. Supp. 634 (N.D. Cal. 1993) ..................................................................... 19

*Jolly v. Eli Lilly & Co.,*
  44 Cal. 3d 1103 (1988) ...................................................................................... 22

*Kistler Instrumente A. G. v. PCB Piezotronics, Inc.,*
  419 F. Supp. 120 (W.D.N.Y. 1976) .................................................................... 20

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
  313 U.S. 487 (1941)........................................................................................... 17

*La Luna Enters., Inc. v. CBS Corp.,*
  74 F. Supp. 2d 384 (S.D.N.Y. 1999).................................................................. 19

*Lemelson v. Carolina Enters., Inc.,*
  541 F. Supp. 645 (S.D.N.Y. 1982)..................................................................... 20

*Martin v. Julius Dierck Equip. Co.,*
  43 N.Y.2d 583, 374 N.E.2d 97 (1978)................................................................ 17

*Padula v. Lilarn Props. Corp.,*
  84 N.Y.2d 519 (1994) ........................................................................................ 19

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.,*
  923 F. Supp. 1231 (N.D. Cal. 1995) ................................................................... 33

*Roberts v. Xtra Lease, Inc.,*
  2001 WL 984872 (E.D.N.Y. June 25, 2001) ...................................................... 19

*Rogers v. Grimaldi,*
  875 F.2d 994 (2d Cir. 1989)............................................................................... 17

*SCFB HOLT LLC v. Collins Stewart Ltd.,*
  2004 WL 1794499 (S.D.N.Y. Aug. 10, 2004) .................................................... 20

*Spanierman Gallery v. Merritt,*
  2004 WL 1781006 (S.D.N.Y. Aug. 10, 2004) .................................................... 18

*Stuart v. Am. Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998) .......................................................................... 17

*Tammac Corp. v. Williams*,
    1993 WL 330639 (W.D.N.Y. Aug. 13, 1993) .............................................. 18

*Wang v. N.Y. Transit, Inc.*,
    1996 WL 583389 (S.D.N.Y. Oct. 10, 1996) ................................................ 18

*Whyte v. Schlage Lock Co.*,
    101 Cal. App. 4th 1443 (2002) ...................................................................... 33

## <u>STATUTES</u>

N.Y. C.P.L.R. § 202 ........................................................................................... 17

iv

PSI's motion for summary judgment must be denied for at least two reasons. First, the motion rests exclusively on the wrong statute of limitations (California) and it is beyond dispute that IBM's trade secret claim was timely brought under the correct statute (New York). Second, even if California's statute of limitations were applicable (as PSI incorrectly maintains), substantial issues of material fact—as to whether and when IBM should reasonably have appreciated PSI's theft—preclude summary judgment. Likewise, substantial issues of material fact preclude summary judgment on whether IBM allegedly failed to take reasonable steps to maintain the secrecy of the trade secrets at issue here.

## I.    INTRODUCTION

In June 2007, seven months after IBM initiated this case, PSI's counsel admitted that PSI's engineering files contained IBM confidential information that IBM had licensed under strict nondisclosure agreements to Amdahl, but had not licensed to PSI. At all times, IBM, PSI, and Amdahl understood that PSI was not permitted to have that information. Counsel's letter directly contradicted PSI's prior representations to IBM that PSI did not have this information—which is referred to as TIDA or TILA[1] information, based on the acronyms for the IBM/Amdahl nondisclosure agreements. In what is likely not a coincidence, counsel's belated admission came shortly after PSI produced files that permitted IBM—for the first time—to investigate whether PSI had obtained and used IBM trade secrets in developing PSI's recently released emulator.

The results of IBM's investigation were shocking. IBM learned that PSI's representations were patently false and, indeed, that PSI's counsel's June 2007 letter disclosed only the tiniest, and most innocuous, tip of a very large iceberg. Contrary to counsel's disclosure, which suggested that

---

[1]  TIDA stands for Technical Information Disclosure Agreement.  TILA stands for Technical Information License Agreement.

PSI had only limited fragments of TIDA/TILA information that had survived an intense "cleansing" process, PSI in fact has massive amounts of such information, including complete "dirty" versions of the very same code that had been "cleansed." Tellingly, counsel's letter stated, in an assertion now known to be false, that the information had not been "used by PSI personnel in developing" PSI's emulator. In other words, PSI's counsel was unable, months after being retained, to determine what IBM trade secrets PSI had and what use PSI made of those trade secrets—a position diametrically opposed to its contention in this motion.

Based on information received in discovery, IBM amended its complaint to add a trade secret misappropriation claim. Since then, PSI has been forced to concede that its historical denials of wrongdoing and its counsel's June 2007 letter were false, and that PSI knowingly misappropriated confidential IBM information and systematically misused that information to develop and test its emulator.

No longer able to deny misappropriation and its concealment thereof, PSI now argues that IBM's trade secret claim is barred by the statute of limitations. With the cat out of the bag, PSI asks this Court to sanction its theft by ruling that the only conclusion a reasonable juror could reach, with all facts and inferences resolved in IBM's favor, is that it was unreasonable for IBM, in the face of repeated lies by PSI, its executives, and its General Counsel—including Mr. Hilton and Mr. Handschuh, who submit declarations supporting PSI's motion—to wait until it had evidence of PSI's theft before bringing trade secret claims.

Distilled to its essence, PSI's motion posits that IBM knew years ago that PSI had obtained certain diagnostic programs from Amdahl, and should have sued PSI for misappropriation based on an assumption that these programs included TIDA/TILA information. IBM should have done so, PSI contends, even though: (a) IBM had no specific knowledge of what materials PSI had obtained

from Amdahl and no access to those materials; (b) PSI's statements to IBM suggested that its emulator implemented only public aspects of IBM's architectures; (c) before obtaining discovery, IBM had no opportunity to determine whether PSI's emulator implemented confidential features that were the subject of IBM's disclosures to Amdahl;[2] (d) PSI never told IBM it had TIDA/TILA information, and repeatedly said it did not; and (e) PSI engaged in a successful charade that concealed its theft from IBM and others—including its investors, many of its employees, and even Amdahl/Fujitsu. Neither the law nor the facts required IBM to act so precipitously.

PSI's statute of limitations argument should be rejected for two reasons. **First**, PSI has asked this Court to apply California's statute of limitations, even though "[u]nder New York law, New York courts ordinarily apply New York's statutes of limitations." *Ins. Co. of N. Am. v. ABB Power Generation*, 925 F. Supp. 1053, 1059 (S.D.N.Y. 1996) (Kaplan, J.) (applying New York's statute over California's); *see also Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996) (applying New York's statute of limitations to trade secret claim governed by Minnesota Uniform Trade Secrets Act, with identical statute of limitations to California's).

Unlike California, which applies a three-year statute of limitations that runs from when the plaintiff knew or should have known of the misappropriation, New York's statute is based on a continuing tort theory. It allows recovery for all acts of misappropriation—including each successive use of misappropriated information—occurring within three years of the filing of a trade secret claim, as long as the trade secret has not been publicly disclosed. Here, PSI does not even contend that the IBM trade secrets at issue were publicly disclosed. Nor does PSI contend that it did not possess or use them during the three years before IBM sued for misappropriation. Indeed, it is

---

[2]  On March 1, 2005, PSI revealed it had installed its first IBM-compatible emulator with an end user, L.L. Bean. (Declaration of Todd Anten ("Anten Dec."), Ex. 1).

undisputed that PSI continued to use IBM's trade secrets during that period. PSI's motion should be denied on this ground alone.

**Second**, even under California law, PSI has not established that no genuine issues of material fact exist with respect to IBM's alleged knowledge of PSI's misappropriation, and PSI's fraudulent concealment. PSI's effort to satisfy this burden rests on a mischaracterization of IBM's claim. PSI says that IBM had reason to know that PSI had obtained certain Amdahl diagnostic tools by the end of 2000 and should have inferred that PSI had misappropriated IBM's trade secrets because—according to PSI—"IBM contends that PSI's receipt and use of Amdahl's diagnostics, in any form, constitutes a misappropriation of IBM trade secrets." (PSI Brief at 2, emphasis added). But IBM has not claimed that any Amdahl diagnostics that PSI may potentially have obtained necessarily disclosed TIDA/TILA information. IBM's claim is directed to "Amdahl tools that embodied IBM's Technical Information and that had not been modified to delete that information." (First Amended Complaint ¶ 48). Without more, mere knowledge that PSI was using some Amdahl diagnostics—without any basis to surmise that these diagnostics embodied TIDA/TILA information—would not start the limitations period even under California's law. It was only through discovery that IBM learned—or could have learned—that PSI had Amdahl diagnostics that embodied IBM trade secrets and was using them to implement confidential aspects of IBM's architectures.

The shortcomings in PSI's proof are myriad, and include an absence of evidence that IBM knew or should have known that: (a) the versions of Amdahl's diagnostics obtained by PSI contained or disclosed TIDA/TILA information, rather than, for example, having been cleansed to remove such information; (b) PSI's emulator (which was not available to IBM) implemented confidential IBM architectural features reflected in IBM's TIDA/TILA disclosures to Amdahl, rather

than only public aspects of IBM's architectures;[3] and (c) not only was PSI implementing confidential aspects of IBM's architectures, but it was doing so by using versions of Amdahl diagnostics that were based on TIDA/TILA information.[4]

There is a long history of communications between IBM and PSI. At the outset, PSI advised IBM that PSI's emulator did not implement all aspects of IBM's architectures, and that PSI needed a TIDA/TILA license to implement the non-public aspects.[5] PSI repeatedly asked IBM to give it TIDA/TILA information, but no agreement was ever reached. PSI's motion therefore presents the extraordinary proposition that—based on communications in which PSI was asking for TIDA/TILA information—IBM knew or should have known that PSI already had that information. Nothing requires IBM to assume such duplicity.

Indeed, in addition to requests for a TIDA/TILA license, PSI repeatedly represented that the information it had obtained from Amdahl did not include TIDA/TILA information. For example, on November 11, 2003, Michael Maulick, PSI's President and CEO, told IBM that PSI had acquired "all of Amdahl's technology that doesn't contain TILA or TIDA." (Anten Dec., Ex. 6). Mr. Maulick later told IBM that the Amdahl information had been "scrubbed" to make certain that PSI had nothing it was not allowed to have. (Anten Dec., Ex. 7 at 163, 166-68; Ex. 8). Similarly, PSI's General Counsel, Gregory Handschuh, who had previously served as Amdahl's General Counsel and negotiated and signed the TIDA and TILA, gave IBM the following assurances:

---

[3] PSI internal documents make clear that ████████████████████████████████████████████████████████████████ . *See* Anten Dec., Ex. 2 at PSI0650975; Ex. 3. Of course, that is not what PSI did, but IBM did not learn that until it reviewed PSI's source code in discovery.

[4] PSI has misappropriated IBM trade secrets that IBM did not disclose to Amdahl/Fujitsu; therefore, even if the Court were to grant the instant motion, it would not extinguish Count Eleven in its entirety. *See* Anten Dec., Ex. 4.

[5] In November 2000, PSI told IBM that PSI needed a license to IBM's non-public architectural specifications to fully emulate IBM's ESA/390 architecture. (Anten Dec., Ex. 5).

> PSI is well aware that IBM made various confidential disclosures to Amdahl and
> Fujitsu. . . . You may be aware that I was formerly general counsel of Amdahl and
> held that position at the time that PSI was formed as a company. While I can no
> longer speak for Amdahl (or Fujitsu IT Holdings, as it came to be known) in an
> official capacity, I want to give you my personal assurances that Amdahl always
> exercised the greatest degree of care in insuring that no IBM confidential information
> was improperly disclosed and that no such information was disclosed or transferred
> to PSI. Since joining PSI, I have reassured myself that no such information exists
> within the company.

(Handschuh Dec., Ex. F, emphasis added). As PSI's latest interrogatory responses show, 

.[6] (Anten Dec., Ex. 9).

In sum, there is ample evidence from which the fact-finder could conclude that: (1) even if

the California statute of limitations were applicable, IBM did not know and should not have known

that PSI possessed IBM confidential information outside of the California statute of limitations

period; and (2) IBM did not fail to take reasonable steps to maintain the secrecy of its confidential

information. Accordingly, PSI's motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     Certain Features Of IBM's Computer Architectures Are Maintained By IBM As Trade Secrets.

A computer is defined by its architecture. The architecture unambiguously specifies the

computer's logical structure and functional operation. Aspects of a computer architecture include,

for example: which instructions and facilities (*e.g.*, add, subtract, multiply) are supported; the format

of those instructions and facilities, including how data is provided to and outputted by the computer;

and details of how the computer communicates with supported peripherals. Aspects of IBM

architectures are described in IBM architectural specifications. Many of these are published in a

---

[6]  Of course, if PSI's senior corporate executives were not lying when they represented that PSI did not have
TIDA/TILA information, PSI's contention that IBM should have known of PSI's misappropriation, at the same time that
PSI's senior executives did not know of it, is preposterous.

document called the Principles of Operation ("POP"). (Declaration of Mark Anzani ("Anzani Dec.") ¶ 3). IBM publishes the POP so that others will have the information necessary to write applications for IBM's machines.

Not all aspects of IBM's architectures are described in the POP. Some aspects are maintained as trade secrets and are disclosed to outsiders—if at all—only under non-disclosure agreements. (*Id.*)

### B.   Amdahl Received IBM's TIDA/TILA Information And Used It In Its Development Programs.

In 1986, IBM entered into a Technical Information Disclosure Agreement ("TIDA") with Amdahl Corporation ("Amdahl"). (Handschuh Dec., Ex. A). The TIDA established a framework under which IBM licensed confidential information to Amdahl in exchange for substantial licensing fees and a detailed commitment by Amdahl to safely guard the information.

In 1996, IBM entered into a Technical Information License Agreement ("TILA") with Amdahl. (Handschuh Dec., Ex. B). Under the TILA, IBM continued to provide confidential specifications to Amdahl on a case-by-case basis in exchange for licensing fees and a commitment to safely guard the information.[7] As PSI admits, the TIDA/TILA agreements required Amdahl (and its successor Fujitsu Limited ("Fujitsu")) to keep IBM's technical information in strict confidence. *See* PSI's Statement of Undisputed Facts ¶¶ 3-4.

Pursuant to the TIDA and TILA, Amdahl used IBM's confidential information in developing their plug-compatible machines ("PCMs"). (PSI Brief at 1; Anten Dec., Ex. 10 at 15:1-19:3).

---

[7] Pursuant to the TIDA/TILA, IBM provided confidential architectural specifications to Amdahl in hardcopy (*i.e.*, paper) form only. Only a limited number of individually numbered copies were provided. Photocopying was prohibited, all copies were kept under lock and key, and they could not be disclosed to persons outside of Amdahl. *See* Handschuh Dec., Exs. A at 3-4 and B at 7-10; Anten Dec., Ex. 10 at 167:24-169:21. Moreover, Amdahl had to "provide, secure, locked work areas," restrict access to those work areas, "maintain a log indicating date, time and duration of each access to the Technical Information," and "report to IBM all known and suspected losses, thefts, or unauthorized accesses." *See* PSI's Statement of Undisputed Facts ¶¶ 3-4.

Discovery has shown that one way Amdahl used this information was in creating certain diagnostic programs for evaluating compatibility. Before obtaining discovery in this action, IBM did not have access to Amdahl's diagnostics.

### C.     PSI Was Spun Off From Amdahl To Continue Amdahl's Emulation Project.

In 1995, Amdahl began collaborating with Intel Corporation to develop software that would emulate IBM's architectures on an Intel-based computer. (Anten Dec., Ex. 11 at PSI2186319; Ex. 12). Unlike Amdahl computers that were based on processors designed to be compatible with IBM architectures, an emulator consists of software that translates code written for IBM computers into code that can be understood by a computer with a different architecture. Amdahl never marketed its emulator.

PSI was spun-off from Fujitsu to complete and commercialize Amdahl's emulator. (Hilton Dec., Ex. A at PSI0810304; Anten Dec., Ex. 11 at PSI2186319). PSI's founder, Ron Hilton, and many of PSI's employees had worked at Amdahl, ███████████████████████████ ████████████████████████████. *See, e.g.*, Anten Dec., Ex. 10 at 68:4-72:6; 115:11-116:16.

██████████████████████████. In an email sent on March 16, 2001, PSI acknowledged to IBM that PSI could not lawfully acquire TIDA/TILA information. (Anten Dec., Ex. 16).

### D.    PSI Repeatedly Sought A TIDA/TILA License From IBM.

Shortly after its formation, PSI began contacting IBM in an effort to obtain TIDA/TILA information. Amazingly, PSI's motion points to PSI's requests for a TIDA/TILA license as evidence that IBM knew or should have known that PSI <u>already had</u> TIDA/TILA information. Unlike Amdahl, however, PSI was unwilling to pay for that information, and IBM rejected PSI's alternative compensation schemes such as taking an "equity" interest in PSI as compensation. (Anten Dec., Ex. 17). Accordingly, the parties never reached agreement on terms that would have allowed PSI to obtain TIDA/TILA information lawfully. (*Id.*).

On November 20, 2000, for example, PSI informed IBM that PSI's emulator had not completely implemented IBM's architectures and requested a license to specifications for the non-public aspects so that PSI could add them to the emulator. (Anten Dec., Ex. 5). On December 22, 2000, PSI proposed a deal under which IBM would provide "TILA specifications of all IBM proprietary features and capabilities of the S/390 architecture, z/Architecture, and any future extensions thereto." (Anten Dec., Ex. 17 at PSI0006888). On January 12, 2001, IBM declined PSI's proposal. (*Id.* at PSI0006892). Seeking reconsideration in a January 23, 2001 email, PSI explained:

> Amdahl partnered with Intel to explore the possibility of emulating S/390 on their new 64-bit architecture.[] Amdahl ultimately decided that emulation was not going to meet the performance requirements of the high-end S/390 market, but agreed to spin off the technology to pursue the low/mid-range market. As a result, PSI was founded in January 1999.
>
> Once we obtain the IBM TILA specifications, we plan to raise about $4-5M to complete the development and rollout of our product. . . . <u>Our budget does not include the TILA fee</u>, which we would like to handle as a non-cash equity transaction.

9

(Hilton Dec., Ex. A, emphasis added). IBM rejected this proposal but reiterated its willingness to

license TIDA/TILA information to PSI for cash:

> As discussed, IBM is willing to sell certain of its S/390 architectures and system design specifications (together "IBM Technical Information") to Platform Solutions on a cash basis only. At this time IBM is not amenable to accepting an equity position in Platform Solutions or a license to Platform Solution's Merlin emulation product as payment for such IBM Technical Information.

(Anten Dec., Ex. 19).

In February and March 2001, PSI renewed its request for a TIDA/TILA license. PSI's March

5 letter stated:

> PSI started with considerable assets from Amdahl, which had undertaken a number of emulation efforts prior to PSI. . . . We believe that we can obtain funding for this effort if we have an agreement with IBM containing the following points: [1] IBM would provide PSI with TIDA, TILA, and 64-bit (z/Architecture) specifications, solely for the purpose of this development contract, and ***entirely under IBM's control***.

(Hilton Dec., Ex. B, emphasis in original). In the portion of this letter quoted by PSI, PSI says that

"[w]e have all the assets developed by Amdahl for S/390 development: [1] IA32-based Merlin S/390

simulator [2] Bring-up programs [3] System-level diagnostics such as HOT and DIRT [4]

Performance benchmarks and workload suites." (*Id.*). But the purpose of this letter was to seek

IBM's agreement to provide PSI with TIDA/TILA information it did not have.

On March 9, 2001, IBM told PSI, yet again, that IBM was unwilling to provide TIDA/TILA

information "through any means other than direct purchase." (Anten Dec., Ex. 20). Because PSI

was unwilling to pay for a TIDA/TILA license and IBM would not take "equity," PSI sought to

clarify whether it could obtain TIDA/TILA information from Amdahl. (Anten Dec., Ex. 21). IBM

explained that "Amdhal [sic] is licensed to use solely and does not own the documents, additionally

Amdahl is prohibited from passing along either the material or the license in all cases. In essence it

is not an asset of Amdahl's." (Anten Dec., Ex. 22).  PSI responded and IBM's response is interlineated in bold:

> [PSI writes] Thanks for the clarification.  That being the case, it sounds like the only alternative that PSI has with respect to Amdahl would be to sell or otherwise license our emulation technology back to them, with Amdahl being the one to actually incorporate the TILA content and market and distribute the final product.  [IBM's response] **As you indicated if PSI were to license its technology to Amdahl, Amdahl being the licensee of IBM's TILA information would be the only entity authorized to employ the TILA information.**

> [PSI writes] A second alternative that we're exploring would be to sell or license our technology to FSI.  Is there any reason we should be aware of that IBM would oppose that?  [IBM's response] **If this is of interest to FSI, IBM would not oppose or be involved with such a transaction.**

> [PSI writes] Failing either of the above, our final alternative would be to license the TILA directly from IBM.  The high-fee and cash only terms proposed would be a significant hurdle for us, but not insurmountable.  [IBM's response] **As previously indicated, IBM would be willing to license its existing material to PSI on the same terms that we have provided it to others.**

(Anten Dec., Ex. 23, emphasis in original (author identification added)).

### E.    PSI Misappropriated IBM's Trade Secrets And Carried Out A Cover-Up.

In the end, PSI did not pursue any of these three alternatives.  Instead, PSI elected a course of action that it never raised with IBM: ███████████████████████████████████████ ████████████████████████████████████ in plain violation of its 1999 license agreement and trade secret law.  (Anten Dec., Ex. 9).  Three weeks ago, PSI ████████ ██████████████ ████

████████████████████████████████████████████████

(*Id.*).  Nevertheless, in its communications with IBM after July 2002, PSI consistently included language that either affirmatively or by omission—but always falsely—represented that it had not obtained IBM proprietary information.

For example, in November 2003, PSI's CEO Michael Maulick wrote to IBM: "As you may or may not know, we have acquired the rights to the former Amdahl patents and all of their technology that doesn't contain TILA or TIDA." (Anten Dec., Ex. 6, emphasis added).  In April 2005, PSI's General Counsel assured IBM:  "Let me categorically state that PSI has not misappropriated any IBM trade secret information nor does it knowingly possess any such information." (Handschuh Dec., Ex. E).  In May 2005, Mr. Handschuh repeated this personal assurance. (Handschuh Dec., Ex. F).  And also in May 2005, Mr. Maulick told IBM that Fujitsu "scrubbed" Amdahl materials "to make sure that Fujitsu was not providing inappropriate technology to PSI." (Anten Dec., Ex. 7 at 163, 166-68; Ex. 8).

PSI also falsely represented to its investors that it had not obtained IBM proprietary information.  It had to.



(*Id.*).  In what discovery has shown to be an elaborate charade,



(Anten Dec., Ex. 9 at 7, emphasis added; Ex. 25). During this whole charade, ███████████
████████████████████████████████████████.

The charade worked and Blueprint funded PSI, believing it had not obtained IBM proprietary

information:

> For instance, the licensing agreement that existed between PSI and Fujitsu was not
> robust enough to make us comfortable. We wanted to enhance the source code rights
> for the tools. There were also some issues around technology that had been
> developed in conjunction with IBM, and we wanted to clean up the code and the
> technology to make sure there was no pollution of that from proprietary IBM
> information. We wanted to make sure we had a process to cleanse the IP from
> anything that had residual linkages back to agreements that Amdahl had with IBM.

(Anten Dec., Ex. 26 at PSI2339970, emphasis added).

PSI also falsely represented to many of its own employees that it had not obtained IBM

proprietary information. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████.

Demonstrating how truly preposterous PSI's motion is, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████
████████████████████████
████████████████████████████████████████
████████████████████████

13



(Anten Dec., Ex. 27 at 130:6-131:2; 176:1-13, emphasis added).

PSI also falsely represented publicly that it had not obtained IBM proprietary information. In February 2005, InformationWeek was preparing a story on PSI. After reviewing that piece, ▮



(Anten Dec., Ex. 29). Similarly, the following quotation appears in a March 2007 article on PSI:

> "The complicating factor from our perspective was the transfer of technology in a way that didn't violate the restrictions on certain types of transfers that contractually existed between Amdahl and IBM," says Greg Handschuh, who at the time was general counsel at Amdahl, and today serves in the same role at PSI. "Once we were satisfied we could do that, we went ahead with the transaction . . . ."

(Anten Dec., Ex. 26 at PSI2339969).

### F.    IBM Learned Of PSI's Misappropriation After Filing This Lawsuit.

IBM sued PSI for patent infringement in November 2006. IBM's original complaint did not include a trade secret misappropriation claim. PSI, however, began producing source and object code for its emulator and diagnostic programs in May 2007, including a massive supplemental production of more than 200 gigabytes of information on May 29, 2007. (Anten Dec. ¶ 46). On June 20, 2007, shortly after IBM's review of PSI's source code had begun, PSI's counsel informed IBM that PSI had "recently reviewed certain materials in its possession" and concluded that "it may have inadvertently received IBM confidential information from Fujitsu.":

> We wish to advise you that having recently reviewed certain materials in its possession, PSI believes it may have inadvertently received IBM confidential information from Fujitsu Computer Systems Corporation. The information in question is in the form or source code listings for test and diagnostic programs . . . .

(Anten Dec., Ex. 30). The IBM confidential information was set forth in a single-spaced, 54-page list of source code and other files in which the word TIDA appeared. (*Id.*). PSI's counsel assured IBM that this information had not been used by PSI, that it had been removed from PSI's files, and that PSI would provide additional information as needed. (*Id.*).

Although IBM immediately asked specific questions, PSI reneged on its offer. (Anten Dec., Ex. 31). IBM served discovery and began reviewing the millions of lines of source code and other documents that PSI had produced to see if PSI's representations were true. They were not: PSI had used and was continuing to use IBM's confidential information, which even now has not been removed from PSI's files. Accordingly, IBM added claims for trade secret misappropriation.

. For the reasons set forth below, those contentions should not be taken seriously.

## III.    ARGUMENT

### A.    PSI's Motion For Summary Judgment That IBM's Trade Secret Misappropriation Claim Is Barred By The Statute of Limitations Should Be Denied.

PSI's motion hinges on the novel contention that California's statute of limitations for trade secret misappropriation claims applies in this New York-based action. PSI acknowledges that the New York statute of limitations is based on a continuing tort theory, and PSI does not dispute that its continuing use of IBM's trade secrets within the three years preceding the filing of IBM's First Amended Complaint is actionable under New York's statute. Therefore, PSI effectively concedes that if New York's statute applies, which it does, then PSI's motion must be denied.

1.    **PSI Relies On The Wrong Statute Of Limitations.**

PSI cites no authority supporting application of California's procedural law in this New York action.  That is, quite simply, because no such authority exists; New York federal courts—both generally and in trade secret misappropriation cases—apply New York's statute of limitations as a matter of course, even when the claim is governed by the substantive law of another state.

First, New York's choice of law rules control the determination of the applicable statute of limitations.  As the Second Circuit explained in *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989), "[a] federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim <u>must</u> apply the choice of law rules of the forum state" (emphasis added).  *See also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal court faced with a choice of applicable state laws will apply the conflict of law rules of the state in which it sits).

New York's choice of law rules direct New York courts to "apply New York's statute of limitations, even when the injury giving rise to the action occurred outside New York."  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).  This is because "matters of procedure are governed by the law of the forum."  *Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 588, 374 N.E.2d 97 (1978).  Because statutes of limitations are procedural for conflicts purposes, New York law will apply, barring an applicable exception.[8]  *See, e.g., Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 388 (S.D.N.Y. 2000) (Kaplan, J.) ("Statutes of limitations are regarded as part of a forum's procedure.  In consequence, New York's law governs the determination of whether plaintiffs' claim is time barred.") (footnote omitted); *Ins. Co. of N. Am.*

---

[8]    Although PSI makes no mention of it, the primary exception, New York's "borrowing statute," N.Y. C.P.L.R. 202 (McKinney 2004), does not apply here because IBM is a resident of New York.  *See Am. Cyanamid Co.*, 158 F.3d at 627 (borrowing statute applies to "a nonresident plaintiff"); *Ins. Co. of N. Am. v. ABB Power Generation Inc.*, 112 F.3d 70, 72 (2d Cir. 1997) (borrowing statute applies "unless plaintiff is a New York resident").

*v. ABB Power Generation*, 925 F. Supp. 1053, 1059 (S.D.N.Y. 1996) (Kaplan, J.) (applying New York's statute of limitations over California's because "such statutes are regarded as part of the forum's procedure, as distinguished from the substance of the right created by the law of the state where the injury occurred").[9]

This general rule applies in cases involving claims of trade secret misappropriation—including claims arising under the Uniform Trade Secrets Act ("UTSA"). In *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425 (S.D.N.Y. 1996), for example, although both parties had assumed that the Minnesota UTSA's statute of limitations—which is identical to California's—applied, the court held that "New York courts treat statutes of limitations as part of the forum's procedure, and therefore apply New York statutes of limitations even if the underlying claim ultimately will be governed by the substantive law of another jurisdiction." *Id.* at 431. The court thereafter applied New York's statute of limitations to the claim of trade secret misappropriation, *id.* at 432-33, while applying Minnesota law to the substance of the claim, *id.* at 434-35; *see also Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 598-99 (N.D. Ill. 1996) (analyzing California UTSA and concluding that even if it were to apply, the Illinois statute of limitations would govern).

---

[9]    *See also Spanierman Gallery v. Merritt*, 2004 WL 1781006, at *4 (S.D.N.Y. Aug. 10, 2004) ("In New York, '[s]tatutes of limitations are usually characterized as procedural, not substantive,' and New York courts apply local procedural rules, even when applying the substantive law of another state.") (citation omitted); *Emerson Elec. Co. v. Black & Decker, Inc.*, 1997 WL 666283, at *4 (S.D.N.Y. Oct. 27, 1997) ("A federal court sitting in diversity must apply the conflicts of laws rules of the state in which it sits. This rule embraces the forum state's applicable statute of limitations and borrowing statute.") (citations omitted); *Wang v. N.Y. Transit, Inc.*, 1996 WL 583389, at *5 n.3 (S.D.N.Y. Oct. 10, 1996) (applying New York's statute of limitations over California's because "New York courts consider statutes of limitations as procedural, not substantive law"); *Tammac Corp. v. Williams*, 1993 WL 330639, at *16 (W.D.N.Y. Aug. 13, 1993) ("[I]n determining whether plaintiff's claims are time barred, this Court must apply the proper New York statutes of limitations as they have been interpreted by New York courts."); *Elghanayan v. Elghanayan*, 190 A.D.2d 449, 453, 598 N.Y.S.2d 524, 527 (1st Dep't 1993) ("[U]nlike substantive issues, which are generally determined by the law of the locus of the partnership, 'Statutes of Limitations have traditionally been characterized as procedural . . . . Since under common-law rules matters of procedure are governed by the law of the forum, it has generally been held that the Statute of Limitations of the forum rather than that of the jurisdiction where the cause of action accrued governs the timeliness of a cause of action.'") (citations omitted).

This approach is supported by the very California case upon which PSI relies. In *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634 (N.D. Cal. 1993), the plaintiff had argued that because Texas law governed the substantive law of the misappropriation claim, Texas law should also govern the statute of limitations. The court rejected that argument, holding "that Texas law should be used to define the terms 'trade secret' and 'misappropriation,' but that California law should govern disposition of issues related to the statute of limitations." *Id.* at 638 n.4.

Notably, PSI neglects to bring this law to the Court's attention, and indeed fails to cite—let alone distinguish—a single New York case regarding conflicts in statute of limitations laws. Instead, PSI cites *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994), for the proposition that a statute of limitations is a "conduct-regulating rule[] because [it] establishes the requirements for liability and [does] not relate to loss allocation." (PSI Brief at 8). Not only is PSI's conclusory pronouncement unsupported by *Padula* (not once does *Padula* mention the statute of limitations), but it is actively misleading in that *Padula* concerns the resolution of a conflict in substantive law, not procedural law.[10]  Because New York courts have affirmed time and again that statutes of limitations are part of a forum's procedure, PSI's reliance on *Padula* and its progeny is misplaced.

### 2. Under New York's Statute Of Limitations, A Claim For Trade Secret Misappropriation "Accrues" Anew Upon Each Successive Use.

Unlike California, New York has not adopted the UTSA; instead, it applies its common law to claims of trade secrets misappropriation. As PSI concedes (PSI Brief at 6-7), New York employs the continuing tort doctrine in trade secrets cases. Under this doctrine, "if the defendant keeps the [misappropriated] trade secret confidential, yet makes use of it to his own commercial advantage,

---

[10]  *See Roberts v. Xtra Lease, Inc.*, 2001 WL 984872, at *6 n.2 (E.D.N.Y. June 25, 2001) (citing *Padula* for proposition that "interest analysis is used to determine what <u>substantive</u> law should apply in any given case") (emphasis added); *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 388 (S.D.N.Y. 1999) (citing *Padula* for proposition that "New York's choice of law rules require the court to apply the <u>substantive</u> tort law of the state with the most significant interest in the litigation") (emphasis added, quotation marks omitted).

each successive use constitutes a new, actionable tort for purposes of the running of the Statute of Limitations." *Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982) (emphasis added); *see also Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1098-99, 930 N.Y.S.2d 358, 362 (3d Dep't 2007); *SCFB HOLT LLC v. Collins Stewart Ltd.*, 2004 WL 1794499, at *8 (S.D.N.Y. Aug. 10, 2004) ("[A]ny use of [plaintiff's] trade secrets within the three years preceding the filing of the instant action will satisfy the statute of limitations."); *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 64 F. Supp. 2d 233, 247 (W.D.N.Y. 1999); *Architectronics*, 935 F. Supp. at 433 (quoting *Lemelson*); *Kistler Instrumente A. G. v. PCB Piezotronics, Inc.*, 419 F. Supp. 120, 123 (W.D.N.Y. 1976) ("[T]he continued use of confidential information gives rise to successive causes of action under the law of New York."). For example, in *Architectronics*, after having determined that New York's statute of limitations applied, the court applied New York's continuing tort doctrine to determine whether a claim of trade secret misappropriation had accrued. 935 F. Supp. at 432-33.

Here, neither Amdahl nor PSI ever publicly disclosed the IBM trade secrets at issue. Amdahl itself was entitled to possess and use that information under the terms of TIDA/TILA agreements.[11] And although PSI employees may have taken IBM confidential information with them to PSI when they left Amdahl/Fujitsu or otherwise received such information from Amdahl/Fujitsu personnel, nowhere does PSI contend that PSI or anyone disclosed such information to the public at large. *See* Anten Dec., Ex. 34.

### 3.    IBM's Trade Secret Claims Are Timely Under New York Law.

Although PSI falsely denied any possession and use of IBM's trade secrets until June 2007,



███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

Although discovery is still ongoing and IBM has not yet completed its analysis of PSI's use of IBM's trade secrets, these instances of misappropriation occurring well within the three-year statute of limitations period are alone sufficient to defeat PSI's motion for summary judgment under New York law. Accordingly, PSI's motion must be denied.

**B.      Even If California's Statute Of Limitations Were To Apply, Genuine Issues Of Material Fact Preclude Summary Judgment.**

Resolution of the statute of limitations is normally a question of fact. *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1112 (1988). Only when "the uncontradicted facts established through discovery are susceptible of only one legitimate inference," may summary judgment be possible. *Id.*

It is well settled that mere suspicion of wrongdoing will not commence the running of the statute of limitations. *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991)

22

("We cannot apply statute of limitations law in a way that pressures litigants to file suits based merely on suspicions and fears. . . . [S]uspicion and fear are not sufficient predicates for launching a lawsuit, and to file an action with no other basis would offend norms articulated in rules like Federal Rule of Civil Procedure 11."); *Garamendi v. SDI Vendome S.A.*, 276 F. Supp. 2d 1030, 1043 (C.D. Cal. 2003) (finding plaintiff is "on notice" only when he has "an awareness of sufficient facts to identify a particular cause of action . . . . [It does] not mean the kind of notice—based on hints, suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit") (citation omitted).

The statute of limitations is also tolled where the defendant fraudulently conceals the evidence of his wrongdoing. *See Hynix Semiconductor v. Rambus, Inc.*, 2007 WL 3284060, at *3 (N.D. Cal. Nov. 2, 2007) (statute of limitations will toll based on fraudulent concealment when plaintiff does not have "knowledge of the harm and its cause"); *Garamendi*, 276 F. Supp. 2d at 1042-43; *see also Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007) ("A defendant's fraud in concealing a cause of action against him will toll the statute of limitations . . . ."); *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 931 (1994) (reversing summary judgment, holding that "defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations"); *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 831-32 (1983). "This rule serves an obvious equitable purpose: it prevents the culpable defendant . . . from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action." *Garamendi*, 276 F. Supp .2d at 1041 (citations omitted). Accordingly, "near-actual" notice, rather than "inquiry notice," is the governing standard when a plaintiff fraudulently conceals the misappropriation. *Id.* at 1042-43.

23

Here, numerous genuine issues of material fact would preclude summary judgment even if California's statute of limitations were applicable, which it is not. According to PSI, "IBM contends that PSI's receipt and use of Amdahl's diagnostics, <u>in any form</u>, constitutes a misappropriation of IBM trade secrets." (PSI Brief at 2, emphasis added). But this fundamental assertion, which underlies PSI's entire argument, grossly mischaracterizes IBM's allegations. IBM has not accused PSI of misappropriation based on its use of <u>all</u> Amdahl diagnostics <u>in any form</u>. On the contrary, as IBM's Second Amended Complaint shows, IBM's allegations are limited to ███████████████

███████████████████████████████████

███████████████████████████████████
███████████████████

████████████████████████████████

Although PSI conspicuously fails to point it out, ███████████████████████

███████████████████████████████████████

███████████████████████████████. ███████████████

███████████████████████████████████████

██████, PSI has offered no evidence that this fact was known to IBM before this litigation was filed. Indeed, it apparently was not well-known within PSI and appears not to have been known by PSI's counsel based on statements they made in letters and interrogatory responses. There is ample evidence from which the finder of fact could conclude that IBM had no basis to know that PSI had obtained diagnostics containing IBM confidential information until well within the three-year California statute of limitations period.

1.    **PSI's Own Evidence Undermines PSI's Contention That IBM Had Notice At Any Time Between PSI's Formation And The Filing Of IBM's First Amended Complaint.**

(a)    *PSI's 2001 Correspondence With IBM Does Not Show Notice.*

PSI identifies several documents that it contends show that IBM was aware, in 2001, that PSI had all Amdahl diagnostics. Yet not one of those documents provides any basis from which IBM could or should have concluded that PSI had a version of those diagnostics that contained TIDA/TILA information. None of the cited documents in fact put IBM on notice that PSI had obtained all Amdahl diagnostics, and that these diagnostics included TIDA/TILA features of IBM's architectures. Indeed, PSI's own vice president of engineering, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. Summary judgment cannot be granted based on these statements.

For example, although Ron Hilton's January 23, 2001 email mentioned that PSI had been granted "rights to Amdahl's emulation technology, associated patents, and access or other intellectual property such as S/390 diagnostics and benchmarks," it does not say "all" and did not suggest that these materials contained IBM confidential information. (*See* Hilton Dec., Ex. A). On the contrary, Hilton provided a long list of proprietary features for which he said PSI "would like to license specs from IBM." (*Id.*). Significantly, this list included many of the features, including "extended sorting," "lock page," "move page," "channel-subsystem call," and "SCLP" that were the subject of TIDA/TILA specifications purchased by Amdahl and Fujitsu and that underlie IBM's misappropriation claims. (*Id.*). Moreover, Hilton further noted:

> Once we obtain the IBM TILA specifications, we plan to raise about $4-5M to complete the development and rollout of our product. We have estimated that there probably remains about 3-6 man-years of engineering efforts to complete the initial

> product, . . . . Our budget does not include the TILA fee, which we would like to handle as a non-cash equity transaction. . . .
>
> Although you have indicated that IBM does not plan to license any proprietary z/Architecture specs at the present time, I do have one basis question. Would it be possible to at least get some indication of the nature of the facilities that are not available to be licensed at this time, and/or some idea of the limitations that the lack of those facilities might impose on our product.

(*Id.*). Rather than showing that PSI had IBM confidential information, this email suggests that PSI did not possess such information and was willing to give away part of its company to get it.

The same is true of Mr. Hilton's March 5, 2001 letter, in which he wrote that "[w]e have all the assets developed by Amdahl for S/390 development: [1] IA32-based Merlin S/390 simulator [2] Bring-up programs [3] System-level diagnostics such as HOT and DIRT [4] Performance benchmarks and workload suites." (Hilton Dec., Ex. B). What PSI fails to mention is that, in that same letter, Mr. Hilton renewed his request for a TIDA/TILA license, stating:

> We believe that we can obtain funding for this effort if we have an agreement with IBM containing the following points: [1] IBM would provide PSI with TIDA, TILA, and 64-bit (z/Architecture) specifications, solely for the purpose of this development contract . . . .

(*Id.*). Once again, this communication effectively said that PSI did not possess IBM confidential information. At the very least, this request raises issues of fact that preclude summary judgment.

Put simply, the very communications that form the principal basis for PSI's motion also reflect efforts by PSI to license TIDA/TILA information from IBM. PSI crops general statements made by PSI at the same time in the same correspondence to suggest that IBM should have known that PSI already had the very information that it was telling IBM it needed and was seeking to license. Drawing the conclusion from this correspondence that PSI had already misappropriated that information would have required an extraordinary level of cynicism on IBM's part. Thus, although discovery has shown that PSI did engage in just this kind of duplicity, its communications with IBM in 2001 and thereafter gave IBM no reason to suspect as much and, in fact, would have led a

reasonable person to conclude that what PSI received from Amdahl did not include the TIDA/TILA information that PSI was both prohibited from having and was asking IBM to license to PSI.

### (b)    *PSI's Declarations Do Not Establish Notice.*

Nothing in the declarations of Scott Blackledge or Ron Hilton suggests, much less establishes, that IBM knew or should have known that PSI had IBM confidential information outside of the California statute of limitations period. Indeed, Mr. Blackledge's declaration should be disregarded in its entirety. For one, it is unclear what declaration he even signed because the document ID numbers on the bottom left and right-hand corners of each page are different and there is a mismatch in the paragraphs spanning pages 2 and 3, suggesting that the version of the declaration that Mr. Blackledge signed is different from that submitted by PSI in support of its motion. PSI's brief cites to a paragraph 8 of that declaration, even though the declaration itself contains no such paragraph. (PSI Brief at 3, 12).

Second, as noted above, nothing in the Hilton or Blackledge declarations suggests that anyone at IBM, including Mr. Blackledge himself, was aware that the versions of the diagnostics that PSI obtained from Amdahl contained code derived from TIDA/TILA information.[12] And



even if he knew that, Mr. Blackledge does not claim to have shared his knowledge with anyone else at IBM.

Third, although Mr. Blackledge holds himself out as "an IBM employee at the time," he and PSI fail to mention that he was out on disability from IBM and attempting to negotiate a job at PSI when he received the email relied on by PSI. *See* Hilton Dec. Ex. D ("I appreciate your continued interest in PSI and will let you know when an opportunity opens up."). And in fact, Mr. Blackledge was laid-off from IBM when his disability leave was over. (Anten Dec., Ex. 44). Thus, even if he had been informed that PSI had versions of the Amdahl diagnostics that contained IBM confidential information, and there is no suggestion that he was, it strains credulity to think that he would have passed on to his IBM superiors the substance of his job search-related communications with PSI. At the very least, Mr. Blackledge's declaration and exhibits give rise to fact issues that preclude summary judgment.

### 2. Nothing In PSI's Statements From August 2001 Through August 2004 Establishes Notice.

PSI also contends that between August 2001 and August 2004, it made statements to IBM and the public that should have put IBM on notice that PSI had misappropriated IBM trade secrets. For example, PSI makes much of Ron Hilton's February 7, 2003 response to a letter received that day from IBM's Gerald Lane, which asked whether there are "portions of the IBM architectural definitions which your emulated instructions do not support" and if so, how "they deviate from the definitions?" (Hilton Dec., ¶ 14, Ex. E). Mr. Hilton wrote:

> It is our intent to implement all of the instructions in the ESA/390 Principles of Operation, the z/Architecture Principles of Operation, and the Interpretive Execution Facility. We do not plan to implement the Vector Facility. We realize that some of this functionality may be covered by IBM patents and we will be willing to pay reasonable royalties as applicable, consistent with past practices in that regard.
>
> Eventually, we also plan to implement those instructions and features related to

<u>Coupling Facility, but we realize that proprietary specifications may have to be</u>
<u>purchased from IBM for that purpose.</u>

To the best of our knowledge, our implementation does not deviate in any way from the IBM architectural specifications. We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain <u>full</u> compatibility."

\* \* \*

In summary, what <u>we need</u> from IBM, in order of priority, is as follows: . . . <u>A</u> <u>licensing agreement for any proprietary specifications</u> (e.g. Coupling Facility).

(Hilton Dec., ¶ 14, Ex. F, emphasis added). Although PSI contends that the third quoted paragraph informed IBM that PSI's diagnostics were testing the proprietary aspects of IBM's architecture, the e-mail as a whole shows just the opposite. The specifications Mr. Hilton refers to are the publicly available POPs for the ESA/390 and System z architectures and an additional specification for the Interpretive Execution Facility, which was also publicly available. Although Mr. Hilton did note that Amdahl's diagnostics have been used "to ascertain full compatibility," in the very same email he confirmed that the diagnostics had <u>not</u> been used to verify compatibility with respect to IBM's specifications for the Vector facility and the proprietary Coupling facility. Thus, by "full" compatibility, he obviously did not mean compatibility with <u>all</u> IBM facilities, but rather only the publicly available ones he had listed at the beginning of the e-mail.

Indeed, this is confirmed by an email that PSI's new CEO Michael Maulick sent to IBM on November 11, 2003, in which he wrote: "As you may or may not know, we have acquired the rights to the former Amdahl patents and <u>all</u> of their technology <u>that doesn't contain TILA or TIDA</u>." (Anten Dec., Ex. 6, emphasis added).[13]

---

[13] Remarkably, PSI's only reference to a statement by Mr. Maulick comes in the form of a quotation taken from an email by an IBM employee, Montgomery Bauman, who attended an industry conference with Mr. Maulick, and wrote: "Platform Solutions purchased all amdahl.fujitsu virtualization intellectual property[.]" (PSI Brief at 13-14; Kirkpatrick Dec., Ex. H). In context, this statement does not suggest any more than the others PSI cites that IBM should have concluded that PSI was in possession of IBM confidential information; it is silent on the issue and does not negate Mr. Maulick's direct statement to IBM on the subject.

Lastly, PSI's attempts to rely on the deposition testimony of Erich Clementi and James Stallings, and the announcement on PSI's website in 2004 that PSI had "acquired the intellectual property and assets of the former Amdahl Corporation," are equally unavailing. Nothing in either Mr. Clementi's or Mr. Stallings testimony suggests that they or anyone else at IBM had a specific basis to believe that PSI possessed IBM trade secrets—but rather, simply that they did not trust PSI—and as it turns out, rightly so. Moreover, the website itself says nothing about PSI acquiring IBM's confidential information or other intellectual property and makes no mention at all of the Amdahl diagnostics.

### 3. Nothing In IBM's Pre- And Post-Lawsuit Statements Suggests That IBM Knew Or Should Have Known Of PSI's Misappropriation Before August 17, 2004.

According to PSI, IBM made statements both before and during this lawsuit that confirm that it was on notice of the facts now alleged to constitute misappropriation and should, at the very least, have brought suit or investigated the circumstances surrounding the transfer of Amdahl's diagnostics to PSI. This section of PSI's brief is particularly misleading since it ignores the investigation that IBM did make and completely mischaracterizes the allegations of IBM's Amended Complaint.

In April 2005, IBM learned from a PSI presentation that PSI had installed the first version of its emulator at a customer site for testing purposes and was claiming that this product would execute IBM's proprietary mainframe instructions. (Anten Dec., Ex. 1). IBM immediately sent two letters requesting that PSI provide IBM with "sufficiently detailed technical information about your product to enable us to more completely determine your use of IBM's intellectual property." (Handschuh Dec., Ex. C; Anten Dec., Ex. 45). PSI's response came from PSI's General Counsel Greg Handschuh, who assured IBM: "Let me categorically state that PSI has not misappropriated any IBM trade secret information nor does it knowingly possess any such information." (Handschuh Dec., Ex. E).

IBM, however, did not simply rely on that letter. On May 23, 2005, Ron Lauderdale of IBM again wrote to Mr. Handschuh to request that PSI provide detailed technical information concerning PSI's product for the purpose of investigating both patent infringement and potential trade secret misappropriation. *See* Handschuh Dec., Ex. E. And once again, Mr. Handschuh gave his personal assurance that he was aware of IBM's confidential disclosures to Amdahl and Fujitsu and could confirm, implying he had investigated the issue, that PSI had <u>not</u> acquired such information:

> I want to give you my personal assurances that Amdahl always exercised the greatest degree of care in insuring that no IBM confidential information was improperly disclosed and that no such information was disclosed or transferred to PSI. Since joining PSI, I have reassured myself that no such information exists within the company.

(Handschuh Dec., Ex. F, emphasis added). IBM has since learned through discovery that these statements were false. ██████████████████████████████████

███████████████████████████████████████████████

████████. At the time it was sent, however, there was nothing on the face of this letter that would have justified IBM in filing suit against PSI. Instead, IBM continued corresponding with PSI in an attempt to find out about its products under development for another year before bringing this lawsuit.

PSI also contends that IBM makes three claims in its complaint that confirm that IBM had notice of misappropriation more than three years before IBM filed suit: (1) that PSI's product could not exist without misappropriation of trade secrets; (2) that IBM was aware that Amdahl's diagnostics were created in part using IBM TIDA specifications; and (3) that IBM cites Hilton's February 7, 2003 letter as conclusive proof that PSI misappropriated IBM trade secrets by using Amdahl diagnostics. (PSI Brief at 15-16). These contentions, however, are either completely unsupported by actual statements in IBM's complaint or in the case of the second one, irrelevant.

For one, nowhere does IBM state that PSI could not have developed an emulator without misappropriating trade secrets. What paragraph 4, the passage PSI cites, actually says is "PSI's emulators, to work as PSI claims, necessarily infringe IBM patents"—a true statement that does not in any way implicate IBM's knowledge of trade secret issues.

Similarly, although IBM's First Amended Complaint does allege that Amdahl diagnostics were created using TIDA/TILA information and were used to test compatibility with confidential aspects of IBM's mainframe architectures, PSI fails to point out that, when IBM served this Amended Complaint, discovery was well underway in this case and PSI had produced copies of the source code for numerous versions of the Amdahl diagnostics—some containing TIDA-based code and some from which that code had been removed—as well as other documents shedding light on the nature and use of those diagnostics. The fact that IBM in 2007 was able through review of PSI's documents to derive information concerning the information PSI obtained from Amdahl hardly sheds light on what IBM knew or should have known more than three years before.

Lastly, PSI's arguments concerning IBM's citation of Ron Hilton's February 7, 2003 letter are taken out of context and misplaced. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████. But absent what IBM learned through discovery, that letter sheds no light whatsoever on PSI's possession of diagnostics that contained IBM confidential information.

    **C.    IBM's Trade Secrets At All Times Were The Subject Of Reasonable Efforts To Maintain Their Secrecy.**

The parties agree that California law governs the <u>substantive</u> aspects of IBM's trade secret claim. California Civil Code § 3426.1(d) provides that:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

PSI is not challenging the first element here. With regard to the second, courts have found that reasonable efforts to maintain secrecy include: advising employees of the existence of a trade secret, limiting access to the information on a "need to know basis," requiring employees to sign confidentiality agreements, marking documents with warnings or reminders, keeping secret documents under lock, controlling plant access, and entering nondisclosure agreements with licensees. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 923 F. Supp. 1231, 1253-54 (N.D. Cal. 1995); *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (2002); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002); *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996); *Cal. Int'l Chem. Co., Inc. v . Sister H. Corp.*, 1999 WL 50891, at *3 (9th Cir. Jan. 19, 1999).

Here, IBM takes extraordinary measures to maintain the confidentiality of the architectural features it maintains as trade secrets including for example:

1) All employees are required to sign a confidentiality agreement wherein they agree not to disclose IBM confidential information outside of IBM, both during and after their employment;

2) Employees must certify every year that they have read and accept the responsibility to comply with the IBM Business Conduct Guidelines;

3) When an employee ends his or her employment at IBM, the need for continued non-disclosure of IBM confidential information and confirmation that the employee has returned all confidential documents in his or her possession are explicitly covered in the exit interview;

4) IBM confidential information can be disclosed or distributed only to IBM employees who have a "need to know," or to third parties who have a need to know, but only with proper management approval and, in the case of third parties, under an appropriate confidential disclosure agreement;

33

5) Confidential architecture documents do not go to outside companies without management approval and confidentiality agreements;

6) All employees are required to wear name badges containing photo identification;

7) Access to parts of IBM's facilities is limited to employees and pre-authorized invited guests who are required to be escorted at all times;

8) Managers must ensure that information is properly classified and that the creator or developer of the information and other employees understand their responsibilities in preserving the confidentiality of IBM confidential information and retrieve any IBM confidential information from an employee when they no longer have a business need for it; and

9) IBM confidential information must be clearly labeled "IBM Confidential" on each page of the document or at the beginning of each electronic file in the case of electronic information. If it cannot be so labeled, the originator must inform all recipients that the information is IBM Confidential.

(Anzani Dec. ¶¶ 7-9).

In addition, the TIDA/TILA agreements with Amdahl provided that IBM confidential information would be provided in hardcopy form only, in a limited number of copies, individually numbered, with a restriction against photocopies, kept under lock and key, and could not be disclosed to persons outside of Amdahl. *See* Handschuh Dec., Exs. A at 3-4 & B at 7-10; Anten Dec., Ex. 10 at 167:24-169:21; *see also* PSI's Statement of Undisputed Facts ¶¶ 3-4.

The facts cited above relating to IBM's investigation and PSI's eight-year concealment effort do not change the fact that IBM made reasonable—indeed, extraordinary—efforts to protect the secrecy of its nonpublic mainframe architecture.

PSI cites three cases to support its argument that IBM trade secrets are not the subjects of efforts that are reasonable under the circumstances to maintain their secrecy, none of which supports PSI's position. In *Forcier v. Microsoft Corp.*, 123 F. Supp. 520, 528 (N.D.Cal. 2000), the court held that the information at issue was not a trade secret pursuant to Cal. Civ. Code § 3426.1(d) because the information had been placed in the public domain, not because of a failure to undertake reasonable efforts to maintain secrecy. And *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th

34

1018, 98 Cal. Rptr. 2d 661 (2000), never even mentions § 3426.1(d), or whether the information at issue constituted a trade secret; the passage provided by PSI as authority is specifically directed to California's rejection of the continuing tort doctrine pursuant to § 3426.6.

The third case upon which PSI relies, *Alamar Biosciences Inc. v. Difco Labs Inc.*, 40 U.S.P.Q.2d 1437 (E.D. Cal. 1997), supports IBM. There, the court took issue with the fact that plaintiff had failed to further investigate an evasive answer by defendant and did not search public patents and patent applications. Unlike the facts in *Alamar*, IBM counsel did follow up with PSI, which vehemently denied misappropriation on numerous separate occasions. In addition, PSI never disclosed IBM's trade secrets in patents, patent applications, or any other publicly available source that would have been available to IBM, and PSI does not contend otherwise.

Thus, a triable issue of fact exists as to whether IBM took reasonable steps to maintain the secrecy of the nonpublic aspects of its architecture at issue here.

### D.    Intentional Interference With Contract.

When IBM filed its Second Amended Complaint, it did not believe the parties would agree on which substantive law applied to the trade secrets claim. Since PSI now agrees that California law should apply to that claim, IBM concedes that its intentional interference claim is preempted.

## IV.    CONCLUSION

For the foregoing reasons, IBM respectfully requests that PSI's motion for summary judgment as to Count Eleven be denied in its entirety and that its motion as to Count Twelve be denied with respect to the statute of limitations.

Dated:  May 5, 2008                          QUINN EMANUEL URQUHART OLIVER
                                             & HEDGES, LLP


                                   By:    /s/ Richard I. Werder, Jr.
                                          Richard I. Werder, Jr.
                                          Edward J. DeFranco
                                          Thomas D. Pease
                                          51 Madison Avenue
                                          22nd Floor
                                          New York, New York 10010-1601
                                          (212) 849-7000

                                          Frederick A. Lorig
                                          865 S. Figueroa Street
                                          Los Angeles, California 90017
                                          (213) 443-3000

                                          Attorneys for Plaintiff
                                          International Business Machines Corporation

### CERTIFICATE OF SERVICE

I, Andrew B. Curran, hereby certify that on May 5, 2008 I caused to be served the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF IBM'S OPPOSITION TO PLATFORM SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNTS ELEVEN AND TWELVE OF IBM'S SECOND AMENDED COMPLAINT** using the CM/ ECF System which sent notification to all counsel of record as indicated below:

Richard I. Werder
rickwerder@quinnemanuel.com

Steven M. Edwards
smedwards@hhlaw.com

Howard Weber
hweber@hhlaw.com

Katherine Jane Weall
katherineweall@quinnemanuel.com

Morris Waisbrot
mwaisbrot@hhlaw.com

Richard Walter Erwine
richarderwine@quinnemanuel.com

Thomas David Pease
thomaspease@quinnemanuel.com

Stephen Edward Morrissey
smorrissey@susmangodfrey.com

Stephen D. Susman
ssusman@SusmanGodfrey.com

Jacob W. Buchdahl
jbuchdahl@susmangodfrey.com

Ryan C. Kirkpatrick
rkirkpatrick@susmangodfrey.com

Tibor Ludovico Nagy, Jr.
tnagy@susmangodfrey.com

Bruce E. Gerstein
bgerstein@garwingerstein.com

D Skylar Rosenbloom
rosenbls@phelps.com

David L. Patron
PATROND@phelps.com

Elena Kar-Hing Chan
echan@garwingerstein.com

Harry M. Barton
harry.barton@phelps.com

Noah H. Silverman
nsilverman@garwingerstein.com

Brent Barriere
BARRIERB@phelps.com

/s/ Andrew B. Curran
Andrew B. Curran