IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Plaintiff,<br><br>-vs.-<br><br>PLATFORM SOLUTIONS, INC. and T3 TECHNOLOGIES, INC.,<br><br>Defendants. | Civil Action No. 06-CV-13565-LAK (THK)<br><br>PLAINTIFF IBM'S RESPONSE TO PLATFORM SOLUTIONS, INC.'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNTS ELEVEN AND TWELVE OF IBM'S SECOND AMENDED COMPLAINT<br><br>[PUBLIC VERSION] |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiff International Business Machines Corporation ("IBM") submits this Response to the "Separate Statement Of Undisputed Facts In Support Of Platform Solutions, Inc.'s Motion For Summary Judgment On Counts Eleven And Twelve Of International Business Machines Corporation's Second Amended Complaint."

| PSI Statement | IBM's Response |
|---|---|
| 1. Beginning in the 1970s, Amdahl Corporation ("Amdahl") developed the five diagnostic programs alleged to contain IBM trade secrets—DIRT, ALPHA, HOT, 8E7 and Bring-up Programs (BUPS)—to test the compatibility of its mainframes with IBM's operating systems. [SAC at ¶¶ 35-40; Declaration of Scott Blackledge at ¶ 3 ("Blackledge Decl."); Declaration of Ronald Hilton at ¶ 3 ("Hilton Decl.").] | Denied.<br><br>(a) The evidence cited by PSI does not indicate that Amdahl began developing the referenced diagnostic programs in the 1970s, nor does it indicate the point at which Amdahl began to incorporate relevant IBM trade secrets in those tools.<br><br>(b) The TIDA and TILA agreements under which the IBM trade secret information at issue in this litigation was provided to Amdahl were executed in 1986 and 1996. (Handschuh Dec., Exs. A and B).<br><br>(c) The referenced Amdahl tools were developed to test compatibility with IBM's computer architectures, not with IBM operating systems. (PSI Brief 1; Anten Dec., ▮▮).<br><br>Immaterial. |
| 2. The accused diagnostics were developed using, among other sources, written technical specifications that IBM disclosed to Amdahl pursuant to technical disclosure agreements known as Technical Information Disclosure Agreements (TIDA) and Technical Information License Agreements (TILA). [SAC at ¶¶ 35-40; Blackledge Decl. at ¶ 7.] | Not disputed, assuming that the "accused diagnostics" refers to DIRT, ALPHA, HOT, 8E7, and BUPs.<br><br>Immaterial to the present motion. |
| 3. The TILA and TIDA required Amdahl to | Not disputed. |

| | |
|---|---|
| adopt a number of detailed security measures. [Declaration of Gregory Handschuh. at ¶¶3-5, Exs. A & B ("Handschuh Decl.").] | |
| 4. For example, the 1986 TIDA required Amdahl to "store the Technical Information, when not in use, in a locked desk, file, or safe in a locked room," "provide, secure, locked work areas," restrict access to those work areas, "maintain a log, indicating date, time and duration of each access to the Technical Information," and "report to IBM all known an suspected losses, thefts, or unauthorized accesses." [Handschuh Decl. at ¶ 3, Ex. A.] | Not disputed. |
| 5. The agreements also provided IBM with the contractual right to inspect Amdahl's compliance with the agreements. [*Id.*, Ex. A ("Applicant agrees to permit IBM, upon reasonable request and during Applicant's working hours, to inspect Applicant's security procedures for compliance with the above requirements."); *Id.* at ¶ 4, Ex. B ("Licensee shall permit IBM, upon reasonable notice and during Licensee's normal working hours, to inspect Licensee's security measures for compliance with this Agreement.").] | Disputed. The quoted provisions of the TIDA and TILA permitted IBM to inspect Amdahl's "security procedures" and "security measures." |
| 6. In 1997, Fujitsu Limited acquired Amdahl. [Handschuh Decl. at ¶ 2.] | Not disputed. |
| 7. On February 11, 1999, Platform Solutions, Inc. ("PSI") was spun off from Amdahl to continue Amdahl's business of developing and marketing PCMs. [Hilton Decl. at ¶ 4.] | Disputed. PSI was not "spun off from Amdahl to continue Amdahl's business of developing and marketing PCMs." The purpose of the spin-off was to permit continuation of Amdahl's internal emulator development program and to commercialize emulation technology. (███████████████; Anten Dec., Ex. 11 at PSI2186319). |
| 8. In exchange for a share of ownership, PSI received, *inter alia*, a license to the Amdahl diagnostics from Amdahl. [Hilton Decl. at ¶ 4.] | Disputed. ████████ |

| | |
|---|---|
| | <br><br>Immaterial.<br><br>(a) PSI did not advise IBM that it was entering into this License Agreement.<br><br>(b) Fujitsu and PSI did not advise IBM that any IBM intellectual property, or any materials created by Amdahl based on IBM TIDA/TILA information was being transferred to PSI, and did not consult IBM or seek IBM's consent to any transfer of intellectual property to PSI.<br><br>(b) IBM did not obtain access to the License Agreement between Fujitsu and PSI until it received it in discovery in this litigation. |
| 9. From 1999 to 2003, PSI was headquartered within Amdahl's facilities in Sunnyvale, California, had access to the Amdahl diagnostics, received physical copies of the diagnostics, and ran the diagnostics to test full compatibility. [Hilton Decl. at ¶ 7.] For example, in early 2000, Fujitsu's Bob Rethemeyer provided Hilton with a compact disc containing Amdahl BUPs that IBM contends constitute IBM trade secrets. PSI was running DIRT by no later than December 13, 2001, PSI was running HOT by no later than June 2002, and PSI was running Alpha by no later than February 2003. [Hilton Decl. at ¶ 7.] | Disputed.<br><br>(a) The evidence cited by PSI does not support the statement that PSI was using Amdahl diagnostics to "test full compatibility," and the lack of any definition of that phrase leaves PSI's statement vague and ambiguous.<br><br>(b)<br><br>(c) IBM has not yet had the opportunity to take depositions of Ron Hilton or Bob Rethemeyer; to the extent that the assertions in this statement are considered to be material, IBM is not yet fully able to respond to them because of the current state of discovery. (Anten Dec. ¶ 47).<br><br>Immaterial. The evidence cited by PSI does not indicate (a) whether PSI was running full versions of the Amdahl tools that included TIDA/TILA information and functionality; (b) that IBM had been advised or had reason to believe that PSI had obtained versions of |

| | |
|---|---|
| | Amdahl tools that included TIDA/TILA information and functionality; or (c) that IBM was advised of the transfer from Rethemeyer to Hilton at any time prior to discovery in this case.<br><br>Counterstatement: Between 2000 and 2003, PSI made a number of requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 10. These development activities occurred in California. [Hilton Decl. at ¶ 8.] | Not disputed. |
| 11. The Amdahl diagnostic programs were developed for the same purpose and relate to the same or similar architectural facilities. [SAC at ¶¶ 39-41 and Declaration of Ryan Kirkpatrick at ¶ 5, Ex. D ("Kirkpatrick Decl.") (IBM's Responses to PSI's Fourth Set of Interrogatories listing the accused diagnostic listings by architectural facility).] | Disputed. PSI's statement appears to be missing language because it is unclear what is meant by "the same purpose" and "the same or similar architectural facilities." IBM does not dispute the allegations of ¶¶ 39-41 of its Second Amended Complaint or the contents of its interrogatory responses. |
| 12. In 2000, IBM and Amdahl were in discussions regarding, *inter alia*, IBM's desire to acquire the Amdahl diagnostic programs. [Blackledge Decl. at ¶4.] | Disputed.<br><br>(a) Hilton Dec., Exh. C, makes clear that the referenced "discussions" in 2000 related principally to Scott Blackledge's desire to acquire Merlin and not to IBM's desire to acquire Amdahl's diagnostic programs.<br><br>(b) Email communications between Ron Hilton and Scott Blackledge make clear that during the time period in question, Mr. Blackledge was aware that PSI was seeking to obtain TIDA/TILA information from PSI and do not indicate that he was aware that PSI had received TIDA/TILA information from Amdahl. *See, e.g.*, Hilton Dec., Ex. D.<br><br>(c) IBM has not yet had the opportunity to take the deposition of Scott Blackledge; to the extent that the assertions in this statement are |

| | |
|---|---|
| | considered to be material, IBM is not yet fully able to respond to them because of the current state of discovery. (Anten Dec. ¶ 47).<br><br>Immaterial. The cited evidence says nothing concerning IBM's knowledge of the nature of the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu. Among other things, PSI cites no evidence indicating that Mr. Blackledge knew that PSI had obtained versions of those Amdahl diagnostic programs from which TIDA/TILA information and functionality had not been removed or that he communicated any knowledge he may have had to others at IBM.<br><br>Counterstatement: To the extent that PSI's statement is intended to imply that IBM knew in 2000 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, between 2000 and 2003, PSI made a number of requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 13. On January 23, 2001, Ronald Hilton, PSI's founder, sent an email to IBM's Edwin Dalley and Robert Chrisfield explaining PSI's development plans and disclosing that PSI obtained "rights to Amdahl's emulation technology, associated patents, and access to other intellectual property such as S/390 diagnostics and benchmarks." [Hilton Decl. at ¶¶ 9-10, Ex. A]. | Disputed, to the extent that PSI selectively quotes Hilton Dec., Ex. A. IBM does not dispute its receipt of that exhibit.<br><br>Counterstatement: To the extent that PSI's statement is intended to imply that IBM knew in January 2001 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, Hilton Dec., Ex. A, contains an express request that IBM give PSI access to |

| | |
|---|---|
| | TIDA/TILA information, clearly implying that PSI did not then have access to such information. In addition, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 14. Chrisfield was, at the time, IBM's Manager of Business Alliances and OEM Sales, and in charge of technical information licensing. [Hilton Decl. at ¶ 9.] | Disputed. Mr. Chrisfield was not "in charge of technical information licensing." (Anten Dec., Ex. 7 at 26:12-27:22, 108:23-109:9).<br><br>Immaterial. |
| 15. On March 5, 2001, Hilton again wrote to Chrisfield regarding PSI's development plans, stating:<br>In support of [PSI's product development plans] we have all the assets developed by Amdahl for S/3 90 development:<br>• IA32-based Merlin S/390 simulator<br>• Bring-up programs<br>• System-level diagnostics such as HOT and DIRT<br>• Performance benchmarks and workload suites.<br>[Hilton Decl. at ¶ 11, Ex. B.] | Disputed, to the extent that PSI selectively quotes Hilton Dec., Ex. B. IBM does not dispute its receipt of that exhibit.<br><br>Counterstatement: To the extent that PSI's statement is intended to imply that IBM knew in March 2001 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, Hilton Dec., Ex. B, contains an express request that IBM give PSI access to TIDA/TILA information, clearly implying that PSI did not then have access to such information. In addition, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23.<br><br>[redacted] |

7

| |  |
|---|---|
| 16. In the summer of 2001, Hilton and representatives of IBM discussed a three-way deal in which IBM would receive Amdahl's diagnostics and Merlin emulation code and PSI would receive a license to IBM's written technical specifications. [Hilton Decl. at ¶ 12.] Both Scott Blackledge, an IBM engineer, and Tom Morris, Jr., Blackledge's manager at IBM, had separate discussions with Hilton in which they indicated that IBM required that it receive the Amdahl diagnostics as part of any exchange of intellectual property. [*Id.*; Blackledge Decl. at ¶ 5.] | Disputed. Hilton Dec., Ex. C, makes clear that the referenced discussions were initiated by Ron Hilton, who was attempting, first, to get permission from Fujitsu to trade Merlin to IBM in exchange for an agreement by IBM to give PSI access to TIDA/TILA information and, second, to interest IBM in such a trade. The exhibit to Mr. Hilton's declaration makes clear that IBM was not interested in such a deal.<br><br>Immaterial. The cited evidence says nothing concerning IBM's knowledge of the nature of the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu.<br><br>Counterstatement:<br><br>(a) To the extent that PSI's statement is intended to imply that IBM knew in Summer 2001 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, Hilton Dec., Ex. C, makes clear that the discussions in question involved an express request that IBM give PSI access to TIDA/TILA information, clearly implying that PSI did not then have access to such information.<br><br>(b) In addition, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |

| | |
|---|---|
| | (c)  |
| | (d) Finally, there is no evidence that anyone, including Scott Blackledge, told IBM's Tom Morris or give him any reason to believe that PSI had obtained versions of Amdahl diagnostics that embodied or disclosed IBM confidential information. |
| 17. Blackledge was a former Amdahl employee familiar with the diagnostics. In 2001, IBM also employed numerous other former Amdahl engineers who had experience with Amdahl's diagnostics, including Janet Bridgewater, the chief architect of ALPHA. [Blackledge Decl. at ¶ 7.] | Not disputed that Mr. Blackledge and Ms. Bridgewater were former Amdahl employees and that IBM also has employed other former Amdahl employees.<br><br>Immaterial. The cited evidence does not indicate that Mr. Blackledge, Ms. Bridgewater, or any other former Amdahl employee employed by IBM (a) was aware that any Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA; or (b) disclosed any knowledge that he or she may have had concerning either Amdahl's diagnostics generally or the versions of the Amdahl diagnostics to which PSI received access to others within IBM.<br><br>Counterstatement: To the extent that PSI's statement is intended to imply that IBM knew in 2001 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and |

| | |
|---|---|
| | TILA, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 18. On May 10, 2002, IBM's Blackledge asked Hilton whether PSI still needed an "Alpha developer." [Hilton Decl. at ¶ 13, Ex. D.] | <u>Not disputed</u>.<br><br><u>Immaterial</u>. |
| 19. Hilton responded, "If you're refering [sic] to the diagnostic, we have not yet attempted to run it, but will probably rely on Amdahl to help us with that. They helped us to get Dirt and Hot running, both of which are working well at this point." [*Id*.] | <u>Not disputed</u> that the email exchange reflected in Hilton Dec., Ex. D, occurred.<br><br><u>Immaterial</u>. Hilton Dec., Ex. D, makes clear on its face that Mr. Blackledge was not communicating with Mr. Hilton in his capacity as an IBM employee, but rather was seeking employment with PSI. In any event, the cited evidence does not indicate that Mr. Blackledge (a) was aware that any Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA; or (b) disclosed any knowledge that he may have had concerning either Amdahl's diagnostics generally or the versions of the Amdahl diagnostics to which PSI received access to others within IBM.<br><br><u>Counterstatement</u>: To the extent that PSI's statement is intended to imply that IBM knew in May 2002 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, Hilton Dec., Ex. D, makes clear that the discussions in question included an express request that IBM give PSI access to TIDA/TILA information, clearly implying that PSI did not then have access to such information. In addition, between 2000 and 2003, PSI made a |

10

| | |
|---|---|
| | number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 20. During the relevant time (1999-present), IBM had its own system-level diagnostics and was aware that Amdahl's diagnostics, like IBM's diagnostics, were created from IBM technical specifications and that Amdahl's system-level diagnostics tested both public and non-public aspects of the IBM Principles of Operation. [Blackledge Decl. at ¶ 7.] | Disputed. The evidence cited by PSI says nothing about "non-public aspects of the IBM Principles of Operation."<br><br>Counterstatement: To the extent that PSI's statement is intended to imply that IBM knew during any time potentially relevant to its statute of limitations motion that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, between 2000 and 2003, PSI made a number of requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 21. On February 7, 2003, IBM's Director of Licensing, Gerald Lane, wrote a letter asking Hilton what features PSI's product would support. [Hilton Decl. at ¶ 14, Ex. E.] | Not disputed.<br><br>Immaterial. |
| 22. That same day, Mr. Hilton responded via email that: "To the best of our knowledge, our implementation does not deviate in any way from the IBM architectural specifications. We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility." [Hilton Decl. at ¶ 15, Ex. F.] | Not disputed that Mr. Hilton sent the email reflected in Hilton Dec., Ex. F. However, the evidence cited by PSI does not define "full compatibility," or suggest, contrary to PSI's earlier communications with IBM, that PSI's emulator was implementing nonpublic aspects of IBM's mainframe architectures or that versions of HOT and DIRT that contained TIDA/TILA information were being for that purpose.<br><br>Counterstatement: Hilton Dec., Ex. F makes clear that the discussions in question included an |

11

| | |
|---|---|
| | express request that IBM give PSI access to TIDA/TILA information, clearly implying that PSI did not then have access to such information. The "IBM architectural specifications" to which Mr. Hilton refers in the portion of this email quoted by PSI are the publicly available ones. Mr. Hilton identifies these specifications in the second paragraph of his email: "It is our intent to implement all of the instructions in the ESA/390 Principles of Operation, the z/Architecture Principles of Operation, and the Interpretive Execution Facility." In the third paragraph, Mr. Hilton refers to non-public specifications that PSI "eventually" intends to implement and recognizes "that proprietary specifications may have to be purchased from IBM for that purpose." Accordingly, to the extent that PSI's statement is intended to imply that IBM knew in February 2003 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, Hilton Dec., Ex. F, as a whole actually shows the opposite.<br><br>Exhibit F is consistent with a number of other requests PSI made to IBM between 2000 and 2003 for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration. Moreover, PSI affirmatively advised IBM that the information PSI had received from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23. |
| 23. On May 4, 2004, Michael Maulick, PSI's CEO, gave a presentation to an audience that included Montgomery Bauman, an IBM employee, regarding PSI's product and history. In an internal IBM email that was forwarded to Erich Clementi, General Manager of System z, as well as Ronald Lauderdale and Edward Lineen, two IBM attorneys, Mr. Bauman summarized Maulick as stating that "Platform | <u>Not disputed</u> that Mr. Bauman attended the presentation referenced in Kirkpatrick Dec., Ex. H, and that he wrote the email reflected in that exhibit.<br><br><u>Immaterial</u>. The reference to Amdahl "virtualization technology" says nothing concerning IBM's knowledge of the nature of the Amdahl diagnostic programs to which PSI |

| | |
|---|---|
| Solutions purchased all Amdahl/Fujitsu virtualization technology." [Kirkpatrick Decl. at ¶ 8-9, Exs. G & H.] | received access as a result of its May 1999 License Agreement with Fujitsu.<br><br>Counterstatement:  To the extent that PSI's statement is intended to imply that IBM knew in May 2004 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23.<br><br>In fact, on November 11, 2003 Mr. Maulick wrote to IBM's Bill Zeitler: "[W]e have acquired the rights to the former Amdahl patents and all of their technology that doesn't contain TILA or TIDA." (Anten Dec., Ex. 6, emphasis added). ■■■■■■■■ |
| 24.   In July 2004, PSI launched a website announcing that "[i]n 1999, PSI was founded by a core team of Amdahl design engineers who acquired the intellectual property and assets of the former Amdahl Corporation." [Declaration of Christian Reilly at ¶ 3 ("Reilly Decl.").] | Not disputed that the quoted statement was contained on PSI's website in July 2004.<br><br>Immaterial.  The cited evidence does not show that IBM reviewed PSI's website at any time potentially relevant to PSI's statute of limitations motion (i.e., within a month or so after the statement quoted by PSI was posted), and the reference to "the intellectual property and assets of the former Amdahl Corporation" says nothing concerning IBM's knowledge of the nature of the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu.<br><br>Counterstatement:  To the extent that PSI's statement is intended to imply that IBM knew in July 2004 that the Amdahl diagnostic programs |

| | |
|---|---|
| | to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA, between 2000 and 2003, PSI made a number of other requests to IBM for TIDA/TILA information, including but not limited to the requests cited in the Hilton declaration, and affirmatively advised IBM that the information PSI had obtained from Fujitsu did not include TIDA/TILA information. *See, e.g.*, Anten Dec., Exs. 5, 6, 16, 17, 21 and 23.<br><br>■■■ |
| 25. In an April 26, 2005 letter, IBM suggested that PSI had "encroached on IBM's intellectual property rights, including patents and trade secrets." [Handschuh Decl. at ¶ 5; Ex. C.] | Not disputed that IBM sent Handschuh Dec., Ex. C.<br><br>Immaterial. Even if IBM knew in April 2005 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA (and there is no evidence that IBM had such knowledge), the California statute of limitations that PSI incorrectly applies in its motion would not have run by the time IBM filed its Second Amended Complaint. |
| 26. On April 29, 2005, PSI responded by denying misappropriation and requesting that IBM "provide PSI with the details or basis for such belief." [*Id.* at ¶ 6, Ex. D.] | Not disputed. |
| 27. IBM replied on May 23, 2005 by stating that "PSI's claim that its product is 'based on proven | Not disputed that IBM sent Handschuh Dec., Ex. E. |

| | |
|---|---|
| systems architecture spun-off from Amdahl' is troubling, as IBM had licensed a large number of confidential technical documents to Amdahl and Fujitsu, and that information was not transferable." [*Id.* at ¶ 7, Ex. E.] | <u>Immaterial</u>. Even if IBM knew in May 2005 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA (and there is no evidence that IBM had such knowledge), the California statute of limitations that PSI incorrectly applies in its motion would not have run by the time IBM filed its Second Amended Complaint. |
| 28. PSI responded on May 26, 2005, again denying misappropriation and requesting that "if [IBM] ha[s] any reason to believe otherwise, please bring it to [our] attention." [*Id.* at ¶ 8, Ex. F.] | <u>Not disputed</u>. |
| 29. James Stallings, then IBM's Vice President of Intellectual Property, admitted in his deposition that IBM did not rely on PSI's denials. [Deposition of James Stallings at 59-60, Kirkpatrick Decl. at ¶ 10, Ex. I.] | <u>Not disputed</u> that Mr. Stallings gave the testimony he gave.<br><br><u>Immaterial</u>. Mr. Stallings testimony refers to statements made by PSI in April and May 2005. Even if IBM knew in April or May 2005 that the Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA (and there is no evidence that IBM had such knowledge), the California statute of limitations that PSI incorrectly applies in its motion would not have run by the time IBM filed its Second Amended Complaint. |
| 30. IBM contends that the Amdahl diagnostics, whether in executable or source code format, disclose IBM trade secrets and that Fujitsu and PSI misappropriated those trade secrets when Fujitsu disclosed and PSI acquired the Amdahl diagnostics. [SAC at ¶ 64.] | <u>Disputed</u> as overly broad. IBM's contentions with respect to trade secrets misappropriation are set forth in its Second Amended Complaint and its interrogatory responses. *See* Kirkpatrick Dec., Ex. C; Anten Dec., Ex. 40. IBM does contend that PSI has misappropriated IBM trade secrets through its possession and use of versions of Amdahl's diagnostic tools that are based on TIDA/TILA information and relate to TIDA/TILA functionality and test nonpublic |

| | |
|---|---|
| | aspects of IBM's mainframe architectures—without regard for whether the tools are in executable or source code format.<br><br>Immaterial. PSI's statement says nothing about when IBM first knew or should have known that (a) any Amdahl diagnostic programs to which PSI received access as a result of its May 1999 License Agreement with Fujitsu were based on or contained or disclosed IBM trade secrets provided to Amdahl under the TIDA and TILA or (b) PSI was using such programs to test for compatibility with TIDA/TILA features of IBM's mainframe architectures. |
| 31. IBM does not contend that PSI received any of the actual written technical specifications disclosed by IBM to Amdahl. [*See generally* SAC and IBM's Responses to PSI's Fourth Set of Interrogatories, Kirkpatrick Decl. at ¶ 5, Ex. D.] | Not disputed at this time. However, discovery is ongoing and IBM continues to investigate other ways in which PSI may have misappropriated IBM trade secrets. (Anten Dec. ¶ 47).<br><br>Immaterial. What is important is not the form in which PSI received IBM's confidential TIDA/TILA information but the fact that PSI received that information. By obtaining diagnostic tools developed by Amdahl on the basis of TIDA/TILA information, PSI improperly obtained the full benefit of that information. |
| 32. From January 2001 to 2007, IBM never asked PSI for a description of the diagnostics or other intellectual property that was transferred by Fujitsu or suggested that the diagnostics might constitute IBM trade secrets. [Hilton Decl. at ¶ 15.] | Not disputed that IBM is unaware of any such request. However, IBM did ask PSI for a description of its products.<br><br>Immaterial.<br><br>Counterstatement:<br><br>(a) In its earliest communications with IBM, PSI suggested that its emulator did not implement TIDA/TILA functionality and that PSI needed access to TIDA/TILA information from IBM in order to develop an emulator that did so. (Anten Dec., Ex. 5).<br><br>(b) ████████ |

| | |
|---|---|
| | [redacted] Until discovery in this case, IBM was not aware that PSI's emulator implemented features of IBM's architectures that were the subject to IBM's TIDA/TILA disclosures to Amdahl or that PSI's implementation of those features was based on PSI's misappropriation of TIDA/TILA information. |
| 33. [redacted] | Not disputed [redacted]. Immaterial. |
| 34. IBM and Fujitsu discussed PSI on at least two occasions. [Zeitler Depo. Ex. 291, Kirkpatrick Decl. at ¶ 7, Ex. F.] | Not disputed that the discussions referenced in Kirkpatrick Dec., Ex. F, occurred. |
| 35. Based on the absence of any evidence produced to the contrary, PSI also contends the following facts are uncontroverted:<br>a. From January 2001 to 2007, IBM never asked Amdahl for a description of the diagnostics or other intellectual property that was transferred to PSI.<br>b. From January 2001 to the present, IBM never exercised its right to inspect Amdahl's compliance with the TIDA/TILA.<br>c. To date, IBM has not instituted any action against Amdahl or its successors or assigns arising from its alleged misappropriation of IBM trade secrets. | Not disputed at this time. However,<br><br>(a) PSI as the moving party on this motion bears the burden of proof and cannot rely on its contentions. On information and belief, Fujitsu conducted an internal investigation of the transfer of intellectual property from Fujitsu to PSI. Discovery is ongoing on that issue, and IBM has not yet had the opportunity to depose relevant Fujitsu witnesses.<br><br>(b) Fujitsu acquired Amdahl in 1997, and Amdahl ceased operations in 2000.<br><br>(c) Based on PSI's communications with IBM prior to this litigation, IBM had no reason to believe that PSI had obtained TIDA/TILA information from Amdahl, and PSI's requests for such information following its spinoff from Amdahl would reasonably lead to the conclusion that PSI had not obtained such information.<br><br>(d) IBM did question PSI concerning whether concerning the intellectual property that PSI had obtained from Amdahl shortly after PSI first publicly claimed that a PSI emulator was |

|  | installed and functioning at a customer location, and PSI denied having obtained any TIDA/TILA information. *See* Handschuh Dec., Exs. E and F; Hilton Dec. ¶¶ 2, 4; Anten Dec., Ex. 45.<br><br>(e) With respect to PSI's statement 35(b), see IBM's response to PSI's statement 5.<br><br><u>Immaterial</u>. Whether IBM has sued Amdahl is irrelevant to the pending motion. |
|---|---|

Dated: May 5, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By: /s/ Richard I. Werder, Jr.
Richard I. Werder, Jr.
Edward J. DeFranco
Thomas D. Pease
51 Madison Avenue
22nd Floor
New York, New York 10010-1601
(212) 849-7000

Frederick A. Lorig
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443-3000

Attorneys for Plaintiff
International Business Machines Corporation

## CERTIFICATE OF SERVICE

I, Andrew B. Curran, hereby certify that on May 5, 2008 I caused to be served the foregoing **PLAINTIFF IBM'S RESPONSE TO PLATFORM SOLUTIONS, INC.'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNTS ELEVEN AND TWELVE OF IBM'S SECOND AMENDED COMPLAINT** using the CM/ECF System which sent notification to all counsel of record as indicated below:

| | | |
|---|---|---|
| Richard I. Werder<br>rickwerder@quinnemanuel.com | Stephen Edward Morrissey<br>smorrissey@susmangodfrey.com | Bruce E. Gerstein<br>bgerstein@garwingerstein.com |
| Steven M. Edwards<br>smedwards@hhlaw.com | Stephen D. Susman<br>ssusman@SusmanGodfrey.com | D Skylar Rosenbloom<br>rosenbls@phelps.com |
| Howard Weber<br>hweber@hhlaw.com | Jacob W. Buchdahl<br>jbuchdahl@susmangodfrey.com | David L. Patron<br>PATROND@phelps.com |
| Katherine Jane Weall<br>katherineweall@quinnemanuel.com | Ryan C. Kirkpatrick<br>rkirkpatrick@susmangodfrey.com | Elena Kar-Hing Chan<br>echan@garwingerstein.com |
| Morris Waisbrot<br>mwaisbrot@hhlaw.com | Tibor Ludovico Nagy, Jr.<br>tnagy@susmangodfrey.com | Harry M. Barton<br>harry.barton@phelps.com |
| Richard Walter Erwine<br>richarderwine@quinnemanuel.com | | Noah H. Silverman<br>nsilverman@garwingerstein.com |
| Thomas David Pease<br>thomaspease@quinnemanuel.com | | Brent Barriere<br>BARRIERB@phelps.com |

/s/ Andrew B. Curran
Andrew B. Curran