IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>               Plaintiff,<br><br>v.<br><br>PLATFORM SOLUTIONS, INC. and T3 TECHNOLOGIES, INC.,<br><br>               Defendants. | Civil Action No. 06-cv-13565-LAK (THK)<br><br>**JURY TRIAL DEMANDED**<br><br>**REDACTED PUBLIC VERSION** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLATFORM SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNTS TEN AND ELEVEN OF INTERNATIONAL BUSINESS MACHINE CORPORATION'S SECOND AMENDED COMPLAINT**

IBM's opposition brief is long on outrage but lacks any credible explanation for why IBM ignored PSI's repeated disclosures that it had acquired and was running Amdahl's diagnostic programs HOT and DIRT – which purportedly contain the very core of IBM's alleged trade secrets. IBM's years of indifference to PSI's actions belie its newly-minted accusations, and IBM's years of inaction allowed the statute of limitations to expire.

Confronted with these facts, IBM advances two principal arguments. First, IBM seeks to apply New York's common law "continuing tort theory" to the California conduct in this case, claiming that New York's statute of limitations is somehow "based on" the continuing tort theory. But this case does not turn on which statute of limitations applies, as IBM suggests; both California and New York have a three-year statute of limitations. Rather, the question is whether California law recognizes the continuing tort theory in determining what conduct gives rise to a separate cause of action for misappropriation of trade secrets. As described below, California's emphatic rejection of the continuing tort theory in defining the nature of a misappropriation claim is a substantive rule of law that bars IBM's cause of action.

Second, IBM grasps for a disputed question of fact, claiming that it relied on PSI's denials that it possessed IBM's trade secrets and that it had no reason to believe that PSI was in possession of its trade secrets before this lawsuit was filed. However, IBM's contention that it did not have notice of facts sufficient to give rise to a duty to investigate is impossible to square with its 2005 letter to PSI contending that PSI's *mere association* with Amdahl had aroused IBM's suspicions of trade secret misappropriation.

In fact, PSI *still* maintains that it did not misappropriate any IBM trade secrets. Nearly all of the information that IBM now claims as trade secrets is already in the public domain, and IBM has long since abandoned any attempt to maintain its secrecy. But for purposes of this

1

motion, whether or not PSI ever possessed IBM trade secrets is irrelevant. Because no reasonable juror could find that IBM's claim was filed within the limitations period, this Court should grant PSI's summary judgment motion.

## I. California's Rejection Of The Continuing Tort Theory Is Substantive Law And Applies In This Case

The parties agree that this Court must apply California substantive law and New York procedural law. In its opposition brief, however, IBM urges this Court to accept the syllogism that any matter relating to a statute of limitations is necessarily procedural; the continuing tort theory relates to the statute of limitations; and therefore, New York's continuing tort theory is procedural. This over-simplified analysis proceeds from a flawed premise to the wrong result.

Contrary to IBM's contention, not all matters pertaining to limitations periods are procedural under New York law. In *Tanges v. Heidelberg North America, Inc.*, 93 N.Y.2d 48 (N.Y. 1999), the Court of Appeals explained that while statutes of limitation are "generally considered procedural," *id.* at 54, when a statute of limitations is intertwined with other statutes, such as a statute of repose, it may be substantive in nature, and a "particular and rigorous analysis" is required, *id.* at 56. New York courts therefore examine the entire statutory framework of the foreign jurisdiction to determine whether a statute of limitations provision is procedural or substantive. *See id.* at 57-59; *see also McKinney v. Schuster*, 110 N.Y.S.2d 74, 75-79 (N.Y. Sup. Ct. 1952); *Hall v. Johnson*, 92 N.Y.S.2d 202, 204 (N.Y. Sup. Ct. 1940) (where statute of limitations "destroys the liability" it "presents a question of substantive law").

In *Tanges*, the Second Circuit asked New York's highest court to determine whether a Connecticut statute of limitations barred a products liability lawsuit brought in New York. *See* 93 N.Y.2d at 51. Examining its language and legislative history, the New York Court of Appeals concluded that the statute, which "integrates provisions of both limitations and repose," *id.* at 55,

2

was part of a comprehensive statutory scheme designed to "'abolish' all of the common-law causes of action and supplant them with a single statutory . . . cause of action." *Id.* at 57. The court explained that the statute could extinguish a right to sue before it ever accrued, and that it was "so inextricably linked and integrated into the exclusive statutory cause of action 'as to warrant saying that it qualified' the right to bring that kind of action." *Id.* at 58 (quoting Goodrich and Scoles, *Conflict of Laws* § 86, at 154-55 (4th ed.)). Accordingly, the court held that the statute was substantive in nature. *See id.* at 58.

A rigorous analysis of the California Uniform Trade Secrets Act ("CUTSA") makes clear that its rejection of the continuing tort theory is substantive law; it qualifies the very right to sue for misappropriation of trade secrets. The conflict in this case is thus not over the limitations periods in New York and California, which are identical. Rather, New York and California have fundamentally conflicting notions about the nature of "misappropriation." The fact that the continuing tort theory informs New York's application of its limitations period does not convert this substantive doctrine into a procedural rule.

In *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288 (9th Cir. 1969), the Court of Appeals for the Ninth Circuit made clear that California (unlike New York) rejected the "property" view of trade secret misappropriation in favor of a "confidential relationship" view:

> California does not treat trade secrets as if they were property. It is the relationship between the parties at the time the secret is disclosed that is protected. . . . The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated.

*Id.* at 293.

3

CUTSA, adopted in 1984, "explicitly affirmed *Monolith* and rejected the contrary view that misappropriation gives rise to multiple claims each time the trade secret is misused or improperly disclosed." *Cadence Design Sys., Inc.* v. *Avant! Corp.*, 29 Cal.4th 215, 222 (2002); *see also* Cal. Civ. Code § 3426.6 ("[A] continuing misappropriation constitutes a single claim."). Like the statutory framework examined in *Tanges*, CUTSA displaced all pre-existing common law claims, established a comprehensive statutory framework for analyzing all claims of trade secret misappropriation and incorporated a uniform limitations period. *See* Cal. Civ. Code § 3426.7; *American Credit Indem. Co.* v. *Sacks*, 213 Cal.App.3d 622, 630 (1989) ("The stated purpose of the UTSA is to provide unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations . . . .") (internal quotation omitted).

In 2002, the California Supreme Court emphasized the significance of California's rejection of the continuing tort doctrine, explicitly holding that continuing misappropriation constitutes a single claim for *all* litigation purposes. *See Cadence*, 29 Cal.4th at 219-26. After describing the relationship between the continuing tort theory and CUTSA's treatment of trade secret misappropriation as a breach of a confidential relationship, the Court stated:

> Cadence argues that a continuing misappropriation constitutes a single claim only for statute of limitations purposes. This argument cannot withstand scrutiny. . . . If "continuing misappropriation" is viewed as a single claim for statute of limitations purposes, then it is difficult to fathom how it could be treated as more than one claim for purposes of litigation generally.
>
> \* \* \*
>
> We conclude that a plaintiff's claim for misappropriation of a trade secret against a defendant arises only once, when the trade secret is initially misappropriated, and each subsequent use or disclosure of the secret augments the initial claim rather than arises as a separate claim.

*Id.* at 222-23, 226 (internal citations omitted). Thus, not only does CUTSA supplant the common law continuing tort theory with a single statutory regime, California's rejection of the

4

continuing tort theory is integral to the cause of action and is predicated on California's view of the *substantive* nature of trade secrets.

The *Tanges* holding confirms this analysis. California's "one relationship-one claim" doctrine functions like a statute of repose: If a defendant misappropriates a trade secret, provides notice, and three years pass, a cause of action is barred as to that act of misappropriation. And like a statute of repose, it has the further effect of barring a claim for any subsequent act of misappropriation, "regardless of whether a potential claim has accrued or, indeed, whether any injury has occurred." 93 N.Y.2d at 55. California's rejection of the continuing tort theory goes beyond merely affecting the remedy; it "practically blocks causes of action before they even accrue." *See id.* at 56. Like the statutory scheme in *Tanges*, CUTSA's rejection of the continuing tort theory "exhibit[s] a substantive texture, nature, and consequence that distinguishes [it] from ordinary limitations provisions," and therefore "envelop[s] both the right and the remedy" with respect to claims of trade secret misappropriation. *See id.*

The only New York case cited by IBM involving a statute of limitations for a trade secret misappropriation claim is *Architectronics, Inc. v. Control Systems, Inc.*, 935 F. Supp. 425 (S.D.N.Y. 1996). However, *Architectronics*, which was decided before the New York Court of Appeals decision in *Tanges*, is of dubious weight. First, the parties did not brief the issue of whether the continuing tort doctrine was substantive or procedural law (both parties, in fact, *assumed* the foreign statute applied), and the court engaged in no analysis on this point; the court merely recited the uncontroversial general rule that statutes of limitation are procedural. *See id.* at 430-31. Second, *Architectronics* involved the UTSA as adopted by Minnesota, and thus did not confront the California authority that long ago rejected the continuing tort theory, *see Monolith*, 407 F.2d at 293, and more recently affirmed the rejection of that doctrine with respect

5

to all aspects of trade secret litigation, *see Cadence*, 29 Cal.4th at 222-23. Regardless of whether *Architectronics* was correctly decided, the decision sheds no light on how New York conflicts principles should apply to the California statutory scheme in this case.[1]

IBM also cites *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634 (N.D. Cal. 1993). *Intermedics* applied the California statute of limitations -- along with California's rejection of the continuing tort theory -- in a case in which Texas substantive law applied. At the time of the *Intermedics* decision, however, Texas courts had not taken any position on the application of the continuing tort doctrine. Moreover, *Intermedics* adopted the precise view that the California Supreme Court rejected in *Cadence* nine years later, holding that the continuing tort doctrine applies solely to the statute of limitations. It also went out of its way to say it would have reached the same result under Texas law. The case is inapposite.

In this case, the continuing tort theory does not merely define the period during which IBM can recover damages; it informs the definition of what a trade secret is and what it means to misappropriate a trade secret. The substantive impact of the California statutory scheme is to extinguish IBM's right to sue PSI before it ever had a right to bring an action under a continuing tort theory. Unlike a plain vanilla statute of limitations, this is California substantive law that applies to -- and bars -- IBM's cause of action.

## II. There Is No Genuine Issue Of Fact As To Whether IBM Had Notice

IBM's contention that it was not on inquiry notice of PSI's possession of alleged trade secrets is not sustainable in light of the following incontrovertible facts:

---

[1] Indeed, *Architectronics* reveals the extent to which New York, in stark contrast to California, adheres to the "property" view of trade secrets. *See, e.g., id.* at 432 ("New York trade secret misappropriation claims are governed by the three-year statute of limitations for suits based on injury to property."); *id.* at 433 (stating "principle that once the information is no longer secret or confidential, there is no property to protect") (internal citation omitted).

- March 5, 2001: PSI discloses in a letter to IBM that it had "*all* the assets developed by Amdahl for S/390 development," including "Bring-up programs" and "System-level diagnostics such as HOT and DIRT" – the very diagnostics that IBM now claims contain prized trade secrets. (Hilton Decl. ¶ 11, Ex. B) (emphasis added).

- February 7, 2003: PSI discloses in an email to IBM that it had "successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain *full compatibility*." ███████████████████████████████████ (Supp. Kirkpatrick Decl. ¶ 3, Ex. B) (emphasis added).

- April 26, 2005: After learning that an IBM customer was testing PSI's machine "in preparation for the sale of [PSI's] product," IBM sends a letter to PSI stating that it was "imperative" that IBM "ascertain whether [PSI had] encroached upon IBM's intellectual property rights, including . . . trade secrets." (Handschuh Decl. ¶ 6, Ex. C.)

- August 17, 2007: IBM files its trade secret claims – more than six years after PSI first disclosed information that, were IBM's overheated rhetoric to be taken at face value, surely should have sent IBM scrambling to investigate what it now characterizes as a "massive" misappropriation of trade secrets.

Given this record, IBM cannot now be heard to argue that PSI's disclosure of its receipt of assets from Amdahl did not provide inquiry notice – indeed, this disclosure *actually prompted an IBM inquiry regarding trade secrets*. What prompted IBM's April 2005 inquiry was crystal clear: on May 23, 2005, IBM wrote to PSI that what it found "troubling" was "PSI's claim that its product is 'based on proven systems architecture spun-off from Amdahl.'" (Handschuh Decl. ¶ 8, Ex. E.)

IBM's 2005 inquiry, standing alone, demonstrates conclusively that PSI's early disclosures were sufficient to place IBM on notice regarding a potential claim of misappropriation; IBM learned nothing in 2005 that it did not already know as early as March 2001. In fact, PSI's 2001 disclosure that it possessed Amdahl's diagnostics including "Bring-up programs" and "System-level diagnostics such as HOT and DIRT" was far more specific than the general Amdahl-related information that IBM found so "troubling" four years later, and was plainly sufficient to constitute inquiry notice under the law. By the time IBM wrote its April 2005 letter, the statute of limitations had already run.

7

According to IBM, its 2005 inquiry was also prompted by the disclosure that "PSI is now offering a product that executes IBM's proprietary mainframe instructions." (Supp. Kirkpatrick Decl. ¶ 2, Ex. A.) IBM stated at that time that it was "very concerned that such a product would infringe IBM's intellectual property rights." IBM now contends, however, that there is an issue of fact as to PSI's notice because IBM failed to comprehend both the extent to which PSI's product was executing IBM instructions and the extent to which the Amdahl diagnostic programs used by PSI contained confidential information.

Once again, however, IBM's position is belied by the contemporaneous record. In a letter dated February 7, 2003, IBM asked PSI two direct questions: "Are there portions of the IBM architectural definitions which your emulated instructions do not support? If so, how do they deviate from the definitions?" (Hilton Decl. ¶ 14, Ex. E.) IBM received PSI's response that same day: "To the best of our knowledge, our implementation does not deviate *in any way* from the IBM architectural specifications. We have successfully run Amdahl's system-level diagnostics such as HOT and DIRT to ascertain full compatibility." (*Id.* ¶ 15, Ex. F) (emphasis added). IBM's Gerald Lane received this email late on a Friday afternoon, and ███████ ████████████████████████████████████████ Mr. Lane testified as follows:

███████████████████████████████████████

(Supp. Kirkpatrick Decl. ¶ 4, Ex. C, pp. 129-30.)

IBM's attempt to inject uncertainty into the record cannot stand in the face of both the contemporaneous written record and Mr. Lane's sworn testimony that ████████████████

8

██████████████████████████████████████████████████. Again, the information that prompted IBM's inquiry regarding trade secrets in 2005 had been disclosed by PSI years earlier. IBM's 2005 demands for information from PSI – stating that it was "very concerned" and "troubl[ed]" by what it had learned about PSI – demonstrate that PSI's 2001 and 2003 disclosures were amply sufficient to place IBM on inquiry notice that its alleged trade secrets were possessed by PSI. At a minimum, PSI's disclosures gave IBM a reason to investigate further its potential trade secret claims. The only new piece of information that IBM had in 2005 was that PSI's product was moving closer to the market, and therefore that IBM's monopoly on the mainframe was in danger of being compromised.

IBM also attempts to create an issue of fact by blurring the sharp distinctions between three very different types of intellectual property, all of which are now claimed as trade secrets by IBM: (1) technical specifications ("TIDA specs") licensed by IBM to Amdahl, written in plain English, which describe the structure and function of IBM architectural facilities that were non-public at the time of disclosure; (2) diagnostic source code ("source code") derived in part from the TIDA specs, written in programmer language; and (3) diagnostic executable code ("diagnostics") derived in part from the TIDA specs, written in machine language. IBM mixes and matches these three distinct items as if they were identical.

For example, IBM repeatedly mischaracterizes PSI's requests for TIDA specs as evidence that PSI concealed its possession of diagnostics (e.g., HOT and DIRT) containing TIDA information. But there is nothing remotely inconsistent between PSI's requests for TIDA specs from IBM and its admitted acquisition of Amdahl diagnostics; neither can substitute for the other. Similarly, IBM's brief includes an extended discussion of PSI's acquisition of source code from Fujitsu, Fujitsu's efforts to delete portions of the source code, and PSI's alleged

9

receipt and use of the deleted portions. IBM argues that the lack of knowledge on the part of PSI's personnel regarding PSI's alleged receipt of confidential *source code* somehow excuses IBM's failure to investigate PSI's admitted acquisition and use of confidential *diagnostics*. Again, the two are entirely distinct. The entire discussion of TIDA specs and source code is at best a red herring, and at worst a deliberate attempt to mislead the Court.[2]

Finally, IBM essentially concedes in its brief that it conducted virtually no investigation into whether PSI had possession of its trade secrets, even after IBM began to make inquiries in 2005. Specifically, IBM provides no justification for: (1) its failure to utilize its inspection rights in its agreements with Amdahl to determine whether confidential information had been given to PSI; (2) its failure to ask even a single question of PSI as to whether the versions of HOT and DIRT it was running contained TIDA information; and (3) its total silence in the face of PSI's 2005 invitation to provide the basis for its suggestion that PSI possessed IBM trade secrets. As argued in PSI's opening brief, this failure to investigate by itself is fatal to IBM's claim.

## III.   Conclusion

For the foregoing reasons, PSI respectfully requests that the Court grant PSI's motion for summary judgment as to Counts Ten and Eleven of IBM's Second Amended Complaint.

---

[2] Despite PSI's 2001 and 2003 disclosures that it was running Amdahl diagnostics, IBM now also suggests that it somehow believed PSI received diagnostics that were stripped of certain confidential features. But IBM adduces no evidence in support of this purported belief. Glaringly absent is testimony from any of the recipients of PSI's 2001 or 2003 disclosures regarding Amdahl diagnostics that this belief caused them to ignore the plain import of the PSI disclosures and conclude that no investigation into PSI's possession of IBM's alleged trade secrets was necessary. IBM's citation to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is unavailing. First, it occurred more than four years after IBM was first placed on notice, when the statute of limitations had already run. Moreover, there is no evidence connecting this conversation in any way to the Amdahl diagnostics at issue (as distinguished from source code or TIDA specs) or to any decision by IBM not to investigate a potential claim of misappropriation. IBM cannot plausibly contend that this alleged conversation raises any genuine issue of material fact as to either notice or diligence.

Dated: New York, New York
       May 15, 2008

                        SUSMAN GODFREY L.L.P.

                        By: /s/ Jacob W. Buchdahl
                        Stephen D. Susman
                        Jacob W. Buchdahl
                        Tibor L. Nagy
                        Susman Godfrey L.L.P.
                        654 Madison Ave., 5th Floor
                        New York, NY 10022
                        (212) 336-8330

                        Stephen Morrissey (Pro Hac Vice)
                        Ryan Kirkpatrick (Pro Hac Vice)
                        Susman Godfrey L.L.P.
                        1901 Avenue of the Stars, Suite 950
                        Los Angeles, CA 90069
                        (310) 789-3100
                        *Attorneys for Platform Solutions Inc.*