## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**INTERNATIONAL BUSINESS
MACHINES CORPORATION,**

                **Plaintiff,**

      **-vs.-**

**PLATFORM SOLUTIONS, INC., and
T3 TECHNOLOGIES, INC.,**

               **Defendants.**

**Civil Action No. 06-CV-13565 (LAK)**

## INTERNATIONAL BUSINESS MACHINES CORPORATION'S AMENDED REPLY TO T3 TECHNOLOGIES, INC.'S AMENDED PETITION FOR INTERVENTION AND COMPLAINT FOR DAMAGES

International Business Machines Corporation ("IBM"), by and through its attorneys Quinn Emanuel Urquhart Oliver & Hedges, LLP, as and for its Amended Reply to the Amended Petition for Intervention and Complaint for Damages against IBM ("Amended Petition") of Intervenor T3 Technologies, Inc. ("T3T"), states as follows:

## PRELIMINARY STATEMENT

IBM filed this action to enjoin the sale of emulator systems developed, manufactured, and sold by Platform Solutions, Inc. ("PSI") which infringe IBM patents and also were developed using misappropriated IBM trade secrets and unlawful copies of IBM operating systems. PSI counterclaimed, asserting that IBM had improperly excluded PSI's emulator systems from the market, but not contesting IBM's good faith in bringing suit to enjoin the use of its intellectual property in PSI's systems. T3T, which re-brands and distributes PSI's emulator systems, intervened, claiming a need, among other things, to protect its alleged interests in

selling PSI's emulator systems to what T3T calls "the small and mid-size business market." T3T's claims with respect to the sale of PSI's emulator systems are derivative of claims asserted by PSI, a fact that T3T forthrightly acknowledged in seeking to intervene in this litigation.

IBM has now entered into a settlement with PSI pursuant to which, on June 30, 2008, PSI became a wholly owned subsidiary of IBM.  IBM's settlement with PSI wholly eliminates the need for IBM to seek an injunction against the further marketing and sale of PSI's infringing emulator systems by PSI and others, including T3T.  As a result of that settlement, IBM has no further need to pursue claims against T3T seeking to enjoin T3T's further sale of PSI's emulator systems.  In addition, IBM's damages claims against T3T based on T3T's handful of sales of infringing PSI emulator systems before June 30, 2008 are not sufficient to warrant the cost and burden of pursuing a patent infringement case seeking affirmative relief against T3T. Accordingly, as IBM previously advised the Court, IBM will not pursue its affirmative claims for patent infringement against T3T.

T3T continues to pursue relief against IBM based largely on IBM's alleged conduct toward PSI in the period preceding IBM's settlement with PSI.  T3T's claims with respect to PSI's emulator systems are bounded in time by IBM's June 30, 2008 acquisition of PSI, and are fatally flawed for a number of reasons.  Among other things, T3T does not deny, because it cannot, that PSI's emulator systems infringe a number of IBM patents, including but not limited to those previously asserted affirmatively by IBM as a basis for enjoining PSI and T3T from selling PSI's emulator systems.

Before IBM brought this lawsuit, PSI sought a patent license from IBM for years because it recognized that a system capable of doing what PSI said its emulator systems could do would necessarily implicate IBM's current patent portfolio and future patents that IBM was likely to

secure as it continued its constant effort to improve and upgrade its mainframe computer systems. PSI repeatedly recognized the patent infringement risks and adopted a "head-in-the-sand" strategy with respect to evaluating IBM's patent portfolio because it did not want to learn facts that would create a treble damage risk under the patent laws. Before this litigation commenced, and while PSI was still seeking to negotiate a patent license with IBM, PSI knew it would need to use "quite a few" IBM patents; admitted to IBM that "some of this functionality may be covered by IBM patents"; agreed in discussions with IBM "that it might be hard for us to avoid some IBM patents, if we are using the IBM instruction set"; and further recognized that "IBM's patent portfolio was simply too large for us to reasonably attempt to prove non-infringement . . . [a]nd of course the list of [IBM] patent applications continues to grow as the architecture evolves, so avoidance would become increasingly prohibitive as we strive to remain competitive going forward." Because PSI knew that IBM's patents applied to PSI's emulator systems and that additional IBM patents would become applicable as PSI sought to enhance its emulator systems over time, PSI repeatedly sought a patent license from IBM, and included substantial royalty payments to IBM in its financial projections.

Beyond that, PSI's founder, acknowledged, among other things, that "it would be practically impossible" to avoid some of the architecture patents listed in IBM's original complaint in this action "and remain fully IBM-compatible," and that PSI "would most likely be held as infringing" the emulation patent covered by IBM's original complaint in this action. For these reasons, and others, PSI's founder recommended that PSI "should not attempt to challenge any of the patents cited in the suit, z or otherwise. Instead, we should stick to our long-standing position that we do not challenge the need for a license." PSI did not follow their founder's

recommended course of action in defending this lawsuit before settling with IBM, choosing instead to deny infringement of patents for which it had repeatedly sought a license.

T3T, however, has not alleged anywhere in its Amended Petition (and these and other facts make clear that T3T cannot prove) that it was ever foreclosed from selling PSI products that did not infringe numerous IBM patents, including but not limited to the patents previously asserted affirmatively by IBM and additional patents covering new functionality added to PSI's emulator systems after IBM last amended its complaint against PSI in August 2007. T3T's claims therefore depend on the legally unsupportable assertion that IBM was required to grant PSI a patent license that would have allowed PSI and T3T to sell emulator systems that infringe IBM patents. Because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

## <u>NATURE OF THE ACTION</u>

1. IBM admits that this action includes acts of IBM allegedly directed at PSI and the causes of action set forth in T3T's Amended Petition; and denies the remaining allegations of Paragraph 1.

2. Denied. By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the

licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

3.    IBM admits that it refers to its zSeries servers as "mainframes"; avers that its zSeries servers compete with a wide range of servers and other computers; admits that mainframe computers and operating systems for such computers, including IBM's zSeries servers and their predecessors and operating systems that run on those servers, are among the computers and operating systems that support the mission-critical data processing needs of a wide range of businesses and other entities; further admits that such mission-critical data processing is one of the uses to which mainframe computers and operating systems for such computers, as well as other computers and operating systems, are put; and denies the remaining allegations of Paragraph 3.

4.    IBM admits that, for any operating system to be able to run on any particular computer system, including a mainframe computer system, that operating system must adhere to the hardware instruction set of that computer system, and that, to run on any particular operating system, a particular application must adhere to the interfaces presented by that operating system; and denies the remaining allegations of Paragraph 4.

5.    IBM admits that it has faced competition historically, including competition from manufacturers of what T3T refers to as "IBM-compatible" mainframe computers; avers that IBM continues to face competition today and that its zSeries servers and the operating systems that run on those servers compete with a wide range of servers and other computers and the operating systems that run on those servers and other computers, as well as with other products and services offered by a wide range of competitors; further admits that IBM has licensed what T3T refers to in its Amended Petition as IBM "mainframe operating systems" for use on certain

computers not manufactured by IBM, including the computers listed on IBM's website at www-03.ibm.com/servers/eserver/zseries/library/swpricinfo/hardware.html; further admits that IBM has provided third-party developers with certain licenses, technical information, and technical support relating to certain IBM computers and operating systems, including OS/390; and denies the remaining allegations of Paragraph 5.

6.    Denied.

7.    IBM admits that Amdahl Corporation ("Amdahl") became a wholly-owned subsidiary of Fujitsu Limited ("Fujitsu") and the combined company thereafter announced in or about October 2000 that it had decided not to develop a 64-bit processor, but would continue to deliver servers in inventory and upgrades and to service its Millennium processors for customers using them; further admits that Hitachi Data Systems ("Hitachi") announced in or about March 2000 that it would discontinue sales of its Trinium and Pilot servers to new customers and would continue to offer maintenance and service to existing customers and system upgrades to existing Trinium users; refers to public statements by Fujitsu and Hitachi, including statements on their websites, for a fair and accurate summary of those companies' current activities; avers that mainframes are sold under competitive conditions; and denies the remaining allegations of Paragraph 7.

8.    IBM admits that, before June 30, 2008, PSI and T3T were marketing computer systems that PSI claimed would run IBM operating systems developed by IBM to run on IBM zSeries servers and their predecessors and applications and data created for use with such operating systems and that PSI claimed would also run other operating systems, such as Linux, Unix, and Windows; avers that T3T's allegations concerning PSI's company history, PSI's licensing of Amdahl technology, and the claimed capabilities of PSI's emulator systems appear

to be consistent with certain statements that appear on PSI's website and in PSI's public presentations, but denies those allegations for lack of knowledge or information sufficient to form a belief as to the truth thereof; avers that, since June 30, 2008 at the latest, PSI has not marketed what T3T calls "IBM-compatible mainframes"; and denies the remaining allegations of Paragraph 8.

9.    IBM admits that the allegations of Paragraph 9 appear to be consistent with certain statements that appear on T3T's website; and otherwise denies the allegations of Paragraph 9 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

10.    IBM avers that T3T has inappropriately defined z/OS to include various other IBM operating systems; further avers that the allegations of Paragraph 10 are bounded in time by IBM's June 30, 2008 acquisition of PSI; and denies the remaining allegations of Paragraph 10.

11.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 11 are bounded in time by IBM's June 30, 2008 acquisition of PSI.

12.    Denied.

## THE PARTIES

13.    Admitted.

14.    IBM admits that T3T's allegations concerning T3T's corporate existence and principal place of business are consistent with public information; and otherwise denies the allegations of Paragraph 14.

15.    IBM admits that IBM transacts business in interstate commerce; further admits that PSI and T3T claim to transact business in interstate and foreign commerce but denies that

allegation for lack of knowledge or information sufficient to form a belief as to the truth thereof;

and denies the remaining allegations of Paragraph 15.

## JURISDICTION

16.    Admitted.

17.    Admitted.

18.    Admitted.

## VENUE

19.    Admitted.

## FACTUAL ALLEGATIONS

20.    Denied.

21.    IBM admits that mainframe computers, like other computers, can be large, expensive, and powerful; further admits that mainframe computers are among the computers used by corporations and government entities for high-volume and mission-critical data processing needs, as well as for other purposes; further admits that custom-written software is sometimes used on mainframe computers; and denies the remaining allegations of Paragraph 21.

22.    Denied.  By way of further response, IBM avers that T3T has never sold "its computer systems" but has instead acted as a distributor of emulator systems developed by other companies, including PSI.

23.    Denied.

24.    Denied.

25.    Denied.

26.    IBM admits that it knows of no other company today that is developing new computers that are capable, lawfully, of running IBM operating systems developed by IBM for use on IBM's zSeries servers and their predecessors; further admits that IBM sells such computers; and denies the remaining allegations of Paragraph 26.

27.    Denied.

28.    IBM admits that Unisys Corporation ("Unisys") markets a line of servers under the names ClearPath Plus Libra Series and ClearPath Plus Dorado Series, that Bull markets a line of servers under the name DPS 9000, and that IBM and a number of other manufacturers market servers and other computers that they call "mainframes" or that they refer to with phrases such as "mainframe-class"; further admits that IBM's zSeries servers compete with these Unisys and Bull servers and other computers from Unisys and Bull as well as a host of other servers and computers from IBM and other manufacturers; refers to its public statements concerning Linux, Unix, and Windows for a fair and accurate summary of IBM's statements in their appropriate context; and denies the remaining allegations of Paragraph 28.

29.    Denied.

30.    IBM admits that operating systems are necessary for any computer, including a mainframe computer, to operate and that operating systems control the computer's operational resources and allow application software to run on the computer; further admits that OS/390 and z/OS are IBM operating systems, certain releases and versions of which run on certain IBM S/390 and zSeries servers, as well as other servers, and that, in the ordinary course of its business, IBM withdrew marketing for OS/390 V2R10, the latest version of OS/390, on December 17, 2002, announced on August 5, 2003 that it would discontinue service for OS/390 V2R10 as of September 30, 2004, and discontinued warranty service for OS/390 V2R10 on

September 30, 2004; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; further admits that OS/390 and z/OS are used by thousands of customers worldwide; and denies the remaining allegations of Paragraph 30.

31.    IBM admits that, for any operating system to be able to run on any particular computer, including a mainframe computer, that operating system must adhere to the hardware instruction set of that computer, and that, to run on any particular operating system, a particular application must adhere to the interfaces presented by that operating system; and denies the remaining allegations of Paragraph 31.

32.    IBM admits that IBM operating systems developed by IBM to run on IBM mainframe computers are specifically designed by IBM to work with and exploit the capabilities of such computers and must adhere to the architectural specifications and interfaces of such computers; and denies the remaining allegations of Paragraph 32.

33.    IBM admits that application programs, data files, and other software designed to operate with only IBM operating systems – by definition – may not run, unmodified, with other operating systems; further admits that many IBM customers have employees specifically trained to operate IBM hardware and software; further admits that servers and other computers running Linux, Unix, and Windows are promoted by competitors, and are regarded by users, as reasonable substitutes for servers running OS/390 and z/OS; denies that there is a "substantial and well-defined subset" of locked-in "mainframe" customers who are "locked-in to the IBM operating systems"; and denies the remaining allegations of Paragraph 33.

34.    IBM admits that many COBOL applications run on IBM mainframes; avers that the COBOL programming language is a multi-platform language available on many different

computer systems, including many non-mainframe computer systems, and that COBOL facilitates the movement of applications among such different systems; refers to the IBM website page entitled "Center stage in SOA development:  System z" for a fair and accurate summary of IBM's statements in their appropriate context; and denies the remaining allegations of Paragraph 34.

35.     IBM admits that it currently markets and supports z/OS and that it has withdrawn marketing and support for OS/390 in the ordinary course of its business; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; and denies the remaining allegations of Paragraph 35.

36.     IBM admits that operating systems for any computer, including mainframe computers, are complex and take time to develop and that many customers want operating systems that have been thoroughly developed, tested, and proven; and denies the remaining allegations of Paragraph 36.

37.     IBM admits that Unisys markets a line of servers under the names ClearPath Plus Libra Series and ClearPath Plus Dorado Series, that Bull markets a line of servers under the name DPS 9000, and that IBM and a number of other manufacturers market servers and other computers that they call "mainframes" or that they refer to with phrases such as "mainframe-class"; further admits that IBM's zSeries servers compete with these Unisys and Bull servers and other computers from Unisys and Bull and a host of other servers and computers from IBM and other manufacturers; refers to its public statements concerning Linux, Unix, and Windows for a fair and accurate summary of IBM's statements in their appropriate context; and denies the remaining allegations of Paragraph 37.

38.    IBM admits that the product market or markets in which IBM's zSeries servers and their predecessors, and the IBM operating systems developed by IBM for use on these servers, compete is worldwide; avers that T3T has failed to define an appropriate market; denies the allegations concerning T3T's business strategy for lack of knowledge or information sufficient to form a belief as to the truth thereof; avers that any IBM actions about which T3T complains are bounded in time by IBM's June 30, 2008 acquisition of PSI; and denies the remaining allegations of Paragraph 38.

39.    IBM admits that IBM's zSeries servers and their predecessors, and the IBM operating systems developed by IBM for use on these servers, compete with a wide range of servers and operating systems made by a number of different manufacturers; avers that T3T has failed to define an appropriate market or to define the term "high-end enterprise server"; avers that IBM lacks monopoly power, as well as a reasonable likelihood of obtaining monopoly power, in any alleged market consisting of or including "all high-end enterprise servers"; denies knowledge or information sufficient to form a belief about T3T's beliefs; and denies the remaining allegations of Paragraph 39.

40.    Denied.

41.    IBM admits that it entered into a Consent Decree in 1956; avers that the dissolution of the Consent Decree was approved by the U.S. District Court for the Southern District of New York on May 1, 1997 and that the Consent Decree was phased out by July 2, 2001; and denies the remaining allegations of Paragraph 41.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    IBM admits the allegations of the first two sentences of Paragraph 47; and denies the remaining allegations of Paragraph 47.

48.    IBM admits that Amdahl and Hitachi sold mainframe computers; further admits that Amdahl became a wholly-owned subsidiary of Fujitsu and the combined company thereafter announced in or about October 2000 that it had decided not to develop a 64-bit processor, but would continue to deliver servers in inventory and upgrades and to service its Millennium processors for customers using them; further admits that Hitachi announced in or about March 2000 that it would discontinue sales of its Trinium and Pilot servers to new customers and would continue to offer maintenance and service to existing customers and system upgrades to existing Trinium users; refers to public statements by Fujitsu and Hitachi, including statements on their websites, for a fair and accurate summary of those companies' current activities; and denies the remaining allegations of Paragraph 48.

49.    IBM admits that the U.S. Department of Justice joined IBM in a motion to dissolve the 1956 Consent Decree; further admits that the dissolution of the Consent Decree was approved by the U.S. District Court for the Southern District of New York on May 1, 1997 and that the decree was phased out by July 2, 2001; refers to the docket of the proceeding in which the Consent Decree was dissolved for a fair and accurate summary of the positions taken by the U.S. Department of Justice in their appropriate context; and denies the remaining allegations of Paragraph 49.

50.    IBM refers to the quoted submission by the U.S. Department of Justice and the docket of the proceeding in which the Consent Decree was dissolved for a fair and accurate

summary of the submission in its appropriate context; and otherwise denies the allegations of Paragraph 50.

51.    Denied.

52.    IBM admits that it measures mainframe performance by reference to MIPS; further admits that the "price per MIPS" of its mainframe systems has fallen over the past forty years; further admits that advances in processor design and manufacturing techniques have contributed to decreasing prices; and denies the remaining allegations of Paragraph 52.

53.    Denied.

54.    IBM refers to the referenced documents for a fair and accurate summary of any statements contained therein in their appropriate context; and denies the remaining allegations of Paragraph 54.

55.    IBM admits that it licensed OS/390 between 1996 and 2000 and thereafter; further admits that OS/390 could run most applications that ran on predecessor operating systems for IBM mainframe computers and that those applications could access certain data created or maintained for use with such operating systems; and denies the remaining allegations of Paragraph 55.

56.    IBM admits that consumers can run OS/390 and certain application software on computers supplied by other computer developers such as Amdahl and Hitachi; further admits that Amdahl and Hitachi sold mainframe computers; further admits that Amdahl became a wholly-owned subsidiary of Fujitsu and the combined company thereafter announced in or about October 2000 that it had decided not to develop a 64-bit processor, but would continue to deliver servers in inventory and upgrades and to service its Millennium processors for customers using them; further admits that Hitachi announced in or about March 2000 that it would discontinue

sales of its Trinium and Pilot servers to new customers and would continue to offer maintenance and service to existing customers and system upgrades to existing Trinium users; refers to public statements by Fujitsu and Hitachi, including statements on their websites, for a fair and accurate summary of those companies' current activities; and denies the remaining allegations of Paragraph 56.

57.     IBM avers that the availability date for z/OS was March 1, 2001; and otherwise admits the allegations of Paragraph 57.

58.     IBM refers to its December 2002 announcement for a fair and accurate summary of the announcement in its appropriate context; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; and denies the remaining allegations of Paragraph 58.

59.     IBM refers to its September 2004 announcement for a fair and accurate summary of the announcement in its appropriate context; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; and denies the remaining allegations of Paragraph 59.

60.     IBM avers that T3T has inappropriately defined z/OS to include various other IBM operating systems; admits that it has licensed certain IBM operating systems, including OS/390 and VSE, for use on non-IBM computer systems, including computer systems marketed by Amdahl, Hitachi, and Fundamental Software, Inc. ("FSI"); and otherwise denies the allegations of Paragraph 60.

61.     IBM admits that public sources state that PSI was founded in 1999; further admits that the allegations of Paragraph 61 appear to be consistent with certain statements that appear on PSI's website and in PSI's public presentations; avers that PSI became a wholly owned subsidiary

of IBM on June 30, 2008; and otherwise denies the allegations of Paragraph 61 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

62.    IBM admits that the allegations of Paragraph 62 appear to be consistent with certain statements that appear on PSI's website and in PSI's public presentations; and otherwise denies the allegations of Paragraph 62 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

63.    IBM admits that the allegations of the first and fourth sentences of Paragraph 63 appear to be consistent with certain statements that appear on PSI's website and in PSI's public presentations; and denies the remaining allegations of Paragraph 63.

64.    Denied.

65.    IBM admits that PSI first corresponded with IBM in or about late 2000; further admits that it has licensed certain IBM operating systems, including OS/390 and VSE, for use on non-IBM computer systems, including computer systems marketed by FSI, which had a patent license with IBM that expired on October 31, 2006; refers to the history of correspondence between IBM and PSI; avers that IBM never entered into a patent license with PSI; and denies the remaining allegations of Paragraph 65.

66.    IBM admits that it had not agreed to license IBM patents to PSI or its operating systems for use on PSI systems by January 2003; refers to the history of correspondence between IBM and PSI; avers that IBM never entered into a patent license with PSI; and denies the remaining allegations of Paragraph 66.

67.    IBM refers to the history of correspondence between IBM and PSI; and otherwise denies the allegations of Paragraph 67

68.     IBM refers to the history of correspondence between IBM and PSI; avers that IBM's March 14, 2003 and April 2, 2003 letters referred to IBM's licensing practices relating to OS/390 and not to z/OS, and to patents licensed for use in the field of IBM's Enterprise Systems Architecture/390 and not for use in the field of IBM's z/Architecture, and expressly referenced, among other things, IBM's right to change its then-current licensing practices; further avers that IBM never entered into a patent license with PSI; and denies the remaining allegations of Paragraph 68.

69.     Denied.  By way of further response, IBM avers that it never entered into a patent license with PSI.

70.     IBM admits that IBM and PSI entered into a limited-term, six-month development license agreement for OS/390 on or about May 14, 2003; further admits that OS/390 V2R10, the latest version of OS/390, was withdrawn from marketing on December 17, 2002, that IBM announced on August 5, 2003 that it would discontinue service for OS/390 V2R10 as of September 30, 2004, and that IBM discontinued warranty service for OS/390 V2R10 on September 30, 2004; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; further avers that PSI acknowledged on April 11, 2003 that the May 2003 development license agreement "may be a temporary arrangement for the sake of expediency"; further avers that PSI agreed that "the granting of this limited license does not in any way grant PSI a patent license or give PSI any express or implied rights, licenses or immunities under any IBM patents or other intellectual property"; further avers that IBM told PSI, in 2001, that IBM did not intend to license its z/Architecture and told PSI, on May 5, 2003, that IBM does "not plan to license PSI in the fields of zArchitecture and coupling"; and denies the remaining allegations of Paragraph 70.

71.    IBM admits that, after IBM formally rejected PSI's requests for licenses for z/OS for use on PSI's systems and told PSI that IBM would not license z/OS to PSI for use on PSI's systems, PSI bypassed the designated IBM personnel to whom PSI had been told to address all communications and requests for licenses and communicated with IBM personnel who were not knowledgeable about the history of communications between IBM and PSI; further admits that, by so doing and by placing orders through IBM personnel other than the designated IBM personnel to whom PSI had been told to address all communications and requests for licenses, PSI obtained licenses for z/OS that, as PSI knew, IBM did not intend to grant, as evidenced by, among other things, PSI's conscious decision not to tell the IBM representatives with whom it met to discuss patent licensing in 2004 that PSI had succeeded in obtaining these z/OS licenses; further admits that IBM has declined to grant PSI additional licenses for z/OS and has advised PSI that it will decline to license z/OS to others for use on PSI systems; and denies the remaining allegations of Paragraph 71.

72.    IBM refers to the history of correspondence between IBM and PSI; and otherwise denies the allegations of Paragraph 72.

73.    IBM denies it maintained a webpage formerly on its website at www.ibm.com/ibmi'ilicensing/patents/practices.shtml; admits that a page formerly on its website at www.ibm.com/ibm/licensing/patents/practices.shtml was taken down on or about February 21, 2006; avers that the statement formerly contained at that website page expressly stated that it "highlights IBM's present patent licensing practices and is subject to change at any time"; refers to the statement formerly contained at that website page for a fair and accurate summary of the statement in its appropriate context; and denies the remaining allegations of Paragraph 73.

74.    IBM refers to the history of correspondence between IBM and PSI; avers that, in 2001, IBM offered to license to PSI certain information concerning IBM's Enterprise Systems Architecture/390, which PSI declined to license, and told PSI that IBM would not license its z/Architecture to PSI; admits that IBM and PSI entered into a limited-term, six-month development-only license agreement solely for OS/390 on or about May 14, 2003; further avers that IBM never entered into a patent license with PSI; and otherwise denies the allegations of Paragraph 74.

75.    Denied.  By way of further response, IBM avers that it never entered into a patent license with PSI.

76.    IBM refers to the history of correspondence between IBM and PSI; avers that IBM never entered into a patent license with PSI; and otherwise denies the allegations of Paragraph 76.

77.    IBM refers to the history of correspondence between IBM and PSI; avers that PSI's emulator systems infringe a number of IBM patents, including but not limited to U.S. Patent No. 6,009,261 entitled "Preprocessing Of Stored Target Routines For Emulating Incompatible Instructions On A Target Processor" (hereinafter "the '261 patent"), U.S. Patent No. 5,953,520 entitled "Address Translation Buffer For Data Processing System Emulation Mode" (hereinafter "the '520 patent"), U.S. Patent No. 5,696,709 entitled "Program Controlled Rounding Modes" (hereinafter "the '709 patent"), U.S. Patent No. 5,825,678 entitled "Method And Apparatus For Determining Floating Point Data Class" (hereinafter "the '678 patent"), U.S. Patent No. 5,687,106 entitled "Implementation Of Binary Floating Point Using Hexadecimal Floating Point Unit" (hereinafter "the '106 patent"), U.S. Patent No. 5,987,495 entitled "Method and Apparatus For Fully Restoring A Program Context Following An Interrupt" (hereinafter "the

'495 patent"), U.S. Patent No. 6,775,789 entitled "Method, System and Program Products For Generating Sequence Values That Are Unique Across Operating System Images" (hereinafter "the '789 patent"), U.S. Patent No. 5,414,851 entitled "Method and Means For Sharing I/O Resources By A Plurality Of Operating Systems" (hereinafter "the '851 patent"), U.S. Patent No. 6,971,002 entitled "Method, System, and Product For Booting A Partition Using One Of Multiple, Different Firmware Images Without Rebooting Other Partitions" (hereinafter "the '002 patent"), and U.S. Patent No. 6,654,812 entitled "Communications Between Multiple Partitions Employing Host-Network Interface" (hereinafter "the '812 patent"),; further avers that PSI's emulator systems also infringe additional patents covering new functionality added to PSI's emulator systems after IBM last amended its complaint against PSI in August 2007; further avers that, as PSI recognized, improvements in PSI's technology over time naturally resulted, and – had PSI not been acquired by IBM on June 30, 2008 – would have continued to result, in PSI's emulator systems infringing additional IBM patents not enumerated in IBM's last amended complaint; and otherwise denies the allegations of Paragraph 77.

78.     IBM refers to the history of correspondence between IBM and PSI; and otherwise denies the allegations of Paragraph 78.

79.     IBM admits that representatives of PSI and IBM met in February 2006; avers that IBM never entered into a patent license with PSI; and denies the remaining allegations of Paragraph 79.

80.     IBM refers to the history of correspondence between IBM and PSI; avers that IBM never entered into a patent license with PSI; and otherwise denies the allegations of Paragraph 80.

81.     Denied.  By way of further response, IBM avers that PSI's emulator systems infringe a number of IBM patents, including but not limited to the '261, '520, '709, '678, '106, '495, '789, '851, '002, and '812, patents and additional patents covering new functionality added to PSI's emulator systems after IBM last amended its complaint against PSI in August 2007.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     IBM avers that it does not "sell" its copyrighted operating systems and relevant software applications but rather licenses them pursuant to the terms of IBM Customer Agreements and/or other appropriate documents; avers that its refusal to license PSI was within the lawful scope of IBM's intellectual property rights; and otherwise denies the allegations of Paragraph 86 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

87.     IBM refers to the history of correspondence between IBM and PSI; denies the allegations of Paragraph 87 insofar as they refer to any intent on the part of IBM; and denies the remaining allegations of Paragraph 87 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

88.     Denied.  By way of further response, IBM avers that any IBM actions about which T3T complains are bounded in time by IBM's June 30, 2008 acquisition of PSI.

89.     Denied.

90.     IBM admits that it has stated that it will not license z/OS and OS/390 for use in conjunction with PSI's emulator systems; avers that any IBM actions about which T3T

complains are bounded in time by IBM's June 30, 2008 acquisition of PSI; and denies the remaining allegations of Paragraph 90.

91.    IBM admits that the allegations of Paragraph 91 appear to be consistent with certain statements that appear on T3T's website; and otherwise denies the allegations of Paragraph 91 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

92.    IBM admits that T3T was an authorized reseller of IBM products; avers that in 1999 IBM offered a range of servers and other computers, including mainframe computers that had a performance capacity in the 5 to 1000 MIPS range; denies the allegations of the second and third sentences of Paragraph 92 for lack of knowledge or information sufficient to form a belief as to the truth thereof; and denies the remaining allegations of Paragraph 92.

93.    IBM avers that in the past IBM entered into and agreement to license certain intellectual property to FSI for a limited purpose; admits that it marketed a product that incorporated FSI software; refers to executed agreements between IBM and T3T; and denies the remaining allegations of Paragraph 93.

94.    IBM denies the allegations of Paragraph 94 insofar as they relate to T3T's own business decisions, products, services, processes, contractual relationships, and market position for lack of knowledge or information sufficient to form a belief as to the truth thereof; and denies the remaining allegations of Paragraph 94.

95.    IBM denies the allegations of Paragraph 95 insofar as they relate to T3T's own business decisions, products, services, processes, contractual relationships, and market position for lack of knowledge or information sufficient to form a belief as to the truth thereof; and denies the remaining allegations of Paragraph 95.

96.    IBM denies the allegations of Paragraph 96 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

97.    IBM denies the allegations of Paragraph 97 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

98.    IBM admits that T3T was an authorized reseller of IBM products; admits that in the Spring of 2002 IBM representatives met with Steven Friedman; refers to the history of correspondence between IBM and FSI; and denies the remaining allegations of Paragraph 98.

99.    IBM denies the allegations of Paragraph 99 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

100.    IBM refers to its December 2002 and September 2004 announcements for a fair and accurate summary of the announcements in the appropriate context; avers that extended service support may be available from IBM for a fee with respect to operating systems as to which IBM has discontinued warranty service; and denies the remaining allegations of Paragraph 100.

101.    Denied.

102.    IBM admits that FSI had a patent license from IBM that expired on October 31, 2006 and that IBM and FSI have not entered into any subsequent patent licenses; and denies the remaining allegations of Paragraph 102.

103.    IBM refers to PSI's February 12, 2007 press release; and denies the remaining allegations of Paragraph 103.

104.    IBM denies the allegations of the first and third sentences of Paragraph 104 for lack of knowledge or information sufficient to form a belief as to the truth thereof; avers that

"Liberty" servers are PSI emulator systems that T3T re-brands and sells and use PSI technology that infringes IBM patents; and denies the remaining allegations of Paragraph 104.

105.    IBM denies the allegations of Paragraph 105 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

106.    IBM avers that it is aware that the University of Alabama Hospital at Birmingham, Pitt County North Carolina, Cascade Natural Gas Corporation, and Polk County Iowa are T3T customers; and denies the remaining allegations of Paragraph 104.

107.    IBM refers to the referenced IDC data from 2005; and denies the remaining allegations of Paragraph 107.

108.    IBM refers to PSI's February 12, 2007 press release; and denies the remaining allegations of Paragraph 108.

109.    IBM denies the allegations relating to T3T's expenditures for lack of knowledge or information sufficient to form a belief as to the truth thereof; and denies the remaining allegations of Paragraph 109.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    IBM admits that mainframe computers and operating systems could be sold separately; refers to its historical statements concerning software licensing terms; avers that the "Specified Operating Environment" section of its August 8, 2006 Software Announcement on "IBM z/OS V1.8 – Extending the enterprise-wide role" relates to IBM's warranty obligations under the IBM Customer Agreement; refers to the August 8, 2006 announcement for a fair and

accurate summary of its contents in their appropriate context; and denies the remaining allegations of Paragraph 114.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    IBM avers that the allegations in Paragraph 121 state a legal conclusion to which no response is required; and otherwise denies the allegations of Paragraph 121.

122.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 122 are bounded in time by IBM's June 30, 2008 acquisition of PSI.

123.    IBM admits that an IBM employee testified on behalf of the United States, that IBM entered into a settlement agreement with Microsoft Corporation ("Microsoft"), and that Microsoft paid IBM approximately $775 million and extended $75 million in credit towards deployment of Microsoft software at IBM pursuant to the terms of that settlement agreement; and denies the remaining allegations of Paragraph 123.

124.    Denied.

## FIRST CAUSE OF ACTION

125.    IBM incorporates by reference its responses to Paragraphs 1-124.

126.    Denied.  By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks

standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 130 are bounded in time by IBM's June 30, 2008 acquisition of PSI and that T3T's request for an injunction is moot..

## SECOND CAUSE OF ACTION

131.    IBM incorporates by reference its responses to Paragraphs 1-130.

132.    Denied.  By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

133.    Denied.

134.    Denied.

135.    Denied.

136.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 136 are bounded in time by IBM's June 30, 2008 acquisition of PSI and that T3T's request for an injunction is moot..

### THIRD CAUSE OF ACTION

137.    IBM incorporates by reference its responses to Paragraphs 1-136.

138.    Denied.  By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

139.    Denied.  By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

140.    Denied.

141.    Denied.

142.    Denied.

143.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 143 are bounded in time by IBM's June 30, 2008 acquisition of PSI and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling products that did not infringe IBM patents.

144.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 145 are bounded in time by IBM's June 30, 2008 acquisition of PSI.

145.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 145 are bounded in time by IBM's June 30, 2008 acquisition of PSI and that T3T's request for an injunction is moot.

## FOURTH CAUSE OF ACTION

146.    IBM incorporates by reference its responses to Paragraphs 1-145.

147.    Denied.  By way of further response, IBM avers that, on June 30, 2008, PSI became a wholly owned subsidiary of IBM, and further avers that, because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

148.    Denied.

149.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 145 are bounded in time by IBM's June 30, 2008 acquisition of PSI.

## FIFTH CAUSE OF ACTION

150.    IBM incorporates by reference its responses to Paragraphs 1-149.

151.    Denied.

152.    Denied.

153.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 153 are bounded in time by IBM's June 30, 2008 acquisition of PSI and that T3T's request for an injunction is moot.

## SIXTH CAUSE OF ACTION

154.    IBM incorporates by reference its responses to Paragraphs 1-153.

155.    IBM avers that the page formerly on its website at www.ibm.com/ibm/licensing/patents/practices.shtml was taken down on or about February 21, 2006; further avers that the statement formerly contained at that website page expressly stated that it "highlights IBM's present patent licensing practices and is subject to change at any time"; refers to the statement formerly contained at that website page for a fair and accurate summary of the statement in its appropriate context; and otherwise denies the allegations of Paragraph 155.

156.    IBM admits that the history of correspondence between IBM and PSI is a fair and accurate summary of IBM's statements in their appropriate context; avers that, in 2001, IBM offered to license to PSI certain information concerning IBM's Enterprise Systems Architecture/390, which PSI declined to license, and told PSI that IBM would not license its z/Architecture to PSI; and otherwise denies the allegations of Paragraph 156.

157.    IBM admits that IBM and PSI entered into a limited-term, six-month development-only license agreement solely for OS/390 on or about May 14, 2003; refers to the history of the correspondence between IBM and PSI; avers that the license agreement disclaimed any express or implied license to any patents; and otherwise denies the allegations of Paragraph 157.

158.    Denied.

159.    IBM admits that the history of correspondence between IBM and PSI is a fair and accurate summary of IBM's statement in its appropriate context; and otherwise denies the allegations of Paragraph 159.

160.    IBM admits that it communicated with PSI in 2004 on the subject of IBM patents; and denies the remaining allegations of Paragraph 160.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

166.    Denied.

167.    Denied.  By way of further response, IBM avers that the allegations of Paragraph 167 are bounded in time by IBM's June 30, 2008 acquisition of PSI and that T3T's request for specific performance of an alleged promise to PSI is moot.

## AFFIRMATIVE AND OTHER DEFENSES

Further replying to T3T's Amended Petition, IBM asserts the following defenses.  IBM's investigation of T3T's claims and its defenses is ongoing, and IBM reserves the right to amend its reply with additional defenses as further information is obtained.

### First Defense:  Failure to State a Claim

1.      The Amended Petition fails to state a claim on which relief may be granted.

### Second Defense:  No Foreclosure of Lawful Market Opportunity

2.      Because neither PSI nor T3T ever obtained a patent license from IBM or had any right to practice IBM's patents, T3T lacks standing to pursue its alleged tying claims and T3T's allegations of tying fail, among other reasons, for lack of an allegation or showing that IBM's alleged conduct with respect to the licensing of IBM operating systems ever foreclosed T3T from selling PSI products that did not infringe numerous IBM patents.

### Third Defense:  Litigation Privilege

3.      IBM's Amended Complaint herein was and is not objectively baseless and as a matter of law IBM's filing of its Amended Complaint is protected by applicable privileges.

### Fourth Defense:  Unclean Hands

4.      T3T's purported claims, individually and as a whole, are barred by the doctrine of unclean hands.

**Fifth Defense:  Lack of Standing (New York General Business Law § 350)**

5.      There is no private right of action under New York General Business Law § 350 for a plaintiff who is not suing in its capacity as a consumer based on an alleged injury that affects the public as a whole.

**Sixth Defense:  Lack of Standing**

6.      T3T's claims are barred, in whole or in part, because T3T lacks standing to assert some or all of the causes of action alleged in the Amended Petition.

**Seventh Defense:  Laches, Estoppel, Waiver, and/or Acquiescence**

7.      T3T's purported claims, or some of them, are barred by the doctrines of laches, estoppel, waiver, and/or acquiescence.

**Eighth Defense:  Mootness**

8.      The allegations of the Amended Petition that relate to T3T's alleged sales of, and opportunities to sell, PSI emulator systems are bounded in time by IBM's June 30, 2008 acquisition of PSI, and T3T's request for an injunction and request for specific performance of an alleged promise by IBM to PSI are moot.

**PRAYER FOR RELIEF**

**WHEREFORE**, IBM prays for the following relief:

a.      That this Court enter a judgment that T3T take nothing by reason of T3T's Amended Petition against IBM and dismiss the Amended Petition with prejudice; and

b.      That this Court award IBM such other and further relief as this Court may deem just and proper.

                                    Respectfully submitted,

DATED:    New York, New York
              August 1, 2008

                                    QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP

                                    By:/s/ Richard I. Werder, Jr.

                                    Richard I. Werder, Jr. (RW-5601)
                                    Edward J. DeFranco (ED-6524)
                                    Philippe Z. Selendy (PS-6972 )
                                    51 Madison Avenue
                                    22nd Floor
                                    New York, New York  10010-1601
                                    (212) 849-7000

                                    Frederick A. Lorig
                                    865 S. Figueroa Street
                                    Los Angeles, California  90017
                                    (213) 443-3000

                                    Attorneys for
                                    International Business Machines Corporation

## CERTIFICATE OF SERVICE

I, Andrew B. Curran, hereby certify that on August 1, 2008 I caused to be served the foregoing **INTERNATIONAL BUSINESS MACHINES CORPORATION'S AMENDED REPLY TO T3 TECHNOLOGIES, INC.'S AMENDED PETITION FOR INTERVENTION AND COMPLAINT FOR DAMAGES** using the CM/ECF system which sent notification to all counsel of record vi email as indicated below:

Richard I. Werder
rickwerder@quinnemanuel.com

Steven M. Edwards
smedwards@hhlaw.com

Howard Weber
hweber@hhlaw.com

Katherine Jane Weall
katherineweall@quinnemanuel.com

Morris Waisbrot
mwaisbrot@hhlaw.com

Richard Walter Erwine
richarderwine@quinnemanuel.com

Thomas David Pease
thomaspease@quinnemanuel.com

Bruce E. Gerstein
bgerstein@garwingerstein.com

D. Skylar Rosenbloom
rosenbls@phelps.com

David L. Patron
PATROND@phelps.com

Elena Kar-Hing Chan
echan@garwingerstein.com

Harry M. Barton
harry.barton@phelps.com

Noah H. Silverman
nsilverman@garwingerstein.com

Brent Barriere
BARRIERB@phelps.com


    /s/ Andrew B. Curran
    Andrew B. Curran