UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                    Plaintiff,

          -against-                                         06 Civ. 13565 (LAK)

PLATFORM SOLUTIONS, INC.,

                    Defendant,

          -and-

T3 TECHNOLOGIES, INC.,

                    Intervenor-Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:


          Steven M. Edwards
          Eric J. Stock                            Bruce E. Gerstein
          HOGAN & HARTSON, LLP                     Noah Silverman
                                                   Elena K. Chan
          Richard I. Werdner, Jr.                  GARWIN, GERSTEIN & FISCHER, LLP
          Edward J. DeFranco
          Richard W. Erwine                        Brent Barriere
          Alexander Rudis                          David L. Patron
          QUINN EMANUEL URQUHART                    Harry M. Barton
          OLIVER & HEDGES, LLP                     PHELPS DUNBAR LLP


          Kenneth B. Wildstein                     *Attorneys for Intervenor-Defendant*


          *Attorneys for Plaintiff*

Lewis A. Kaplan, *District Judge*.

IBM initially brought this action against Platform Solutions, Inc. ("PSI"), a producer of IBM-compatible computers, principally for patent infringement and breach of contract.[1]  T3 Technologies, Inc. ("T3"), which had entered into "Reseller Agreements"[2] with PSI and another company called Fundamental Software, Inc. ("FSI") that enabled T3 to sell IBM-compatible servers containing critical PSI and FSI components, intervened and asserted antitrust and other claims against IBM based largely on IBM's refusal to license a new operating system to PSI and FSI.[3]  IBM, having settled with and acquired PSI, now moves to dismiss T3's claims, arguing that T3 lacks standing to assert its federal and state law claims.  It asserts also that T3's remaining state law claim for promissory estoppel fails as a matter of law.

*Facts*

I.      *The Technology*

An understanding of this case requires a basic familiarity with certain of the technology involved.

Mainframes are powerful computers that typically are used by companies and governments.  Servers too are computers, but they tend to be smaller than mainframes and usually

---

[1] *See* Pl. Cpt. [DI 1] ¶ 1.

[2] *See* T3 Rule 56.1 St. [DI 140] ¶¶ 10-12, 21-22.

[3] T3 intervened as a defendant and filed a pleading entitled "Amended Petition in Intervention and Complaint for Damages" [DI 63].  The Court refers to it as T3's complaint ("T3 Cpt.").

3

perform discrete tasks.

Mainframes and servers are used in conjunction with operating systems, which are programs "that control[] the allocation and use of computer resources (such as central processing unit time, main memory space, disk space, and input/output channels). The operating system also supports the functions of software programs, called 'applications,' that perform specific user-oriented tasks."[4] The critical point, however, is that "for any operating system to be able to run on any particular computer system, including a mainframe computer system, that operating system must adhere to the hardware instruction set of that computer system, and that, to run on any particular operating system, a particular application must adhere to the interfaces presented by that operating system."[5]

## II.    IBM's Architecture

IBM's mainframes, operating systems, and compatible software (collectively, "architecture") allegedly became industry standard by the 1960s or 1970s.[6] During that period, IBM freely licensed its operating systems, a practice that encouraged the purchase of IBM mainframes by, among other things, making it relatively easy for customers, competitors, and third parties to develop compatible hardware and software products.[7] T3 alleges that consumers invested substantial

---

[4]

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 12 (D.D.C. 1999).

[5]

*Compare* T3 Cpt. [DI 63] ¶ 4 *with* IBM Reply Br. [DI 129] ¶ 4.

[6]

T3 Cpt. ¶¶ 42-46.

[7]

*Id.* ¶ 45-47.

4

amounts of money in IBM-compatible application software on the assumption that IBM would continue to provide this support to competitors and that it would be prohibitively expensive for them to abandon the IBM architecture.[8]

T3 alleges that other non-party competitors by 1976 began using IBM's licenses to develop cheaper competing IBM-compatible mainframes on which they could run IBM operating systems and compatible software.[9] According to T3, producers of competing mainframes eventually obtained about twenty percent of the mainframe market but stopped manufacturing mainframes in 2000.[10] IBM contends that they did so because the market was in decline.[11]

*III.*    *T3*

T3 was established in 1992.[12] As an IBM authorized reseller,  T3 distributed small IBM mainframes (i.e., those with processing power under fifty million instructions per second ("MIPS")), among other products."[13]  In 1999, however, IBM announced that it would stop producing mainframes with less than sixty MIPS.[14]

---

[8]     *Id.* ¶¶ 5, 10, 45-47.

[9]     *Id.* ¶ 47.

[10]    *Id.* ¶ 48.

[11]    Pl. Br. [DI 138] at 4 & n.10.

[12]    *Compare* T3 56.1 St. [DI 150] ¶ 44 *with* IBM 56.1 Reply [DI 154] ¶ 44.

[13]    *Compare* T3 56.1 St. ¶¶ 44, 65 *with* IBM 56.1 Reply ¶¶ 44, 65.

[14]    *Compare* T3 56.1 St. ¶ 45 *with* IBM 56.1 Reply ¶ 45.

A.      *FSI and the tServer*

IBM's halt in production of mainframes capable of less than sixty MIPS allegedly left some of its customers without mainframes or forced them to buy machines more powerful than they needed.[15]

As a result, T3 entered into a "Reseller Agreement" in 2000 with Fundamental Software, Inc. ("FSI"), which provided T3 with a "nonexclusive, nontransferable, nonassignable and limited right to market, resell, distribute and support" products FSI "own[ed]."[16]  Pursuant to that agreement, FSI built and T3 sold low-level IBM compatible mainframes called tServers,[17] which consisted of (1) Unix or Linux Operating System Software,[18] (2) hardware components obtained by T3 from IBM distributors, (3) FSI's FLEX-ES code and (4) a T3 proprietary management system.[19] The FLEX-ES software enabled Intel-based systems, including the tServer, to emulate IBM thirty-one bit architecture,[20] and the critical point is that FLEX-ES was essential to the tServer.  Without

-----

[15]
　　　　*Compare* T3 56.1 St. ¶¶ 46-47 *with* IBM 56.1 Reply ¶¶ 46-47.

[16]
　　　　T3 56.1 St. ¶¶ 10-12.

[17]
　　　　*Id.* ¶ 12.  *Compare* T3 56.1 St. ¶¶ 48-50 *with* IBM 56.1 Reply ¶¶ 48-50.

[18]
　　　　The FLEX-ES software enabled Intel-based systems to emulate IBM thirty-one bit architecture.  T3 56.1 St. ¶ 2.

[19]
　　　　*Compare* T3 56.1 St. ¶ 53 *with* IBM 56.1 Reply ¶ 53.

[20]
　　　　T3 56.1 St. ¶ 2.

6

it, the tServer could not have run IBM operating systems and applications because the tServer, unlike

IBM's computers, used a processor or "chip" manufactured by Intel rather than the IBM processors

used in IBM computers.[21]  FSI was able to build the tServer in part because it was licensed to use

IBM's thirty-one bit OS/390 operating system.[22]

   The tServer used thirty-one bit technology and processed between eight and two

hundred MIPS.[23]  T3's sales of six hundred tServers[24] represented seventy-five percent of all IBM-

compatible mainframes using FSI technology.[25]

   B.  *IBM Upgrades its Technology*

   Over time, IBM invested billions of dollars to develop z/OS, a sixty-four bit operating

system[26] that IBM maintains is more functional and competitive with distributed systems than its

---

[21]

   T3 56.1 St. ¶ 19.

[22]

   *Id.* ¶ 2.

[23]

   *Compare* T3 56.1 St.  ¶ 50 *with* IBM 56.1 Reply  ¶ 50.

[24]

   *Compare* T3 56.1 St.  ¶ 63 *with* IBM 56.1 Reply  ¶ 63.

[25]

   Def. Br. [DI 146] at 7-8.  *Compare* T3 56.1 St. ¶ 50 *with* IBM 56.1 Reply ¶ 50.

[26]

   T3 56.1 St. ¶ 35.

thirty-one bit predecessor, OS/390.[27]  It introduced the new system in March 2001.[28]

During a meeting with T3 in March 2002, IBM threatened to terminate T3 as an IBM authorized reseller unless T3 discontinued its sale of the thirty-one bit tServer.[29]  When T3 refused, IBM terminated T3 as a distributor of IBM mainframes.[30]

In September 2004, IBM announced that it would discontinue providing support for its thirty-one bit operating systems by March 2007[31] because demand for thirty-one bit systems was waning.[32]  FSI's license of OS/390 expired in October 2006, and IBM declined to renew it.[33]  The expiration of FSI's license made it impossible for FSI to continue making available the FSI software that enabled tServers to run IBM operating systems and compatible software on Intel processors, so IBM's refusal to renew that license caused T3's sales of tServers to cease.[34]

---

[27]

*Id.* ¶¶ 41-42.  Although T3 disputes IBM's assertion that z/OS made IBM's operating systems "more competitive with distributed systems," it does not identify any evidence to the contrary.  *See id.*  Accordingly, IBM's assertion is deemed admitted.  S.D.N.Y. Civ. R. 56.1(c).

[28]

T3 56.1 St. ¶ 38.

[29]

*Compare* T3 56.1 St. ¶ 64 *with* IBM 56.1 Reply ¶ 64.

[30]

*Compare* T3 56.1 St. ¶ 65 *with* IBM 56.1 Reply ¶ 65.

[31]

T3 56.1 St. ¶ 37.

[32]

T3 56.1 St. ¶ 43.  Although T3 claims that the "market was moving to 64-bit," it fails to cite admissible evidence to buttress its contention.  *See id.*  IBM's assertion therefore is deemed admitted.  S.D.N.Y. Civ. R. 56.1(c).

[33]

T3 56.1 St. ¶ 3.

[34]

Def. Br. at 11.

C. *PSI and the Liberty Server*

In 2005, as the market for the tServer declined, T3 entered into a "Reseller" Agreement" with PSI,[35] which sought to license IBM's z/OS operating system.[36]  The T3-PSI agreement provided that T3 would serve as a "reseller" and "authorized distributor" of PSI systems, which PSI licensed to T3.[37]

The chief and perhaps only product in question was another IBM-compatible server called the Liberty Server, which was comparable to the tServer in an important respect.  It was an Intel-based machine that used PSI firmware to emulate IBM's z/OS operating system.[38]  In consequence, the Liberty Server could run applications and programs designed to run on the z/OS operating system despite the fact that the Liberty Server used an Intel rather than an IBM processor.  But PSI too required a license from IBM for the z/OS operating system in order to make its product available without infringing IBM's rights.

T3 claims that PSI sought such a license and that IBM initially promised to grant it. It asserts, however, that IBM in 2006 ultimately refused to license z/OS to PSI.[39]  As a result of

---

[35]

T3 56.1 St. ¶ 21.

[36]

*Id.* ¶ 6.

[37]

*Id.* ¶ 22.

[38]

*Compare* T3 56.1 St. ¶¶ 67-68 *with* IBM 56.1 Reply ¶¶ 67-68.

[39]

T3 Cpt. ¶¶ 79-80.

9

IBM's decision not to license z/OS, T3 sold only five Liberty Servers.[40]

*IV.     This Action*

        The thrust of T3's complaint is that IBM monopolized alleged markets for IBM-compatible mainframe computers and mainframe operating systems and improperly tied licenses of IBM's operating systems to the purchase of IBM mainframes in violation of Sections 2 and 1 of the Sherman Act,[41] respectively.  T3 contends that IBM's refusal to license FSI and PSI, which produced software essential to the servers T3 marketed, caused T3's sales to cease.  It alleges also that IBM's termination of T3 as an IBM distributor is probative of IBM's intent to monopolize the mainframe market.[42]  T3 asserts also a claim for deceptive practices under the New York General Business Law based on the same theory as its federal claims.  Finally, T3 alleges that it detrimentally relied on IBM's representations to PSI under a theory of promissory estoppel.

*Discussion*

        Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[43]  Where the burden of proof at trial would

---

[40]    IBM 56.1 Reply ¶ 102.  IBM disputes any implication that it intended to halt sales of Liberty Servers by refusing to license its software.  *See id.*

[41]    15 U.S.C. §§ 1-2.

[42]    T3 Cpt. ¶¶ 91-98.

[43]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[44]  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[45]

## I.    Standing

T3 claims that IBM violated the antitrust laws by allegedly attempting to monopolize the market for IBM-compatible mainframes.[46]  It asserts that it was injured by IBM's refusal to license its software to FSI and PSI and its alleged termination of T3 as an IBM distributor.  IBM, however, argues that T3 lacks antitrust standing because its injury flows entirely from that of FSI and PSI.

Antitrust standing is distinct from constitutional standing, in which a mere showing of harm in fact will establish the necessary injury.[47]  Under Section 4 of the Clayton Act,[48] a private antitrust plaintiff must demonstrate not only injury in fact but both "antitrust injury" and that the

---

[44]

*Celtex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[45]

*See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d. Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

[46]

T3 Cpt. ¶ 126.

[47]

*See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.1 (1983)).

[48]

15 U.S.C. § 15.

plaintiff would be an "efficient enforcer" of antitrust claims.[49]

### A.     *Antitrust Injury*

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[50]  It is a necessary element of, but not sufficient to establish, antitrust standing.[51]

In our Circuit, one who complains of injury that is indirect or derived from injury sustained by another entity with which it has a business relationship has not alleged antitrust injury.[52] As the Circuit has put it, "a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered an antitrust injury necessary for antitrust standing."[53]

T3  claims it was injured in two ways.  First, it claims injury as a result of IBM's decision not to license its software to FSI and PSI.  Second, it complains also of IBM's decision to terminate T3 as an IBM-authorized distributor when T3 allegedly rejected its demand that it stop

---

[49]

        *See Port Dock*, 507 F.3d at 121; *Paycom Billing Servs., Inc. v. Mastercard Int'l Inc.*, 567 F.3d 283, 290-91 (2d Cir. 2006).

[50]

        *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 107 (1986)).

[51]

        *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995).

[52]

        *See Port Dock*, 507 F.3d at 121-22; *G.K.A. Beverage Corp.*, 55 F.3d at 766.

[53]

        *G.K.A. Beverage Corp.*, 55 F3d at 766; s*ee also Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970) ("While any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders, or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages and thereby take a leading role in the enforcement of the prohibition in question.").

selling the tServer, which T3 asserts was part of IBM's alleged scheme to "thwart competition by the tServer"[54] in the alleged mainframe computer market.

        As an initial matter, it is undisputed that the tServer and Liberty Server could not run IBM mainframe operating systems and applications without "incorporat[ing]" the FSI and PSI software licensed to T3 pursuant to the "Reseller Agreement[s]."[55] Under its "Reseller Agreement" with FSI, T3 received a "nonexclusive, nontransferable, nonassignable and limited right to market, resell, distribute and support" products FSI "owne[d]."[56] That agreement required also that T3 use commercially reasonable efforts to promote and market FSI's products and prohibited T3 from making any "improvements to or modification of" FSI's products without FSI's consent.[57] Similarly, T3's "Resller Agreement" with PSI provided that T3 serve as a "reseller" and "authorized distributor of PSI Systems," which PSI licensed to T3.[58] T3's agreements reveal that the FSI and PSI software and firmware – the critical components of the tServer and the Liberty Server and the alleged targets of IBM's anticompetitive actions – were simply incorporated into those machines.[59]

        In these circumstances, it is not at all surprising that, as T3 states, its claims against

---

[54]      Def. Br. at 8.

[55]      T3 56.1 St. ¶¶ 10-16, 19, 21-23, 28.

[56]      T3 56.1 St. ¶¶ 11-12.

[57]      *Id.*

[58]      *Id.* ¶ 22.

[59]      *Id.* ¶ 19, 28.

IBM "largely mirror PSI's Counterclaims against IBM."[60]  T3 discontinued its sale of Liberty Servers and tServers because IBM decided not to license its operating system to PSI and FSI.[61]  Even assuming T3's version of the facts, it was terminated as an IBM distributor as part of the alleged IBM scheme to harm competitors in the market for mainframe computers.  Its alleged injuries therefore all are results of IBM's decisions (1) not to license its software to FSI and PSI and (2) to stop supporting its OS/390 operating system.[62]

T3 claims, to be sure, that it was a "manufacturer" of servers.  It does so in an effort to bring itself within the market for computers at which it alleges IBM's actions were directed.  And a good deal of time and ink could be spent on debating exactly which entities here were "manufacturers," whatever exactly that means.  But the exercise is bootless, as any issue of fact it may present would be immaterial.

The critical point is that T3's standing turns on the facts that (1) the actions complained of were IBM's refusals to license PSI and FSI and (2) the injuries of which T3 complains – whether it is a manufacturer, a distributor, or something else – all were derivative of those actions vis-a-vis PSI and FSI.  As the Second Circuit has made clear, moreover, the notion that competitors have antitrust standing is "oversimplified."[63]  A claimant does not have standing simply because it is a competitor of an alleged antitrust violator.  Instead, Section 4 of the Clayton Act confers standing

---

[60]

       T3 56.1 St. ¶ 9 (T3 Cpt. ¶ 12); Def. Br. at 11.

[61]

       Def. Br. at 12.  *Compare* T3 56.1 St. ¶ 102 *with* IBM 56.1 Reply ¶ 102.

[62]

       Def. Br. at 5.

[63]

       *Port Dock*, 507 F.3d at 122.

14

upon a plaintiff that has suffered a direct antitrust injury,[64] "more than simply an injury causally linked to an antitrust violation."[65]  In the circumstances of this case, T3 has failed to show such an injury regardless of whether it properly is characterized as a manufacturer or distributor.

T3's reliance on *Yellow Pages Cost Consultants Inc. v. GTE Directories Corp.*[66] is misplaced.  In *Yellow Pages*, consultants of advertisers in the yellow pages directories sued the publisher after the publisher banned the consultants from placing advertisements on behalf of advertisers.[67]  The court held that the consultants had antitrust standing because they were the direct targets of the alleged violation, not because they were the defendant's competitors.[68]  "Directness in the antitrust context means 'close in the chain of causation' . . . . There could hardly be a closer causal link than the one between [the publisher's] refusal to let [c]onsultants place advertisements for their clients and their clients' canceling contracts."[69]  The court's holding was founded also on

---

[64]

     *G.K.A. Beverage Corp.*, 55 F.3d at 767.

[65]

     *Volvo*, 857 F.2d at 66 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986)).

[66]

     951 F.2d 1158, 1162 (9th Cir. 1991).

[67]

     *Id.* at 1159-60.

[68]

     *Id.* at 1162-63.  T3's claim that it suffered an antitrust injury based on *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203 (S.D.N.Y. 1981), similarly is unpersuasive.  The court held that GAF, a camera designer, was a direct victim of an agreement among Kodak and other companies to withhold information concerning flash bulbs from camera designers.  519 F. Supp. at 1222-23.

[69]

     951 F.2d at 1162.

a finding that the publisher specifically intended to injure the consultants.[70]

T3, by contrast, has failed to demonstrate that it was a direct target of the alleged antitrust violations by IBM that are the subject of this complaint.  IBM's termination of T3 as a distributor, although it seems at first blush to be an appropriate subject of complaint, affords no standing to T3 either.  The alleged antitrust violation here was IBM's monopolization or attempted monopolization of the alleged mainframe computer manufacturing market.[71]  If IBM's actions in that regard were unlawful, it was because IBM thereby wilfully acquired or maintained market power – its ability to raise prices or reduce output – in that market.[72]  Although T3 conceivably was injured by the termination of its distributorship, that injury did not flow from any market power wilfully acquired or maintained by IBM in the mainframe market.[73]  Accordingly, T3 lacks standing to complain even of the termination.

*Yankees Entertainment & Sports Network, LLC v. Cablevision Systems Corp.*,[74] also cited by T3, is distinguishable as well.  The court there held that the defendant demonstrated antitrust injury because, among other things, the defendant's injury was "distinct" and "irrespective" of that

---

[70]

       *Id.* ("The addition of specific intent to this direct injury also makes antitrust standing appropriate.").  Further, the Ninth Circuit assessed the plaintiff's standing according to the "field of competition" test, to which the Second Circuit does not subscribe.  *Id.*

[71]

       *See* 15 U.S.C. § 2.

[72]

       *See, e.g.*, *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004).

[73]

       *See id.*

[74]

       224 F. Supp. 2d 657 (S.D.N.Y. 2002).

16

of other aggrieved entities.[75]  Here T3 does not allege it suffered an injury irrespective of any harm

to FSI and TSI.  Its alleged injury is entirely derivative of that allegedly suffered by them.  As

discussed, IBM's termination of T3 as a distributor did not cause antitrust injury.


B.        "Efficient Enforcer" Factors

Even if T3 adequately had alleged antitrust injury, it still would lack antitrust

standing[76] unless it had demonstrated also that it would be a "proper plaintiff" by satisfying the

"efficient enforcer" factors:  (1) the directness or indirectness of the asserted injury, (2) the existence

of an identifiable class of persons whose self-interest would normally motivate them to vindicate the

public interest in antitrust enforcement, (3) the speculativeness of the alleged injury, and (4) the

difficulty of identifying damages and apportioning them among direct and indirect victims as to

avoid duplicative recoveries.[77]  In assessing these factors, the Court considers "whether any of the

. . . factors, largely relating to the directness and identifiability of plaintiff's injury, prevent the

plaintiff from being an efficient enforcer of the antitrust laws."[78]

T3 fails to satisfy any of the "efficient enforcer" factors.  First, as discussed, the injury

---

[75]

   *Id.* at 669.

[76]

   *Paycom Billing Servs., Inc. v. Mastercard Int'l Inc.*, 467 F.3d 283, 290 (citing *Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005)).

[77]

   *Volvo*, 857 F.2d at 66 (citing *AGC*, 459 U.S. at 540-45).

[78]

   *Winstar Commc'ns, LLC v. Equity Office Props., Inc.*, 170 Fed. Appx. 740, 742 (2d Cir. 2006).

17

to T3 was indirect.  FSI and PSI, with which T3 had "Resller Agreement[s],"[79] were the entities directly harmed.  FSI was precluded from selling software enabling an Intel-based server to emulate IBM's thirty-one bit architecture when IBM refused to renew its patent license.[80]  PSI similarly was precluded from selling or licensing firmware allowing computers to run IBM operating systems when IBM refused to license its patents to PSI.[81]  T3's sales of the tServer and Liberty Server ceased when IBM refused to license its patents to FSI and PSI, respectively.[82]  Any injury suffered by T3 therefore was indirect and flowed from the injuries suffered by FSI and PSI.[83]

Second, the existence of FSI and PSI, entities motivated by self-interest to challenge IBM's alleged antitrust violations, further undermines T3's ability to demonstrate standing.  Indeed, FSI and PSI brought claims against IBM in this litigation.  Further, PSI's settlement with and acquisition by IBM is immaterial to the "efficient enforcer" analysis[84] because IBM necessarily paid PSI for its claims as part of that acquisition.  Moreover, T3's claims are merely redundant of PSI's. In its complaint, T3 concedes that its claims against IBM "largely mirror PSI's Counterclaims

---

[79]

T3 56.1 St. ¶¶ 10-15, 21-23.

[80]

*Id.* ¶¶ 2-3.

[81]

*Id.* ¶¶ 6-8.

[82]

Def. Br. at 11-12.  *Compare* T3 56.1 St. ¶ 102 *with* IBM 56.1 Reply ¶ 102.

[83]

*See Paycom*, 467 F.3d at 293.

[84]

See *Anaren Microwave, Inc. v. Loral Corp.*, 855 F. Supp. 634 (S.D.N.Y. 1994) (holding that the plaintiff lacked antitrust standing notwithstanding the defendant's settlement with the party from whom the plaintiff's injuries were derived).

against IBM."[85]  Denying T3 standing to challenge IBM's conduct therefore "is not likely to leave a significant antitrust violation undetected or unremedied."[86]  In this instance, permitting T3 "to perform the office of a private attorney general" would be unjustified.[87]

Finally, the extent of T3's losses from its inability to sell the tServer and Liberty Server are highly speculative[88] and apportioning damages would difficult at best.[89]  At least one other company, Cornerstone Solutions, Inc., had an agreement with FSI to distribute FSI's FLEX-ES product.[90]  In addition, that FSI expressed concern about T3's Reseller Agreement with PSI suggests that T3's business relationship with FSI was tenuous.[91]  Allowing T3 to serve as a private attorney general therefore would require speculation as to the extent of T3's damages.  Moreover, it would be impossible to apportion damages between PSI and FSI, which suffered direct injuries, on the one hand, and T3, which allegedly was injured when its "Reseller Agreement[s]" with FSI and TSI were

---

[85]

T3 56.1 St. ¶ 9 (T3 Cpt. ¶ 12).

[86]

*Paycom*, 467 F.3d at 293 (citing *AGC*, 459 U.S. at 542).

[87]

*Id.*

[88]

*See AGC*, 459 U.S. at 542 (finding that damages resulting from an "indirect injury" were "highly speculative").

[89]

*See Trinko*, 540 U.S. at 417 (Stevens, J., concurring) ("[I]t remains the case that whatever antitrust injury respondent suffered because of [petitioner's] conduct was purely derivative of the injury that [another entity] suffered.  And for that reason, respondent's suit . . . runs both the risk of duplicative recoveries and the danger of complex apportionment of damages.").

[90]

T3 56.1 St. ¶ 16.

[91]

*Id.* ¶¶ 16, 30.

terminated, on the other.[92]


## II.     Refusal to Deal

T3's lack of antitrust standing is dispositive.  But its claims would fail in any event. For even assuming *arguendo* that T3 had antitrust standing, its claims would fail because it cannot establish that IBM's refusal to deal with FSI and PSI is actionable under the Sherman Act.

The antitrust laws do "not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."[93]  Nevertheless, that right is not unqualified.  A refusal to deal with a rival can violate the Sherman Act if a party terminates a "voluntary (and thus presumably profitable) course of dealing . . . to forsake short-term profits to achieve an anticompetitive end."[94]

T3 contends that IBM's decision "to cease a prior course of conduct" violated the antitrust laws.[95]  Specifically, it challenges IBM's decisions to stop freely licensing its patents and

---

[92]

See *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. 519 at 545; *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474 (1982) ("[T]he splintered recoveries and litigative burdens that would result from a rule requiring that the impact of an overcharge be apportioned between direct and indirect purchasers could undermine the active enforcement of the antitrust laws by private actions.").

[93]

*Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

[94]

*Id*.

[95]

See Def. Br. at 21.

supporting its OS/390 operating system.[96]   According to T3, IBM had "no legitimate business reason" for changing its patent licensing practices," and "its sole purpose was to suppress competition from a more favorable technology."[97]

T3, however, cannot satisfy the "limited exception"[98] to the refusal to deal doctrine. Specifically, T3 has not demonstrated that IBM has foregone short term profits by refusing to license its patents "to achieve an anticompetitive end."[99]   IBM invested billions of dollars to develop its sixty-four bit operating systems, which contain numerous technical improvements over its thirty-one bit technology.[100]   It introduced them to make its operating systems more functional[101] and competitive with distributed systems as the market for thirty-one bit technology waned.[102]   In these circumstances, IBM is not required to support and maintain its thirty-one bit technology.[103]   IBM's

---

[96]

   *Id.* at 5, 11-12.

[97]

   *Id.* at 21.

[98]

   *Trinko*, 540 U.S. at 408.

[99]

   *Id.* (citing *Aspen Skiing* Co. *v. Aspen Highlands Corp.*, 472 U.S. 585, 610-11 (1985)).

[100]

   T3 56.1 St. ¶¶ 35, 38; Def. Br. at 22 ("T3 readily concedes that IBM made a significant investment in developing [its sixty-four bit technology].").

[101]

   T3 56.1 St. ¶ 41.

[102]

   *Id.* ¶ 42-43.  Although T3 disputes that IBM developed the sixty-four bit technology to make its operating system "more competitive with distributed systems," it does not identify any evidence to the contrary. IBM's assertion therefore is deemed admitted. S.D.N.Y. Civ. R. 56.1(c).

[103]

   *See David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 753 (S.D. Tex. 1998) ("The antitrust laws do not require a competitor to maintain archaic or outdated technology . . . .").

refusal to support and license its operating system to FSI and PSI therefore does not constitute anticompetitive conduct under the Sherman Act.

III.    *Claims Under the New York General Business Law*

T3 lacks standing also to maintain its claims under sections 349 and 350 of the New York General Business Law, which prohibit "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."[104]  In interpreting the General Business Law, New York courts will "not presume an intent to include recovery for derivative injuries within the scope of the statute in the absence of a clear indication of such intent from the Legislature."[105]  Although T3 contends that it was directly injured by IBM's attempt to "exclud[e] makers of competitive mainframes from the market,"[106] T3's injury in fact resulted from IBM's decision not to license its patents to FSI and PSI.  Therefore, T3's injury is purely derivative of the injuries that FSI and PSI purportedly suffered.

T3's attempt to distinguish *Blue Cross & Blue Shield of New Jersey v. Phillip Morris USA Inc.*[107] is unpersuasive.  T3's injury, like the injury of the plaintiff in *Blue Cross*, "arises solely as a result of injuries sustained by another party."[108]  Put differently, T3 has suffered an injury under

---

[104]

See N.Y. GEN. BUS. L. §§ 349-50.

[105]

*Blue Cross & Blue Shield of N.J., Inc. v. Phillip Morris USA Inc.*, 3 N.Y.3d 200, 207, 785 N.Y.S.2d 399, 403 (N.Y. 2004).

[106]

Def. Br. at 27.

[107]

3 N.Y.3d 200, 785 N.Y.S.2d 399 (N.Y. 2004).

[108]

*Id.* at 207.

the General Business Law only if FSI and PSI also were injured.

Moreover, T3's reliance on *In re Pharmaceutical Industry Average Wholesale Price Litigation*[109] is unavailing.  In that case, the Massachusetts District Court held that both the State of New York and a group of New York counties had standing under the General Business Law because "both overpaid for Medicaid reimbursements based on defendants' deceptive pricing submissions."[110]  The court's holding rested on a finding that the counties had an "independent legal duty" under state law to pay a portion of Medicaid reimbursement costs.[111]  Therefore, the counties were injured by the defendants' activities regardless of whether the state also sustained an injury. T3's injuries are not analogous.

## IV.     *Promissory Estoppel*

Under New York law, a claim for promissory estoppel requires a showing of (1) a clear and unambiguous promise, (2) a reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained by the party asserting the estoppel by reason of his reliance.[112]  T3 alleges that PSI and T3 justifiably relied on IBM's representation to PSI that, "under our current practice, IBM would be willing to enter into a patent license with PSI."[113]

T3's claim for promissory estoppel is deficient as a matter of law.  T3 does not allege

---

[109]     No. 01-12257, 2007 U.S. Dist. LEXIS 26242 (D. Mass. April 2, 2007).

[110]     *Id.* at *102.

[111]     *Id.* at *103.

[112]     *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989).

[113]     T3 Cpt. ¶¶ 157-162.

that IBM made any representations to T3.  Instead, T3 claims to have relied on a representation IBM allegedly made to PSI.[114]  Moreover, IBM made its alleged representation to PSI in March 2003,[115] before T3 and PSI entered into their February 2005 "Reseller Agreement."[116]  As a result, IBM could not have known that T3, a third party, would rely on its alleged representation.  T3's reliance therefore is unreasonable as a matter of law.[117]

*Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment dismissing T3's complaint [DI 63] is granted.  As this terminates the last open claims, the Clerk shall enter final judgment and close the case.

SO ORDERED.

Dated:          September 30, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

_____

[114]    *Id.* ¶¶ 160-61.

[115]    *Id.* ¶ 157.

[116]    T3 56.1 St. ¶ 21.

[117]    *See, e.g.*, *Olin Corp. v. E.I. DuPont Nemours & Co.*, No. 05 Civ. 100S, 2007 WL 610625, at *4 (W.D.N.Y. Feb. 23, 2007) (holding that "intent to benefit a third party [must] be unmistakenly obvious to the promisor").